# EXHIBIT 1

Filed: 1/29/2018 11:15 AM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO.  29D01-1801-CT-000760 |

| | | |
|---|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Joseph Hipps ("Plaintiff") brings this Verified Class Action Complaint (the "Complaint") on behalf of all other public common shareholders of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") against (a) Sardar Biglari ("S. Biglari"), the Company's controlling shareholder, Chief Executive Officer ("CEO") and Chairman of the Biglari Holdings board of directors (the "Board"); (b) the other members of the Board; and (c) Biglari Holdings.  The allegations of the Complaint are based on the knowledge of Plaintiff as to himself and on information and belief, including the investigation of counsel, as to all other matters.

### INTRODUCTION

1.     This class action challenges a self-interested scheme to reorganize Biglari Holdings' corporate structure for the express purpose of ensuring S. Biglari's control over the Company (the "Reorganization") in perpetuity.  As detailed herein, the Reorganization will impair the rights of the Company's public shareholders.  Worse yet, Biglari Holdings' minority public

shareholders will not even have a meaningful vote on the harmful transaction because S. Biglari will control the outcome.

2.    Through a series of transactions, S. Biglari created Biglari Holdings and installed himself as the Company's CEO and Chairman.  S. Biglari subsequently exploited his positions of power to cause the Company to enter into a number of lucrative related-party transactions with himself and his immediate family, including an investment management agreement (the "Investment Management Agreement") with his personal hedge fund, through which he received more than $80 million in fees from the Company over the last four years.

3.    The proposed Reorganization is not S. Biglari's first attempt to create a dual-class capital structure for the Company.  In 2011 and 2012, S. Biglari tried to effectuate a corporate reorganization at Biglari Holdings in which the Company would adopt a high-vote/low-vote capital structure (the "Failed Reorganization Attempt").  Among other things, a dual-class structure would allow S. Biglari to preserve his voting bloc by issuing low-vote shares in future stock-for-stock acquisitions that would cause little to no dilution of his equity stake.

4.    Unfortunately for S. Biglari—who only owned approximately 15% of the Company's outstanding shares of common stock at the time—he and the rest of the Board were never able to garner the necessary shareholder support to approve his plan.  Thus, S. Biglari abandoned the Failed Reorganization Attempt.

5.    Starting shortly after the Failed Reorganization Attempt, S. Biglari embarked on a multi-year, multi-pronged campaign to obtain majority control of Biglari Holdings, and he will now implement the dual-class structure that other Company shareholders did not support in 2011 and 2012.  By early 2016, S. Biglari reached his goal and crossed the 50% ownership threshold. Having achieved majority voting control, S. Biglari now seeks to unilaterally impose a dual-class

-2-

capital structure on Biglari Holdings, regardless of whether the Company's public shareholders oppose the plan.

6.      In November 2016, S. Biglari again proposed to the Board that the Company implement a dual-class capital structure. The Board's Governance, Compensation and Nominating Committee (the "GCN Committee") supposedly evaluated the transaction. The GCN Committee's actions were perfunctory at best. To begin, at least one member of the GCN, defendant Kenneth R. Cooper ("Cooper"), has significant entanglements with S. Biglari that render him incapable of disinterestedly and independently considering S. Biglari's proposal. Cooper's mere service on the GCN Committee undermined any chance that the Committee would act independently of S. Biglari's influence. Additionally, the GCN Committee never retained a financial advisor to assist with its purported evaluation of the proposed transaction. Most shockingly, the GCN Committee met only three times over a thirteen (13) month period, before unanimously recommending that the Board adopt and approve S. Biglari's proposal without modification to any of its terms. Unsurprisingly, the full five-member Board, which included S. Biglari, Cooper, and another non-independent director, unanimously determined to adopt the GCN Committee's recommendation.

7.      In connection with the Reorganization, on December 21, 2017, S. Biglari and his fellow directors caused Biglari Holdings to enter into an agreement and plan of merger (the "Reorganization Agreement") to reorganize itself as a holding company with a dual-class structure. The Reorganization Agreement is among Biglari Holdings, NBHSA Inc. ("New BH") and BH Merger Company ("Merger Sub"). Pursuant to the Reorganization Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH. Upon completion of the merger, New

BH will be named "Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted.

8.     New BH will have two classes of common stock:  Class A common stock ("Class A Stock") and Class B common stock ("Class B Stock").  A share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will provide no voting rights.

9.     As a result of the Reorganization, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reorganization, (a) ten shares of Class B Stock and (b) one share of Class A Stock.  In other words, in connection with the Reorganization, Biglari Holdings shareholders will receive for each of their shares of common stock (a) one share of Class B Stock and (b) $1/10^{th}$ of one share of Class A Stock.

10.     The Company, however, will not issue any fractional shares of Class A Stock. Rather, where the Reorganization would result in the issuance of fractional Class A shares, shareholders will receive one additional share of Class B Stock for every $1/5^{th}$ of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.  This cash-out feature of the Reorganization will increase S. Biglari's voting control over the Company, as the Company will essentially retire an unknown number of voting shares currently held by the Company's public, minority shareholders.

11.     More importantly, as a result of the Reorganization, S. Biglari will forcibly secure indefinite control over the Company.

12.     The Board took no efforts to give the Company's public shareholders a say in whether to implement the Reorganization.   Rather, the adoption and implementation of the

Reorganization is contingent on the affirmative vote of a simple majority of all votes entitled to be cast by all of the Company' stockholders—including S. Biglari—at a yet-to-be-scheduled special meeting (the "Special Meeting"). Because S. Biglari proposed the Reorganization, voted in favor of the Reorganization as a director, and has already publicly indicated he intends to vote his majority equity stake in support of it, the adoption and implementation is a *fait accompli*. In the absence of Court intervention, Biglari Holdings' public shareholders will be unable to prevent the irreparable harm that the Reorganization will cause them. Plaintiff therefore requests, among other things, that the Court permanently enjoin the vote on, and consummation of, the Reorganization.

## THE PARTIES AND RELEVANT NON-PARTIES

13.     Plaintiff Joseph Hipps is currently a Biglari Holdings shareholder and has been a Biglari Holdings shareholder at all times relevant to the claims asserted herein.

14.     Defendant Biglari Holdings is a holding company owning subsidiaries engaged in a number of diverse business activities, including media, property and casualty insurance, and restaurants. Biglari Holdings is incorporated under the laws of the State of Indiana, with its principal executive offices located at 17802 IH 10 West, Suite 400, San Antonio, Texas 78257. The Company is publicly traded on the New York Stock Exchange under the ticker symbol "BH."

15.     Defendant S. Biglari has been the Company's CEO and Chairman of the Company's Board since 2008. In addition, S. Biglari has served as chairman, CEO and sole owner of Biglari Capital Corp. ("Biglari Capital") since 2000. Biglari Capital is the general partner of The Lion Fund, L.P. and The Lion Fund II, L.P. (collectively, "The Lion Funds"), which are both private investment partnerships. S. Biglari served as a director of Western Sizzlin Corporation ("Western Sizzlin") from December 2005 until its acquisition in 2010, including as its chairman from 2006 to 2010. S. Biglari also served as a director of CCA Industries, Inc. ("CCA Industries"), a manufacturer and marketer of health and beauty aids, from August 2011 to July 2014 and from

October 2015 to present.  Additionally, S. Biglari served as a director of Insignia Systems, Inc. ("Insignia Systems"), a developer and marketer of point-of-purchase in-store products and services, from December 2015 to March 2017, serving as co-chairman from January 2016 to March 2017.  According to Amendment No. 33 to S. Biglari's Schedule 13D filed with the U.S. Securities and Exchange Commission ("SEC") on December 28, 2017, S. Biglari beneficially owns approximately 52.5% of Biglari Holdings' outstanding shares of common stock.

16.     Defendant Philip L. Cooley ("Cooley") has served as Vice Chairman of the Biglari Holdings Board since April 2009 and as a Company director since 2008.  Cooley co-founded Biglari Capital with S. Biglari.  Cooley has served as an advisory director of Biglari Capital since 2000 and as a director and Vice President of The Lion Funds.  Cooley served with S. Biglari as a director of CCA Industries from August 2011 to July 2014, as a director of Insignia Systems from October 2015 to March 2017, and as a director of Western Sizzlin from December 2005 to 2010, including as vice chairman of Western Sizzlin under S. Biglari from 2006 to 2010.  Cooley was S. Biglari's finance professor at Trinity University in San Antonio, and the two have had a close personal and business relationship since that time.  According to the Company's annual meeting proxy statement filed with the SEC on March 27, 2014 (the "2014 Proxy"), Cooley has personally invested in The Lion Funds.  Cooley has been described as S. Biglari's "business partner" and "right-hand man," and the two have invested together since as early as 2000.  Indeed, the Company's public filings recognize that Cooley is not an "independent" director.

17.     Defendant Cooper has served as a member of the Biglari Holdings Board since October 2010.  The Company's public filings identify Cooper as an attorney engaged in private practice.  However, according to a September 23, 2011 article in *The AmLaw Daily* titled "Firms Dine on Restaurant-Related Corporate Work," Cooper was described as "Biglari's top in-house

lawyer."  Cooper served as a director of Western Sizzlin from 2007 until 2010.  Cooper was appointed as a Western Sizzlin director one year after S. Biglari and Cooley were installed as directors, and chairman and vice chairman, respectively.  Cooper has personally owned partnership interests in the The Lion Funds.  In addition, Cooper founded Ascot Management, LLC, and selected S. Biglari to serve on its board of directors.  Cooper served on the three-person GCN Committee, which purportedly evaluated and recommended the Reorganization.

18.     Defendant James P. Mastrian ("Mastrian") has served as a member of the Biglari Holdings Board since August 2012.  Mastrian also served as a director of CCA Industries from 2009 to August 2012.  Mastrian served on the three-person GCN Committee, which purportedly evaluated and recommended the Reorganization.

19.     Defendant Ruth J. Person ("Person") has served as a member of the Biglari Holdings Board since 2002.  Person served on the three-person GCN Committee, which purportedly evaluated and recommended the Reorganization.

20.     The defendants listed in paragraphs 15 to 19 are collectively referred to herein as the "Board" or "Individual Defendants."

21.     Biglari Holdings and the Individual Defendants are collectively referred to herein as the "Defendants."

22.     Relevant non-party New BH is an Indiana corporation and a direct, wholly-owned subsidiary of the Company.  New BH has its primary executives offices located at 17802 IH 10 West, Suite 400, San Antonio, Texas 78257.

23.     Relevant non-party Merger Sub is an Indiana corporation and a direct, wholly-owned subsidiary of New BH.

I.      **SUBSTANTIVE ALLEGATIONS**

A.      **THE FORMATION OF BIGLARI HOLDINGS**

24.      In 2000, S. Biglari launched The Lion Fund, L.P. as a private investment partnership.  Shortly thereafter, S. Biglari invited Defendant Cooley—his friend and former finance professor—to join the board of directors of The Lion Fund, L.P.

25.      In or prior to August 2005, S. Biglari, through The Lion Fund L.P., began buying stock of Western Sizzlin, and in March 2006, S. Biglari and Cooley were appointed Western Sizzlin's board chairman and vice chairman, respectively.  S. Biglari then increased his ownership in Western Sizzlin and, by December 2006, had secured enough voting power to engineer the election of a new board slate consisting of directors whom he had nominated.

26.      Between 2007 and 2008, S. Biglari acquired shares of The Steak N Shake Company ("Steak 'n Shake"), which at the time was a separate entity from Western Sizzlin.  By August 2008, S. Biglari had become CEO and chairman of the board of Steak 'n Shake as well.[1]  In March 2010, the two companies consolidated under S. Biglari's continued leadership through Steak 'n Shake's acquisition of Western Sizzlin.

27.      In 2010, Steak 'n Shake acquired Biglari Capital, the general partner of The Lion Funds.  That same year, S. Biglari caused the Company to change its name from Steak 'n Shake to Biglari Holdings.

B.      **S. BIGLARI UNSUCCESSFULLY ATTEMPTS TO CREATE A DUAL-CLASS CAPITAL STRUCTURE AT BIGLARI HOLDINGS**

28.      On July 5, 2011, Biglari Holdings filed a definitive proxy statement with the SEC relating to a special meeting of shareholders to be held on August 5, 2011 (the "2011 Special

---

[1] Cooley was also added to the Steak 'n Shake board in 2008.

Meeting"). At the 2011 Special Meeting, Biglari Holdings shareholders were asked to vote on a proposed amendment to the Company's articles of incorporation (the "Charter") that would reclassify the Company's capital structure. Specifically, shareholders were asked to vote on whether:

> To amend the [Company's] Amended and Restated Articles of Incorporation in order to (a) increase the total number of shares of all classes of stock that the [Company] is authorized to issue from the current 12,500,000 shares to 60,000,000; (b) redesignate the [Company's] existing common stock, stated value $0.50 per share, as Class A Common Stock and reduce the authorized number of shares of the redesignated Class A Common Stock from 2,500,000 to 2,000,000; and (c) authorize 48,000,000 shares of a new Class B Common Stock, each share of which would have economic rights equivalent to one-fifth (1/5th) of a share of Class A Common Stock, and would have one-one-hundredth (1/100th) of the vote of a share of Class A Common Stock.

29.     At the time, S. Biglari owned just over 15% of the Company's outstanding common stock. S. Biglari and the Company rationalized the proposed reclassification as a way for Biglari Holdings to effectively pursue its goals as an acquisitive holding company. The new Class B shares would purportedly be used to finance acquisitions and provide more optionality to investors in the Company.

30.     The 2011 Special Meeting commenced on August 5, 2011 but was promptly adjourned until September 2, 2011.

31.     On September 1, 2011, the Company issued a press release announcing that it decided to further delay the 2011 Special Meeting that was scheduled for September 2, 2011.

32.     At the Company's annual meeting of shareholders held on April 19, 2012, S. Biglari explained that the special meeting to consider the proposed recapitalization had been put on hold.

33.     On October 5, 2012, the Company filed a definitive proxy statement with the SEC relating to a special meeting of shareholders to be held on November 2, 2012 (the "2012 Special Meeting"). At the 2012 Special Meeting, Biglari Holdings shareholders would again be asked to

amend the Company's Charter to reclassify its capital structure.  Specifically, shareholders would vote on whether:

> To amend the [Company's] Amended and Restated Articles of Incorporation in order to (a) increase the total number of shares of all classes of stock that the [the Company] is authorized to issue from the current 12,500,000 shares to 60,000,000; (b) redesignate the [Company's] existing common stock, stated value $0.50 per share, as Class A Common Stock and reduce the authorized number of shares of the redesignated Class A Common Stock from 2,500,000 to 2,000,000; and (c) authorize 48,000,000 shares of a new Class B Common Stock, each share of which would have economic rights equivalent to one-fifth (1/5th) of a share of Class A Common Stock, and would have one-one-hundredth (1/100th) of the vote of a share of Class A Common Stock.

34.     Influential proxy advisory firm Institutional Shareholder Services ("ISS") was critical of the reclassification proposal.  Among ISS's concerns was the possibility that acquisition targets would demand a premium in accepting new low-vote Biglari Holdings Class B shares in a transaction.

35.     At that time, S. Biglari still owned approximately 15% of the Company's outstanding shares.

36.     On November 2, 2012, the Company announced that it had decided to delay the 2012 Special Meeting until Friday, December 14, 2012.  Presumably because the reclassification proposal lacked necessary support, the 2012 Special Meeting was again postponed on or just before December 14, 2012, and ultimately was never held.

### C.     S. BIGLARI OBTAINS EQUITY CONTROL OF BIGLARI HOLDINGS

37.     After S. Biglari's initial efforts to implement a dual-class structure at the Company failed, he proceeded to take majority control of the Company. The Reorganization will ensure his voting control over the Company for the foreseeable future.

38.     On February 5, 2013, Biglari Holdings filed a Form S-3 registration statement with the SEC in which the Company disclosed a planned rights offering (the "2013 Rights Offering").

39.     The 2013 Rights Offering would provide existing Biglari Holdings shareholders with the ability to convert the rights into additional shares of Company stock to the extent they chose to invest the additional capital required for that exercise.  Further, if the 2013 Rights Offering was not fully subscribed by the existing shareholders, other shareholders who had exercised their prescribed rights could then "oversubscribe," and acquire the shares not taken.

40.     As originally announced, the 2013 Rights Offering aimed to raise approximately $50 million for the Company.  On August 6, 2013, however, the Board made a final announcement of the details of the 2013 Rights Offering, in which prices were set and the capital target was raised to approximately $75 million.  This 50% increase in the size of the 2013 Rights Offering made many more shares available to the shareholders who cared to oversubscribe.

41.     The Company ultimately distributed one transferable subscription right (collectively, the "Rights") for each share of its common stock to shareholders of record on August 27, 2013.  Every five Rights entitled a shareholder to subscribe for one share of common stock at a price of $265.00.  The 2013 Rights Offering was oversubscribed and 286,767 new shares of common stock were issued.

42.     On September 16, 2013, S. Biglari purchased 2,016 shares pursuant to his basic subscription rights, and on September 20, 2013, he purchased 242 shares pursuant to oversubscription election.[2]  On September 16, 2013, The Lion Funds purchased 41,149 shares pursuant to their basic subscription rights, and on September 20, 2013, The Lion Funds purchased 4,923 additional shares pursuant to their oversubscription election.  Thereafter, S. Biglari controlled over 16% of the Company's outstanding common stock.

---

[2] Earlier in September 2013, S. Biglari acquired approximately 7,000 shares in unrelated purchases.

43.     The following year, the Company completed another rights offering through which shareholders of record on August 19, 2014, were entitled to receive one right per share, and every five rights entitled each shareholder to subscribe for one common share (the "2014 Rights Offering"). The subscription price was $250.00 which represented an approximately a 40.3% discount to the closing price of Biglari Holdings common stock on July 21, 2014, the last trading day immediately prior to the announcement of the 2014 Rights Offering, which was $418.60 per share.

44.     After the 2014 Rights Offering, Biglari's controlled approximately 18.1% of the Company's common stock.

45.     On November 21, 2014, a dissident shareholder group announced the nomination of six director candidates to run in opposition to the slate nominated by the Board for election at the Company's 2015 annual shareholder meeting.  Two of the nation's leading proxy advisory firms, ISS and Glass Lewis & Co. ("Glass Lewis"), were each critical of S. Biglari and the incumbent slate. While the dissident slate did not receive the endorsement of nationally recognized proxy advisory firm ISS, ISS did take the extraordinary step of recommending stockholders withhold their votes for all six of the incumbent Biglari Holdings nominees.  Two of the dissident slate's nominees received the support of Glass Lewis.

46.     In its report, ISS stated that "support is not warranted for the incumbent nominees" because of "repeated failure[ ] of governance."  ISS further stated that the Board's "numerous questionable governance practices" included putting most of the Company's liquid assets of more than $600 million in a hedge fund controlled by S. Biglari alone, and a licensing deal between the Company and S. Biglari (described further below) that could pay him as much as $100 million if

he is removed in a takeover.  The report summarized that there was a "significant question about the stewardship of the incumbent directors."

47.     At the Company's annual meeting on April 9, 2015, S. Biglari and the incumbent Board managed to prevail in the proxy contest.  However, without S. Biglari's voting bloc, certain incumbent Biglari Holdings directors would not have been reelected to the Board.

48.     With obstacles to S. Biglari's personal visions and interests mounting, S. Biglari undertook a series of steps to acquire majority voting control over the Company.

49.     In the spring of 2015, S. Biglari sought to increase his stake in the Company and his representatives began negotiating with the GCN – then comprised of Cooper (as chairman), Mastrian, Person and former director William Johnson—about a potential transaction between the Company and The Lion Funds, including The Lion Funds' acquisition of additional Company stock.[3]

50.     On June 3, 2015, the Board adopted and approved amendments to the Company's Restated By-Laws (the "By-Laws Amendment").  Among other things, pursuant to Ind. Code § 23-1-42-5, a section was added to the Biglari Holdings By-Laws to exclude the Company from the protections and provisions of the Indiana Control Share Acquisitions Chapter, Ind. Code § 23-1-42-1, *et. seq.*  The Indiana Control Share Acquisitions Chapter limits voting rights for shares acquired in excess of statutory thresholds, unless the acquisition of the excess shares is approved by the issuer's disinterested shareholders or the corporation opts out of the statute's provisions prior to the acquisition of such excess shares by amending the corporation's articles of incorporation or bylaws.  The 20% threshold prescribed by the statute was protecting the

---

[3]  As of June 3, 2015, The Lion Funds were the beneficial owner of 365,726 Company shares, representing 17.7% of the Company's outstanding shares.  This equity together with his personal stake allowed S. Biglari to control just shy of 20% of the Company's outstanding stock.

Company's minority shareholders from a takeover by S. Biglari.  Sure enough, after the Company opted out of the protections afforded by the statute, S. Biglari promptly took majority control of the Company.

51.     The day after the By-Law Amendment, on June 4, 2015, The Lion Funds commenced a tender offer to acquire up to 575,000 shares of the common stock of Biglari Holdings not otherwise owned by affiliates of The Lion Funds at a price of $420.00 in cash per share (the "Tender Offer").

52.     On June 11, 2015, the Company's purportedly independent directors met to consider the Tender Offer and ultimately recommended to the full Board that it make no recommendation to Biglari Holdings shareholders on the advisability of the Tender Offer.

53.     On July 1, 2015, The Lion Funds completed their Tender Offer for common stock of Biglari Holdings, purchasing 616,312 shares of common stock at a price of $420.00 per share for aggregate consideration of $258,851,040.[4]  After the Tender Offer closed, and The Lion Funds exercised their right under the Tender Offer to increase the number of shares they could acquire, S. Biglari controlled 49.5% of the Company's outstanding common stock.

54.     Notably, the Company holds nearly all of its investments in The Lion Funds.  Thus, S. Biglari was effectively using Company money to massively increase his voting control over Biglari Holdings.

55.     Subsequently, leading up to February 2, 2016, The Lion Funds made dozens of open market purchases of Company common stock that collectively increased S. Biglari's voting control over the Company to 50.6%.

---

[4] Pursuant to the terms of the Tender Offer, The Lion Funds elected to increase the number of Biglari Holdings shares accepted for payment by 41,312 shares.

56.     As of the date of this Complaint, S. Biglari controls a majority of Biglari Holdings' outstanding shares of common stock.   Specifically, as of December 28, 2017, S. Biglari beneficially owned approximately 52.5% of Biglari Holdings' outstanding common stock.

57.     As a result of his majority stake and his roles as Chairman and CEO, S. Biglari controls Biglari Holdings.  S. Biglari is able to dictate the outcome of any matter submitted to a vote of Biglari Holdings, including any vote on the proposed Reorganization.

58.     Biglari Holdings' Form 10-K filed with the SEC on February 27, 2017, describes S. Biglari's control as follows:

> ***Sardar Biglari, our Chairman and CEO, beneficially owns over 50% of [the Company's] outstanding shares of common stock, enabling Mr. Biglari to exert control over matters requiring stockholder approval.***
> Mr. Biglari has the ability to control the outcome of matters submitted to our shareholders for approval, including the election or removal of directors, the amendment of our certificate of incorporation or bylaws, along with other significant transactions.  In addition, Mr. Biglari has the ability to control the management and affairs of the Company.  This control position may conflict with the interests of some or all of the Company's other shareholders.

(Emphasis in original.)

59.     The Reorganization will increase and indefinitely perpetuate S. Biglari's control over the Company.

### D.     S. BIGLARI CAUSES BIGLARI HOLDINGS TO REPEATEDLY ENTER HIGHLY-LUCRATIVE RELATED-PARTY ARRANGEMENTS

60.     The Reorganization will likewise ensure that S. Biglari is able to continue to extract value from the Company through the Investment Management Agreement and other related-party transactions.

61.     At S. Biglari's behest, the Company holds nearly of its investments by means of limited partner interests in The Lion Funds.  The Lion Funds are managed by Biglari Capital, which is solely owned by S. Biglari.  Biglari Capital (*i.e.*, S. Biglari) earns an incentive reallocation

fee for the Company's investments equal to 25% of the net profits above an annual hurdle rate of 6% over the previous "high water" mark.

62.     As reflected in the chart below, this highly atypical relationship for a public company has been very lucrative for S. Biglari.  Between 2013 and 2016, S. Biglari received over **$80 million** as a result of the Investment Management Agreement.

| Year | Incentive Reallocation Fees |
|------|------------------------------|
| 2013 | $14,702,000 |
| 2014 | $34,406,000 |
| 2015 | $23,000 |
| 2016 | $31,628,000 |
| Total | $80,759,000 |

63.     S. Biglari's compensation from the Investment Management Agreement has made S. Biglari the highest paid CEO in the restaurant industry.

64.     Additionally, S. Biglari has used his influence to cause the Company to enter into a license agreement under which S. Biglari has granted the Company a license to use his name when connected to the provision of certain products and services, as well as a sublicense agreement with Steak 'n Shake that, among other things, grants Steak 'n Shake the right to use the trademark "Steak 'n Shake *by Biglari*."  (Emphasis added).

65.     However, in the event of a change of control at the Company or S. Biglari's termination without cause or resignation following specified occurrences, including (a) his removal as Chairman of the Board or CEO or (b) his loss of sole capital allocation authority (*i.e.*, a change to the Investment Management Agreement), S. Biglari would be entitled to receive revenue-based royalty payments related to the usage of his name under the terms of the License Agreement for a defined period of no less than five years.  According to an April 28, 2017 article in the *San Antonio Express-News* titled "Biglari Holdings may scrap controversial licensing deal with CEO," "[b]ased on the [C]ompany's 2016 revenue, that would mean [S. Biglari] could pocket

-16-

a little more than *$100 million* over five years" under the License Agreement in the event of a change of control.  (emphasis added)

66.     S. Biglari has also used his control to put multiple members of his immediate family on the Company's payroll.  For example, since at least 2014, S. Biglari's brother Shawn Biglari has worked in business development for Steak 'n Shake.  Shawn Biglari received $153,200 and $141,250 in compensation from the Company during 2015 and 2016, respectively.

67.     Further, since at least 2014, S. Biglari's father Ken Biglari has served as a "consultant" to Steak 'n Shake.  While Ken Biglari's compensation for 2014 and 2015 has not been publicly disclosed, Ken Biglari received $124,167 in consulting fees from the Company during 2016.

68.     Additionally, S. Biglari caused Biglari Holdings to enter into a shared services agreement with Biglari Capital pursuant to which the Company provides certain services to Biglari Capital (*e.g.*, use of space at the Company's corporate headquarters).

### E.     S. BIGLARI WILL INCREASE AND CEMENT HIS CONTROL OVER BIGLARI HOLDINGS THROUGH THE REORGANIZATION

69.     According to New BH's Form S-4 registration statement filed with the SEC on December 22, 2017 (the "S-4"), at the regularly scheduled November 5, 2016 meeting of the Biglari Holdings Board, S. Biglari made a proposal for the Company to create a dual-class capital structure.  The Board then asked Defendants Cooper, Mastrian and Person, the three members of the GCN Committee, to evaluate the proposal.

70.     In light of Cooper's various entanglements with S. Biglari, including his prior Board service for other S. Biglari-affiliated companies, Cooper's participation fatally compromised the GCN Committee's independence.

71.     Between November 5, 2016 and December 21, 2017, the GCN Committee met a mere three times to discuss the Reorganization proposal.[5]  Purportedly, these three meetings include (a) the initial proposal of the Reorganization (*i.e.*, November 5, 2016), and (b) its approval (*i.e.*, December 21, 2017).  This means that the GCN Committee only met one time in this thirteen (13) month period to deliberate about the proposed Reorganization.

72.     Despite the significant consequences attendant to any reorganization of the Company's capital structure, the GCN Committee did not even engage a financial advisor to assist it or opine on the fairness of the transaction to the Company's minority shareholders.

73.     On December 21, 2017, after receiving the recommendation of the GCN Committee, Biglari Holdings entered into the Reorganization Agreement.

74.     The Reorganization Agreement is among Biglari Holdings, New BH and Merger Sub.  Pursuant to the Reorganization Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH.  Upon completion of the merger, New BH will be named "Biglari Holdings Inc." and replace the Company as the publicly-held corporation through which the Company's business is conducted.

75.     New BH will have two classes of common stock: Class A Stock and Class B Stock. A share of Class B Stock will have economic rights equivalent to 1/5[th] of a share of Class A Stock, but unlike the Class A Stock, will provide its holders no voting rights.

76.     As a result of the Reorganization, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they

---

[5] The S-4 does not suggest **any** negotiation between the Committee and S. Biglari regarding any of the terms of the Reorganization.

own immediately prior to the effective time of the Reorganization, (i) ten shares of Class B Stock and (ii) one share of Class A Stock.  In other words, shareholders will receive for each share of Biglari Holdings common stock (i) one share of Class B Stock and (ii) 1/10th of one share of Class A Stock.

77.     In lieu of fractional shares of Class A Stock, shareholders will receive one additional share of Class B Stock for every 1/5th of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.

78.     The primary rationale for the Reorganization is to cement S. Biglari's control over the Company, particularly in the event that the Company engages in stock-for-stock acquisitions that would have otherwise diluted said control.  Indeed, the S-4 states that:

> We are creating a new holding company to: [i]mplement a dual class structure that will allow the Company to pursue strategic objectives without diluting the voting power of its existing shareholders, including preserving Mr. Biglari's control of the Company . . . .

79.     Furthermore, the first "Reason[ ] for the Reorganization" disclosed in the S-4 is that it "Maintains Founder's Control."

> ***Maintains Founder's Control.***  To attain the dual goal of preserving Mr. Biglari's control of the Company, while gaining the ability to issue stock in a transaction, we think it is necessary to create a dual class structure.  Currently, a stock-for-stock acquisition involving voting stock would dilute current shareholders.  Sardar Biglari controls the direction of the Company through his beneficial ownership of approximately 52.3% of the outstanding shares of common stock.  The Company has been designed and continues to be shaped by Mr. Biglari. . . . [W]e do not want to dilute the voting power of the shares beneficially owned by the founder in a stock-for-stock transaction.  We believe that certain companies managed by founders and entrepreneurs ought to possess a dual class structure. . . . We believe the proposed capital structure, by enabling us to preserve Mr. Biglari's voting control, will help to insulate us from outside influences.  *Our purpose: To sustain the dual goal of maintaining the founder's control and of preserving the option of issuing equity in acquisitions, financings or for other purposes.*

-19-

80.     Approval of the Reorganization is conditioned on the affirmative vote of a simple majority of all votes entitled to be cast at the upcoming special meeting.  Because S. Biglari has "indicated that he . . . intends to vote in favor of the reorganization/recapitalization proposal," attainment of the requisite approval from a simple majority of votes entitled to be cast—and therefore passage and implementation of the Reorganization (absent Court intervention)—is assured.

### F.     THE REORGANIZATION UNFAIRLY BENEFITS S. BIGLARI TO THE DETRIMENT OF THE COMPANY'S PUBLIC SHAREHOLDERS

81.     The numerous benefits to S. Biglari from the Reorganization are clear.  S. Biglari will increase his voting control over the Company and implement a new capital structure that will allow him to indefinitely retain that control.  As a result, S. Biglari's highly-lucrative related-party transactions with the Company will remain in place for as long as he desires.  Additionally, S. Biglari can sell a significant portion of non-voting Class B Stock without any concern of jeopardizing his control over the Company.

82.     In sharp contrast, the Reorganization provides no benefit to the Company's public shareholders.  Rather, the Company's public shareholders will be stuck holding a security in a new company with a capital structure that is highly disfavored by the investment community.  Influential proxy advisors Glass Lewis and ISS are both vocal critics of dual-class capital structures.  According to the 2018 Proxy Paper Guidelines – An Overview of the Glass Lewis Approach to Proxy Advice:

> Glass Lewis believes dual-class voting structures are typically not in the best interests of common shareholders.  Allowing one vote per share generally operates as a safeguard for common shareholders by ensuring that those who hold a significant minority of shares are able to weight in on issues set forth by the board.
>
> Furthermore, [Glass Lewis] believe[s] that the economic stake of each shareholder should match their voting power and that no small group of shareholders, family or otherwise, should have voting rights different from those of other shareholders.  On

matters of governance and shareholder rights, [Glass Lewis] believe[s] shareholders should have the power to speak and the opportunity to effect change. That power should not be concentrated in the hands of a few for reasons other than economic stake.

[Glass Lewis] generally consider[s] a dual-class share structure to reflect negatively on a company's overall corporate governance. Because [Glass Lewis] believe[s] that companies should have share capital structures that protect the interests of non-controlling shareholders as well as any controlling entity, [Glass Lewis] typically recommend[s] that shareholders vote in favor of recapitalization proposals to eliminate dual-class share structures. Similarly, [Glass Lewis] will generally recommend against proposals to adopt a new class of common stock.

83.     Similarly, ISS's United States Summary Proxy Voting Guidelines 2017 Benchmark

Policy Recommendations provides:

**Dual Class Structure**

**General Recommendation:** Generally vote against proposals to create a new class of common stock unless: …[t]he new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

84.      As noted in the S-4, the investment policies of certain institutional investors

prohibit the holding of non-voting stock like the Class B Stock.

***The Reorganization and Recapitalization May Negatively Affect the Decision of Institutional Investors to Invest in New BH, and Could Have Implications for the Inclusion of Shares of Class A Common Stock or Class B Common Stock in Certain Stock Indices.*** The reorganization and recapitalization may negatively affect the decision by certain institutional investors to purchase or hold shares of Class B common stock. The holding of non-voting stock, such as the Class B common stock, may not be permitted by the investment policies of certain institutional investors or may be less attractive to the portfolio managers or certain institutional investors.

85.     As a result of the decision not to issue fractional shares of the Company's new Class

A Stock in the Reorganization, the Company's public shareholders will lose voting rights, while

S. Biglari increases his voting control. Specifically, pursuant to the terms of the Reorganization,

in lieu of receiving fractional shares of high-vote Class A Stock, shareholders will receive an

additional share of no-vote Class B Stock for every 1/5th of one shares of Class A Stock they

otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.

86.     The S-4 concedes that the treatment of fractional shares in connection with the Reorganization may increase S. Biglari's beneficial ownership.

> **The reorganization and recapitalization could increase or prolong Sardar Biglari's control.**
> Sardar Biglari, our Chairman and CEO, currently beneficially owns over 50% of the Company's outstanding shares of common stock and thus has the ability to control the outcome of matters submitted for shareholder approval.  As a result of the treatment of fractional shares in the reorganization and recapitalization, Mr. Biglari's beneficial ownership may increase.[6]

87.     Despite the negative consequences of the Reorganization, including the loss of, and impairment to, the voting rights of the Company's minority public stockholders, Plaintiff and the Class (defined below) will not have any meaningful vote in connection with the proposed Reorganization.

## II.     CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this Action pursuant to Indiana Rule of Trial Procedure 23, individually and on behalf of all other holders of Biglari Holdings common stock (except Defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

89.     This Action is properly maintainable as a class action.

90.     The Class is so numerous that joinder of all members is impracticable.  There are hundreds or thousands of Biglari Holdings shareholders scattered throughout the United States.

---

[6] The receipt of cash in lieu of fractional shares of Class A Stock could also trigger capital gains tax liability for the Company's public shareholders.

As of December 21, 2017, there were 2,067,613 shares of Biglari Holdings common stock issued and outstanding.

91.     There are questions of law and fact common to the Class, including, *inter alia*, whether:

  a.  S. Biglari breached his fiduciary duties owed to the Class as the Company's controlling shareholder in connection with the Reorganization;

  b.  The Individual Defendants breached their fiduciary duties owed to the Class in connection with the Reorganization;

  c.  Plaintiff and the other members of the Class are being and/or will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy; and

  d.  Plaintiff and the other members of the Class will be damaged irreparably by the Defendants' conduct.

92.     Plaintiff is committed to prosecuting the Action and has retained competent counsel experienced in litigation of this nature.

93.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.

94.     Plaintiff is an adequate representative of the Class.

95.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

96. Defendants have acted, and/or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

97. Plaintiff and the Class have no adequate remedy at law.

## COUNT I
## DIRECT CLAIM AGAINST S. BIGLARI IN HIS CAPACITY AS CONTROLLING SHAREHOLDER FOR BREACH OF FIDUCIARY DUTY

98. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99. S. Biglari, as Biglari Holdings' controlling shareholder, owes fiduciary duties to the Class including the highest duties of good faith, fair dealing, due care and loyalty.

100. S. Biglari breached his fiduciary duties by exploiting his position of control to cause the Company to enter into the Reorganization on terms unfairly beneficial to himself and detrimental to the Class.

101. As a result of S. Biglari's wrongful actions, upon consummation of the Reorganization, the Class will have their voting rights impaired.

102. Plaintiff and the Class have no adequate remedy at law.

## COUNT II
## DIRECT CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. The Individual Defendants, as Biglari Holdings directors, are fiduciaries of the Class. As such, they owe the Class the highest duties of good faith, fair dealing, due care and loyalty.

105.    The Individual Defendants have breached their fiduciary duties by, among other things, facilitating and approving the Reorganization, which only serves to benefit S. Biglari.

106.    As a result of the Individual Defendants' wrongful actions described herein, upon consummation of the Reorganization, the Class will have their voting rights impaired.

107.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III
## DIRECT CLAIM AGAINST S. BIGLARI FOR UNJUST ENRICHMENT

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    Upon consummation of the Reorganization, S. Biglari will be unjustly enriched by virtue of his increased voting control over the Company and his ability to maintain that voting control in perpetuity.

110.    It would be unconscionable for S. Biglari to be permitted to receive the illicit benefits that have and will be bestowed upon him as a result of the misconduct alleged herein.

111.    As a result of the wrongful actions of S. Biglari and the Individual Defendants, Plaintiff and the Class will be damaged.

112.    Plaintiff and the Company have no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Enjoining the vote on, and consummation of, the Reorganization;

B.      Declaring that the Defendants breached their fiduciary duties owed to the Class;

C.      Declaring that S. Biglari has been unjustly enriched;

D.      In the absence of injunctive relief, awarding appropriate damages together with pre- and post-judgment interest;

E.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

F.    Awarding such other and further relief as is just and equitable.

Dated this 26th day of January, 2018.

PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC

OF COUNSEL:

/s/ Brad A. Catlin

**KESSLER TOPAZ MELTER &
CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

**FRIEDMAN OSTER & TEJTEL
PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

Filed: 1/29/2018 11:15 AM
Tammy Baltz
Clerk
Hamilton County, Indiana

## **VERIFICATION**

I, Joseph Hipps, solemnly affirm under the penalties of perjury that the contents of the foregoing Verified Class Action Complaint are true and correct to the best of my knowledge, information and belief.

Executed this $\underline{25^{th}}$ day of January, 2018.

JOSEPH HIPPS

# EXHIBIT 2

Filed: 1/29/2018 11:15 AM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,                                    In the Hamilton County Superior Court 1
Individually and on Behalf
Of All Others Similarly Situated,                CAUSE NO.  29D01-1801-CT-000760

                  Plaintiff,

      -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
                Defendants.


TO DEFENDANT:     Biglari Holdings, Inc.
                    17802 IH 10 West, Suite 400
                    San Antonio, TX 78257-2509

      You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

      The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

      An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

      If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated:  1/29/2018 _____                                 (Seal)
                          Clerk, Hamilton County Superior Court

      **(The following manner of service of summons is hereby designated.)**
_____     Registered or certified mail.
_____     Service at place of employment, to-wit:
_____     Service on individual - (Personal or copy) at above address.
_____     Service on agent.  (Specify)
_____X_____     Other service.  Via UPS Overnight Delivery, Signature Required

                    Brad A. Catlin, Atty. No. 21570-29
                    Price Waicukauski Joven & Catlin, LLC
                    301 Massachusetts Avenue
                    Indianapolis, Indiana 46204
                    Telephone: (317) 633-8787
                    Facsimile: (317) 633-8797
                    bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____

Sheriff's Costs                                    Sheriff

                                          By: _____
                                                              Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                              Clerk, Marion County Superior Court

Dated: _____, 2018.      By: _____
                                                              Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                              Clerk, Marion County Superior Court

                                          By: _____
                                                              Deputy

# SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

In the Hamilton County Superior Court 1

CAUSE NO.  29D01-1801-CT-000760

           Plaintiff,

      -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
           Defendants.


TO DEFENDANT:     SARDAR BIGLARI
                     138 Manchester Way
                     Shavano Park, TX 78249-2023

      You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

      The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

      An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

      If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____1/29/2018_____        _____ (Seal)
                                       Clerk, Hamilton County Superior Court

      **(The following manner of service of summons is hereby designated.)**

_____      Registered or certified mail.
_____      Service at place of employment, to-wit:
_____      Service on individual - (Personal or copy) at above address.
_____      Service on agent.  (Specify)
___X___      Other service.  Via UPS Overnight Delivery, signature required

                    Brad A. Catlin, Atty. No. 21570-29
                    Price Waicukauski Joven & Catlin, LLC
                    301 Massachusetts Avenue
                    Indianapolis, Indiana 46204
                    Telephone: (317) 633-8787
                    Facsimile: (317) 633-8797
                    bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                              Sheriff

                                             By: _____
                                                          Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                             Clerk, Marion County Superior Court

Dated: _____, 2018.            By: _____
                                                          Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                                             Clerk, Marion County Superior Court

                                             By: _____
                                                          Deputy

# SUMMONS

JOSEPH HIPPS,                                    In the Hamilton County Superior Court 1
Individually and on Behalf
Of All Others Similarly Situated,                CAUSE NO.  29D01-1801-CT-000760

                    Plaintiff,

        -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
                    Defendants.


TO DEFENDANT:     Philip L. Cooley
                  438 Bentley Mnr
                  Shavano Park, TX 78249-2023

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

        The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: ___1/29/2018_____        _____(Seal)
                                      Clerk, Hamilton County Superior Court


**(The following manner of service of summons is hereby designated.)**

_____        Registered or certified mail.
_____        Service at place of employment, to-wit:
_____        Service on individual - (Personal or copy) at above address.
_____        Service on agent.  (Specify)
___X___         Other service.  Via UPS Overnight Delivery, Signature Required


                    Brad A. Catlin, Atty. No. 21570-29
                    Price Waicukauski Joven & Catlin, LLC
                    301 Massachusetts Avenue
                    Indianapolis, Indiana 46204
                    Telephone: (317) 633-8787
                    Facsimile: (317) 633-8797
                    bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                            Sheriff

                                           By: _____
                                                Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                        Clerk, Marion County Superior Court

Dated: _____, 2018.      By: _____
                                           Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                        Clerk, Marion County Superior Court

                                           By: _____
                                                Deputy

Filed: 1/29/2018 11:15 AM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,                                        In the Hamilton County Superior Court 1
Individually and on Behalf
Of All Others Similarly Situated,                    CAUSE NO.  29D01-1801-CT-000760

                          Plaintiff,

         -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
                     Defendants.


TO DEFENDANT:      Kenneth R. Cooper
                        18814 Cierra Sur
                        San Antonio, TX 78258-4021

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

        The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated:   1/29/2018                                                        (Seal)
                            Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

_____            Registered or certified mail.
_____            Service at place of employment, to-wit:
_____            Service on individual - (Personal or copy) at above address.
_____            Service on agent.  (Specify)
___X___            Other service.  Via UPS Overnight Delivery, Signature Required

                                Brad A. Catlin, Atty. No. 21570-29
                                Price Waicukauski Joven & Catlin, LLC
                                301 Massachusetts Avenue
                                Indianapolis, Indiana 46204
                                Telephone: (317) 633-8787
                                Facsimile: (317) 633-8797
                                bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the \_\_\_\_ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____

Sheriff's Costs                                    Sheriff

                                                  By: _____
                                                        Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the \_\_\_ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                        Clerk, Marion County Superior Court

Dated: _____, 2018.    By: _____
                                                        Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                                        Clerk, Marion County Superior Court

                                        By: _____
                                              Deputy

# SUMMONS

JOSEPH HIPPS,                                          In the Hamilton County Superior Court 1
Individually and on Behalf
Of All Others Similarly Situated,                     CAUSE NO.  29D01-1801-CT-000760

                    Plaintiff,

       -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
                Defendants.


TO DEFENDANT:    James P. Mastrian
                      210 Bella Colinas Dr
                      Austin, TX 78738-7631


You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated:   1/29/2018                                                (Seal)
                              Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

| | |
|---|---|
| _____ | Registered or certified mail. |
| _____ | Service at place of employment, to-wit: |
| _____ | Service on individual - (Personal or copy) at above address. |
| _____ | Service on agent.  (Specify) |
|   X   | Other service.  Via UPS Overnight Delivery, Signature Required |


                          Brad A. Catlin, Atty. No. 21570-29
                          Price Waicukauski Joven & Catlin, LLC
                          301 Massachusetts Avenue
                          Indianapolis, Indiana 46204
                          Telephone: (317) 633-8787
                          Facsimile: (317) 633-8797
                          bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____

Sheriff's Costs                           Sheriff

                                          By: _____
                                                                Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                          Clerk, Marion County Superior Court

Dated: _____, 2018.        By: _____
                                                                Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                                          Clerk, Marion County Superior Court

                                          By: _____
                                                                Deputy

Filed: 1/29/2018 11:15 AM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,                                              In the Hamilton County Superior Court 1
Individually and on Behalf
Of All Others Similarly Situated,                         CAUSE NO. 29D01-1801-CT-000760

                        Plaintiff,

      -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
And RUTH J. PERSON,
                    Defendants.


TO DEFENDANT:     Ruth J. Person
                     2404 Tamarack Ct.
                     Ann Arbor, MI 48105-9660

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

        The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _1/29/2018_____                           (Seal)

                      Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

_____        Registered or certified mail.
_____        Service at place of employment, to-wit:
_____        Service on individual - (Personal or copy) at above address..
_____        Service on agent. (Specify)
___X_____        Other service. Via UPS Overnight Delivery, Signature Required

                    Brad A. Catlin, Atty. No. 21570-29
                    Price Waicukauski Joven & Catlin, LLC
                    301 Massachusetts Avenue
                    Indianapolis, Indiana 46204
                    Telephone: (317) 633-8787
                    Facsimile: (317) 633-8797
                    bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                                  Sheriff

                                                 By: _____
                                                     Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                                 Clerk, Marion County Superior Court

Dated: _____, 2018.        By: _____
                                                     Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                                                 Clerk, Marion County Superior Court

                                                 By: _____
                                                     Deputy

# EXHIBIT 3

STATE OF INDIANA        )        IN THE HAMILTON SUPERIOR COURT NO. 1
                        ) SS:
COUNTY OF HAMILTON  )        CAUSE NO. 29D01-1801-CT-760

JOSEPH HIPPS,                )
        Plaintiff,           )
                             )
        v.                   )
                             )
BIGLARI HOLDINGS INC.,       )
et. al.,                     )
        Defendants.          )

**FILED**

FEB 0 5 2010

*Tammy Baitz*
CLERK OF THE
HAMILTON SUPERIOR COURT

## JUDGE'S ENTRY OF FEBRUARY 5, 2018

*The Clerk shall enter the following on the CCS and shall place this entry in the RJO:*

Plaintiff filed *PLAINTIFF'S CORRECTED MOTION FOR PRELIMINARY*

*INJUNCTION* on January 29, 2018. Court now sets this matter for hearing on the

**20th day of February, 2018 at 10:00 am. (2 hours).**

**SO ORDERED.**

_____
STEVEN R. NATION, Judge
Hamilton Superior Court No. 1

DISTRIBUTION:
Per CCS



29D01 – 1801 – CT – 000760
ORD
Order Issued
1834847

# EXHIBIT 4

Filed: 1/29/2018 5:15 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO.  29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S CORRECTED MOTION FOR PRELIMINARY INJUNCTION

**I.   INTRODUCTION**

Pursuant to Indiana Rule of Trial Procedure 65, plaintiff Joseph Hipps ("Plaintiff"), by and through the undersigned counsel, hereby moves the Court on behalf of himself and all similarly situated shareholders of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") for an Order preliminarily enjoining: (i) an upcoming special meeting of Biglari Holdings shareholders (the "Special Meeting"), at which Sardar Biglari ("S. Biglari"), the Company's Chief Executive Officer ("CEO"), Chairman, and controlling stockholder will unilaterally force an unfair recapitalization of the Company (the "Reorganization"); and (ii) the consummation of the Reorganization.[1]  The grounds for this Motion are summarized below, and will be set forth in full in Plaintiff's brief ("Brief") and the documents and exhibits in support thereof.  The Brief and supporting documents are adopted by reference herein as if set forth fully herein and made an integral part hereof.  In

---

[1] The Reorganization will occur through a merger transaction pursuant to the Agreement and Plan of Merger (the "Reorganization Agreement"), dated as of December 21, 2017, by and among Biglari Holdings, NBHSA Inc. ("New BH") and BH Merger Company ("Merger Sub").

further support of this Motion, Plaintiff also adopts by reference herein as if set forth fully herein and made an integral part hereof the operative Verified Class Action Complaint (the "Complaint") filed on January 29, 2018.

In support of this Motion, Plaintiff states as follows:

## II.   STATEMENT OF FACTS[2]

1.      This shareholder class action challenges, *inter alia*, breaches of fiduciary duty by S. Biglari, the Company's founder, Chairman, CEO, and controlling stockholder, as well as the other members of the Company's board of directors (the "Board") in connection with the Reorganization. ¶ 1, 98-107.

2.      As alleged in detail in the Complaint, members of the Board breached their fiduciary duties by approving the Reorganization at the behest of, and for the exclusive benefit of, S. Biglari. The Reorganization is unfair to the Company's minority shareholders and will cause them irreparable harm by irrevocably altering the Company's capital structure to ensure S. Biglari's perpetual control over the Company. ¶¶ 81-87, 103-107.

3.      The Reorganization is the product of S. Biglari's self-interest and domination of his fellow directors, who facilitated on terms unfair to its public shareholders. ¶¶ 6, 16-17, 69-72, 81-87.

4.      The Reorganization will occur pursuant to the Reorganization Agreement among Biglari Holdings, New BH and Merger Sub. Under the Reorganization Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH. Upon completion of the merger, New

---

[2] All "¶" and "¶¶" citations refer to the numbered paragraphs of the Complaint. Plaintiff respectfully refers the Court to the Complaint for a full summary of the facts giving rise to this action and Plaintiff's request for preliminary injunctive relief.

BH will be named "Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted. ¶¶ 7, 74.

5.    While the Company currently has only one class of common stock, New BH will have two classes of common stock:  Class A common stock ("Class A Stock") and Class B common stock ("Class B Stock").  A share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will provide no voting rights. ¶¶ 8, 75.

6.    As a result of the Reorganization, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reorganization, (a) ten shares of Class B Stock and (b) one share of Class A Stock.  In other words, in connection with the Reorganization, shareholders will receive for each of their shares of Biglari Holdings common stock (a) one share of Class B Stock and (b) $1/10^{th}$ of one share of Class A Stock.  ¶¶ 9, 76

7.    The Company, however, will not issue any fractional shares of Class A Stock.  Rather, where the Reorganization would result in the issuance of fractional Class A shares, shareholders will receive one additional share of Class B Stock for every $1/5^{th}$ of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.  ¶¶ 10, 77.

8.    As a result of the Reorganization, S. Biglari will be able to maintain that voting control in perpetuity, regardless of future issuances of Company stock.  In addition, because the Company will not issue any fractional shares of its new voting stock, the Reorganization will also increase S. Biglari's voting control over the Company by eliminating an unknown number of voting shares currently in the hands of public shareholders.  ¶¶ 1, 10, 59, 85.

9.     S. Biglari orchestrated, and the Board approved and recommended, the Reorganization for the explicit purpose of indefinitely vesting control of the Company in S. Biglari's hands.  Indeed, according to the Form S-4 filed by New BH in connection with the Reorganization, the Board has informed public shareholders that the purpose of the Reorganization is "[t]o sustain the dual goal of maintaining the founder's [*i.e.*, S. Biglari's] control and of preserving the option of issuing equity in acquisitions, financings or for other purposes."  ¶¶ 78-79.

10.     In addition, S. Biglari, who currently controls over 52% of the Company's voting shares, will unilaterally approve the Reorganization at the Special Meeting.  Indeed, rather than providing public shareholders with any meaningful vote on the Reorganization, approval is merely conditioned on the affirmative vote of a simple majority of all shares entitled to vote at the Special Meeting.  ¶¶ 12, 80.

11.     Notably, prior to obtaining majority control, S. Biglari tried similar recapitalizations at Biglari Holdings, but he could not garner the necessary shareholder support.  Now, because S. Biglari has control of 52% of the Company's voting power, Plaintiff and the Company's other minority shareholders will be forced to exchange their stock for stock in a new company that S. Biglari will control for the foreseeable future.  ¶¶ 12, 15, 28-36, 56.

12.     Though no date has been set for the Special Meeting, it may be little more than a month away.  Soon after S. Biglari casts his vote at the Special Meeting, the Company will consummate and implement the Reorganization, forever altering the Company's capital structure and irreparably harming the Company's minority shareholders.  ¶¶ 12, 80.

13.     By promoting S. Biglari's interests above all other Company shareholders, and by taking actions that will significantly impact the voting rights of the minority public shareholders,

S. Biglari and the other defendant directors have breached their fiduciary duties to the Company's shareholders.  ¶¶ 98-107.

**III.**   **ARGUMENT**

14.     While Plaintiff believes that the instant Motion is meritorious, he plans to file a motion seeking leave of the Court to expedite proceedings in this matter (the "Motion to Expedite") so Plaintiff may take the limited discovery necessary to further develop a factual record in advance of the hearing and adjudication of this Motion.  The development of the factual record through narrowly-tailored, expedited discovery will inure to both the litigants and the Court by allowing a more robust adjudication of the merits of the motion.  *See Edudata Corp. v. Scientific Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (ordering expedited discovery because it would "better enable the court to judge the parties' interests and respective chances for success on the merits" at preliminary injunction hearing).

15.     Regardless of whether Plaintiff's request for expedited discovery succeeds, the Court should still issue an order preliminarily enjoining the Special Meeting and Reorganization, until the Court can hear a full trial on the merits of Plaintiffs' claims.  Indiana courts measure the propriety of issuing a preliminary injunction by the following factors:

> (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction.

*Indiana v. Econ. Freedom Fund*, 959 N.E.2d 794, 803 (Ind. 2011).

16.     Each of these factors is satisfied here.

17.     *First*, Plaintiff has demonstrated a reasonable likelihood of success at trial by establishing a prima facie case that defendants' breached their fiduciary duties.  As directors of Biglari Holdings (and, with regard to S. Biglari, as the Company's controlling shareholder), S.

Biglari and the Board owed Biglari Holdings shareholders the fiduciary duties of loyalty, good faith and fair dealing. *See* Ind. Code § 23-1-35-1; *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 ("The fiduciary must deal fairly, honestly, and openly with his corporation . . . [and] must not be distracted from the performance of his official duties by personal interests."); *Lees Inns of Am., Inc. v. William R. Lee Irrevocable Tr.*, 924 N.E.2d 143, 157 (Ind. Ct. App. 2010) ("We initially observe that the 'majority shareholder owes fiduciary duties to the minority shareholders.'") (quoting *Galligan v. Galligan*, 741 N.E.2d 1217, 1228 (Ind. 2001)).

18.    By proposing the Reorganization, voting for its approval as a director, and ensuring that his vote was the only vote that mattered on the Reorganization, S. Biglari put his interests ahead of the interests of all other shareholders, who gain nothing from this transaction. ¶¶ 12, 81-87.

19.    The remaining four defendant directors did nothing to address the divergent interests of S. Biglari and the Company's minority shareholders. ¶¶ 6, 69-72. Among other things, the Board committee that initially "reviewed" this transaction: (1) did not retain a financial advisor; (2) met only three (3) times over a thirteen (13) month period; and (3) did not negotiate for the modification of any aspect of the Reorganization initially proposed by S. Biglari. ¶¶ 6, 71-72. Simply put, they failed to make an informed decision on behalf of all stockholders, but rather, acted to benefit S. Biglari to the public shareholders' detriment. The full five-member Board, including S. Biglari, then unanimously voted to approve the Reorganization upon the committee's recommendation. ¶ 6.

20.    Thus, despite S. Biglari's manifest conflicts of interest, the Board did not take any precautions to mitigate any such conflicts. The Board could have, but did not, recuse S. Biglari from the vote or deliberations about the Reorganization. The Board likewise declined to condition

-6-

the Reorganization on the approval of a majority of the unaffiliated shareholders.[3]  Instead, it ensured that S. Biglari's vote would dictate the outcome of the Special Meeting.

21.     S. Biglari's use of his position as a director and controlling stockholder of the Company to benefit himself, and his fellow directors' failure to engage in a fair process to protect the interests of the public shareholders, was a breach of their respective fiduciary duties, and Plaintiff has a reasonable probability of success on these claims.  *See Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (noting that "in carrying out its affirmative duty to protect the interests of the minority, [a board] could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority.").

22.     *Second*, consummation of the Reorganization will cause Plaintiff and the Company's other minority shareholders irreparable harm.  Once S. Biglari approves the Reorganization at the Special Meeting, Biglari Holdings will promptly begin the process of permanently altering its capital structure and issuing two new classes of stock, which will immediately begin trading on national exchanges.  Once this occurs, it will be impossible to "unscramble the eggs" by reversing the issuance of shares in New BH.  *See, e.g., Catamaran Acquisition Corp. v. Spherion Corp.*, No. CIV.A. 00C-09-180JRS, 2001 WL 755387, at *4 (Del. Sup. Ct. May 31, 2001) ("the Court of Chancery would find it impossible to 'unscramble the eggs' by rescinding the Agreement") *Police & Fire Ret. Sys. of City of Detroit v. Bernal*, Civil Action

---

[3] *See, e.g., In re John Q. Hammons Hotels Inc. S'holder Litig.*, Civil Action No. 758-CC, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) ("The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests.").

No. 4663-CC, 2009 WL 1873144, at *2 (Del. Ch. June 26, 2009) ("Moreover, it would be impossible to 'unscramble the eggs' by attempting to unwind the merger once it has been completed."); *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 603 (Del. Ch. 1974) ("While the remedy of rescission is available . . . it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed.") (internal citation omitted).

23.     Moreover, because the Reorganization will result in the cancellation of a number of shares currently held by the Company's public shareholders and a corresponding increase in S. Biglari's voting control over the Company, once it occurs, Biglari Holdings shareholders' voting rights will be permanently displaced.   This will also make rescission very difficult, if not impossible, and damages incalculable and unrecoverable.  *See, e.g.*, *Examen, Inc. v. VantagePoint Venture Partners 1996*, No. Civ.A. 1142-N, 2005 WL 820601, at * 1 ("[I]n the abstract, the loss of voting rights can constitute irreparable harm . . . ."); *Flight Options Int'l, Inc. v. Flight Options, LLC*, C.A. No. 1459-N, 2005 WL 6799224, at *10 (Del. Ch. July 11, 2005) (finding irreparable harm where rescission was "less facile" because of the "likelihood that further changes [would] be made in the Company's capital structure").

24.     *Third*, the balance of equities clearly favors Plaintiff.  In contrast to the irreparable harm that Plaintiff and all Biglari Holdings shareholders (other than S. Biglari) will suffer if the Reorganization occurs, a preliminary injunction will only preserve the status quo until the final resolution of Plaintiff's claims.  If Plaintiffs' claims do not succeed, S. Biglari can still change the Company's corporate structure in the future.  Moreover, assuming S. Biglari maintains his majority

voting control throughout this litigation, he will still be able to unilaterally approve the Reorganization at another Special Meeting.

25.     *Fourth*, it is in the public interest to grant the preliminary injunction because it will ensure that officers and directors of public corporations adhere to their fiduciary obligations.  *See, e.g.*, *Sample v. Morgan*, 935 A.2d 1046, 1062 (Del. Ch. 2007) (holding that public interest would not be served by allowing breaches of fiduciary duty to go uncorrected).

## IV.     <u>CONCLUSION</u>

Accordingly, Plaintiffs respectfully request that the Court issue an order: (1) enjoining the Company from holding the Special Meeting; (2) enjoining the consummation of the Reorganization; and (3) granting such other and further relief as the Court deems appropriate under the circumstances.

Dated this 26th day of January, 2018.

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I CERTIFY that on this 29th day of January 2018, a copy of Plaintiff's Motion for Preliminary

Injunctions was served via UPS, Overnight Delivery:

Biglari Holdings Inc.                    Kenneth R. Cooper
17802 IH 10 West, Suite 400,             18814 Cierra Sur
San Antonio, TX 78257                    San Antonio, TX 78258

Sardar Biglari                           James P. Mastrian
138 Manchester Way                       210 Bella Colinas Dr
Shavano Park, TX 78249                   Austin, TX 78738

Philip L. Cooley                         Ruth J. Person
438 Bentley Mnr                          2404 Tamarack Ct
Shavano Park, TX 78249                   Ann Arbor, MI 48105

/s/ Brad A. Catlin
Brad A. Catlin

# EXHIBIT 5

FILED
February 6, 2018

*[signature]*

CLERK OF THE HAMILTON
CIRCUIT COURT

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO.  29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## ORDER GRANTING TEMPORARY ADMISSION OF ATTORNEY J. DANIEL ALBERT

This matter comes before the Court on Verified Petition for Temporary Admission of Attorney J. Daniel Albert *Pro Hac Vice* filed by Plaintiff.  This Court, being duly advised, hereby finds that this Petition should be GRANTED.

IT IS THEREFORE ORDERED that attorney J. Daniel Albert shall be permitted to serve as attorney as co-counsel with Brad Catlin.  Pursuant to Rule 3 of the Indiana Rules of Admission to the Bar and the Discipline of Attorney, J. Daniel Albert shall file a Notice of Temporary Admission with the Clerk of the Indiana Supreme Court.

Dated: **February 6, 2018**

*[signature]* Steven R. Nation

Judge, Hamilton Superior Court No. 1

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert          (via email, ew)
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305       (via email, ew)
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A    (via email, ew)
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

FILED
February 6, 2018

CLERK OF THE HAMILTON
CIRCUIT COURT

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO.  29D01-1801-CT-000760 |

|  |  |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## ORDER GRANTING TEMPORARY ADMISSION
## OF ATTORNEY JUSTIN O. RELIFORD

This matter comes before the Court on Verified Petition for Temporary Admission of Attorney Justin O. Reliford *Pro Hac Vice* filed by Plaintiff.  This Court, being duly advised, hereby finds that this Petition should be GRANTED.

IT IS THEREFORE ORDERED that attorney Justin O. Reliford shall be permitted to serve as attorney as co-counsel with Brad Catlin.  Pursuant to Rule 3 of the Indiana Rules of Admission to the Bar and the Discipline of Attorney, Justin O. Reliford shall file a Notice of Temporary Admission with the Clerk of the Indiana Supreme Court.

Dated: **February 5, 2018**

_____
Judge, Hamilton Superior Court No. 1

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com   (via email, ew)
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305   (via email, ew)
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A
New York, NY 10075
jfriedman@fotpllc.com   (via email, ew)
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

FILED
February 6, 2018

CLERK OF THE HAMILTON
CIRCUIT COURT

STATE OF INDIANA        )   IN THE HAMILTON COUNTY SUPERIOR COURT 1
                             )   SS:
COUNTY OF HAMILTON     )   CAUSE NO.  29D01-1801-CT-000760

JOSEPH HIPPS, Individually and on    )
Behalf of All Others Similarly Situated,   )
                                )
         Plaintiff,            )
                                )
      v.                       )
                                )
BIGLARI HOLDINGS, INC., SARDAR   )
BIGLARI, PHILIP L. COOLEY,       )
KENNETH R. COOPER, JAMES P.     )
MASTRIAN, and RUTH J. PERSON,    )
                                )
        Defendants.         )

## ORDER GRANTING TEMPORARY ADMISSION
## OF ATTORNEY CHRISTOPHER M. WINDOVER

       This matter comes before the Court on Verified Petition for Temporary Admission of Attorney Christopher M. Windover *Pro Hac Vice* filed by Plaintiff.  This Court, being duly advised, hereby finds that this Petition should be GRANTED.

       IT IS THEREFORE ORDERED that attorney Christopher M. Windover shall be permitted to serve as attorney as co-counsel with Brad Catlin.  Pursuant to Rule 3 of the Indiana Rules of Admission to the Bar and the Discipline of Attorney, Christopher M. Windover shall file a Notice of Temporary Admission with the Clerk of the Indiana Supreme Court.

Dated: **February 5, 2018**            _____

                               Judge, Hamilton Superior Court No. 1

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com
dalbert@ktmc.com          (via email, ew)
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305      (via email, ew)
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster              (via email, ew)
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

FILED
February 6, 2018

CLERK OF THE HAMILTON
CIRCUIT COURT

STATE OF INDIANA     )    IN THE HAMILTON COUNTY SUPERIOR COURT 1
                             )    SS:
COUNTY OF HAMILTON    )    CAUSE NO.  29D01-1801-CT-000760


JOSEPH HIPPS, Individually and on   )
Behalf of All Others Similarly Situated,   )
                               )
          Plaintiff,            )
                               )
      v.                       )
                               )
BIGLARI HOLDINGS, INC., SARDAR   )
BIGLARI, PHILIP L. COOLEY,      )
KENNETH R. COOPER, JAMES P.    )
MASTRIAN, and RUTH J. PERSON,   )
                               )
         Defendants.         )


## ORDER GRANTING TEMPORARY ADMISSION
## OF ATTORNEY ERIC L. ZAGAR

      This matter comes before the Court on Verified Petition for Temporary Admission of

Attorney Eric L. Zagar *Pro Hac Vice* filed by Plaintiff.  This Court, being duly advised, hereby

finds that this Petition should be GRANTED.

      IT IS THEREFORE ORDERED that attorney Eric L. Zagar shall be permitted to serve as

attorney as co-counsel with Brad Catlin.  Pursuant to Rule 3 of the Indiana Rules of Admission

to the Bar and the Discipline of Attorney, Eric L. Zagar shall file a Notice of Temporary

Admission with the Clerk of the Indiana Supreme Court.


Dated:  **February 5, 2018**          _____

                                     Judge, Hamilton Superior Court No. 1

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com      (via email, ew)
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807      (via email, ew)
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A      (via email, ew)
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

# EXHIBIT 6

Case 1:18-cv-00349-TWP-TAB   Document 1-2   Filed 02/06/18   Page 65 of 212 PageID #: 74

29D01-1801-CT-000760

Filed: 1/26/2018 5:10 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

Hamilton Superior Court 1

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## APPEARANCE

1.  The undersigned attorney and all attorneys listed on this form now appear in this case for the following party member(s):

    Plaintiffs: Joseph Hipps, Individually and on Behalf of All Others Similarly Situated.

2.  Applicable attorney information for service as required by Trial Rule 5(B)(2) and for case information as required by Trial Rules 3.1 and 77(B) is as follows:

    | | |
    |---|---|
    | Name: | Brad A. Catlin |
    | Attorney No.: | 21570-29 |
    | Firm: | PRICE WAICUKAUSKI JOVEN & CATLIN, LLC |
    | Address: | The Hammond Block Building |
    | | 301 Massachusetts Avenue |
    | | Indianapolis, IN  46204 |
    | Telephone: | (317) 633-8787 |
    | Facsimile: | (317) 633-8797 |

3.  There are other party members:  No

4.   If first initiating party filing this case, the clerk is requested to assign this case the following Case Type under administrative rule 8(b)(3):  CT

5.   I will accept service by FAX:  No

6.   This case involves support issues:  No

7.   There are related cases:  No

8.   This form has been served on all other parties.   Certificate of Service is attached:  No

9.   Additional information required by state or local rule:  None

Respectfully submitted,

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin, Atty. No. 21570-29
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Phone: (317) 633-8787
Fax: (317) 633-8797
Email: bcatlin@price-law.com

# EXHIBIT 7

Filed: 1/29/2018 11:19 AM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT 1 |
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Pursuant to Indiana Rule of Trial Procedure 65, plaintiff Joseph Hipps ("Plaintiff"), by and through the undersigned counsel, hereby moves the Court on behalf of himself and all similarly situated shareholders of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") for an Order preliminarily enjoining: (i) an upcoming special meeting of Biglari Holdings shareholders (the "Special Meeting"), at which Sardar Biglari ("S. Biglari"), the Company's Chief Executive Officer ("CEO"), Chairman, and controlling stockholder will unilaterally force an unfair recapitalization of the Company (the "Reorganization"); and (ii) the consummation of the Reorganization.[1]  The grounds for this Motion are summarized below, and will be set forth in full in Plaintiff's brief ("Brief") and the documents and exhibits in support thereof.  The Brief and supporting documents are adopted by reference herein as if set forth fully herein and made an integral part hereof.  In

---

[1] The Reorganization will occur through a merger transaction pursuant to the Agreement and Plan of Merger (the "Reorganization Agreement"), dated as of December 21, 2017, by and among Biglari Holdings, NBHSA Inc. ("New BH") and BH Merger Company ("Merger Sub").

further support of this Motion, Plaintiff also adopts by reference herein as if set forth fully herein and made an integral part hereof the operative Verified Class Action Complaint (the "Complaint") filed on January 26, 2018.

In support of this Motion, Plaintiff states as follows:

## II.    STATEMENT OF FACTS[2]

1.        This shareholder class action challenges, *inter alia*, breaches of fiduciary duty by S. Biglari, the Company's founder, Chairman, CEO, and controlling stockholder, as well as the other members of the Company's board of directors (the "Board") in connection with the Reorganization. ¶ 1, 98-107.

2.        As alleged in detail in the Complaint, members of the Board breached their fiduciary duties by approving the Reorganization at the behest of, and for the exclusive benefit of, S. Biglari.  The Reorganization is unfair to the Company's minority shareholders and will cause them irreparable harm by irrevocably altering the Company's capital structure to ensure S. Biglari's perpetual control over the Company. ¶¶ 81-87, 103-107.

3.        The Reorganization is the product of S. Biglari's self-interest and domination of his fellow directors, who facilitated on terms unfair to its public shareholders. ¶¶ 6, 16-17, 69-72, 81-87.

4.        The Reorganization will occur pursuant to the Reorganization Agreement among Biglari Holdings, New BH and Merger Sub.  Under the Reorganization Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH.  Upon completion of the merger, New

---

[2] All "¶" and "¶¶" citations refer to the numbered paragraphs of the Complaint.  Plaintiff respectfully refers the Court to the Complaint for a full summary of the facts giving rise to this action and Plaintiff's request for preliminary injunctive relief.

BH will be named "Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted. ¶¶ 7, 74.

5.    While the Company currently has only one class of common stock, New BH will have two classes of common stock:  Class A common stock ("Class A Stock") and Class B common stock ("Class B Stock").  A share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will provide no voting rights. ¶¶ 8, 75.

6.    As a result of the Reorganization, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reorganization, (a) ten shares of Class B Stock and (b) one share of Class A Stock.  In other words, in connection with the Reorganization, shareholders will receive for each of their shares of Biglari Holdings common stock (a) one share of Class B Stock and (b) $1/10^{th}$ of one share of Class A Stock.  ¶¶ 9, 76

7.    The Company, however, will not issue any fractional shares of Class A Stock. Rather, where the Reorganization would result in the issuance of fractional Class A shares, shareholders will receive one additional share of Class B Stock for every $1/5^{th}$ of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.  ¶¶ 10, 77.

8.    As a result of the Reorganization, S. Biglari will be able to maintain that voting control in perpetuity, regardless of future issuances of Company stock.  In addition, because the Company will not issue any fractional shares of its new voting stock, the Reorganization will also increase S. Biglari's voting control over the Company by eliminating an unknown number of voting shares currently in the hands of public shareholders.  ¶¶ 1, 10, 59, 85.

9.     S. Biglari orchestrated, and the Board approved and recommended, the Reorganization for the explicit purpose of indefinitely vesting control of the Company in S. Biglari's hands.  Indeed, according to the Form S-4 filed by New BH in connection with the Reorganization, the Board has informed public shareholders that the purpose of the Reorganization is "[t]o sustain the dual goal of maintaining the founder's [*i.e.*, S. Biglari's] control and of preserving the option of issuing equity in acquisitions, financings or for other purposes."  ¶¶ 78-79.

10.     In addition, S. Biglari, who currently controls over 52% of the Company's voting shares, will unilaterally approve the Reorganization at the Special Meeting.  Indeed, rather than providing public shareholders with any meaningful vote on the Reorganization, approval is merely conditioned on the affirmative vote of a simple majority of all shares entitled to vote at the Special Meeting.  ¶¶ 12, 80.

11.     Notably, prior to obtaining majority control, S. Biglari tried similar recapitalizations at Biglari Holdings, but he could not garner the necessary shareholder support.  Now, because S. Biglari has control of 52% of the Company's voting power, Plaintiff and the Company's other minority shareholders will be forced to exchange their stock for stock in a new company that S. Biglari will control for the foreseeable future.  ¶¶ 12, 15, 28-36, 56.

12.     Though no date has been set for the Special Meeting, it may be little more than a month away.  Soon after S. Biglari casts his vote at the Special Meeting, the Company will consummate and implement the Reorganization, forever altering the Company's capital structure and irreparably harming the Company's minority shareholders.  ¶¶ 12, 80.

13.     By promoting S. Biglari's interests above all other Company shareholders, and by taking actions that will significantly impact the voting rights of the minority public shareholders,

S. Biglari and the other defendant directors have breached their fiduciary duties to the Company's shareholders.  ¶¶ 98-107.

**III.    ARGUMENT**

14.    While Plaintiff believes that the instant Motion is meritorious, he plans to file a motion seeking leave of the Court to expedite proceedings in this matter (the "Motion to Expedite") so Plaintiff may take the limited discovery necessary to further develop a factual record in advance of the hearing and adjudication of this Motion.  The development of the factual record through narrowly-tailored, expedited discovery will inure to both the litigants and the Court by allowing a more robust adjudication of the merits of the motion.  *See Edudata Corp. v. Scientific Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (ordering expedited discovery because it would "better enable the court to judge the parties' interests and respective chances for success on the merits" at preliminary injunction hearing).

15.    Regardless of whether Plaintiff's request for expedited discovery succeeds, the Court should still issue an order preliminarily enjoining the Special Meeting and Reorganization, until the Court can hear a full trial on the merits of Plaintiffs' claims.  Indiana courts measure the propriety of issuing a preliminary injunction by the following factors:

> (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction.

*Indiana v. Econ. Freedom Fund*, 959 N.E.2d 794, 803 (Ind. 2011).

16.    Each of these factors is satisfied here.

17.    *First*, Plaintiff has demonstrated a reasonable likelihood of success at trial by establishing a prima facie case that defendants' breached their fiduciary duties.  As directors of Biglari Holdings (and, with regard to S. Biglari, as the Company's controlling shareholder), S.

Biglari and the Board owed Biglari Holdings shareholders the fiduciary duties of loyalty, good faith and fair dealing. *See* Ind. Code § 23-1-35-1; *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 ("The fiduciary must deal fairly, honestly, and openly with his corporation . . . [and] must not be distracted from the performance of his official duties by personal interests."); *Lees Inns of Am., Inc. v. William R. Lee Irrevocable Tr.*, 924 N.E.2d 143, 157 (Ind. Ct. App. 2010) ("We initially observe that the 'majority shareholder owes fiduciary duties to the minority shareholders.'") (quoting *Galligan v. Galligan*, 741 N.E.2d 1217, 1228 (Ind. 2001)).

18.     By proposing the Reorganization, voting for its approval as a director, and ensuring that his vote was the only vote that mattered on the Reorganization, S. Biglari put his interests ahead of the interests of all other shareholders, who gain nothing from this transaction. ¶¶ 12, 81-87.

19.     The remaining four defendant directors did nothing to address the divergent interests of S. Biglari and the Company's minority shareholders. ¶¶ 6, 69-72. Among other things, the Board committee that initially "reviewed" this transaction: (1) did not retain a financial advisor; (2) met only three (3) times over a thirteen (13) month period; and (3) did not negotiate for the modification of any aspect of the Reorganization initially proposed by S. Biglari. ¶¶ 6, 71-72. Simply put, they failed to make an informed decision on behalf of all stockholders, but rather, acted to benefit S. Biglari to the public shareholders' detriment. The full five-member Board, including S. Biglari, then unanimously voted to approve the Reorganization upon the committee's recommendation. ¶ 6.

20.     Thus, despite S. Biglari's manifest conflicts of interest, the Board did not take any precautions to mitigate any such conflicts. The Board could have, but did not, recuse S. Biglari from the vote or deliberations about the Reorganization. The Board likewise declined to condition

-6-

the Reorganization on the approval of a majority of the unaffiliated shareholders.[3]  Instead, it ensured that S. Biglari's vote would dictate the outcome of the Special Meeting.

21.      S. Biglari's use of his position as a director and controlling stockholder of the Company to benefit himself, and his fellow directors' failure to engage in a fair process to protect the interests of the public shareholders, was a breach of their respective fiduciary duties, and Plaintiff has a reasonable probability of success on these claims.  *See Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (noting that "in carrying out its affirmative duty to protect the interests of the minority, [a board] could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority.").

22.      *Second*, consummation of the Reorganization will cause Plaintiff and the Company's other minority shareholders irreparable harm.   Once S. Biglari approves the Reorganization at the Special Meeting, Biglari Holdings will promptly begin the process of permanently altering its capital structure and issuing two new classes of stock, which will immediately begin trading on national exchanges.   Once this occurs, it will be impossible to "unscramble the eggs" by reversing the issuance of shares in New BH.  *See, e.g., Catamaran Acquisition Corp. v. Spherion Corp.*, No. CIV.A. 00C-09-180JRS, 2001 WL 755387, at *4 (Del. Sup. Ct. May 31, 2001) ("the Court of Chancery would find it impossible to 'unscramble the eggs' by rescinding the Agreement") *Police & Fire Ret. Sys. of City of Detroit v. Bernal*, Civil Action

---

[3] *See, e.g., In re John Q. Hammons Hotels Inc. S'holder Litig.*, Civil Action No. 758-CC, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) ("The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests.").

No. 4663-CC, 2009 WL 1873144, at *2 (Del. Ch. June 26, 2009) ("Moreover, it would be impossible to 'unscramble the eggs' by attempting to unwind the merger once it has been completed."); *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 603 (Del. Ch. 1974) ("While the remedy of rescission is available . . . it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed.") (internal citation omitted).

23.    Moreover, because the Reorganization will result in the cancellation of a number of shares currently held by the Company's public shareholders and a corresponding increase in S. Biglari's voting control over the Company, once it occurs, Biglari Holdings shareholders' voting rights will be permanently displaced.  This will also make rescission very difficult, if not impossible, and damages incalculable and unrecoverable.  *See, e.g.*, *Examen, Inc. v. VantagePoint Venture Partners 1996*, No. Civ.A. 1142-N, 2005 WL 820601, at * 1 ("[I]n the abstract, the loss of voting rights can constitute irreparable harm . . . ."); *Flight Options Int'l, Inc. v. Flight Options, LLC*, C.A. No. 1459-N, 2005 WL 6799224, at *10 (Del. Ch. July 11, 2005) (finding irreparable harm where rescission was "less facile" because of the "likelihood that further changes [would] be made in the Company's capital structure").

24.    *Third*, the balance of equities clearly favors Plaintiff.  In contrast to the irreparable harm that Plaintiff and all Biglari Holdings shareholders (other than S. Biglari) will suffer if the Reorganization occurs, a preliminary injunction will only preserve the status quo until the final resolution of Plaintiff's claims.  If Plaintiffs' claims do not succeed, S. Biglari can still change the Company's corporate structure in the future.  Moreover, assuming S. Biglari maintains his majority

voting control throughout this litigation, he will still be able to unilaterally approve the Reorganization at another Special Meeting.

25. *Fourth*, it is in the public interest to grant the preliminary injunction because it will ensure that officers and directors of public corporations adhere to their fiduciary obligations. *See, e.g.*, *Sample v. Morgan*, 935 A.2d 1046, 1062 (Del. Ch. 2007) (holding that public interest would not be served by allowing breaches of fiduciary duty to go uncorrected).

## IV.    **CONCLUSION**

Accordingly, Plaintiffs respectfully request that the Court issue an order: (1) enjoining the Company from holding the Special Meeting; (2) enjoining the consummation of the Reorganization; and (3) granting such other and further relief as the Court deems appropriate under the circumstances.

Dated this 26th day of January, 2018.

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

# EXHIBIT 8

STATE OF INDIANA     )   IN THE HAMILTON COUNTY SUPERIOR COURT
                               )   SS:
COUNTY OF HAMILTON   )   CAUSE NO. 29D01-1801-CT-000760

JOSEPH HIPPS, Individually and on       )
Behalf of All Others Similarly Situated,    )
                                       )
           Plaintiff,                 )
                                       )
        v.                          )
                                       )
BIGLARI HOLDINGS, INC., SARDAR     )
BIGLARI, PHILIP L. COOLEY,        )
KENNETH R. COOPER, JAMES P.      )
MASTRIAN, and RUTH J. PERSON,     )
                                       )
        Defendants.            )

## COMPENDIUM OF AUTHORITIES CONTAINED
## IN PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## <u>NOT CITED IN NORTHEASTERN REPORTER SYSTEM</u>

<u>**CASES**</u>                                                                      <u>**Tab**</u>

*Catamaran Acquisition Corp. v. Spherion Corp.*,
    No. CIV.A. 00C-09-180JRS, 2001 WL 755387 (Del. Sup. Ct. May 31, 2001) ......................1

*Edudata Corp. v. Scientific Computs, Inc.*,
    599 F. Supp. 1084 (D. Minn. 1984)...............................................................................2

*Examen, Inc. v. VantagePoint Venture Partners 1996*,
    No. Civ.A. 1142-N, 2005 WL 820601.............................................................................3

*Flight Options Int'l, Inc. v. Flight Options, LLC*,
    C.A. No. 1459-N, 2005 WL 6799224 (Del. Ch. July 11, 2005).................................4

*Gimbel v. Signal Companies, Inc.*,
    316 A.2d 599 (Del. Ch. 1974)..............................................................................5

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
    Civil Action No. 758-CC, 2009 WL 3165613 (Del. Ch. Oct. 2, 2009)....................................6

*Police & Fire Ret. Sys. of City of Detroit v. Bernal*,
    Civil Action No. 4663-CC, 2009 WL 1873144 (Del. Ch. June 26, 2009) ...............................7

*Sample v. Morgan*,
    935 A.2d 1046 (Del. Ch. 2007)Compe.................................................................8

*Sealy Mattress Co. of New Jersey v. Sealy, Inc.*,
532 A.2d 1324 (Del. Ch. 1987)................................................................................................9

Dated:  January 26, 2018

# *TAB 1*

Case 1:18-cv-00349-TWP-TAB Document 1-2 Filed 02/06/18 Page 82 of 212 PageID #: 91
Catamaran Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

2001 WL 755387
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

CATAMARAN ACQUISITION CORP.
and CORNERSTONE EQUITY
INVESTORS, IV, L.P., Plaintiffs,
v.
SPHERION CORPORATION, Defendant.

No. CIV.A. 00C-09-180JRS.
|
Submitted: April 24, 2001.
|
Decided: May 31, 2001.

Plaintiffs Motion to Amend Complaint. Granted.
Plaintiffs Motion to Transfer to Court of Chancery.
Granted in Part and Denied in Part.

**Attorneys and Law Firms**

Daniel V. Folt, Esquire, Cozen & O'Connor, Wilmington,
Delaware, 19801. Attorneys for Plaintiffs.

Allen M. Terrell, Jr., Esquire, Frederick L. Cottrell, III,
Esquire, Dominick Gattuso, Esquire, Richards Layton
& Finger, Wilmington, Delaware, 19899. Attorneys for
Defendant.

MEMORANDUM OPINION

SLIGHTS, J.

I. INTRODUCTION

*1 The Court is called upon to undertake the often
difficult task of determining whether the gravamen of a
complaint sounds in law or equity. The distinction, of
course, is critical in ascertaining this Court's jurisdiction
over a controversy. The question is called in the context of
a Motion to Amend Complaint and Motion to Transfer
to the Court of Chancery filed by plaintiffs, Interim
Healthcare, Inc. ("Interim"), Catamaran Acquisition

Corp. ("Catamaran") and Cornerstone Equity Investors
IV, L.P. ("Cornerstone")(collectively "plaintiffs").

The amendments to the complaint proffered by plaintiffs
include new claims for reformation and equitable
rescission of a contract between Interim Services, Inc.,
a wholly owned subsidiary of defendant, Spherion
Corporation ("Spherion"), Catamaran, and Cornerstone.
Spherion maintains that plaintiffs' equitable claims are
not viable and that they are brought for the purpose of
divesting this Court of jurisdiction and denying Spherion
of its constitutional right to a trial by jury. The facts,
addressed in relevant part below, read like a combined
equity/civil procedure question on the Delaware bar
examination.

II. FACTS

On September 26, 1997, Spherion, Catamaran and
Cornerstone entered into a Restated Stock Purchase
Agreement (the "Agreement") which memorialized
Spherion's sale of its stock in Interim to Catamaran.
As is customary, the Agreement included various
representations regarding Interim's pending liabilities and
financial fitness.

In their initial complaint, filed on September 25, 2000,
plaintiffs allege that Spherion breached the Agreement
and committed fraud by failing to disclose during due
diligence that litigation was pending against Interim
involving alleged medical malpractice which resulted
in severe neurological compromise of a young child.
Spherion's answer to the initial complaint, filed on
December 13, 2000, denies liability on both counts
principally on the ground that the malpractice claim was
covered by insurance and, therefore, was excepted from
the Agreement's required disclosures.

The Motion to Amend proposes sweeping amendments
to the plaintiffs' initial pleading. The fraud claim is
withdrawn in its entirety. The breach of contract claim
relating to the failure to disclose the pending medical
malpractice litigation is no longer the showcase claim.
Indeed, in the proposed amended complaint, it now merits
mention in only 22 paragraphs of a pleading containing
134 paragraphs. The primary factual predicate upon
which plaintiffs now seek relief, and the only predicate
for the equitable claims, is Spherion's alleged failure

2001 WL 755387

to disclose that, in the year prior to the Agreement, Interim had been overpaid approximately $18,400,000 in Medicare reimbursements. This overpayment, in turn, has created a substantial liability for plaintiffs who now must return the overpayments to Medicare. [1] The proposed amended complaint also sets forth causes of action for breach of contract arising from Spherion's failure to disclose other pending or anticipated claims and liabilities. Spherion does not oppose the Motion to Amend as it relates to these claims. [2]

**\*2** The alleged Medicare overpayments are particularly relevant to the motions *sub judice* because they give rise to plaintiffs' contention that the purchase price for the Interim stock was grossly inflated. [3] Specifically, plaintiffs allege that the downward adjustment to Interim's revenue necessitated by the reimbursement to Medicare of overpayments to Interim should result in a reduction of the purchase price from $134,000,000 to $84,033,600. The innocent misrepresentation by Spherion that no overpayments had been received forms the basis of the equitable rescission claim. The parties' mistaken belief at the time they entered into the Agreement that no overpayments had been received by Interim forms the basis of the reformation claim.

## III. DISCUSSION

### A. The Parties' Contentions

Plaintiffs allege that a breach of contract claim is not an appropriate vehicle to recover the damages they have suffered flowing from the inflated stock purchase price. [4] And because the misrepresentations were "innocent," plaintiffs cannot even assert, much less recover, on a tort-based claim for misrepresentation. Legal rescission is also unavailable to the plaintiffs because they are not able to allege a requisite element: fraud or intentional representation. Accordingly, plaintiffs contend that their only recourse to address the inflated price they paid for Interim is to seek reformation or equitable rescission of the Agreement.

Spherion counters by emphasizing that money damages, available in this Court, can compensate plaintiffs for all the harm they allegedly have suffered at the hands of Spherion. Moreover, the timing of plaintiffs' motion to amend and the dramatic change in the focus and character

of this litigation effectuated by the proposed amendments have prompted Spherion to question plaintiffs' motives and to urge the Court to scrutinize the pending motions carefully to discern their true purpose. In this regard, Spherion notes that the facts relating to the Medicare overpayments were well known to plaintiffs when they filed the initial complaint in September, 2000. The sudden shift to equity-based claims, according to Spherion, reflects plaintiffs' post-filing realization that their claims may play better at a bench trial than before a jury. Spherion urges the Court not to countenance plaintiffs' belated decision to shop its claims in another forum.

Plaintiffs dismiss as unfounded Spherion's characterization of their proposed amendments and request to transfer the case to Chancery as "gamesmanship." They claim that they delayed litigating the claims arising from the overpayments because they, along with Spherion, were attempting to negotiate a satisfactory resolution of the dispute with HCFA. Only when negotiations failed did they seek to amend the complaint to add these claims. Moreover, plaintiffs note that they have changed counsel since the first complaint was filed and argue that they should be afforded the opportunity to pursue their new counsel's strategy for the litigation.

### B. The Motion to Amend

#### 1. The Standard of Review

**\*3** Leave to amend pleadings will be granted unless there is evidence of undue delay, bad faith or dilatory motive on the part of the movant, or the futility of the claims is evident on the face of the pleading. [5] The Court must exercise its discretion when balancing the desirability of resolving litigation on the merits of all available claims against the possible prejudice or surprise to the other party. [6]

The Court's analysis here will focus on futility. There is no credible evidence of bad faith or dilatory motive, nor has there been a significant delay in the filing of the motion to amend. This litigation commenced in September, 2000. Since then, the parties have not initiated discovery or, until now, engaged in motion practice. The Court has yet to issue a scheduling order. Moreover, the Court is satisfied with the plaintiffs' explanations for the delay in filing the instant motions and for the rationale which precipitated

the proposed amendments. Spherion's argument that the proposed amendments will cause them prejudice to the extent they result in the denial of trial by jury is misplaced in the Rule 15 context. [7] The timely introduction of new equitable claims which arise from the same facts and circumstances giving rise to the legal claims cannot form the basis for an allegation of prejudice under Rule 15. [8]

The questions, then, for the Court to determine are whether the proposed amended claims which sound in equity are legitimate claims and, if so, whether their presence in the litigation requires that the entire controversy be transferred to the Court of Chancery. [9]

### 2. The Equitable Rescission Claim

Plaintiffs' rescission claim is straightforward: Spherion knew of the possibility that a routine annual audit by an HCFA intermediary might discover significant overpayments by Medicare but honestly did not believe that overpayments had been received. Accordingly, Spherion represented that "there are no existing overpayments due and owing to HCFA...." [10] Plaintiffs likewise did not believe overpayments would be found in the HCFA audit at the time they entered into the Agreement, and were comforted in the accuracy of their belief, i.e., induced, by Spherion's misstatement. The misrepresentation, innocent though it may have been, cost plaintiffs (particularly Catamaran) an additional $50,000,000 in the form of a higher purchase price for Interim. Plaintiffs have not pled fraud and, indeed, have gone to lengths to emphasize that they possess no facts which would allow them to do so. From plaintiffs' perspective, the proposed amended complaint describes the classic case of *scienta utrimque par pares contrahentes facit:* equal knowledge on both sides make contracting parties equal. [11]

It appears that plaintiffs' survey of the legal landscape upon which they traverse is accurate. At common law, a misrepresentation is not actionable unless the plaintiff can allege that the person making the statement knew or should have known of its falsity. [12] On the other hand, a court of equity can grant relief, including rescission, based upon innocent misrepresentations. [13] Plaintiffs represent that they can ascribe no culpability to Spherion in connection with the representations relating to Medicare overpayments. Thus, legal theories such as fraud or

even negligent misrepresentation [14] are unavailable to plaintiffs. [15] And if plaintiffs have no legal claims or remedies available to address their predicament, they must turn to equity for relief. [16]

**\*4** The boundaries of legal and equitable rescission have been well-charted by Delaware courts. As Chancellor Allen observed:

> It is perhaps not commonly appreciated that rescission is a remedy awarded by law courts. A court of law may, upon adjudication of a contract dispute, determine, where the elements of the claim are proven, that a contract has been rescinded, and enter an order restoring plaintiff to his original condition by awarding money or other property of which he had been deprived. Equitable rescission, on the other hand, which is otherwise known as cancellation, is a form of remedy in which, in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required. Thus, the remedy of equitable rescission typically requires that the court cause an instrument, document, obligation or other matter affecting plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring plaintiff to his original position and reestablishing title or recovering possession of property. [17]

Rescission in its purest form, then, seeks to "unmake" or "cancel" an agreement and to return the parties to the *status quo ante.* [18] It does not appear from plaintiffs' proposed amended complaint that they want to "unmake" the Agreement. Rather, although they invoke the appropriate incantation, including a prayer for "cancellation" of the agreement, the plaintiffs' amended complaint focuses on recouping from Spherion some of

the money they paid to acquire Interim. [19] According to plaintiffs, the amount they paid for Interim in excess of its actual value easily can be calculated based on a formula set forth in the Agreement. Nevertheless, the claim is couched in the proposed amended complaint as equitable rescission of the Agreement-- an agreement which memorializes a transaction consummated more than three years ago.

The Court is satisfied (and agrees with Spherion) that the Court of Chancery would find it "impossible to 'unscramble the eggs' ' by rescinding the Agreement. [20] And, therefore, the Court is satisfied that plaintiffs' equitable rescission claim-- at least in its current form-- is futile for purposes of Rule 15. [21] This conclusion does not end the inquiry, however. Rescissory damages may be appropriate when "the equitable remedy of rescission is impractical" but otherwise warranted. [22] Plaintiffs have alleged that they have suffered substantial monetary damages as a result of an innocent misrepresentation relating to a material term of the Agreement. The Court has already determined that it is unable, as a matter of law, to provide a legal remedy under these circumstances. Consequently, the Court is confronted with a rather perplexing question: can a plaintiff maintain a claim for rescissory damages (traditionally a legal remedy) in a court of equity even though he cannot do so in a court of law? Of course, the question places this Court in the awkward position of attempting to define the scope of equity's jurisdiction. Nevertheless, the procedural posture of this case requires the Court to address the question, at least to some extent, to dispose of the motions *sub judice.* The Court concludes that the Court of Chancery may, under settled tenets of equity, entertain a claim for rescissory damages even if the claim could not be prosecuted at common law. Or, stated more aptly, the Court cannot conclude that plaintiffs' rescission claim would be futile in the Court of Chancery.

**\*5** "[E]quity will not suffer a wrong without a remedy...." [23] And "[e]quity's appropriate focus should be on the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong." [24] Thus, the mere existence of a possible remedy at law will not *ipso jure* divest the Court of Chancery of subject matter jurisdiction. [25] "To preclude concurrent equitable jurisdiction, the alternative legal remedy at a minimum must be available to the

plaintiff as a matter of right and must offer full, fair and complete relief...." [26] Here, the wrong alleged is an innocent misrepresentation relating to a material term of a contract. While breach of contract damages may be available, this Court cannot afford a complete remedy for all damages allegedly suffered by the plaintiffs as a result of the misrepresentation. The Court of Chancery, on the other hand, can afford full, fair and complete relief. [27] Accordingly, plaintiffs will have their opportunity to seek rescission or rescissory damages in the Court of Chancery. [28]

The Motion For Leave to Amend the Complaint to add a claim for Equitable Rescission is GRANTED. Plaintiffs may also amend their complaint to add a prayer for rescissory damages.

### b. The Reformation Claim

In addition to rescission, plaintiffs seek reformation of the Agreement on the ground that all parties to the Agreement at the time of consummation were mistaken as to the existence of overpayments from Medicare. The reformation claim is pled as an alternative to equitable rescission as is permitted by the rules of this Court. [29] Reformation of a contract is undertaken for the purpose of rectifying a failure of the contract to reflect the true intent of the parties thereto. Thus, it has been said that "rescission differs from reformation in that reformation does not seek to 'unmake' or cancel an agreement but to enforce an agreement as intended, notwithstanding that the written instrument, as a result of fraud or mutual mistake, does not accurately reflect the agreement actually reached." [30] In essence, the court amends or rewrites the instrument in accordance with its interpretation of the parties' expectations at the time the contract was made. [31]

That a party to the contract may have a claim for damages on either the unreformed or reformed contract does not extinguish a party's right to reformation. [32] Reformation of the agreement supplements or compliments the damages award; it does not substitute for damages or vice versa. [33] In Delaware, reformation is available only in the Court of Chancery. [34] Thus, assuming they have pled a viable reformation claim, plaintiffs may pursue reformation in the Court of Chancery notwithstanding the

Case 1:18-cv-00349-TWP-TAB   Document 1-2   Filed 02/06/18   Page 86 of 212 PageID #: 95
Castparts Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

availability of rescissory damages or damages for breach of contract.

Spherion contends that plaintiffs' reformation claim is futile. Specifically, Spherion argues that plaintiffs cannot establish that either party to the Agreement was mistaken with respect to the potential that Interim may be assessed with overpayment liability to Medicare. [35] According to Spherion, overpayment liability was contemplated by both parties as a real possibility after the fiscal intermediary's audit of Interim's Medicare reimbursements. The proposed amended complaint, however, alleges that both parties labored under a mistake with respect to the existence of, (and/or the extent of) Medicare overpayments. The allegation is well pled and will be accepted as true. [36]

**\*6** Plaintiffs' Motion to Amend Complaint to add a claim for reformation is GRANTED.

### B. The Motion to Transfer

Because the Court has determined that plaintiffs may amend their complaint to add claims over which this Court has no jurisdiction, the Court must next determine whether to retain jurisdiction over any portion of this litigation or whether the entire controversy should be litigated in the Court of Chancery. Plaintiffs have requested that the entire matter be transferred to the Court of Chancery; [37] Spherion opposes the request because it wants to exercise its demand for a jury trial, at least with respect to the purely legal claims. Accordingly, Spherion suggests that the Court "bifurcate" the claims and transfer only the rescission and reformation claims to Chancery. Alternatively, Spherion suggests that I seek appointment as a Vice Chancellor so that I can preside over both the legal claims as they are tried to a jury, and the equitable claims as they are tried to the Court. [38]

Pursuant to the so-called "clean-up doctrine," the Court of Chancery, in its discretion, could hear all claims, both equitable and legal, and afford complete relief, including money damages if appropriate. [39] The exercise of ancillary jurisdiction, however, is permissive; the Court of Chancery may decline to hear strictly legal claims and allow such claims to be presented to a jury. [40]

"[S]ince its inception in 1776, the Delaware Constitution has afforded its citizens the right to jury trials in both criminal and civil proceedings... expressly preserv[ing] all of the fundamental features of the jury system as they existed at common law." [41] "The *sine qua non* of that common law jurisprudence is the principle that either party shall have the right to demand a jury trial upon an issue of fact in an action at law." [42] And "[t]he fact that the plaintiff joins legal and equitable claims in a Complaint should not automatically deprive a defendant of the right to a trial by jury on the purely legal issues." [43] Of particular importance in the determination of whether to sever legal and equitable claims is the extent to which the claims are so "intertwined" as to make separation impractical or impossible. [44] While these concepts have been developed in the context of the Court of Chancery's ancillary jurisdiction over legal claims, the Court can discern no reason why the concepts would not apply equally to this Court's determination of whether to transfer legal claims (poised for trial by jury in this Court) to the Court of Chancery along with equitable claims over which this Court has no jurisdiction.

Counts I through IV of the Amended Complaint are breach of contract claims. Of these claims, only Count I addresses the Medicare overpayments. Counts II, III and IV address Spherion's alleged failure to disclose other material claims or liabilities in breach of the Agreement. These claims are purely legal and entirely separate from the equitable claims and the Court will order that they be severed from the remaining claims and retain jurisdiction over them. The inconvenience and expense caused by severance, if any, is outweighed by this Court's respect for the right to trial by jury of common law claims.

**\*7** Count I presents a more complicated issue. It is clear that the rescission, reformation and breach of contract claims arising from the Medicare overpayments present factual issues in common including, but not limited to, the exact amount of the overpayment and the extent to which the overpayment was or should have been anticipated by both parties to the Agreement. Even Spherion tacitly has acknowledged that Count I is intertwined with the equitable claims when it observed at oral argument that the resolution of Count I may render moot Counts V (reformation) and VI (equitable rescission). [45] Severance of Count I from Counts V and VI would work an unmanageable hardship on the courts and the parties.

Finally, with respect to the equitable claims, clearly they must be severed and transferred to the Court of Chancery.

## IV. CONCLUSION

Based on the foregoing, the Motion to Amend is GRANTED. Plaintiffs may further amend the complaint to add a prayer for rescissory damages in accordance with this decision. The Motion to Transfer is GRANTED in part and DENIED in part. The Court will sever the claims, retain jurisdiction over Counts II through IV, and transfer Counts I, V, and VI to the Court of Chancery in accordance with 10 *Del. C.* § 1902. Once these claims are transferred to the Court of Chancery, either party may petition for, or either court may *sua sponte* initiate, proceedings to consolidate the cases before one judge (or Chancellor) in accordance with Art. IV Sect. 13(2) of the Delaware Constitution of 1897.

IT IS SO ORDERED.

## All Citations

Not Reported in A.2d, 2001 WL 755387

## Footnotes

1  Spherion disputes the actual amount of the overpayments and represents that the matter is not resolved because plaintiffs have yet to pursue available appeals to the Health Care Financing Administration of the United States Department of Health and Human Services ("HCFA"). Moreover, according to Spherion, HCFA has already determined that the assessed overpayment as initially calculated was excessive and has adjusted the amount downward as much as $8 million.

2  The proposed amended complaint also appears to add Interim as a party plaintiff. This proposed amendment is not addressed by either party. The Court assumes, therefore, that it is unopposed.

3  The purchase price was derived from a multiple of Interim's net income before interest, taxes, depreciation and amortization (EBITDA).

4  Spherion does not oppose plaintiffs' motion to amend as it relates to their new claim for breach of contract which seeks indemnification from Spherion for any amounts plaintiffs are required to repay to Medicare as a result of the overpayments.

5  *Hess v. Carmine,* Del.Super., 396 A.2d 173, 177 (1978).

6  *PNC Bank, Del. v. Turner,* Del.Super., 659 A.2d 222, 225 (1995).

7  Super. Ct. Civ. R. 15.

8  See *Annone v. Kawasaki Motor Corp.,* Del.Supr., 316 A.2d 209, 211 (1974)(court's analysis of prejudice should be directed to the criteria set forth in Rule 15(c)).

9  See *Guy v. Judicial Nominating Comm'n,* Del.Super., 659 A.2d 777, 786 (1995)(court will deny motion to amend when amended claim would not survive a motion to dismiss).

10  Dkt. 1, Ex. A, ¶ 3.17.

11  The Court must disagree with Spherion's assessment that plaintiffs' recovery on the breach of contract claim would moot the rescission claim. The breach of contract claim seeks indemnification for amounts repaid to Medicare or others as a result of the Medicare overpayments. The rescission claim seeks to address the amount plaintiffs allegedly overpaid for Interim.

12  See *In re Brandywine Volkswagon,* Del.Super., 306 A.2d 24, 28 (1973).

13  *E.I. DuPont De Nemours & Co.,* v. HEM Research, Inc., Del. Ch., C.A. No. 10747, Allen, C. (Oct. 13, 1989)(Mem. Op. at 12 n. 12) ("It ... should be noted that in cases involving a prayer for rescission based upon a claim of *innocent* misrepresentation, the equity court has exclusive jurisdiction.").

14  See *Dial v. Astropower, Inc.,* Del.Super., C.A. No. 98C-08-150, Quillen, J. (June 20, 2000)(Letter Op. at 9)(defining elements of negligent misrepresentation) (citation omitted).

15  It should be noted that in light of plaintiffs' admission that they cannot plead fraud, Spherion has questioned whether plaintiffs can sustain a *prima facie* case for equitable rescission. Specifically, Spherion argues that plaintiffs must plead and prove a knowing misrepresentation to prevail on their rescission claim because the contract at issue is "an executed contract." See Wilson v. Pepper, Del. Ch., C.A. No. 962, Chandler, V.C. (Dec. 21, 1989)(Mem. Op. at 6 n. 2)("[I]t has been stated that equity does not have jurisdiction to grant rescission of an executed contract absent fraud.")(citing *Holley v. Jackson,* Del. Ch., 158 A.2d 803, 806 (1959)). But see *Shore Builders, Inc. v. Dogwood, Inc.,* D. Del., 616 F.Supp. 1004, 1015-16 (1985)(predicting that the Delaware Supreme Court would not require a showing of fraud to rescind an executed

contract and questioning whether *Holley* actually endorsed such a requirement); *Norton v. Poplos,* Del.Supr., 443 A.2d 1, 4 (1982)(stating that a contract may be rescinded for fraud, misrepresentation or mistake). Because the Court is not required to resolve this apparent conflict in the case law to dispose of the motions *sub judice,* it will leave resolution or reconciliation of the conflict, as the case may be, for another day.

16    10 *Del. C.* §§ 341, 342; *Chateau Apartments Co. v. City of Wilmington,* Del.Supr., 391 A.2d 205, 207-08 (1978).

17    *E.I. DuPont De Nemours, supra,* Mem. Op. at 6-7 (citation omitted)

18    *Norton v. Poplos,* Del.Supr., 443 A.2d 1 (1982).

19    *Compare Alejandro & Reinholz v. Hornung,* Del. Ch., C.A. No. 12442, Jacobs, V.C. (Aug. 12, 1992)(Mem. Op. at 7) (concluding that plaintiff's complaint failed to state a claim for equitable rescission because, despite its "incantation of magic words", it did not actually seek cancellation of the contract at issue); *McMahaon v. New Castle Assocs.,* Del. Ch., 532 A.2d 601, 603 (1987)("Chancery jurisdiction is not conferred by the incantation of magic words.... [The court must] go behind the facade of prayers to determine the true reason for the suit.").

20    *Harman v. Masoneilan International, Inc.,* Del. Ch., 418 A.2d 1004, 1006-07 (1980)(court can't "unscramble the eggs"); *Gimbel v. Signal Cos., Inc.,* Del. Ch., 316 A.2d 599, 603 (1974)(same). *See also Stegemeier v. Magness,* Del. Ch., 728 A.2d 557, 565 (1999)(declining to rescind land sale transaction because homes already had been built and sold to third parties); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 714 (1983)(finding rescission impractical to undo long completed cash out merger); *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497, 501 (1981)(not feasible to unwind merger and other corporate changes).

21    In light of this Court's determination, as explained below, that the rescission claim should be heard in the Court of Chancery, and considering the admittedly unusual circumstance where this Court is predicting the disposition of a claim by another trial-level court, there should be no question as to whether this Court's prediction rises to the level of a claim or issue preclusion determination. It does not. Plaintiffs are free to make their pitch for cancellation of the Agreement in the Court of Chancery within the confines of their Rule 11 obligations. This Court's prediction of the Court of Chancery's disposition of the cancellation claim was a necessary step in the logical progression (at least from one judge's perspective) of the Court's analysis of the jurisdiction issue.

22    *See Stegemeier,* 728 A.2d at 565; *Lynch,* 429 A.2d at 501; *Strassburger v. Early,* Del. Ch., 752 A.2d 557, 581-82 (2000).

23    *Fischer v. Fischer,* Del. Ch., C.A. No. 16864, Steele, V.C. (Nov. 4, 1999)(Mem. Op. at 10).

24    *Id.*

25    *See El Paso Natural Gas Co. v. Transmission Gas Co.,* Del.Supr., 669 A.2d 36, 39 (1995).

26    Wolfe & Pettinger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 2-3[b] at 2-43 (2000) (citations omitted).

27    *See E.I. DuPont De Nemours & Co., supra,* Mem. Op. at 12 n. 12 ("It should be noted that in cases involving a prayer for rescission based upon a claim of innocent misrepresentation, the equity court has exclusive jurisdiction") (citation omitted); *Dick v. Reeves,* Del.Supr., 206 A.2d 671, 674-75 (1965)(lack of knowledge of misrepresentation not a defense to rescission claim in equity). *See also DuPont v. Delaware Trust Co.,* Del. Ch., 364 A.2d 157, 160-61 (1975)(awarding rescissory damages when cancellation was not practical).

28    Spherion alleges that plaintiffs cannot justifiably contend that they were mistaken with respect to the possibility of a Medicare overpayment. Spherion argues that this fact alone renders plaintiffs' rescission claim futile, even if alleged innocent misrepresentations animate the claim. While this argument ultimately may prove dispositive, it is more appropriate at summary judgment. For now, the Court must accept the well plead allegations of the amended complaint as true. *Nix v. Sawyer,* Del.Super., 466 A.2d 407 (1983).

29    *Super. Ct. Civ. R.* 8(e)(2).

30    Wolfe, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 12.4[a], at 12-45 (2000).

31    *In re Enstar Corp.,* Del.Supr., 604 A.2d 404, 413 (1992).

32    *See The Travelers Indem. Co. v. North American Phillips Corp .,* Del. Ch., C.A. No. 12,029, Berger, V.C. (Aug. 26, 1992) (Mem. Op. at 3-4)(claim for declaratory relief, damages, and legal rescission did not extinguish claim for reformation); *66 Am.Jur.2d* Reformation of Instruments, § 78 at 600 (1973)("Although a party may bring his suit in the first instance for the reformation of the instrument and in the same proceeding ask for a decree for the damages he seeks, his election to obtain his remedy at law does not estop him from seeking reformation in equity").

33    *Id.*

34    *Hessler, Inc. v. Ellis,* Del. Ch., 167 A.2d 848, 850 (1961).

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 755387

35   *See Amer v. NVF Co.,* Del. Ch., C.A. No. 11812, Allen, C. (June 15, 1994)(Mem. Op. at 16)(mutual mistake or fraud requisite element of reformation).

36   *Itek Corp. v. Chicago Aerial Indus., Inc.,* Del.Super., 257 A.2d 232, 233 (1969).

37   10 *Del. C.* § 1902.

38   *See* Art. IV, Sect. 13(2) of the Delaware Constitution of 1897. *See e.g., Monsanto Company v. Aetna Casualty & Surety Co.,* Del.Super., C.A. No. 88C-JA-118, Martin, J. (Sept. 29, 1090)(Mem. Op. at 7) (Superior Court judge seeks appointment as Vice Chancellor to preside over severed legal and equitable claims).

39   *American Appliance v. State ex rel. Brady,* Del.Super., 712 A.2d 1001, 1003 (1998); *Herzing v. Priestly,* Del. Ch., C.A. No. 11704, Chandler, V.C. (Apr. 15, 1992)(Mem.Op.).

40   *See, e.g., Getty Refining & Marketing v. Park Oil Co.,* Del. Ch., 385 A.2d 147, 151 (1978), *aff'd,* Del.Super., 407 A.2d 533 (1979).

41   *McCool v. Gehret,* Del.Super., 657 A.2d 269, 282 (1995) (citation omitted).

42   *Id.*

43   *Getty Refining,* 385 A.2d at 151(citations omitted)(noting that to hold otherwise would allow a plaintiff to "deprive a defendant of a jury trial merely by adding spurious equitable claims").

44   *Id.* at 150.

45   Transcript at 26-27.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

# *TAB 2*

599 F.Supp. 1084
United States District Court,
D. Minnesota, Fourth Division.

EDUDATA CORPORATION, Plaintiff,

v.

SCIENTIFIC COMPUTERS, INC., Hubert H.
Humphrey, III, Attorney General of the State of
Minnesota, and Michael A. Hatch, Commissioner of
Commerce of the State of Minnesota, Defendants.
SCIENTIFIC COMPUTERS, INC.,
a Minnesota corporation, Plaintiff,

v.

EDUDATA CORPORATION, a Delaware
corporation, Shamrock Associates, a New Jersey
Limited Partnership, Sun Equities Corporation, a
Delaware corporation, and Paul Koether and Natalie
Koether, Residents of New Jersey, Defendants.

Civ. Nos. 4–84–968, 4–84–978.
|
Sept. 28, 1984.

**Synopsis**
Company making tender offer filed complaint against
takeover target, State Attorney General, and State
Commissioner of Commerce seeking judgment declaring
that certain provisions of the Minnesota Corporate Take-
Overs Act and Minnesota Business Corporation Act were
unconstitutional as applied to its tender offer and were
preempted by the Williams Act. Takeover target filed
complaint against company making tender offer and
others alleging violations of federal and state statutes.
Upon motions of company making offer and takeover
target for temporary restraining orders, the District
Court, Diana E. Murphy, J., held that: (1) company
making tender offer was not entitled to temporary
restraining order, and (2) takeover target was entitled
to temporary restraining order suspending tender offer
pending further hearing.

Order accordingly.

Order affirmed in part and dismissed in part, 8 Cir., 746
F.2d 429.

**West Headnotes (4)**

**[1]** **Injunction**
👉 Grounds in general;multiple factors

Whether temporary injunctive relief may be
granted is determined by consideration of four
factors, namely, the threat of irreparable harm
to movant, state of the balance between this
harm and the injury that granting injunction
will inflict on other parties litigant, probability
that movant will succeed on merits and the
public interest.

Cases that cite this headnote

**[2]** **Injunction**
👉 Mergers and acquisitions;anti-takeover
measures

Company making tender offer was not
entitled to temporary restraining order
preventing target company from enforcing
certain provisions of the Minnesota
Corporate Take-Overs Act and Minnesota
Business Corporation Act, and from
commencing any judicial proceeding relating
to those laws in any other forum, in that Take-
Overs Act differed from statutes found to be
unconstitutional in other cases, commissioner
of commerce was currently expanding factual
record with his investigation and his
subsequent action might moot constitutional
question, and public interest would be
furthered by full disclosure of all material
information concerning tender offer. M.S.A.
§ 80B.01 et seq.; Minn.St.1984, §§ 302A.011,
subds. 37–39, 302A.449, subd. 7, 302A.671.

1 Cases that cite this headnote

**[3]** **Injunction**
👉 Mergers and acquisitions;anti-takeover
measures

Takeover target was entitled to a temporary
restraining order suspending tender offer
pending further hearing, in that company
making tender offer had not shown that its

harm from delay was irreparable, restraining order would protect it from criminal and civil penalties it feared because of any possible conflict between state and federal law and harm to takeover target, the value of its shares, and jobs for its employees were of legal concern if law were violated. M.S.A. § 80B.01 et seq.; Minn.St.1984, §§ 302A.011, subds. 37–39, 302A.449, subd. 7, 302A.671.

Cases that cite this headnote

**[4]** **Federal Civil Procedure**
👉 **Grounds and Objections**

Takeover target's motion for expedited discovery would be granted since further development of record before preliminary injunction hearing concerning tender offer would better enable court to judge parties' interests and respective chances for success on the merits.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1085** Theodore Altman, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, Thomas E. Glennon and Richard Primuth, Lindquist & Vennum, Minneapolis, Minn., for Edudata Corp.

Roger Magnuson and Linda Freyer, Dorsey & Whitney, Minneapolis, Minn., for Scientific Computers, Inc.

Barry Greller, Asst. Atty. Gen., St. Paul, Minn., for Hubert H. Humphrey, III and Michael A. Hatch.

**ORDER**

DIANA E. MURPHY, District Judge.

These companion cases arise from a tender offer commenced by Edudata Corporation (Edudata), a Delaware corporation, on September 20, 1984, for all outstanding shares of the common stock of Scientific Computers, Inc. (SCI), a Minnesota corporation.

**\*1086** Edudata filed a verified complaint against SCI, Hubert Humphrey III, Attorney General of Minnesota, and Michael A. Hatch, Commissioner of Commerce in Minnesota, in this court on the same day. Edudata seeks a judgment declaring that certain recently-enacted provisions of the Minnesota Corporate Take-Overs Act, Minn.Stat. Ch. 80B, and the Minnesota Business Corporation Act, Minn.Stat. §§ 302A.011, subd. 37, 38, 39; 302A.449, subd. 7 and 302A.671, are unconstitutional as applied to Edudata's tender offer and are preempted by the "Williams Act", 82 Stat. 454, et seq. codified at 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f), amendments to the Securities Exchange Act of 1934. The complaint also requested temporary, preliminary and permanent injunctive relief restraining SCI from enforcing the above provisions of Minnesota law and from commencing any judicial proceeding relating to these laws in any other forum. Jurisdiction is alleged under 28 U.S.C. §§ 1331(a), 1332, 1337(a), 1343(3) and (4), and 15 U.S.C. § 78aa.

SCI filed a verified complaint in this court on September 26, 1984 against Edudata, Shamrock Associates (Shamrock), Sun Equities Corporation (SECC), Paul Koether and Natalie Koether. SCI also bases part of its claim on violations of the Williams Act. In addition, it charges violations of the Minnesota Business Corporation Act, the Minnesota Corporate Take-Overs Act, and fraud. Jurisdiction is alleged under 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332 and pendent jurisdiction.

These matters are now before the court upon motions of Edudata and SCI for temporary restraining orders and upon SCI's motion to expedite discovery.

In addition to the actions commenced in this court, the parties are involved in state judicial and administrative proceedings. On September 24, Michael Hatch, the Minnesota Commissioner of Commerce, issued an Order suspending the registration by Edudata of its tender offer pursuant to Minn.Stat. § 80B.03 subd. 4a. Hatch found that the takeover materials did not provide full disclosure of all material information as Edudata failed to specify its future plans concerning the target company (SCI), to identify adequately Edudata's background and affiliates and to specify any potential liability Edudata may have due to misstatements or omissions of material fact made in its public offering of July 1984. Hatch also ordered a hearing on October 4, 1984 to determine whether the suspension shall be terminated or made

permanent. Edudata asks this court to set aside Hatch's order suspending its tender offer.

SCI has also initiated a suit in state court against Edudata and Craig-Hallum, Inc., a Minnesota corporation. On September 26, 1984, Judge Irving Iverson issued a temporary restraining order in that action, enjoining defendants from proceeding with, causing or aiding and abetting the tender offer by Edudata to purchase shares of SCI from residents of Minnesota or engaging in any activities in furtherance of the tender offer, and from accepting tenders of shares of SCI stock. Judge Iverson also enjoined Edudata from consummating the control share acquisition of SCI prior to a special shareholders meeting which, pursuant to Minn.Stat. § 302A.671, subd. 3 (1984), has been called for November 15, 1984.

At the hearing before this court on September 26, 1984, the parties addressed the effect of this state court order. Counsel for Edudata stated that the case was being removed to this court, but SCI's counsel responded that removal is improper because there is not complete diversity. SCI asserts that a federal restraining order is needed to enjoin Edudata from proceeding nationally since the state order only protects Minnesota citizens.

## DISCUSSION

**[1]**   Whether temporary injunctive relief may be granted is determined by consideration of four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase* **\*1087** *Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981).

**[2]**   Edudata argues that enforcement of the Minnesota statutes will cause immediate irreparable injury, not only to Edudata and its shareholders, but also to SCI and its shareholders, no matter what approach Edudata takes. If it abandons its tender offer, it will be deprived of its right under the Williams Act to make a national tender offer. Yet, if Edudata proceeds with its tender offer in disregard of Minnesota law, it may be subject to criminal and civil penalties, and the validity of tenders and ownership of SCI stock may be in doubt. Finally, Edudata argues that compliance with the Minnesota statutes could result in civil liabilities for failure to comply with federal law, unreasonable delay, commitment of substantial amounts

of money to prepare and participate in the hearing provided for by the Minnesota law, and disruption of the market in securities of SCI.

Edudata argues that other prerequisites of injunctive relief are also satisfied. It alleges that SCI will suffer no harm by suspension of the Minnesota statutes because the Williams Act serves the same purpose of investor protection; that success on the merits is "virtually certain"; and that the public interest is best served by allowing Edudata to proceed with its federally protected rights, thus offering SCI shareholders and the investing public a unique investment opportunity.

The major thrust of Edudata's motion is devoted to its chances of success on the merits. It relies heavily on *Edgar v. Mite Corporation,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and *National City Lines Inc. v. LLC Corp.,* 687 F.2d 1122 (8th Cir.1982), for the proposition that the Minnesota statutes are unconstitutional and preempted by federal law. It argues that the October 4 hearing before Commissioner Hatch is precisely the type of disruption found to be unconstitutional in *Mite* and *National City Lines.*

The state defendants argue that both cases are distinguishable and that the Minnesota legislature was aware of both cases and crafted Minn.Stat. § 80B— the only provision properly before the court—to avoid the problems presented there. It points out that the Illinois Act struck down in *Mite* contained three key provisions which are not part of the Minnesota statute: 1) a precommencement notification period requirement, 2) a hearing procedure with no strict time deadlines, and 3) a procedure where the Secretary of State would pass on the substantive fairness of the tender offer.

At the hearing, SCI opposed Edudata's motion for constitutional and practical reasons. It argued that this matter is not ripe for constitutional resolution. The Commissioner of Commerce is currently expanding the factual record with his investigation and his subsequent action may moot the constitutional question. Although Edudata seeks to prohibit SCI from bringing any other proceeding in another forum, SCI has already filed a state court claim. SCI argues that the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and considerations of comity prevent this court from enjoining those pending state court's proceedings.

---

SCI also alleges that Edudata appears to be a shell corporation with three employees, no management experience and limited assets before its public offering in July, 1984. SCI asserts that Edudata has conspired, with the Koethers, Shamrock and SECC, to take over SCI through a series of fraudulent disclosures and material omissions and to loot it of its assets. SCI contends that it will suffer irreparable injury if the shares tendered in response to Edudata's offer are transferred in that, among other things, Edudata will have acquired effective control of SCI; the price and liquidity of the public market for SCI stock will drop; SCI's long-standing customer/supplier relationships may be destroyed; and many SCI employees may either lose their jobs or their innovative spirit.

The court recognizes that important interests are at stake on all sides of this dispute. Delay is a potent weapon in a **\*1088** tender offer fight, at times enabling entrenched management to defeat what may be a beneficial tender offer to shareholders and targeted company alike. On the other hand, federal and state policy favors adequate disclosure so that shareholders and investors may make informed decisions. Serious constitutional issues have been raised, as well as serious allegations of violations of federal and state law. The state law challenged by Edudata differs from that at issue in *Mite* and *National City Lines.* Further development of the parties' legal positions and the record is necessary before the court can determine the likelihood of success on the merits in these actions.

The public interest would be furthered by full disclosure of all material information concerning Edudata's tender offer. One of the main goals of the Williams Act is to protect shareholders and investors by furnishing them with the necessary information required to exercise an informed choice. [1] *Edgar v. Mite,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Commissioner Hatch used almost identical criteria as in the Williams Act to determine that Edudata's tender offer materials do not provide full disclosure of key information concerning Edudata's background, affiliates, and future plans. SCI and the state defendants have made a sufficient showing to justify delaying this tender offer to permit closer examination of the offering disclosures. Injunctive relief may be appropriate pending determination whether federal law requires additional disclosures or until all necessary information is disclosed. *See Pacific Realty Trust v. APC Investments,* 685 F.2d 1083 (9th Cir.1982);

*Whittaker Corporation v. Edgar,* 535 F.Supp. 933 (D.C.Ill.1982).

**[3]** Although both parties claim irreparable harm, the court finds that the balance of harm favors SCI and that a temporary restraining order should issue suspending Edudata's tender offer pending further hearing. This will obviously delay Edudata's tender offer to its disadvantage, but Edudata has not shown that its harm is irreparable. Moreover, a restraining order will protect Edudata from the criminal and civil penalties it fears because of any possible conflict between state and federal law. Edudata claims that SCI shareholders would be irreparably harmed by a delay or defeat of its offer, but shareholders could also be harmed by false or misleading disclosures. SCI claims it would be irreparably harmed if effective control of the corporation were obtained by Edudata. In the absence of violation of federal or state law, this would be of no legal concern. However, harm to SCI, the value of its shares, and jobs for its employees are of legal concern if the law were violated. All that this court can determine at this point is that closer examination is warranted.

Neither side has addressed the issue of a bond or its amount. SCI, however, filed a bond in the amount of $5000 with its motion for a restraining order. No objection to that bond has been made, and on this record the court finds it to be sufficient until further hearing.

**[4]** Finally, the court finds that SCI's motion for expedited discovery should be granted. Further development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits.

### ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1. The motion of Edudata Corporation for a temporary restraining order is denied.

**\*1089** 2. The motion of Scientific Computers, Inc. for a temporary restraining order is granted,

and Edudata Corporation, Shamrock Associates, Sun Equities Corporation, Paul Koether, Natalie Koether, their agents and all persons in active participation with them, are hereby enjoined from proceeding with, causing or aiding and abetting the tender offer by Edudata Corporation to purchase shares of Scientific Computers, Inc., or engaging in any activities in furtherance of Edudata Corporation's tender offer, and from accepting tenders of shares of Scientific Computers, Inc. stock.

3. This restraining order shall be effective immediately and will remain in effect until midnight on October 18, 1984 or further order of this court.

4. A hearing will be held on the parties' request for preliminary injunctions on October 17, 1984 at 2:00 p.m.

5. The parties shall furnish to this court and opposing counsel by October 11, 1984 any additional memoranda, affidavits, or exhibits applicable to these motions.

6. The motion of Scientific Computers, Inc. for expedited discovery is granted allowing it to proceed with the depositions of the officers, directors and managing agents of the Edudata Corporation, Shamrock Associates and Sun Equities Corporation, beginning on October 1, 1984.

**All Citations**

599 F.Supp. 1084

---

Footnotes

1    The act provides in pertinent part: It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. 15 U.S.C. § 78n(e). *See also* the disclosure requirements in 15 U.S.C. §§ 78m(d) and 78n(d).

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 3*

2005 WL 820601
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

EXAMEN, INC.
v.
VANTAGEPOINT VENTURE PARTNERS 1996

No. Civ.A. 1142-N.
|
April 4, 2005.

Dear Counsel:

**Opinion**

CHANDLER, J.

*1 Before the Court is defendant VantagePoint Venture Partners 1996's Motion For Injunction Pending Appeal ("Motion") of Vice Chancellor Lamb's March 31, 2005 ruling (the "Opinion") on the pleadings in favor of plaintiff Examen, Inc. Stays or injunctions pending appeal are governed by the four-part test articulated in *Kirpat, Inc. v. Del. Alcoholic Beverage Comm'n,* 741 A.2d 356 (Del.1998), and are subject to the discretion of the trial Court. DEL.SUPR. CT. R. 32(a). The Motion is denied.

*Kirpat* states that the Court should "balance all the equities in the case" and consider four factors: 1) the likelihood of success on the merits of the appeal; 2) whether the petitioner will suffer irreparable harm if the stay is denied; 3) whether any other interested party will suffer substantial harm if the stay is granted; and 4) whether the public interest will be harmed if the stay is granted. *Id.* at 357-58. Upon balancing these four factors, I conclude that an injunction pending appeal is not warranted.

Although VantagePoint is correct that the proverbial eggs may become scrambled if its application for an injunction pending appeal is denied, *see Gimbel v. Signal Cos. Inc.,* 316 A.2d 599, 603 (Del.Ch.1974), and that, in the abstract, the loss of voting rights can constitute irreparable harm, *see Aprahamian v. HBO & Co .,* 531 A.2d 1204, 1208 (Del. Ch.1987), VantagePoint is not at risk of losing voting rights here because it never possessed the rights it is attempting to assert in this action. VantagePoint is a sophisticated investor that elected to purchase stock in a Delaware corporation governed by Delaware law, and indeed negotiated the terms upon which it obtained its preferred holdings in Examen. Opinion at 4 n.6. As such, VantagePoint cannot reasonably argue that it is at risk to lose voting rights it never had.

VantagePoint also correctly argues that if an appeal can be completed on the timetable previously agreed upon by the parties, the harm that Examen would suffer by not being able to consummate the transaction as scheduled is lessened, and not likely to be substantial. If, however, VantagePoint's appeal forces Examen to delay the closing of the transaction (and there is no guarantee that the appeal could be completed before April 15, 2005), the potential harm to Examen could quickly become quite substantial.

I conclude, however, that VantagePoint's likelihood of success on the merits of its appeal is, at best, very remote. In its application for an injunction pending appeal, VantagePoint has not pointed to any flaws in the Vice Chancellor's analysis that would lead me to conclude that VantagePoint has any quantifiable likelihood of success on the merits of its appeal. The Opinion demonstrates that the Vice Chancellor's decision was both carefully considered and well reasoned. Furthermore, it does not appear that the public interest will be affected by either the granting or denial of the present application, so the final *Kirpat* factor is of no import in the instant analysis. [1]

*2 Upon balancing these four factors and all of the equities in the case, this Court declines to exercise its discretion to enter an injunction pending appeal. The Motion For Injunction Pending Appeal is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2005 WL 820601

Footnotes

Clarke, Re: v. VantagePoint Venture Partners 1996, Not Reported in A.2d (2005)

2005 WL 820601

1    Plaintiff argues that Delaware has a strong interest in governing the affairs of Delaware corporations, *see McDermott, Inc. v. Lewis,* 531 A.2d 206, 214 (Del.1987), and that "any attempt ... to apply California law to the determination of VantagePoint's voting rights will harm the public interest." Plaintiff's argument misses the mark. Certainly, if the Supreme Court of Delaware were to agree with VantagePoint's contentions, Delaware's interest in governing the internal affairs of its corporations would be drastically altered. The inquiry at this moment, however, is whether the entry of the injunction would harm the public interest, and the answer to that question is no.

---

**End of Document**                                                             © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 4*

2005 WL 6799224
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware,
New Castle County.

FLIGHT OPTIONS INTERNATIONAL,
INC., a Delaware corporation, Plaintiff,
v.
FLIGHT OPTIONS, LLC, a Delaware
limited liability company, Kathryn Gilchrist
Simpson, Louise Francesconi, Charles E.
Franklin, and William Lynn, Defendants.

C.A. No. 1459–N.
|
Submitted: July 7, 2005.
|
Decided: July 11, 2005.

**Attorneys and Law Firms**

Melanie K. Sharp, Esquire, James P. Hughes, Jr.,
Esquire, Seth J. Reidenberg, Esquire of Young Conaway
Stargatt & Taylor, LLP, Wilmington, Delaware, Robert
S. Fischler, Esquire of Ropes & Gray LLP, New York,
New York, and Justin J. Wolosz, Esquire of Ropes &
Gray LLP, Boston, Massachusetts, Attorneys for Plaintiff
Flight Options International, Inc.

Jesse A. Finkelstein, Esquire, Lisa A. Schmidt, Esquire,
Lisa M. Zwally, Esquire, Michael R. Robinson, Esquire,
and Harry Tashjian, IV, Esquire of Richards, Layton
& Finger, Wilmington, Delaware, John F. Cambria,
Esquire, Gregory F, Hauser, Esquire, and Adam J.
Biegel, Esquire of Alston & Bird LLP, New York, New
York, and David E. Brown, Jr., Esquire of Alston &
Bird LLP, Washington, DC, Attorneys for Defendants
Kathryn Gilchrist Simpson, Louise Francesconi, Charles
E. Franklin, and William Lynn.

Kenneth J. Nachbar, Esquire and Megan Ward Cascio,
Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, Attorneys for Defendant Flight Options, LLC.

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor.

**\*1** Plaintiff Flight Options International, Inc. ("FOI")
owns approximately 31% of Defendant Flight Options,
LLC, a Delaware limited liability company (the
"Company"). Raytheon Travel Air Company ("RTA")
owns approximately 69% of the Company. The Company
has serious financial problems: debt obligations are
coming due and it has insufficient funds to meet those
obligations. RTA is prepared to provide $50 million to
the Company, but only as an equity investment.[1] RTA
and the Company have agreed through the Common
Units Purchase Agreement (the "Purchase Agreement"),
dated June 9, 2005, that RTA will issue 5 billion
"Common Units" of common equity in the Company
at $0.01 per unit. FOI has preemptive rights allowing
it to participate on the same terms as RTA, but it has
chosen not to exercise those rights. Recognizing, however,
that consummation of the Purchase Agreement, now
scheduled for as soon as the close of business on July
11, 2005, would dilute its equity interest in the Company
to 1%, it brought this action to enjoin the Company
from implementing the Purchase Agreement pending
arbitration of their substantive disputes. FOI alleges that
the Purchase Agreement violates the Second Amended
and Restated Limited Liability Company Agreement
of Flight Options, LLC (the "LLC Agreement")[2] and
is the product of the failure of the RTA-designated
managers of the Company to discharge their fiduciary
duties in accordance with Delaware law and to meet
their obligations under the LLC Agreement. For the
reasons set forth below, the Court will enjoin the proposed
transaction for a period of 30 days to afford FOI
the opportunity to seek continued interim relief in the
arbitration forum which the parties have chosen for
dispute resolution.

**I. BACKGROUND**

The Company does two things: (1) it is the world's second
largest provider of fractional and aviation membership
services;[3] and (2) it loses money.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

2005 WL 6799224

The current structure of the Company, with RTA and FOI as its two members, traces back to March 2002 when the fractional aviation interests of RTA and its affiliates and of FOI and its affiliates were combined. [4] Since the formation of the Company, Raytheon and its affiliates have supported the Company with more than $300 million in debt and preferred equity investments. In contrast, FOI and its principals have contributed a paltry $2 million. As of June 2003, Raytheon had provided $48 million out of the $50 million contributed by the members of the Company. At that time, the parties entered into the LLC Agreement and the Investment and Restructuring Agreement (the "Restructuring Agreement"). [5] As a result of the restructuring, RTA purchased additional common and preferred units of the Company, increasing its equity stake from 50.1% and gaining the right to appoint a majority of the Company's Board of Managers (the "Board"). [6]

Under the LLC Agreement, the Company is governed by the Board which is supposed to have seven members. Four of its current members, Defendants Kathryn Gilchrist Simpson, Louise Francesconi, Charles E. Franklin, and William Lynn serve as designees of RTA and are employees or officers of Raytheon (the "RTA Managers"). Two other managers, Travis R. Metz and Robert P. Pinkas, were designated by FOL The seventh position, reserved for the Company's chief executive officer, is vacant because there is no permanent chief executive officer.

**\*2** The Company's need for additional cash infusions did not abate with the restructuring. By the end of 2004, Raytheon's separate investments had reached approximately $250 million. The Board members, including Metz and Pinkas, were well aware of the Company's credit problems. For example, the October 5, 2004, Board minutes reflect the following: (1) counsel advised the Board of its duties "in a zone of insolvency context"; (2) the Company's management reported that Raytheon was resisting efforts to extend debt repayment deadlines; and (3) Raytheon was encouraging the Company to seek equity from some other source. [7]

The Board gathered a week later to approve a forbearance agreement that had been negotiated with Raytheon to delay repayment of debt owed by the Company. The minutes of that meeting also describe the fiscal exigencies that the Company was confronting and would be confronting on an ongoing basis. [8] Thus, by the end of 2004, the Board knew that 2005 would present significant debt management questions for its consideration.

The Board met on March 9, 2005. The Company's chief financial officer, Mark Brody, projected the need for additional cash flow of $4–5 million in April and in each of the next several months. Clearly, additional funding would be needed. Pinkas expressed his view that a third-party investment was unlikely until a permanent chief executive officer was installed and the Company's operating performance had improved. Company management was asked to "formulate a plan and process for the Board to consider regarding how the Company could obtain an equity capital infusion in the longer term, and ... outline for the Board how the Company would fund its short-term cash needs on its own." [9] In addition, Raytheon's proposal that the Company issue additional preferred equity units to RTA in connection with a new $20 million loan and certain forbearances by Raytheon was also addressed.

Company management had been assessing options for obtaining funding from other sources. As early as 2004, it had worked with Seabury Group LLC ("Seabury"), an investment banking, restructuring, and management consulting firm engaged in the transportation sector.

> Seabury identified the Company's maintenance and aircraft dispatch availability issues as one source of its financial problems. Seabury learned that the Company had a fleet wide reliability rate of approximately 65 percent, meaning that the Company was able to provide Company-owned aircraft to its subscribers requesting air transportation only approximately 65 percent of the time, often due to maintenance issues. For the remaining approximately 35 percent of requests, the Company had to charter aircraft to serve its customers. The markedly higher cost incurred by the Company for charter aircraft was one of the

reasons that the Company was not profitable. [10]

From its review of the Company's operational and financial circumstances, Seabury drew the following conclusions which it reported to Company management in March 2005:

> **\*3** [U]ntil the Company's fleet wide reliability, and associated maintenance problems, were greatly improved, the Company was highly unlikely to be able to raise capital from external sources and would need to continue to rely on funding from Raytheon .... [and] the Company likely would need to fix its maintenance and reliability issues and show profitability in two consecutive calendar quarters before it would be able to attract any interest from equity investors. [11]

At its April 4, 2005, meeting, the Board was informed of Seabury's gloomy conclusions. The Board approved, unanimously, the Company's borrowing from a Raytheon affiliate of $20 million with a maturity date of May 27, 2005 (the "Overline Loan"). Also approved was a forbearance agreement extending maturity of $17 million indebtedness to a Raytheon affiliate from March 2005 to May 31, 2005.

Company management also presented the Board with the results of an appraisal of the Company's common equity units by Standard and Poor's ("S & P"). The purpose was to support the Company's purchase of 6.5 million common units held by its former chief executive officer for no value. The repurchase of all of the units for the normal consideration of one dollar was supported by the Board, including Metz and Pinkas. [12] The S & P draft report suggested that the Company's fair market value was in the range of negative $150–200 million. The final version of the S & P report [13] was received by the Company in mid-May and it was updated on May 26, 2005. The report, premised primarily upon Company financials and management projections, concluded that shareholder equity, as of December 31, 2004, was a negative $199 million and that it would be at that level

or worse through 2010. Accordingly, S & P assigned only "*de minimis*" value to the Company's equity units. S & P's report reflected: Company losses of $31.6 million in 2003 and $42.1 million in 2004; a projected loss of $50 million in 2005; and a projected profit first occurring in 2008.

In the middle of April 2005, Charles F. Mueller, Raytheon's director of corporate development, contacted Jeffries Quarterdeck ("Jeffries"), a firm providing services relating to mergers and acquisitions, financing, and restructuring for companies in the aerospace and defense industries. After obtaining financial information from the Company and consulting with its chief financial officer, Jeffries was "unwilling to propose any type of financing for the Company because of its financial condition." [14] Indeed, it noted that the Company "lost money for every hour its planes were in the air." [15] Jeffries drew the following conclusions: (1) "[u]ntil the Company addressed the underlying operational causes for its losses, ... there was no possibility of arranging external debt or equity financing for the Company at that time" and (2) any "external financing could be accomplished only at extraordinary interest rates or by essentially giving up equity control of the Company." [16] These conclusions were reported to the Board on May 13, 2005.

**\*4** The Company owed Madison Capital, one of its few third-party lenders, $14 million that was due on May 27, 2005. The debt had been guaranteed by Metz and Pinkas, but they were refusing to extend their guarantees. Accordingly, at the May 13, 2005, Board meeting, in addition to reporting Jeffries' conclusions, Company management informed the Board of the guarantors' decision and the Company's need for (1) $14 million to repay Madison Capital; and (2) $23 million to meet projected cash flow needs for the balance of 2005. On May 10, 2005, RTA had submitted a term sheet for its purchase of new equity. [17] That term sheet, which would form the basis for the Purchase Agreement now challenged by FOI provided: (1) an increase in the Overline Loan from $20 million to $50 million ($14 million of which was to repay the Madison Capital loan); (2) a maturity date for the increased Overline Loan of June 30, 2005; (3) the issuance on June 30, 2005, of $50 million worth of common units of the Company, valued at $0.01 per unit, to RTA and to any other equity holder who chose to exercise preemptive rights in connection with the issuance; and (4) a forbearance by Raytheon until March 2006 of

approximately $18 million of debt that would come due in 2005. The sale price for the equity units of $0.01 per unit was subject to confirmation by an independent appraiser that the fair market value was equal to or less than the specified unit price.

Pinkas opposed the proposed equity financing and indicated that there were third parties interested in investing in the Company. He did not identify those third parties, except for Apollo Management, L.P., a firm that representatives of RTA had already contacted. The Board unanimously approved the additional debt financing proposals and it authorized, although over the opposition of Pinkas and Metz, Company management to negotiate with RTA over the terms of the equity financing and to retain S & P to value the common equity units.

Raytheon had been meeting the cash needs of the Company for more than two years without any assistance from FOI. With the forbearance agreements and increasing indebtedness, it was becoming more deeply involved in its apparent role as lender of last resort. Indeed, the Overline Loan was intended to be of short duration, but it was obvious that the Company would have great difficulty in repaying it when it became due on June 30. Raytheon's position evolved to a willingness to delay repayment of certain debt and to extend additional financing, but all would be conditioned upon the closing of the Purchase Agreement. [18] Thus, as of June 9, 2005, the Company and Raytheon executed the Purchase Agreement and another forbearance and deferral agreement. On July 1, 2005, after the filing of this action, Raytheon also submitted a term sheet offering to provide new financing in the amount of $32.4 million. [19]

After the May 13 Board meeting, when it had become obvious that an RTA equity investment would occur, the Company's outside counsel contacted Metz and Pinkas for assistance in negotiating with RTA for a more favorable price. No response was received. On May 24, 2005, Company management wrote to representatives of RTA and FOI asking that they identify potential investors. RTA made two suggestions the next day. A week later, Pinkas identified three potential investors.

**\*5** In the intervening weeks, representatives of either the Company or Raytheon discussed possible investments in the Company with six different entities. Three, after receiving financial information, either did not respond

or responded with a lack of interest. Three other entities engaged in more substantive discussions with Company management:

1. UIJ Aviation, a Canadian aviation venture, indicated that it valued the Company's equity at zero and that Raytheon would receive only "cents on the dollar" for its debt but that it might require more if it agreed to a deferred payment schedule. In addition, UIJ expressed an interest in receiving special concessions from Raytheon in contracts for aircraft maintenance. Raytheon was unwilling to relinquish its indebtedness rights and would not provide special terms to UIJ for its maintenance work; accordingly, UIJ has indicated that it is not interested in any transaction involving the Company.

2. Apollo Management, L.P. appears to have given serious thought to an investment in the Company. It took the position that the Company's equity was of "no value" and that its debt was worth less than face value. It submitted a written proposal, dated April 12, 2005, that any acquisition of the Company would provide no return for equity holders and only a partial return on debt. It also indicated that it desired to acquire certain other Raytheon assets which were not for sale. In light of that response, no further negotiations occurred.

3. Assets Solutions International, Inc. ("ASI") met with Company management on June 22, 2005. It is continuing to conduct due diligence following an expression of interest in purchasing and acquiring common equity if the Company's debt could be addressed as well. Although ASI's request for an exclusivity period until July 10, 2005, was denied, ASI has continued its due diligence and its discussions with representatives of RTA, FOI, and the Company. [20]

The Company's outside counsel, on May 31, 2005, sought to enhance the terms of the Purchase Agreement, by seeking a higher price per unit, an extension of due dates for other indebtedness, and a post-closing adjustment to the purchase price in the event any higher price was paid by a third party within a twelve month period. Raytheon rejected those efforts, but it did consent to including a "fiduciary out" in the Purchase Agreement. [21] Following execution of the Purchase Agreement, all eligible equity holders, including FOI, were sent a preemptive rights notice. No notice of intent to assert preemptive rights had been submitted by the June 30 deadline.

The Company had a net loss of approximately $34 million through May 2005 and it was expected to lose $8 million in June. As of July 1, the Company had cash reserves of approximately $4 million but owed Raytheon Aircraft Services roughly $7 million for maintenance services. Although the Overline Loan is to be repaid by July 11, 2005, the Company does not have the ability to do so. In addition, another $20 million will be required during the balance of 2005 to satisfy working capital requirements and to pay a $3.8 million facility mortgage note to a third-party lender which becomes due in August 2005. [22]

## II. CONTENTIONS

### A. From FOI's Perspective

 *6  FOI acknowledges that Raytheon and its affiliates control both the equity and the debt of the Company. The Purchase Agreement does not provide for any new funds for the Company. It simply accomplishes a conversion of Raytheon debt to Raytheon equity and whether that happens on July 11, 2005, or sometime later should make little difference to Raytheon. FOI, however, maintains that it makes a big difference to FOI because its equity interest in the Company will be eviscerated for no consideration. The decision that the Company's common equity is worthless is, according to FOI, unfair and unjustified. Because Raytheon controls "both sides" of the transaction, the actions of its representatives must be judged under the "entire fairness" standard. In addition, FOI is contractually entitled to a price set through an "arms' length" transaction. The Purchase Agreement meets neither of these standards. Thus, FOI argues, there is a reasonable probability that it would prevail on its claims before the arbitration panel. In addition, the severe reduction of its equity interest will constitute irreparable harm and a balancing of the equities favors granting it relief because it will suffer palpable harm without interim injunctive relief, but neither the Company nor RTA will suffer any adverse consequences because Raytheon will not capriciously harm an entity into which it has made such a sizeable investment.

### B. From the Defendants' Perspective

The Defendants vigorously contest FOI's claims. Initially, they stress that the Company only exists because of Raytheon's long and substantial commitment to funding

its operations. The Company has a negative balance sheet; it loses money; and its prospects for a turn around in the short term are bleak. Equity value simply is not there. Moreover, FOI could have protected its interests through the exercise of its preemptive rights to acquire additional equity on the same terms as RTA. The Defendants also point out that irreparable harm will not result Raytheon's participation will likely be on a continuing basis and rescission may be an adequate remedy. Alternatively, the diminuition in value can be determined and, thus, damages would also be adequate —all in what Defendants view as the unlikely event that FOI should prevail on the merits of its claims. Finally, because of the unquestioned and immediate need of the Company for additional funding, which Raytheon is now committed to accomplishing in the event the Purchase Agreement is consummated, and the history of FOI's failure to participate in meeting the Company's ongoing cash needs, the equities align against the issuance of a preliminary injunction.

## III. ANALYSIS

### A. The Appropriate Standard

A plaintiff seeking a preliminary injunction bears the burden of demonstrating: (1) a reasonable probability of success on the merits at trial; (2) that it will suffer imminent, irreparable harm if its application is denied; and (3) that the harm to the plaintiff, if relief is denied, outweighs the harm to the defendant if relief is granted. [23] The preliminary injunction, here, is sought in aid of arbitration. That requires an analysis of the likelihood of success prong at two levels: (1) the moving party's entitlement to arbitration; and (2) the merits of its arbitration claims. [24] The parties agree that the dispute among them is to be resolved by arbitration. [25] Moreover, "where the right to arbitrate is clear," as here, "the analysis of the merits of the underlying claims may be more limited." [26] This "more limited" standard has been framed as requiring the party seeking the preliminary injunction only to "establish a reasonable probability that its arbitration position is sound." [27]

### B. Probability of Success on the Merits

 *7  FOI has not yet filed a demand for arbitration. Accordingly, it is something of a challenge to determine

whether a preliminary injunction should issue in aid of an arbitration where the grounds for the arbitration have not been set forth in that forum. The Court's understanding of the claims that FOI intends to present to the arbitrators includes the following: (1) that the $0.01 per unit price at which the Company will issue to RTA new common units is unfair and unwarranted; (2) the Board failed to conduct an adequate "market check" in advance of approving the Purchase Agreement on June 9, 2005; (3) the "fiduciary out" negotiated by the Company's outside counsel is illusory because of its limited scope and short duration. The parties diverge at the outset over whether the conduct of the RTA Managers is to be judged under the "entire fairness" standard or whether their obligation is to satisfy an "arms length" standard set forth in the LLC Agreement.[28]

By 6 *Del C.* § 18–1101(c), Delaware's Limited Liability Company Act (the "Act") provides:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

Thus, it is necessary to turn to the LLC Agreement. By Section 6.5(b), the LLC Agreement imposes the following standard: "Each Manager shall have the same fiduciary duties in managing the affairs of the Company as the directors of a Delaware corporation have, under applicable law, to its shareholders and others, as applicable."[29] On the other hand, by Section 6.2(1), the LLC Agreement establishes the following standard to govern transactions between the Company and any affiliate of the Company:

> Unless otherwise approved by a majority of disinterested Managers, all transactions between the Company on the one hand, and any Affiliate of the Company on the other hand, will be on arms' length terms and conditions, including fair market values and prices equivalent to those that would be charged and paid between parties at arms' length at the time of the entering into of the transactions in question.

The parties who are bound by the LLC Agreement are sophisticated parties, and it is the Court's burden to discern the intention of the parties in defining, through the LLC Agreement, the obligations of RTA and the RTA Managers to the Company and to other stakeholders .[30] When the LLC Agreement was negotiated, it was obvious that a majority of the Board would be comprised of RTA designees. Thus, in any transaction between the Company and Raytheon, or one of its affiliates, the RTA Managers would find themselves in a position of inherent conflict where their loyalty would always be fairly subject to question. It is with this in mind that the LLC Agreement must be construed, "It is, of course, a maxim of contract interpretation that more specific contractual terms will trump those that are more general."[31] Section 6.2(1) specifically is targeted at transactions between the Company and its affiliates, and it is more specific with respect to assessing the conduct of the RTA managers in a related party transaction than would be the more general fiduciary duty provision of Section 6.5(b). In short, the LLC Agreement imposes general fiduciary duties upon the managers but, in the context of a transaction between the Company and its affiliates, those duties are limited to requiring that the transaction be on "arms' length terms and conditions"[32] and, in accordance with § 18–1110(c) of the Act, carried out in good faith and through fair dealing.[33]

**\*8** In accordance with the LLC Agreement, the RTA Managers must justify their approval of the interested party transaction as one on "arms' length terms and conditions."[34] FOI does not question the terms and conditions of the Purchase Agreement other than the price and, perhaps, the provisions of the "fiduciary out" clause. Through Metz's affidavit, FOI sets up its claim relating to the price of the common units and S & P's supporting valuation .[35] Metz., who does not claim to be an independent valuation professional in this matter,[36]

expresses the view that each common unit is worth $1.44. [37]

FOI also argues that the process adopted by the RTA Managers was so flawed as to cast doubt upon the value established through that process for the new common units. First, it points out that the Company never retained an investment adviser and it did not receive a formal opinion from either Seabury or Jeffries. Second, FOI contends, quite plausibly, that the Company has favorable future prospects. [38] The impact of potential future prosperity on current value was not, according to FOI, given appropriate weight. Third, Apollo Management's position reflected the first response to a solicitation that was then cut off by the Raytheon interests. As such, it was only the opening salvo in a negotiation that never went further. Accordingly, it is an unreliable reference.

Thus, it is against this backdrop that the Court must determine whether FOI has "establish[ed] a reasonable probability that its arbitration position is sound." [39] That question is not whether the Court, in the absence of an agreement by the parties to submit the merits of their dispute to an arbitration panel, would enjoin the issuance of new common units to RTA. Instead, it requires an assessment, however imprecise, as to how FOI's claims would likely be received in the arbitration forum. It is not simply a question of whether the claims to be submitted to the arbitrators are colorable; nor does it require certainty that a favorable result will be obtained. Instead, FOI must persuade the Court that the arbitration panel could find in its favor and that there is a reasonable possibility of such a result. It is important for the Court not to impress its views of this matter on the venue chosen by the parties for the resolution of their dispute. Thus, the Court must be careful in predicting the outcome in the arbitration forum. Ultimately, it is a question of whether FOI has come forward with a showing that its claim is sufficient to accommodate these considerations.

The evidence that the price of the new Common Units is a fair reflection of what would have been reached in an arms' length transaction consists of: (1) the S & P valuation; (2) the "opinions" from Seabury and Jeffries; and (3) a limited marketing or "market check" effort. Each has its shortcomings. The S & P valuation is not unreasonable, but it relies exclusively on the discounted cash flow method. While the discounted cash

flow approach may have been the single best tool, other methodologies were not employed as a check. [40] In addition, the Company's relatively short history and the difficulty of projecting its cash flows into the future all counsel for caution. Moreover, S & P did not explore in depth the nature of the industry and its prospects. With respect to Seabury and Jeffries, the intensity of their efforts cannot be discerned from the affidavits presenting their conclusions. [41] In addition, Jeffries' involvement was solicited by Raytheon's director of corporate development, *i.e.,* not by anyone directly associated with the Company. Neither Jeffries nor Seabury offered a formal opinion. Again, while ultimately none of this may matter, there is room for doubt. The effort to obtain proposals—an effort to secure an accurate read of market perception—was done in a haphazard manner. The results may accurately reflect the market, but the lack of coordination and process, again, tends to undermine the results. Finally, the "fiduciary out" provision which requires a "definitive written offer" and the delivery of $50 million within approximately one month of approval of the Purchase Agreement, does not support the reliability of the established price because the short period offers only limited opportunity for any potential investor to pursue necessary due diligence and to arrange for the required funding.

**\*9** The question, of course, is not how the Court views the valuation information as a whole; it is how the arbitrators would view it. The Court is satisfied, however, that there is a likelihood that the arbitrators would find FOI's challenge to be sound: that they would conclude that the fate of a company with revenues in excess of $600 million annually and the fate of an almost one-third interest in the Company should not be based on a price established by such a process. Raytheon controlled the setting of the price; while it may eventually be sufficient for it to argue that the balance sheet and the cash demands demonstrate an absence of value in the equity, the process chosen was so informal as to undermine substantially the ability of the RTA Managers to show that the price is the equivalent of an arms' length transaction's result, at least within the projected views of an arbitration panel. [42] Accordingly, under the in aid of arbitration standard, FOI has met its merits-based burden.

### C. *Irreparable Harm*

2005 WL 6799224

Without irreparable harm, there is no need for the Court to grant interim relief and the parties can fairly wait until final decision on the merits. Winning sooner, instead of later, is, of course, preferable. When a court enters a preliminary injunction, it does so frequently without a full understanding of the facts and without the parties' having had the opportunity to develop fully their advocacy positions. Thus, courts must be careful in awarding such relief; indeed, it is said that a "preliminary injunction is an extraordinary remedy," [43] and it is crucial for the successful plaintiff to demonstrate that it will suffer irreparable harm in the absence of judicial intervention.

FOI starts with the argument that it need not make a showing of irreparable harm. It relies upon Section 21.13 of the LLC Agreement, which provides in pertinent part:

> **Specific Performance.** The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party ... from a failure of a party to perform any of the obligations under this Agreement. Therefore, if any party ... enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party ... has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

While this language perhaps could be read as requiring the court to be more flexible in assessing whether FOI has made the necessary showing, it is not dispositive. [44] First, it only addresses the question of an adequate remedy at law—a necessary predicate to the exercise of equitable jurisdiction without regard to whether the plaintiff seeks interim or permanent equitable relief It does not specifically address the more precise aspect of irreparable harm. In short, there are instances where there may not be an adequate remedy at law but there, at the same time, may not be the potential for irreparable harm. Second, the parties may not confer equitable subject matter jurisdiction upon this Court by agreement. [45] Thus, further consideration is required.

**\*10** Consummation of the Purchase Agreement will dilute FOI's equity interest in the Company from 31% to 1%. A severe dilution has been found to constitute irreparable harm because, at least in part, of the difficulties in restoring the injured party to its proper status through a grant of final relief. [46] However, there is no general rule that applies to all circumstances. Instead, a case-by-case analysis, considering the various potential consequences of the dilutive conduct is necessary. [47]

The Defendants have cogent arguments as to why a finding of irreparable harm may not be appropriate. First, the benefits of dilution will accrue to Raytheon; Raytheon will likely, but with no guarantee, continue holding that equity; under the LLC Agreement, Raytheon will be required to give notice to FOI of any proposed transfer of its equity interest; and, thus, the arbitration panel would likely be confronted with a factual setting in which, if applicable, rescission could be accomplished. Second, the value of FOI's interest in the Company before and after the issuance of the new equity can be determined —even if imprecisely—and, thus, damages could be fairly measured. If damages are available, the Defendants point out, the harm cannot be said to be irreparable. Finally, the dilution of FOI's equity interest will not impair its right to designate two members of the Board. As the Defendants argue, but with little comfort for FOI, FOI's role in corporate governance through the Board will not be diminished.

In response, FOI notes that the LLC Agreement exculpates the RTA Managers from personal liability for money damages to the extent that "their act[s] or omission[s] [were] taken or omitted in good faith and in a manner that the Covered Person [Manager] reasonably believed to be in or not opposed to the best interests of the Company or permitted by the [LLC Agreement]." [48] On the other hand, the exculpatory provision does not extend to RTA. Nevertheless, FOI's ability to collect damages from the RTA Managers, in the event that it should prevail on the merits of its claims, is, at best, problematic.

Although rescission may be more likely in this matter to be a viable remedy than it frequently is, there remain a number of substantial impediments. These range from the possibility, even if not the likelihood, that Raytheon will sell its interests in the Company to the likelihood that further changes will be made in the Company's capital structure thereby making rescission less facile. Moreover, the process of calculating the diminishment in value (of course, assuming that there would be any) may be a daunting task.

In sum, reducing FOI's equity interest in the Company from 31% to 1% may fairly be characterized as irreparable harm.

### D. *Balancing of the Equities*

If the Purchase Agreement is implemented, FOI's significant equity position will be reduced to approximately 1% of the Company and, if that is done improperly, restoring to FOI its former position or fairly compensating it for its loss will be problematic. As for the Company, this is not a dispute where some third-party investor or creditor may do substantial harm to it in the absence of the proposed transaction. Raytheon, of course, will act as it chooses as creditor. If it chooses to force the issue, it can cause the parade of horribles posited by the Company—loss of jobs, closing of facilities, defaults on contracts. That harm, however, will be caused to an entity in which Raytheon holds approximately 69% of the equity. In short, in balancing the equities between the Company and FOI, the balance tips slightly in favor of FOI. The interests of the RTA Managers, as such, would not be adversely affected by the entry of a preliminary injunction.

### E. *Propriety of a Preliminary Injunction*

**\*11** FOI has succeeded, although by the barest of margins, under the relaxed standard associated with preliminary injunctions in aid of arbitration in demonstrating a likelihood of success, the occurrence of irreparable harm in the absence of interim relief, and a favorable balancing of the equities. [49] Thus, a preliminary injunction, as described below, will issue to maintain the status quo pending commencement of the arbitration proceeding between the parties and the arbitration forum's opportunity to review the need for continuing interim relief.

### IV. CONCLUSION

The Company's future depends upon what Raytheon plans to do with, or to, it. This Court's actions in the context of a motion for a preliminary injunction in aid of arbitration are likely to be of little, if any, long-term consequence for the Company. Raytheon controls the Company's Board of Managers, it controls the

Company's equity, and its credit position is overwhelming. Although obviously dependent upon the course chosen by Raytheon, FOI's interest in the Company is likely limited in terms of both value and duration. The parties agree that their disputes should be resolved through arbitration; without a preliminary injunction, the ability of the arbitrators to protect the interests of FOI, as limited as they may be as a practical matter, would be impaired. In light of the relaxed standard for a preliminary injunction in aid of arbitration, it is appropriate for the Court to exercise its discretion to maintain the status quo.

FOI's application for interim injunctive relief is not without its unappealing aspects. It negotiated the Restructuring Agreement and the LLC Agreement which diluted its interest without securing any future protection from dilution except through the preemptive rights provision. It now has elected not to exercise those rights. Since the formation of the Company, as now constituted, FOI and its affiliates have contributed a pittance to slake the Company's thirst for cash, but it willingly allowed Raytheon to fund, and to fund, and to fund those needs. The arbitrators may well finally conclude that FOI is not entitled to relief. Moreover, they may conclude that FOI is not entitled to relief pending their final resolution of the parties' dispute. The LLC Agreement specifically authorized the pursuit of interim relief in the arbitration forum under the American Arbitration Association's Optional Rules for Emergency Measures of Protection. [50] That established the proper process for determining whether the status quo should be maintained for the duration of the arbitration proceeding and its respects the parties' agreement to submit this dispute to arbitration.

Accordingly, the Court will issue a preliminary injunction prohibiting consummation of the Purchase Agreement. That injunction, however, will expire, in the absence of further order, in thirty days. During this period, FOI may take its claims to the arbitration forum and seek interim relief there.

**\*12** An order will be entered to implement this Memorandum Opinion.

### All Citations

Not Reported in A.2d, 2005 WL 6799224

---

2005 WL 6799224

Footnotes

1      Since commencement of this action, RTA has formally offered to lend the Company another $32.4 million, but only if its proposed equity investment transaction closes.

2      Verified Compl. Ex. C.

3      With headquarters in Cleveland, Ohio, the Company has approximately 1,300 employees and 209 aircrafts and, in 2004, had revenues of $625 million.

4      RTA is a wholly owned subsidiary of Raytheon Aircraft Holdings, Inc, which, in turn, is a wholly owned subsidiary of Raytheon Company ("Raytheon")For convenience, reference to "Raytheon" may include its subsidiaries.

5      Cambria Aff., Ex. A.

6      Before the restructuring, FOI had held approximately 49.9% of the equity interest in the Company. Also, before the restructuring, RTA and FOX had appointed an equal number of managers to the Board.

7      Cambria Aff., Ex. C.

8      Cambria Aff., Ex. D.

9      The minutes of the March 9, 2005, Board meeting appear at Cambria Aff., Ex. F.

10     Clauss Decl. at ¶ 13.

11     *Id.* at ¶ 14. The Defendants point to a "report" prepared by Seabury. *Id.,* Ex. A. While more in the nature of a presentation demonstrative, it does recite, at 4, that "[i]t is likely, in Seabury's opinion, that current equity shareholders will be wiped out, and that creditors will receive pennies on the dollar under all possible [restructuring] scenarios."

12     Metz distances himself from the implications of this vote by noting that the chief executive officer had been terminated under circumstances that left him with little, if any, bargaining room. Metz Reply Aff. at ¶¶ 13–20. That, however, does not explain a similar stance with respect to the repurchase a month later of 75,000 common units for no value from an employee who departed the Company, but without any cloud.

13     Verified Compl., Ex. B.

14     Richter Decl. at ¶ 6.

15     *Id.*

16     *Id.* at ¶¶ 7–8. Neither Jeffries nor S & P would provide any formal opinion to the Company regarding either the fair value of the common units or of the Purchase Agreement.

17     Cambria Aff., Ex. I.

18     The sale of the 5 billion common units to RTA would provide the Company with no new cash. Instead, it would accomplish a conversion of debt to equity.

19     Mueller Decl., Ex. B.

20     It is now apparent that ASI will not present a material offer before the close of business on July 11, 2005.

21     The "fiduciary out" feature is limited in scope and requires a "definitive written agreement" for a Superior Investment Proposal and a $50 million cash (or equivalent) payment by July 10, 2005. Purchase Agreement, Section 9.2. To be a Superior Investment Proposal, it must, *inter alia,* "as a whole, present[ ] a more favorable opportunity for Flight Options that the transactions contemplated by [the Purchase Agreement]." Purchase Agreement, Section 1.1.

22     With respect to the additional financing proposed by the July 1, 2005, term sheet in the amount of $32.4 million, $12.5 million has already been used to pay off a third party creditor which was threatening litigation. In the absence of third-party funding or further funding by Raytheon, the Company will not be able to need its financial obligations or to continue operations. Because there is no reasonable expectation that a third-party lender or investor will appear by July 11, 2005, the Company's fate, and that of whatever interest FOI may have, rests with Raytheon and how it will, in fact, exercise its powers as the Company's, while not exclusive, most significant creditor.

23     *See, e.g., SI Management, L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995).

24     *Kansas City S. v. Grupo TMM, S.A.,* 2003 WL 22659332, at *2 (Del. Ch. Nov. 4, 2003).

25     The LLC Agreement requires arbitration of "any dispute, controversy or claim" between a member and another member, or between a member and the Company. Section 18.2. In addition, the arbitration provisions include any dispute, controversy or claim between a member and an affiliate of a member. Affiliate is defined to include the managers of the Company, in this instance, the RTA Managers. App. at B–2.

26     *Kansas City S.,* 2003 WL 22659332, at *2 (quoting *Price Org., Inc. v. Univ. Computers Servs., Inc.,* 1992 WL 356026, at *8 (Del., Ch. Dec. 2, 1992)). *But see Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,* 2004 U.S. Dist LEXIS 1427, at

*12 (S.D.N.Y. Feb. 3, 2004) (rejecting a more relaxed standard of review for a "status quo" injunction pending further proceedings in arbitration).

27   *Id.* In *Kansas City Southern,* the Court did not resolve the question "as to how much the Court should limit its inquiry." *Id.* at n.10.

28   The Defendants concede that the RTA Managers "stand on both sides" of the Purchase Agreement. If they are subject to the full panoply of fiduciary duties in this case, the appropriate standard for review of their conduct would be "entire fairness;" that is, they would be required to demonstrate that the Purchase Agreement was entirely fair as to price and process.

29   Pursuant to Section 6–6 of the LLC Agreement, "[e]ach Member shall have the same fiduciary duties to each other Member as the shareholders of a Delaware corporation have, under applicable law, to each other."

30   *See Kier Constr., Ltd. v. Raytheon Co.,* 2005 WL 628498, at *5 (Del. Ch. Mar. 10.2005).

31   *Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 173 n.44 (Del. Ch.2003).

32   The notion of arms' length terms and conditions conjures up an image of real negotiations—the process of give and take. It is doubtful that any such activity occurred between the Company and Raytheon to any significant extent. The terms and conditions of the Purchase Agreement were largely set by Raytheon. The capacity of Company management to negotiate effectively with Raytheon may be questioned because the Company apparently is in the zone of insolvency and Raytheon controls the equity and is the principal creditor. Of course, as the result of negotiations, a limited "fiduciary out" clause was added. As a practical matter, the inquiry must be one of whether the price fairly reflects what would have been the outcome of an arms' length negotiation. The reliability of a determination of price cannot be fairly assessed, at least in this context, without consideration of the process.

33   At issue here is the scope of the fiduciary duties owed by the RTA Managers to the Company. The definition of "Affiliate" appears in Appendix E of the LLC Agreement, It means, "with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; ..." Because RTA controls the Company, whether through its ability to designate a majority of the board of managers or by its effective equity control, RTA is an "affiliate" of the Company.

> It should be noted that the arbitrators might take a different view. The LLC Agreement broadly imposed fiduciary duties on the RTA Managers. A limitation on those important duties should have been, it could be determined, more precisely delineated and, if resort to a contract construction principle of the specific provision controlling the general provision is needed, then Section 6.2(1) was not adequate to achieve the results sought by the Defendants.

34   The burden of demonstrating that the Purchase Agreement is based on an arms' length price is properly imposed upon the RTA Managers because that is the standard prescribed in the LLC Agreement for them to justify their conduct, instead of the more onerous "entire fairness" standard, a burden which, if applicable, clearly would be theirs.

35   Metz notes that S & P used only a discounted cash flow analysis, eschewing other potential methodologies to determine value.

36   Metz does have experience in valuing businesses as part of his duties as a managing director of a private equity investment firm that manages more than $1.5 billion. FOI did not submit an independent cash flow analysis. The reasons for that tactical choice are not clear although one is tempted to wonder about the conclusions that might have been drawn.

37   Metz Aff. at ¶ 12. A detailed review of Metz's attack on the S & P discounted cash flow analysis, Metz Aff. at ¶¶ 5–12, would serve little purpose in the context of a preliminary injunction motion. It is sufficient to note that his concerns are fairly addressed in the Deetz Decl. at ¶ 7–10.

> If the common units are worth $1.44 each, one wonders why the preemptive rights were not exercised. FOI chose not to do so (perhaps because it did not have the resources), but that does not explain why FOI could not have induced others to participate (or assist it in participating) if, in fact, the units were worth 144 times the purchase price. While there is no duty to exercise preemptive rights, these sophisticated parties included no dilution protection feature in the LLC Agreement, except for the preemptive rights provision that allows each member to amass equity units on the same basis as the other member.

> FOI also attacks the independence of S & P because Raytheon is an "S & P client." Verified Compl. at ¶ 33. FOI offers nothing more and what it has alleged has no suggestion of materiality and, thus, fails to cast any doubt on S & P's independence. *See, e.g., NBC Universal Inc. v. Paxson Communications Corp.,* 2005 WL 1038997, at *7–3 (Del. Ch. Apr. 29, 2005).

38   That, of course, is premised on an assumption that the Company survives until the "future" arrives. To be sure, the Company does have serious difficulties that extend beyond its current liquidity crisis. For example, the Company's churn

Case 1:18-cv-00349-TWP-TAB   Document 1-2   Filed 02/06/18   Page 111 of 212 PageID #: 120
Flight Options From, Inc. v. Flight Options, LLC, Not Reported in A.2d (2005)

2005 WL 6799224

rate (a function of customers lost measured against customers gained) is above the industry average. *See* Deetz Decl. at ¶ 11(iv).

39  *Kansas City S.,* 2003 WL 22659332, at *2.

40  S & P acknowledges the usefulness of other methodologies—the Guideline Company Method and the Comparable Company Method. It states that the necessary information to employ other methodologies was not available, but it is not clear why that is the case. Verified Compl., Ex. B, at ¶ 6.3.

41  Because of the compressed schedule for considering the preliminary injunction application, admittedly due largely to FOI's delay in filing this action, no depositions were taken.

42  Although the Act provides that drafters of limited liability company agreements may relieve managers of some of the burdens of fiduciary duties, the duty of good faith must remain. FOI alleges that the RTA Managers failed to meet their duty of good faith. The Court is satisfied, at least on the present record, that FOI has not demonstrated any basis for finding a breach of the duty of good faith, even under the in aid of arbitration standard. There is no reason to doubt that the RTA Managers reasonably and in good faith believed that the Common Units were of no (or *de minimis* ) value and that the proposed financing was in the Company's best interest. The balance sheet is negative, cash needs cannot be met, and the debt is substantial. In addition, they had the benefit of the S & P valuation. Their views may be wrong (or they may be right), but for these purposes, their conduct cannot be viewed as resulting from a lack of good faith.

43  *Lawson v. Meconi,* 2005 WL 1323123, at *2 (Del. Ch. May 27, 2005).

44  The Defendants argue that Section 21.13 can have no application here because it bears the heading "Specific Performance" and this is not an action for specific performance. They are right: Section 21.13 of the LLC Agreement bears the heading "Specific Performance" and this is not an action for specific performance; however, by Section 21.7 of the LLC Agreement, "Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof." The text of Section 21.13 cannot be fairly read as limited to specific performance actions only.

45  As to the capacity of contracting parties under circumstances, not present here, to confer subject matter jurisdiction by contract, see 10 *Del. C.* § 346.

46  *See, e.g., Suchodolski Assocs. v. Cardell Fin. Corp.,* 2004 U.S. Dist LEXIS 1427 (S.D.N.Y. Feb. 3, 2004). The parties all cite *Solar Cells, Inc. v. True N. Partners, LLC,* 2002 WL 749163 (Del. Ch. Apr. 25, 2002), which, while instructive, involves a more "injunction-friendly" set of facts. More than equity dilution (*e .g.,* dilution of role in corporate governance) was at stake there. Also, the challenged dilution was accomplished in what the Court considered an underhanded manner. Here, Metz and Pinkas were aware of the substance of the Purchase Agreement well in advance of the June 9 meeting and, for another month, have had, although on a limited basis, the opportunity to pursue other options. There is one aspect about *Solar Cells* which may be viewed as putting FOI's claims in a better light. The fiscal difficulties experienced in *Solar Cells* resulted from claims of third-party creditors; here, the creditor of consequence—Raytheon—is also the party which is acquiring the enhanced equity position as the result of dilution of FOI's interest.

47  *See Rovner v. Health–Chem Corp.,* 1996 WL 377027, at *13 (Del. Ch. July 3, 1996) (considering the impact of voting power dilution).

48  LLC Agreement, Section 7.3(a).

49  The Defendants argue that equitable relief should be denied to FOI because of its delay in pursuing this action. It took from June 9, 2005, when the Purchase Agreement was applied (and those terms had been known for perhaps as long as a month before then) until June 27, 2005, to file this action. The defense of laches "operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment." *Scureman v. Judge,* 626 A.2d 5, 13 (Del. Ch.1992). It appears that efforts to avoid litigation were pursued during the interim; it appears that the Defendants did not change their position during the interim; under the circumstances, it is difficult to say that the delay was unreasonable. Thus, laches is not available as a defense to FOI's motion for a preliminary injunction.

50  LLC Agreement, Section 18.2(a).

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 5*

🚩 KeyCite Yellow Flag - Negative Treatment
Called into Doubt by Gagliardi v. TriFoods Intern., Inc., Del.Ch., July 19, 1996

316 A.2d 599
Court of Chancery of Delaware, New Castle County.

Louis S. GIMBEL, III, Plaintiff,

v.

The SIGNAL COMPANIES, INC., et al., Defendants.

Jan. 10, 1974.

**Synopsis**
Proceeding on minority stockholder's suit to enjoin sale by corporation of stock in wholly owned subsidiary. The Chancery Court, New Castle County, Quillen, Chancellor, held that in view of discrepancy in testimony as to value and speed with which board of directors acted in approving sale, court would grant preliminary injunction conditioned on posting of substantial bond.

Order accordingly.

Affirmed, Del., 316 A.2d 619.

West Headnotes (13)

**[1]** **Injunction**
👉 Discretionary Nature of Remedy

An application for preliminary injunction is addressed to sound discretion of court, to be guided according to circumstances of particular case.

7 Cases that cite this headnote

**[2]** **Injunction**
👉 Preservation of status quo
**Injunction**
👉 Extraordinary or unusual nature of remedy

Preliminary injunction constitutes extraordinary relief generally employed to do no more than preserve status quo pending

decision of cause at final hearing on proofs taken.

30 Cases that cite this headnote

**[3]** **Injunction**
👉 Likelihood of success on merits
**Injunction**
👉 Irreparable injury

In exercising its discretion to grant preliminary injunction court must determine whether applicant has shown reasonable probability of ultimate success and that applicant will suffer irreparable injury if court fails to issue preliminary injunction.

108 Cases that cite this headnote

**[4]** **Injunction**
👉 Balancing or weighing hardship or injury

In determining whether applicant for preliminary injunction will suffer irreparable injury if preliminary injunction is denied, court must also consider potential hardship to parties enjoined.

15 Cases that cite this headnote

**[5]** **Corporations and Business Organizations**
👉 Management of Corporate Affairs in General

Not every management transaction of normal routine requires shareholder approval. 8 Del.C. §§ 141(a), 271(a).

2 Cases that cite this headnote

**[6]** **Corporations and Business Organizations**
👉 Purchase and sale of property

If sale involves corporate assets which are quantitatively vital to operation of corporation and substantially affects existence and purpose of corporation, sale is beyond power of board of directors. 8 Del.C. §§ 141(a), 271(a).

12 Cases that cite this headnote

**[7]** **Corporations and Business Organizations**
👈 Duties to, rights and remedies of, and actions by, dissenting shareholders

Record on minority stockholder's application for preliminary injunction to enjoin sale of corporate stock of wholly owned subsidiary failed to establish that sale constituted a sale of all or substantially all of corporation's assets so as to require stockholder approval of sale. 8 Del.C. §§ 141(a), 271.

9 Cases that cite this headnote

**[8]** **Corporations and Business Organizations**
👈 Evidence

In determining whether sale of stock in wholly owned subsidiary was for inadequate price, court must start with presumption that board of directors acted in good faith in approving sale.

12 Cases that cite this headnote

**[9]** **Corporations and Business Organizations**
👈 Business judgment rule in general

Business judgment rule does not irrevocably shield decisions of corporate directors from challenge.

11 Cases that cite this headnote

**[10]** **Corporations and Business Organizations**
👈 Receiver

Record in support of minority stockholder's application for preliminary injunction against sale of stock of wholly owned subsidiary failed to establish any self-dealing on part of board of directors which approved sale.

6 Cases that cite this headnote

**[11]** **Corporations and Business Organizations**
👈 Purchase and sale of property

Actual fraud is not necessary to challenge sale of corporate assets.

Cases that cite this headnote

**[12]** **Corporations and Business Organizations**
👈 Duties of directors and officers in general; business judgment rule

Board of directors is not required to seek competitive bids before making sale of corporate assets.

Cases that cite this headnote

**[13]** **Corporations and Business Organizations**
👈 Receiver

In light of conflict in evidence as to value of assets of wholly owned subsidiary which was subject matter of suit, and in view of speed with which board of directors acted in approving sale, court would grant minority stockholder's application for preliminary injunction conditioned on posting of substantial bond. Court of Chancery Rules, rule 65(c), Del.C.Ann.

33 Cases that cite this headnote

**\*601** Opinion on plaintiff's application for preliminary injunction; granted; amount of security fixed.

**Attorneys and Law Firms**

Rodney M. Layton, and Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, Denis G. McInerney, F. Arnold Daum, W. Leslie Duffy, William T. Lifland, and Allen S. Joslyn, of Cahill, Gordon & Reindel, New York City, for plaintiff.

Richard F. Corroon, Robert K. Payson, and Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, Alan N. Halkett, of Latham and Watkins, and Brewster L. Arms, Los Angeles, Cal., for defendant Signal Companies, Inc. and Signal Oil and Gas Co.

S. Samuel Arsht, of Morris, Nichols, Arsht & Tunnell, Wilmington, William J. Manning, and Charles D. Edelman, of Simpson, Thacher & Bartlett, New York City, for defendant Burmah Oil Inc.

**Opinion**

QUILLEN, Chancellor:

This action was commenced on December 24, 1973 by plaintiff, a stockholder of the Signal Companies, Inc. ('Signal'). The complaint seeks, among other things, injunctive relief to prevent the consummation of the pending sale by Signal to Burmah Oil Incorporated ('Burmah') of all of the outstanding capital stock of Signal Oil and Gas Company ('Signal Oil'), a wholly-owned subsidiary of Signal. The effective sale price exceeds 480 million dollars.[1] The sale was approved at a special meeting of the Board of Directors of Signal held on December 21, 1973.

The agreement provides that the transaction will be consummated on January 15, 1974 or upon the obtaining of the necessary governmental consents, whichever occurs later, but, in no event, after February 15, 1974 unless mutually agreed. The consents evidently have been obtained. On Monday, December 24, 1973, on the occasion of the plaintiff's application for a temporary restraining order, counsel for Signal and Signal Oil reported to this Court that the parties would not consummate this transaction prior to this Court's decision on the plaintiff's application for a preliminary injunction or January 15, 1974, whichever should occur first.

In light of that representation, no temporary restraining order was entered and the matter was set down for a hearing on plaintiff's application for a preliminary injunction. Affidavits and depositions were submitted. The matter was briefed and a hearing was held on January 4, 1974. By agreement, additional affidavits were filed on January 7th and January 9th. This is the Court's decision on plaintiff's application for a preliminary injunction to prevent the sale of Signal Oil to Burmah pending trial on the merits of plaintiff's contentions. It should be noted that the only parties who have appeared thus far are the plaintiff, Signal, Signal Oil and Burmah. It should also be noted that the plaintiff is part of an investment group which has some 2,400,000 shares representing 12% Of the outstanding stock of Signal.

While the amount of money involved in this litigation is enormous and the values involved hotly disputed, the issues are basically simple to isolate and the Delaware law to be applied is, for the most part, well established and not open to question. I regret that time has not permitted

needed editing and that this opinion is therefore longer than desirable. In applying the law to the transaction in question, the Court believes it is first desirable to review the standards for a preliminary injunction.

**[1] [2]** An application for a preliminary injunction 'is addressed to the sound discretion of the court, to be guided according **\*602** to the circumstances of the particular case.' High on Injunctions, (4th Ed.) Vol. 1, Sec. 11; Nebeker v. Berg, 13 Del.Ch. 6, 9, 115 A. 310, 311 (Ch.1921). Furthermore, the preliminary injunction constitutes extraordinary relief generally employed 'to do no more than preserve the status quo pending the decision of the cause at the final hearing on proofs taken.' Williamson v. McMonagle, 9 Del.Ch. 380, 386, 83 A. 139, 140 (Ch.1912); High on Injunctions, Supra, at Sec. 5a.

**[3]** In exercising its discretion, the Court must ask itself two familiar questions, which have long constituted the backdrop for evaluating the merits of any plaintiff's plea for a preliminary injunction.

Stated briefly, the first question is: 'Has the plaintiff satisfied the Court that there is a reasonable probability of his ultimate success on final hearing?' Chancellor Josiah O. Wolcott, in an early case involving the sale of corporate assets, discussed the movant's burden with regard to this question:

> 'It is well settled that a preliminary injunction will not issue unless the complainant satisfies the court that there is at least a reasonable probability of ultimate success upon a final hearing. This rule has been announced not only in cases where the improbability of ultimate success is because of a question of law (citations omitted), but as well where it appears from an examination of evidence upon a disputed question of fact (citations omitted).'

Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 117, 122, 123, 122 A. 142, 158 (Ch.1923). See also David J. Greene & Co. v. Schenley Industries, Inc., Del.Ch., 281 A.2d 30 (1971); High on Injunctions, Supra, at Sec. 8.

The second question can be stated as follows: 'Has the plaintiff satisfied the Court that he will suffer irreparable injury if the Court fails to issue the requested preliminary injunction?'

In his treatise on injunctions, James L. High spoke of this concern of equity:

'Substantial and positive injury must always be made no appear to the satisfaction of a court of equity before it will grant an injunction (at Sec. 9) . . . An injunction, being the 'strong arm of equity' should never be granted except in a clear case of irreparable injury, and with full conviction on the part of the court of its urgent necessity.' (at Sec. 22).

See also, Bayard v. Martin, 34 Del.Ch. 184, 193, 101 A.2d 329, 334 (Supr.Ct.1953), cert. den. 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1954). Consolidated Fisheries Co. v. Consolidated Solubles Co., 34 Del.Ch. 24, 99 A.2d 253 (Supr.Ct.1953).

[4] Moreover, this second question of irreparable injury to the plaintiff should injunctive relief be denied has a corollary which requires the Court to consider potential hardship to the defendant. In this regard, Judge Rodney once wrote:

'In the exercise of a sound judicial discretion in the award or denial of a preliminary injunction, the court should balance the conveniences of the parties and the possible injuries to them according as they may be affected by the granting or the withholding of the injunction. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834.'

Aldridge v. Franco Wyoming Oil Co., 9 F.R.D. 278, 279 (D.Del.1949). See also Pauley Petroleum, Inc. v. Continental Oil Co., 43 Del.Ch. 366, 231 A.2d 450 (Ch.1967), aff'd 43 Del.Ch. 516, 239 A.2d 629 (Supr.Ct.1968); High on Injunctions, Supra, at Sec. 13.

And, it is the plaintiff's duty to 'tip' that balance:

'While the relative convenience and inconvenience of the parties will prompt courts to consider questions of harm in exercising the discretionary

power of injunction, yet a probable case must asways be made out in support of the moving side before the writ will issue.'

**\*603** Allied Chemical & Dye Corp. v. Steel & Tube Co., Supra, 14 Del.Ch. at 122, 122 A. at 158. See also, Gerity v. Cable Funding, 372 F.Supp. 679 (D.Del.1973).

Justice Tunnell, in his frequently cited opinion in Bayard v. Martin, Supra, capsulized the task this Court faces in this case:

'In acting upon applications for preliminary injunctions, a court of equity is bound to 'balance the conveniences' of the respective parties . . . (citations omitted). The probability of ultimate success, being of obvious practical importance, is one of the elements which must always be weighed in the balance, along with the probability of any harm, to be suffered by one party or the other on account of giving the requested temporary relief, or withholding it, as the case may be.'

34 Del.Ch. at 190, 101 A.2d at 333.

Citing Judge Caleb Wright's decision in American Smelting and Refining Co. v. Pennzoil United, Inc., 295 F.Supp. 149 (D.Del.1969), the plaintiff has contended that, at this stage in the proceedings, 'where the likelihood of irreparable harm is (as) great as it is herein, . . . a finding of probability of success is not essential' to justify a preliminary injunction (Plaintiff's Brief at p. 20). Although, in certain cases, the 'harm' element may weigh more heavily than the 'probability of success' element in a court's deliberations, it would clearly be unwise equity practice to completely ignore either consideration. Judge Wright did not ignore the 'probability of success' element. In fact, in the very case relied upon, Judge Wright said: 'In other words, plaintiff must demonstrate a reasonable probability of success on final hearing.' 295 F.Supp. at 152. This Court will not ignore it either. Rather, the Court will attempt to weigh and balance both probability of success and probability of irreparable harm in reaching its decision.

'These two elements of probability
are in fact inseparable, and since
in practice they appear in blends
of infinite variety, the weighing and
balancing of the strength of one against
the weakness of the other is often a
matter of the utmost delicacy, calling
for a mastery of the technical rules of
law as well as a penetrating common
sense in practical affairs.'

Bayard v. Martin, Supra, 34 Del.Ch. at 192, 101 A.2d at 334.

A preliminary injunction is 'a form of relief which will never be granted unless earned.' Lenahan v. National Computer Analysts Corp., Del.Ch., 310 A.2d 661, 664 (1973). In order for the plaintiff here to 'earn' his preliminary injunction against the sale of Signal Oil to Burmah, the Court must be satisfied, on the present record, that the plaintiff has a reasonable probability of succeeding on the merits of his claim. Further, the Court must also be satisfied that a preliminary injunction is necessary to protect the plaintiff from irreparable injury and that the plaintiff's need for such protection outweighs any harm that the Court can reasonably expect to befall the defendants if the injunction were granted.

Partly because of the enormous amount of money involved in this case, it is easy to discuss the irreparable injury aspect. From the plaintiff's point of view, the imminent threat of the closing of the sale does present a situation where it may be impossible to 'unscramble the eggs.' Metro Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F.Supp. 1344, 1348 (S.D.N.Y., 1968). While the remedy of rescission is available (see Bowers v. Columbia General Corp., 336 F.Supp. 609 (D.Del.1971)), it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed. Moreover, when the plaintiff claims with expert support, a potential damage in the neighborhood of $300,000,000, it is doubtful that any damage claim against the directors can reasonably be a meaningful alternative. Compare **\*604** Thomas v. Kempner, C.A. 4138, Del.Ch., unreported (March 22,

1973). In short, if the plaintiff can sustain his legal position, it seems to me that he has established he will suffer irreparable harm if the consummation of the sale is not enjoined.

On the other hand, the harm to Signal of entering an injunction is also massive. Under the contract, if the transaction is delayed by litigation, Burmah has a right to withdraw and the Court has no legal power to prevent such withdrawal.[2] The loss of Signal's legal right to enforce the contract is itself irreparable harm. Moreover, it is clear generally that Signal not only has excessive Eurodollar loans outstanding but is also facing a 'cash crunch' and the transaction, if completed as scheduled, should return in 1974 in interest expense saving and earnings some $36,000,000, and substantially more than the projected short term annual earnings from Signal Oil ($9,900,000 in 1971 and $12,800,000 in 1972). Chitiea affidavit, docket number 36. Furthermore, it is common knowledge that the present world oil market is in a chaotic state and it is difficult to judge with any assurance what tomorrow might bring in the way of economic conditions and government control including tax policy. The capital needs of Signal Oil are great and the cost of pursuing some of its untapped resources is substantial and of high risk. Even when walking among giants, a sale involving $420,000,000 cash is somewhat out of the routine. In short, if a preliminary injunction enters and the sale falls through and Signal ultimately prevails on the merits, Signal would have no remedy adequate to compensate it for a transaction which involves a taxable gain of $220,000,000.

In summary on the question of irreparable harm, it appears to me that there is irreparable harm to the losing side on this preliminary injunction application in the event the loser should ultimately prevail on the merits. Thus, in this case, the Court feels that the emphasis in analysis on this application for a preliminary injunction should focus on whether the plaintiff has a reasonable probability of success in this lawsuit.

Turning specifically to the pleadings in this case, the complaint contains three separate counts. In Count 1 of the complaint, plaintiff asserts that the special meeting of the Board of Directors of Signal at which the proposed sale was approved and authorized and was not properly noticed and that the proposed sale requires authorization by the majority of the outstanding stock of Signal pursuant to 8 Del.C. s 271(a).

In Count 2, plaintiff alleges that the 480 million dollar sale price is 'wholly inadequate,' and further alleges certain personal motives by certain directors in making the business decision.

In Count 3, the plaintiff alleges a class action on behalf of all Signal stockholders who, according to the complaint, were entitled to vote upon the proposed sale.

In the application for a preliminary injunction plaintiff has not pressed the allegations that the special meeting of the Board of Directors was not properly noticed and that the directors were improperly motivated by personal advantage. Indeed, it appears that 12 out of 14 directors attended the meeting and the other two did in fact receive the notice. Nothing in the record would justify a finding at this stage that the directors acted for any personal advantage or out of improper motive or intentional disregard of shareholder interests. Nor is it important to determine on this preliminary injunction application **\*605** whether the case can proceed as a class action or not, although the discussion herein does in part relate to that decision.

Thus, in my judgment, the factual and legal issues are basically reduced to two. First, does the sale require authorization by a majority of the outstanding stock of Signal pursuant to 8 Del.C. s 271(a)? [3] Second, was the action by Signal's Board in approving the 480 million dollar sale price reckless as to justify the entry of a preliminary injunction prohibiting the consummation of the sale?

Both of these questions require reference to the facts appearing in the record, which has been reviewed in its entirety. I might add that the record is excellent considering the time factor under which counsel were laboring and, in my judgment, except on the crucial question of evaluation, entirely satisfactory for the determination of the present application. Equally helpful were the briefs of counsel on which heavy reliance has been placed both as to the facts and the law.

I turn first to the question of 8 Del.C. s 271(a) which requires majority stockholder approval for the sale of 'all or substantially all' of the assets of a Delaware corporation. A sale of less than all or substantially all assets is not covered by negative implication from the statute. Folk, The Delaware General Corporation Law, Section 271, p. 400, ftnt. 3; 8 Del.C. s 141(a).

It is important to note in the first instance that the statute does not speak of a requirement of shareholder approval simply because an independent, important branch of a corporate business is being sold. The plaintiff cites several non-Delaware cases for the proposition that shareholder approval of such a sale is required. But that is not the language of our statute. Similarly, it is not our law that shareholder approval is required upon every 'major' restructuring of the corporation. Again, it is not necessary to go beyond the statute. The statute requires shareholder approval upon the sale of 'all or substantially all' of the corporation's assets. That is the sole test to be applied. While it is true that test does not lend itself to a strict mathematical standard to be applied in every case, the qualitative factor can be defined to some degree notwithstanding the limited Delaware authority. But the definition must begin with and ultimately necessarily relate to our statutory language.

In interpreting the statute the plaintiff relies on Philadelphia National Bank v. B.S.F. Co., 41 Del.Ch. 509, 199 A.2d 557 (Ch.1964), rev'd on other grounds, 42 Del.Ch. 106, 204 A.2d 746 (Supr.Ct.1964). In that case, B.S.F. Company owned stock in two corporations. It sold its stock in one of the corporations, and retained the stock in the other corporation. The Court found that the stock sold was the principal asset B.S.F. Company had available for sale and that the value of the stock retained was declining. The Court rejected the defendant's contention that the stock sold represented only 47.4% Of consolidated assets, and looked to the actual value of the stock sold. On this basis, the Court held that the stock constituted at least 75% Of the **\*606** total assets and the sale of the stock was a sale of substantially all assets.

But two things must be noted about the Philadelphia National Bank case. First, even though shareholder approval was obtained under s 271, the case did not arise under s 271 but under an Indenture limiting the activities of B.S.F. for creditor financial security purposes. On appeal, Chief Justice Wolcott was careful to state the following:

> 'We are of the opinion that this question is not necessarily to be answered by references to the general law concerning the sale of assets by a corporation. The question before us is the narrow one of what particular language of a contract means and is

to be answered in terms of what the parties were intending to guard against or to insure.'

42 Del.Ch. at 111—112, 204 A.2d at 750.

Secondly, the Philadelphia National Bank case dealt with the sale of the company's only substantial income producing asset.

The key language in the Court of Chancery opinion in Philadelphia National Bank is the suggestion that 'the critical factor in determining the character of a sale of assets is generally considered not the amount of property sold but whether the sale is in fact an unusual transaction or one made in the regular course of business of the seller.' (41 Del.Ch. at 515, 199 A.2d at 561). Professor Folk suggests from the opinion that 'the statute would be inapplicable if the assets sale is 'one made in furtherance of express corporate objects in the ordinary and regular course of the business " (referring to language in 41 Del.Ch. at 516, 199 A.2d at 561). Folk, Supra, Section 271, p. 401.

[5]  [6]  But any 'ordinary and regular course of the business' test in this context obviously is not intended to limit the directors to customary daily business activities. Indeed, a question concerning the statute would not arise unless the transaction was somewhat out of the ordinary. While it is true that a transaction in the ordinary course of business does not require shareholder approval, the converse is not true. Every transaction out of normal routine does not necessarily require shareholder approval. The unusual nature of the transaction must strike at the heart of the corporate existence and purpose. As it is written at 6A Fletcher, Cyclopedia Corporations (Perm.Ed. 1968 Rev.) s 2949.2, p. 648:

'The purpose of the consent statutes is to protect the shareholders from fundamental change, or more specifically to protect the shareholder from the destruction of the means to accomplish the purposes or objects for which the corporation was incorporated and actually performs.'

It is in this sense that the 'unusual transaction' judgment is to be made and the statute's applicability determined. If the sale of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the power of the Board of Directors. With these guidelines, I turn to Signal and the transaction in this case.

Signal or its predecessor was incorporated in the oil business in 1922. But, beginning in 1952, Signal diversified its interests. In 1952, Signal acquired a substantial stock interest in American President lines. From 1957 to 1962 Signal was the sole owner of Laura Scudders, a nation-wide snack food business. In 1964, Signal acquired Garrett Corporation which is engaged in the aircraft, aerospace, and uranium enrichment business. In 1967, Signal acquired Mack Trucks, Inc., which is engaged in the manufacture and sale of trucks and related equipment. Also in 1968, the oil and gas business was transferred to a separate division and later in 1970 to the Signal Oil subsidiary. Since 1967, Signal has made acquisition of or formed substantial companies none of which are involved or related with the oil and gas industry. See Walkup affidavit, docket number 34. As indicated previously, the oil and gas production development of Signal's business is now carried on by  *607  Signal Oil, the sale of the stock of which is an issue in this lawsuit.

According to figures published in Signal's last annual report (1972) and the latest quarterly report (September 30, 1973) and certain other internal financial information, the following tables can be constructed. [4]

Based on the company's figures, Signal Oil represents only about 26% Of the total assets of Signal. While Signal Oil represents 41% Of Signal's total net worth, it produces only about 15% Of Signal's revenues and earnings. Moreover, the additional tables shown in Signal's brief from the Chitiea affidavit are also interesting in demonstrating the low rate of return which has been realized recently from the oil and gas operation.

## PRE-TAX DOLLAR RETURN

---------------------

## ON VALUE OF ASSETS

------------------

**9 Mos. Ended**

------------

|  | September 30, 1973 | 1972 | 1971 |
|---|---|---|---|
| Truck manufacturing | 12.8% | 12.9% | 8.1% |
| Aerospace and |  |  |  |
| industrial | 7.5 | 6.1 | 5.9 |
| Oil and gas | 3.6 | 3.5 | 2.7 |

**PRE-TAX DOLLAR RETURN**

---------------------

**ON NET WORTH**

------------

**9 Mos. Ended**

--------------

|  | September 30, 1973 | 1972 | 1971 |
|---|---|---|---|
| Truck manufacturing | 25.1% | 24.2% | 15.5% |
| Aerospace and |  |  |  |
| industrial | 16.8 | 14.1 | 14.0 |
| Oil and gas | 4.8 | 4.7 | 3.9 |

While it is true, based on the experience of the Signal-Burmah transaction and the record in this lawsuit, that Signal Oil is more valuable than shown by the company's books, even if, as plaintiff suggests in his brief, the $761,000,000 value attached to Signal Oil's properties by the plaintiff's expert Paul V. Keyser, Jr., were substituted as the asset figure, [5] the oil and gas properties would still constitute less than half the value of Signal's total assets. Thus, from a straight quantative approach, I agree with Signal's position that the sale to Burmah does not constitute a sale of 'all or substantially all' of Signal's assets.

In addition, if the character of the transaction is examined, the plaintiff's position is also weak. While it is true that Signal's original purpose was oil and gas and while oil and gas is still listed first in the certificate of incorporation, the simple fact is **\*608** that Signal is now a conglomerate engaged in the aircraft and aerospace business, the manufacture and sale of trucks and related equipment, and other businesses besides oil and gas. The very nature of its business, as it now in fact exists, contemplates the acquisition and disposal of independent branches of its corporate business. Indeed, given the operations since 1952, it can be said that such acquisitions and dispositions have become part of the ordinary course of business. The

facts that the oil and gas business was historically first and that authorization for such operations are listed first in the certificate do not prohibit disposal of such interest. As Director Harold M. Williams testified, business history is not 'compelling' and 'many companies go down the drain because they try to be historic.' Williams' deposition, docket number 301 p. 28.

It is perhaps true, as plaintiff has argued, that the advent of multi-business corporations has in one sense emasculated s 271 since one business may be sold without shareholder approval when other substantial businesses are retained. But it is one thing for a corporation to evolve over a period of years into a multi-business corporation, the operations of which include the purchase and sale of whole businesses, and another for a single business corporation by a one transaction revolution to sell the entire means of operating its business in exchange for money or a separate business. In the former situation, the processes of corporate democracy customarily have had the opportunity to restrain or otherwise control over a period of years. Thus, there is a chance for some shareholder participation. The Signal development illustrates the difference. For example, when Signal, itself formerly called Signal Oil and Gas Company, changed its name in 1968, it was for the announced 'need for a new name appropriate to the broadly diversified activities of Signal's multi-industry complex.' Walkup affidavit, docket number 34.

The situation is also dramatically illustrated financially in this very case. Independent of the contract with Burmah, the affidavit of Signal's Board Chairman shows that over $200,000,000 of Signal Oil's refining and marketing assets have been sold in the past five years. Walkup affidavit, docket number 34. This activity, prior to the sale at issue here, in itself constitutes a major restructuring of the corporate structure.

[7]   I conclude that measured quantatively and qualitatively, the sale of the stock of Signal Oil by Signal to Burmah does not constitute a sale of 'all or substantially all' of Signal's assets. This conclusion is supported by the closest case involving Delaware law which was been cited to the Court. Wingate v. Bercut, 146 F.2d 725 (9th Cir. 1944). Accordingly, insofar as the complaint rests on 8 Del.C. s 271(a), in my judgment, it has no reasonable probability of ultimate success.

I turn now to the second and more difficult question presented on this application for a preliminary injunction.

The plaintiff attacks the proposed transaction on the grounds that the 480 million dollar sale price is wholly inadequate compensation for the assets of Signal Oil.

[8]   In evaluating the merits of this allegation, precedent requires the Court to start from the normal presumption that Signal's Board of Directors acted in good faith in approving the sale of Signal Oil to Burmah. Chancellor Josiah Wolcott spoke thusly of this good faith presumption:

> '. . . (T)he directors of the defendant (selling) corporation are clothed with that presumption which the law accords to them of being actuated in their conduct by a Bona fide regard for the interests of the corporation whose affairs the stockholders have committed to their charge. This being so, the sale in question must be examined with the presumption in its favor that the directors who **\*609**  negotiated it honestly believed that they were securing terms and conditions which were expedient and for the corporation's best interests.'

Robinson v. Pittsburgh Oil Ref. Corp., 14 Del.Ch. 193, 199, 126 A. 46, 48 (Ch.1924). See also Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 376, 93 A. 380, 382 (Ch.1915).

This presumption, an important aspect of what has generally come to be known as the 'business judgment rule,' has been consistently reaffirmed and broadened with respect to the sale of corporate assets over the past several decades. See also Allaun v. Consolidated Oil Co., 16 Del.Ch. 318, 325, 147 A. 257, 261 (Ch.1929); Mitchell v. Highland-Western Glass Co., 19 Del.Ch. 326, 330, 167 A. 831, 833 (Ch.1933); Gropper v. North Central Texas Oil Co., 35 Del.Ch. 198, 202, 208, 114 A.2d 231, 233, 237 (Ch.1955); Cottrell v. Pawcatuck Co., 35 Del.Ch. 309, 311, 116 A.2d 787, 788 (Ch.1955) aff'd 36 Del.Ch. 169, 172—175, 128 A.2d 225, 228 (Sup.Ct.1956); and see generally, Folk, Supra, ss 144, 271 (1972). Application of the rule, of necessity, depends upon a showing that informed directors

did, in fact, make a business judgment authorizing the transaction under review. Kaplan v. Centex Corporation, Del.Ch., 284 A.2d 119, 124 (1971); Mitchell v. Highland-Western Glass Co., Supra, 19 Del.Ch. at 329, 167 A. at 833 (Ch.1933).

Although not dealing specifically with the sale of a substantial corporate asset, Chief Justice Daniel F. Wolcott recently recognized the strength of the presumption inherent in this rule:

> 'A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.'

Sinclair Oil Corporation v. Levien, Del.Supr., 280 A.2d 717, 720 (1971). Quite recently, Vice Chancellor Brown also applied the business judgment rule when called upon to enjoin a large scale corporate merger. Muschel v. Western Union Corporation, Del.Ch., 310 A.2d 904, 908 (1973).

[9]   This does not mean, however, that the business judgment rule irrevocably shields the decisions of corporate directors from challenge. As Vice Chancellor Marvel explained in Marks v. Wolfson, the business judgment rule weighs in favor of the directors' decision to sell assets unless the complaining shareholders can prove fraud or a clearly inadequate sale price:

> 'In other words, it (is) incumbent on plaintiffs to prove that the defendants against whom relief is sought were either guilty of actual fraud or that the price fixed for the sale of Highway's assets was so clearly inadequate as constructively to carry the badge of fraud.'

41 Del.Ch. 115, 123, 188 A.2d 680, 685 (Ch.1963). See also Alcott v. Hyman, 40 Del.Ch. 449, 184 A.2d 90 (Ch.1962); aff'd 42 Del.Ch. 233, 208 A.2d 501 (Supr.Ct.1965).

[10]   In challenging the sale of Signal Oil to Burmah, the plaintiff here does not seriously charge that the

proposed transaction constitutes fraudulent self-dealing on the part of Signal's Board of Directors. In deed, only one member of the Board, Willis H. Thompson, Jr., is expected to have any relationship with Burmah after the sale. Thompson is President and Chief Executive Officer of Signal Oil. He plans to continue in that position if Signal Oil is sold to Burmah. Other than that, the only benefit any members of the Board would receive from the sale is that which would accrue to any ordinary shareholder according to his holdings in Signal. It is usually assumed that such individual benefit also works for the benefit of the corporation. *610 Cottrell v. Pawcatuck Co., Supra, 36 Del.Ch. at 182, 128 A.2d at 232. At this stage, the Court can find no indication of self-dealing on the part of the Board of Directors such as would taint the proposed transaction or neutralize the effect of the business judgment rule. And, therefore, plaintiff's argument at pages 33 and 34 of his brief, that the usual presumption of director good faith ought not apply, must fail. Plaintiff relies mistakenly on cases wherein questionable corporate transactions involving blatant self-dealing. Such is not the case here where arm's length bargaining marked the transaction and the vote of interested directors was not necessary to approve the transaction. Folk, Supra, Section 271, pp. 405—406.

[11]   Actual fraud, whether resulting from self-dealing or otherwise, is not necessary to challenge a sale of assets. And, although the language of 'constructive fraud' or 'badge of fraud' has frequently and almost traditionally been used, such language is not very helpful when fraud admittedly has not been established. There are limits on the business judgment rule which fall short of intentional or inferred fraudulent misconduct and which are based simply on gross inadequacy of price. This is clear even if language of fraud is used. The principles are familiar and should start with the directors' discretion and the limits thereof when dealing with price under the business judgment rule:

> 'When the question is asked whether in a given case the price is adequate, it is readily seen that room is afforded for honest differences of opinion. While the parties to the controversy may be guilty of an intolerance of view towards each other, yet a court, when called upon to decide the question, must endeavor, as best it may, to arrive at the correct answer, making all due

Gimbel v. Signal Companies, Inc., 316 A.2d 599 (1974)

allowance for the range over which honestly inclined minds may wander. It is further true that inadequacy of price will not suffice to condemn the transaction as fraudulent, unless the inadequacy is so gross as to display itself as a badge of fraud. I take it that so long as the inadequacy of price may reasonably be referred to an honest exercise of sound judgment, it cannot be denominated as fraudulent. When the price proposed to be accepted is so far below what is found to be a fair one that it can be explained only on the theory of fraud, or a reckless indifference to the rights of others interested, it would seem that it should not be allowed to stand.'

Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 1, 19, 120 A. 486, 494 (Ch.1923).

(F)airness or unfairness of the price . . . must be judged in the light of the conditions as they existed at the time of the execution of the contract.'

Allied Chemical & Dye Corp. v. Steel & Tube Co., Supra, 14 Del.Ch. 64, at 95, 122 A. 142, at 155.

'It is not every disparity between price and value that will be allowed to upset a proposed sale. The disparity must be sufficiently great to indicate that it arises not so much from an honest mistake in judgment concerning the value of the assets, as from either improper motives underlying the judgment of those in whom the right to judge is vested or a reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders including of course the minority.'

Allaun v. Consolidated Oil Co., Supra, 16 Del.Ch. at 325, 147 A. at 261 (Ch.1929). See also Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 58, 156 A. 183, 188 (Ch.1931);

Baron v. Pressed Metals of America, Inc., 35 Del.Ch. 325, 332, 117 A.2d 357, 361 (Ch.1955), aff'd 35 Del.Ch. 581, 123 A.2d 848 (Supr.Ct.1956).

One recognized test on the directors' business judgment is the free marketplace. In Marks v. Wolfson, Supra, Vice Chancellor Marvel employed 'the classic test imposed in the early Delaware cases' in **611** reaching his conclusion that the sale price established for corporate assets satisfied the law:

'In actual point of fact the evidence sustains a finding, in my opinion, that the bargaining which resulted in the sale here in issue took place between a willing buyer who was not required to buy and a willing seller under no real compulsion to sell and that such bargaining was genuine and motivated by self-interest on the part of those on opposite sides of the bargaining table.'

41 Del.Ch. at 124, 125, 188 A.2d at 686 (Ch.1963).

More recently, Vice Chancellor Short dealt with the problem of conflicting testimony on the valuation of assets in applying the business judgment rule to uphold a corporate decision to exchange a sizeable amount of stock for certain assets:
'The expert testimony and legal analysis on these (valuation) issues are in hopeless conflict. But since I am satisfied that in any event the methods of valuation used were not so clearly wrong as to result in an unconscionable advantage secured to the (transferors of the assets to the corporation) resolution of these issues is not required.

'I conclude that since the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors whose sole interest was the furtherance of the corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members.'

Puma v. Marriott, Del.Ch., 283 A.2d 693, 695, 696 (1971); Muschel v. Western Union Corporation, Supra.

Keeping in mind this guidance and other similar precedent on valuation and director responsibility to obtain a fair price for corporate assets, the Court will now consider those allegations whereby the plaintiff seeks to hurdle the protections of the business judgment rule and successfully challenge the sale of Signal Oil. The question is: Did the Signal Directors act recklessly in accepting a wholly inadequate price for Signal Oil?

Factually, to support his claim of recklessness, the plaintiff basically relies on three related factors: the alleged gross inadequacy of price; the failure of the Board of Directors to act on such an important matter with informed reasonable deliberation; and specifically the failure of the Board of Directors to obtain an updated appraisal of Signal Oil's properties before agreeing to accept Burmah's offer. Except for the key question of value, there is not significant dispute over the factual chronology.

Prior to Burmah's first contact relating to this agreement, which was on October 17, 1973,[6] Signal had been negotiating a proposed merger with United Aircraft. The deal fell through in September 1973. In connection with that transaction, a report was drafted by DeGolyer and MacNaughton, a prominent independent firm of petroleum geologists. The report valued Signal Oil's reserves as of June 30, 1973 at an approximate figure between 230 and 260 million dollars. DeGolyer and MacNaughton Appraisal Report, docket number 45; Shumway deposition, docket number 29, p. 37. There were other accounting reports prepared by Price Waterhouse and Company in connection with the proposed merger. In addition, Signal requested Kenneth E. Hill, an expert in the evaluation of oil properties, to undertake an evaluation of the petroleum properties of Signal Oil. Mr. Hill had done so and, as of September 13, 1973, his opinion of the fair market value of the oil properties was $350,000,000. Hill affidavit, docket number 48.

**\*612** On October 17, 1973, in Houston, Texas, Max Roberts and Clifford Andrews, representatives of Burmah, approached Willis H. Thompson, President and Chief Executive Officer of Signal Oil, about the possibility of Burmah acquiring some or all of Signal Oil's properties. Thompson referred them to Forrest N. Shumway, the President and Chief Executive Officer of Signal and on October 24, 1973, there was a meeting in Los Angeles. At that time, N. J. D. Williams, Chief Executive Officer of Burmah Oil Co. Ltd., the British parent of Burmah,

indicated that Burmah was interested in acquiring the assets of Signal Oil in a range of $400,000,000. Shumway said that any offer in excess of $400,000,000 would be submitted to the Board of Directors.

There followed an exchange of information including the DeGolyer and MacNaughton report and the accounting reports of Price Waterhouse. Negotiations continued through November, including extensive drafting sessions with Burmah's attorneys. The matter was not put before Signal's Board of Directors at the November 27, 1973 meeting although the Board was advised generally that management had other inquiries about subsidiaries since the United transaction fell through. A Burmah representative was invited to address a meeting of the Signal Oil Board, at which was discussed Burmah's history, business and operating policies. By early December, a third draft of the purchase agreement had been prepared, access to confidential data had been permitted and Burmah had sent Signal a draft of a press release to announce the transaction. All this occurred during a period when there was no notification to the Board of Directors in their capacity as Board members of the developments. An attorney for the minority, on the basis of rumors, wrote a letter dated December 3, 1973 indicating opposition to a sale of oil and gas properties, indicating further that shareholder approval was required, and requesting consultation. See Exhibit 10 of docket number 21.

Burmah's formal offer was communicated to Signal on December 18, 1973. The offer required acceptance on or before December 21, 1973. A special meeting of the Board of Directors of Signal was called for December 21. This meeting was called on notice of only a day and a half and the outside directors were not notified of the purpose of the meeting. At least three of the outside directors were confronted with the proposed sale for the first time at the special meeting itself. Plaintiff learned of the proposed sale when it was reported in the press on Saturday, December 22, 1973.

At the meeting, a handwritten outline of the transaction was submitted to the directors and an oral presentation was made in support of the transaction. There was no updated evaluation of the oil and gas reserves of Signal Oil presented. There was no effort made at that time to determine if other companies would offer a higher price. The meeting lasted a couple of hours and resulted in the approval of a transaction of over $480,000,000 and

possibly one of the largest private cash sales ever to take place.

It is important to note what was discussed at the special Board of Director's meeting on December 21. In addition to the depositions, the handwritten memorandum and handwritten minutes outlining the presentation were useful in determining the discussion. Exhibits 5 and 6 of docket number 21. It is also important to note that the discussion took place with the background of aborted United negotiations and other inquiries. It appears that there was some review of the per share value of Signal stock and it was determined that, as of the market closing on December 20, the total market value of Signal stock was estimated at 440 million dollars. The terms of the contract were reviewed with an overall analysis of the tax consequences. There was discussion of the use of the proceeds to be gained from the sale of Signal Oil and, in particular, the advantage of pre-paying certain indebtedness, the advantage  **613** from increased interest income, and the needs of the other subsidiaries, which were giving a greater return. There was discussion of sales, income, cash flow, the balance sheet and the general financial status of the corporation. The current situation in the oil industry was discussed including the impact on price and profit and the potential for additional oil finds. Oil reserve values received substantial discussion. Price increases were contemplated. The risk of price controls and the limitations that could come from allocations and excess profit taxes were reviewed. Capital expenditure requirements of Signal Oil were reviewed and, particularly, the risk factor in the North Sea investment. The advantage of the Signal Oil investment was compared with the advantage of having the cash on hand. The advisability of waiting for a higher price was discussed. The Burmah offer was the best suggested price of any discussions with potential buyers and Burmah could pay it. In summary, while the meeting was short for a transaction of this size, there was an overall view of the situation, [7] generally within the confines of the material the company already had available.

The plaintiff makes a point 'of the lack of knowledge on the part of the directors as to the oil industry in general and the sale of Signal in particular.' Plaintiff's Memorandum p. 4. In the first regard, the plaintiff simply unfairly overstates his case. The Board of Signal includes the following twelve people who were present at the December 21st meeting. Four members of the Board (William E. Walkup, Chairman of the Board,

Forrest N. Shumway, President, Andrew J. Chitiea, Sr., Vice President-Financial Administration, and Brewster L. Arms, House Counsel) are directly involved in the management of Signal and each had extensive experience. A fifth, Willis H. Thompson, Jr., is President of Signal Oil and a geologist. Two others, Harry H. Wetzel and Donald C. McHone, are management people in subsidiary corporations. Clinton R. Stevenson is partner of Signal's principal outside legal counsel.

Information in the record on the four outside directors includes the following information. James E. Patrick, Jr. is a retired banker with some banking experience in the oil industry. Howard M. Williams is Dean of the Graduate School of Management at UCLA and a Harvard Law graduate with extensive tax background. Robert O. Reynolds is a businessman whose experience includes 25 years as an individual oil investor. Arch Manson, Jr. is President of a theatrical and TV lighting and staging corporation and also President of a corporation dealing in fire protection material.

Suffice it to say that the Board of Signal is a sophisticated one and one which by experience and background would compare favorably to Boards of Directors of similar corporations.

Moreover, it is apparent that the Board was aware that Signal had cash needs and was naturally reluctant to do anything that might upset a sale which would bring to the Board $420,000,000 cash and which was for a total consideration that exceeded by approximately $75,000,000 the market value of the total number of Signal shares currently outstanding. [8] They were understandably fearful of challenging the time factor imposed by Burmah's offer of December 18th.

 **614** But having given full weight to the legitimate considerations of the Board, it is necessary, at the risk of repetition, to pinpoint elements which suggest imprudence. The circumstances are such as to raise the question as to whether the Signal Board, when the sale of Signal Oil stock was presented, were able to perform their fiduciary obligation as directors to make an informed judgment of approving the transaction. In particular, it is difficult to ignore the following facts.

The transaction had been in progress since October. I am satisfied that management decided early in the game, and probably in October, that the offer, when made, would be

Gimbel v. Signal Companies, Inc., 316 A.2d 599 (1974)

recommended to the Board. Certainly by early December the only reasonable assumption was that management would recommend the transaction to the Board.

To highlight the fact that management did not bring the proposed transaction to the attention of the Signal Board, it should be noted that in early December management did bring the transaction to the attention of the Signal Oil Board, evidently because personnel at Signal Oil were somewhat restless about the investigation being conducted by the Burmah people. But the point is management was ready to go out of its way of relieving anxiety in the subsidiary that was being transferred and yet made no advance effort to educate the directors whose responsibility it was to approve the transaction. The point is aggravated by the fact that there was a regular board meeting with one hundred per cent attendance on November 27, 1973. Walkup affidavit, docket number 34. [9]

Even granting that management had prior legal difficulties with the minority group of which the plaintiff is a member, it is hard to overlook the fact the minority interest wrote to each board member, expressed opposition to the sale of the oil and gas interest, further stated its belief that any such transaction required shareholders' approval and further requested to be consulted. Except for obtaining an opinion of counsel to counter the legal position on the requirement of shareholder action, this request was totally ignored by management and by the Board. Such lack of consideration for a minority viewpoint of the substantial block of stock, and perhaps the largest single block of stock, gives rise to the allegation, which probably cannot be established as motivation, that management was trying to effectively freeze out a minority interest. Compare Gerlach v. Gillam, 37 Del.Ch. 244, 139 A.2d 591 (Ch.1958).

There does not appear to be in the record any effort on the part of management to slow or seek a delay in the December 21st deadline which was imposed by the December 18th offer of Burmah. Rather the circumstances are consistent with Signal's management approval of the forced decision on a tight time schedule. It is clear that Burmah's strategy was to force a quick decision. Roberts affidavit, docket number 20, paragraph 15.

The decision to call a special meeting of the Board on approximately two days' notice highlights the failure

of management to advise the Board in their capacity as Board members of this very important transaction. Only six directors (Walkup, Shumway, Chitiea, Arms, Thompson and Stevenson) knew of the purpose of the meeting in advance. Walkup affidavit, docket number 34. Not only was the call short but management failed to give any notice of the subject matter in advance. The question is not one of legality. The question is one of permitting the Board the **615** opportunity to make a reasonable and reasoned decision.

[12] There is no question that the energy crisis has created a drastic change in the value of oil and gas properties. Even granting that there may be wide divergence in expert viewpoint, the situation made desirable an updated evaluation since the Hill evaluation as of September 30 and the De Golyer and MacNaughton evaluation as of June 30. [10] Indeed, the defendants' own expert in this proceeding, while he values Signal Oil at less than the sale price, also values Signal Oil at $60,000,000 more on December 21 than he did on September 30. Moreover, questions on fairness were naturally directed to Thompson, a director who will continue with Signal Oil after the sale to Burmah.

In addition, even though the directors knew of Signal's need for cash, there had been no precise analysis about the use of the money to be obtained from the sale. Indeed, the income projections which were presented at the director's meeting showed that income will decrease in the three years after the sale as compared with the projections prior to the sale. Even making allowance for the fact that Signal Oil has evidently failed to achieve projections, this presentation is somewhat out of the ordinary. See Exhibit 5 to docket number 21; Chitiea deposition, docket number 28, p. 121.

The factors, which suggest imprudence and perhaps some others such as the differences that Signal Oil personnel had with the De Goyler and MacNaughton report and certain potential liabilities of Signal which survive the sale, do not in my judgment raise at this stage a reasonable probability that the plaintiff will be able to pierce the 'business judgment' standard. When considered in light of the whole case, they do not in themselves justify the conclusion that the 'direcotrs acted so far without information that they can be said to have passed an unintelligent and unadvised judgment.' Mitchell v. Highland-Western Glass Co., Supra, 19 Del.Ch. at 329—330, 167 A. at 833. But, and perhaps particularly on this preliminary application,

the full circumstances surrounding the approval do relate to the overriding factual issue in the case. What was Signal Oil worth on December 21, 1973? Or to put the question in its legal context, did the Signal directors act without the bounds of reason and recklessly in approving the price offer of Burmah?

[13]  Thus, the ultimate question is not one of method but one of value. The method does not appear so bad on its face as to alter the normal legal principles which control. But hasty method which produces a dollar result which appears perhaps to be shocking is significant. On the basis of affidavits relating to value, the Court has the tentative belief that plaintiff would have a reasonable prospect of success on the merits since limited record indicates a gross disparity between the fair market value of Signal Oil on December 21, 1973 and what the Board of Directors were willing to sell the company for, namely, $480,000,000. To the extent the scale tips, on the present record, the nod is to the plaintiff. But I hasten to add that an extremely high security consistent with the figures being discussed, should be required.

The affidavits dealing with the value of Signal Oil as of December 21, 1973 have been submitted to the Court. They are in marked conflict on almost every important matter. Naturally, what most concerns the Court is the enormous discrepancy in expert estimates on the total value of Signal Oil. But, the tremendous difference that a slight variation of single factor makes in the ultimate value is also crucial. In effect, an unreasonable valuation of one factor could alter the ultimate result.

**\*616** Signal's primary expert, Kenneth E. Hill, who valued the fair market value of Signal Oil's oil and gas properties in September, 1973, at $350,000,000, now concludes that their worth had reached $410,000,000 by December 21, 1973. ( 8 of Hill Aff.) [11]  He further values Signal Oil's other assets at approximately $28,000,000 and concludes (at 20 of his affidavit):

'Accordingly, I value Signal Oil in its entirety as a company at $438,000,000, as compared to the purchase price of $480,000,000 plus the North Sea retained interest which Signal Oil's parent corporation is to receive from the sale of the Signal Oil stock to Burmah.'

On the other hand, Paul V. Keyser, Jr., one of plaintiff's experts, concludes that Signal Oil's oil reserves alone can be conservatively valued at $791,875,000 ( 12 of Keyser's

January 3, 1974 aff.); that its total gas reserves are worth another $124,980,000 ( 13); and that its other properties are worth $98,000,000 ( 14). [12]  Mr. Keyser discounts the total of these values ($1,014,855,000) by a substantial discount factor of 25% To produce his final fair market value estimate of $761,000,000 ( 15), a figure almost twice Mr. Hill's estimate and $281,000,000 more than the sale price agreed upon by defendants.

There is general consensus as to what factors should be considered; namely, the price of oil, the amount of oil and gas reserves (which could increase if the future price of oil makes development economically feasible), production costs, capital outlay, taxes, discount and risk factors, etc. But there is considerable conflict between the two sides as to their estimates of what future weight each factor deserves in their calculations.

For example, with regard to price, Mr. Hill used an average price over a future 19 year period of $6.68 per barrel in reaching his December 21, 1973 valuation. (Hill Aff. Ex. C). (This was $1.54 more per barrel than he had used in marking his September, 1973 appraisal (Hill Aff. Ex. B).) Mr. Keyser, on the other hand, used an average price of $8.00 per barrel over a future 20 year period (Keyser Aff. 7, 8). Similarly, Mr. Hill used an average production cost figure of $1.80 per barrel in his September and December valuations. (Hill Aff. Exs. B & C). Mr. Keyser used an average production cost figure of $1.50 in his calculations. (Keyser Jan. 8, 1974 Aff. 6). Among other variables, the experts also disagree on capital expenditures, discount factors, and, especially, various tax ramifications.

As noted above, while a differential of a few cents or barrels in one factor or another may, at first blush, seem insignificant, such is not the case at all. Forrest A. Garb, another of plaintiff's experts, illustrates the disparity which results. See Garb affidavit of January 8, 1974, docket number 60. He submits a tabulation which 'merely recomputes the value of Signal's domestic oil reserves using the same projections as Mr. Hill except for substitution of more realistic oil prices.' Then he says:

> 'This one change results in increasing Mr. Hill's evaluation by $116,660,000. Use of a 10% Discount factor, rather than the 12% Discount factor employed by Mr. Hill increases the valuation by an additional $29,190,000. Elimination of Mr. Hill's

provision for income taxes, to reflect Burmah's expectation, would result in further increases of $210,500,000 or $194,560,000, depending upon whether a 10% Or 12% Discount rate is used. The use of the De Golyer and MacNaughton expense projections, rather than those assumed by Mr. Hill, would further increase the valuation by an amount approximately $100 million.'

**\*617** I note that Mr. Hill has been involved in evaluating Signal Oil in several capacities, that it is claimed he has been inconsistent in his conclusions and that he has not properly reflected market developments as of December 21, 1973. The weight against his opinion at this stage is slight indeed but slight weight can produce gross disparity.

This exemplifies the problem that so disturbs the Court. Although expert affidavits have been filed, there has neen no oral testimony, no cross-examination, and no real opportunity for the Court to evaluate the basic figures and assumptions upon which these experts based their complicated analysis. In effect, the most important issue in the case had had the relative worst form of evidence. [13] Hence, even for preliminary injunction purposes, the Court is unable to properly judge the validity of the ultimate evaluations which conflict so greatly. The dollars involved are at such variance as to suggest that someone may be dead wrong.

Thus, the Court does not want to overemphasize the ultimate significance of its conclusion herein although the Court recognizes the temporary significance. Both sides have produced experts of high qualification and the question, especially in light of the business judgment rule, is extremely close. Certainly, the affidavits do not come near to exhausting the potential differences among the experts on this complex evaluation. Indeed, it is easy to speculate beyond the record that there are other experts who will support the conclusion voiced by affidavits in support of the directors' decision. In short, it is hard to imagine a final record after a full trial on the merits bearing much resemblance to the record on which I make the immediate decision in the plaintiff's favor. The situation is not to my liking, but Chancellor Josiah O. Wolcott said in the Allied Chemical & Dye case, 14 Del.Ch. at 24—25, 120 A. at 496:

'. . . As much as I am loath to issue the powerful process of injunction, yet where facts are presented which justify it, no personal reluctance of the Chancellor should restrain him. It is needless, of course, to say that the issuance of the preliminary injunction against the sale determines nothing finally. All that I am intending to now decide is that a case is presented which calls for fuller investigation; and that the subject-matter of the suit should remain in Statu quo pending such investigation.'

In essence, notwithstanding the affidavits and the conflict in their content, there remains a serious question about the reasonable probability that the plaintiff will succeed in this action. Therefore, notwithstanding my tentative conclusion on reasonable probability, I am convinced that the discrepancy between the values is so great that an immediate fuller investigation into this matter of fair value should be had. I have been mindful that, if the preliminary injunction is denied now, the plaintiff may well be barred of any significant relief upon proof which is not conclusive against him and which is of a character sufficiently strong to permit him at least to have the opportunity to sustain his contentions. To deny the injunction may well finally dispose of the case. Allied Chemical & Dye Corp. v. Steel & Tube Co., Supra, 14 Del.Ch. at 24, 120 A. at 496.

But I am also mindful of the possible injuries that may be done to the Corporation and to those shareholders which support **\*618** the Board action. I am particularly mindful that time may be of the essence in this situation where there are so many varying factors in such varying degrees. The longer the delay, the more likelihood the deal with be lost. It is not my intention, to the extent I can avoid, to allow a preliminary injunction to destroy the Corporation's opportunity for this transaction. Preliminary injunctions which allow the plaintiff all the relief he could hope to gain are rarely granted. Data General Corporation v. Digital Computer Controls, Inc., Del.Supr., 297 A.2d 437 (1972). The transaction, if its approval was within the legal power of the Signal Board, should be allowed to proceed. This means that the Court is going to have to impose difficult time standards on

counsel and to narrowly limit the issues to be explored in the immediate future.

In particular, the Court will issue a preliminary injunction, to be effective upon posting of the required security, restraining the sale until February 15, 1974, unless the injunction is lifted or extended earlier by a subsequent order of the Court. If the preliminary injunction takes effect, pursuant to Rule 42, whether for further purposes of preliminary hearing or for purposes of final hearing I am not certain and would seek counsel's guidance, I will sever the issue of evaluation of Signal Oil and will set aside three trial days, January 23, January 24, and January 25 for trial solely on the issue of evaluation. If more time is needed for trial, it will be made available. Between now and January 21, counsel can take discovery as time permits. The names of all experts to be used must be disclosed not later than January 15.

One other significant factor remains which itself could be decisive. Under our Court Rules, Rule 65(c), Del.C.Ann., '(n)o . .. preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.' Frankly, counsel have been extremely unhelpful on the question of security, notwithstanding the fact that the Court specifically inquired at the hearing on

January 4. The plaintiff suggested no security be required and the defendant Signal suggested security in excess of 200 million dollars. As noted, in this case, the security question is in itself a substantial one because it is not difficult to imagine that a security requirement of a high dollar value might be as effective in denying the plaintiff an opportunity to be heard as would the denial of a preliminary injunction. On the other hand, the difference between 480 million dollars plus and 438 million dollars, the value ascribed to Signal Oil by the Hill affidavit, is 42 million dollars plus, and the simple fact of the matter is Burmah seems to have an immediate out if they want to exercise it or if conditions, highly speculative, change Burmah's mind.

Judging the risk now in light of the short time interval now contemplated, Burmah's now apparent continuing desire to consummate the transaction, but bearing in mind the risk of losing the best offer that Signal has had as well as the potential loss to Burmah, and giving full weight to the language of the Rule, the Court fixes security in the amount of twenty five million dollars, an amount which is, as far as I have been able to determine, without precedent.

The plaintiff should present an order, on notice, tomorrow.

**All Citations**

316 A.2d 599

---

Footnotes

1   The purchase price consists of 420 million dollars cash to be paid by Burmah at the closing, the cancellation of approximately 60 million dollars in indebtedness of Signal to Signal Oil, and the transfer by Signal Oil to Signal of a 4 3/4% Net profits interest in the unexplored portion of Block 211/18 in the North Sea. Compare Baron v. Pressed Metals of America, Inc., 35 Del.Ch. 581, 123 A.2d 848 (Supr.Ct.1956).

2   The purchaser has the option not to consummate the transaction if the following condition (paragraph 8.07 of the agreement) has not been met.
    '8.07 No suit or action, investigation, inquiry, or request for information by an administrative agency, governmental body or private party, and no legal or administrative proceeding shall have been instituted or theatened which questions or reasonably appears to portend subsequent questioning of the validity or legality of this Agreement or the transactions provided for herein.'

3   'Every corporation may at any meeting of its board of directors sell, lease, or exchange all or substantially all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by a majority of the outstanding stock of the corporation entitled to vote thereon at a meeting duly called upon at least 20 days notice. The notice of the meeting shall state that such a resolution will be considered.'
    The predecessor statute was evidently originally enacted in 1916 in response to Chancellor Curtis' statement of the common law rule in Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 377, 93 A. 380, 383 (Ch.1915):

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                17

'The general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have the power to sell all, or substantially all, the property of the company if the holder of a single share dissent.'

4   The tables that follow are contained in the Chitiea affidavit, docket number 36.

### SIGNAL'S REVENUES (in millions)

|  | 9 Mos. Ended September 30, | December 31, | |
| --- | --- | --- | --- |
|  | 1973 | 1972 | 1971 |
| Truck manufacturing | $655.9 | $712.7 | $552.5 |
| Aerospace and industrial | 407.1 | 478.2 | 448.0 |
| Oil and gas | 185.8 | 267.2 | 314.1 |
| Other | 16.4 | 14.4 | 14.0 |

### SIGNAL'S PRE-TAX EARNINGS (in millions)

|  | 9 Mos. Ended September 30, | December 31, | |
| --- | --- | --- | --- |
|  | 1973 | 1972 | 1971 |
| Truck manufacturing | $ 55.8 | $ 65.5 | $ 36.4 |
| Aerospace and industrial | 20.7 | 21.5 | 19.5 |
| Oil and gas | 10.1 | 12.8 | 9.9 |

### SIGNAL'S ASSETS (in millions)

|  | 9 Mos. Ended September 30, | December 31, | |
| --- | --- | --- | --- |
|  | 1973 | 1972 | 1971 |
| Truck manufacturing | $581.4 | $506.5 | $450.4 |
| Aerospace and industrial | 365.2 | 351.1 | 331.5 |
| Oil and gas | 376.2 | 368.3 | 369.9 |
| Other | 113.1 | 102.0 | 121.6 |

### SIGNAL'S NET WORTH (in millions)

|  | 9 Mos. Ended September 30, | December 31, | |
| --- | --- | --- | --- |
|  | 1973 | 1972 | 1971 |
| Truck manufacturing | $295.0 | $269.7 | $234.6 |
| Aerospace and industrial | 163.5 | 152.2 | 139.6 |
| Oil and gas | 280.5 | 273.2 | 254.4 |
| Other | (55.7) | (42.1) | (2.0) |

5   In my judgment, it is necessary to include the 25% Discount factor which Mr. Keyser states 'it seems prudent to apply.' Keyser affidavit, docket number 15.

6   Burmah had previously expressed an earlier interest in Signal Oil in 1968.

7   Shumway sums up the Signal case pointedly: 'Now, here is a situation where we have sold 25 percent of our assets and 25 percent or less of last year's earning power, maybe 30 percent this year, and we've got 110 percent of our market price and we are being sued for stupidity. That's just hard to believe.' Shumway deposition, docket number 29, p. 49.

8   See paragraph 14 of complaint. Director Williams testified appropriately: 'It was cash. Those are the best terms I can think of.' Williams deposition, docket number 30, p. 22.

9   As early as October 24th, Burmah had indicated a price in the range of 400 million dollars, and was advised such an offer would be taken to the Board of Directors. Thompson deposition, docket number 24, p. 48. Shumway indicated the terms would be satisfactory in October. Chitiea deposition, docket number 28, p. 25.

10  Contrary to the suggestion of the plaintiff, competitive bids are not required. Abelow v. Midstates Oil Corp., 41 Del.Ch. 145, 151, 189 A.2d 675, 678 (Supr.Ct.1963).

Gimbel v. Signal Companies, Inc., 316 A.2d 599 (1974)

11    The Hill affidavit is docket number 48.

12    The January 3, 1974 Keyser affidavit is docket number 15 and a later affidavit dated January 8, 1974 is docket number
      59. The later is noted by date in references.

13    I am not criticizing in this regard. The issue is complex and the affidavits themselves excellent in light of the time factor. But
      they are obviously not a basis for factual conclusions in this area. As for the suggestion in the Daum affidavit of January 8,
      1974, docket number 58, that the defendants are to blame for the lack of live testimony, I note either side was free to make
      an application at the January 4, 1974 hearing. Indeed, perhaps a courtroom examination at that point was premature.

---

**End of Document**                                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 6*

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Crimson Exploration Inc.Stockholder Litigation, Del.Ch., October 24, 2014

2009 WL 3165613
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In re JOHN Q. HAMMONS HOTELS
INC. SHAREHOLDER LITIGATION.

Civil Action No. 758-CC.
|
Submitted: July 2, 2009.
|
Decided: Oct. 2, 2009.

West KeySummary

**1** **Judgment**

👉 Stock and stockholders, cases involving

Genuine issue of material fact as to whether the controlling stockholder used his control to negotiate a merger that was beneficial to him at the expense of minority shareholders precluded summary judgment in action challenging the price paid for publicly held shares. Minority shareholders alleged that an inadequate price was paid for their shares due to the majority shareholder negotiating an array of private benefits for himself. The minority stockholders received cash for their shares, whereas the controlling shareholder received a small equity interest in the surviving limited partnership, a preferred interest with a large liquidation preference, and various other contractual rights and obligations.

34 Cases that cite this headnote

**Attorneys and Law Firms**

Norman M. Monhait, of Rosenthal Monhait & Goddess, P.A., Wilmington, Delaware; of Counsel: Joel H. Bernstein, Ethan D. Wohl, and Matthew C. Moehlman, of Labaton Sucharow LLP, New York, New York; Richard B. Brualdi and Gaitri Boodhoo, of The Brualdi Law Firm, PC, New York, New York, Attorneys for Plaintiffs.

Thomas A. Beck and Blake Rohrbacher, of Richards, Layton & Finger, P.A., Wilmington, Delaware; of Counsel: Michael Thompson and Lori Sellers, of Husch Blackwell Sanders LLP, Kansas City, Missouri, Attorneys for Defendant John Q. Hammons.

David J. Teklits, Kevin M. Coen, and Justin B. Shane, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; of Counsel: Alan J. Stone, of Milbank Tweed Hadley & McCloy, New York, New York, Attorneys for Defendants John Q. Hammons Hotels, Inc., JQH Acquisition LLC, JQH Merger Corporation, John E. Lopez-Ona, Jacqueline Anne Dowdy, Daniel L. Earley, William J. Hart, Donald H. Dempsey, David C. Sullivan, and James F. Moore.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.

**\*1** This case arises out of the merger in September of 2005 of John Q. Hammons Hotels, Inc. ("JQH" or the "Company") with and into an acquisition vehicle indirectly owned by Jonathan Eilian, pursuant to which the holders of JQH Class A common stock received $24 per share in cash (the "Merger"). Plaintiffs in this purported class action seek damages for the allegedly inadequate price paid for the publicly held Class A shares. Plaintiffs contend that John Q. Hammons, JQH's controlling stockholder, used his control position to negotiate an array of private benefits for himself that were not shared with the minority stockholders. Eilian, a third party with no prior relationship with Hammons or JQH, negotiated with Hammons and the special committee, which was formed to represent and negotiate on behalf of the minority stockholders. The result of these negotiations was that the Class A stockholders received cash for their shares, and Hammons, in exchange for his Class B stock and interest in a limited partnership controlled by JQH, received a small equity interest in the surviving limited

partnership, a preferred interest with a large liquidation preference, and various other contractual rights and obligations.

Plaintiffs contend that Hammons breached his fiduciary duties as a controlling stockholder by negotiating benefits for himself that were not shared with the minority stockholders. Plaintiffs also contend that the JQH directors breached their fiduciary duties by allowing the Merger to be negotiated through an allegedly deficient process, and by voting to approve the Merger. Plaintiffs also assert claims against the Merger acquisition vehicles for aiding and abetting the breaches of fiduciary duty. Finally, plaintiffs assert four disclosure claims based on alleged misstatements and omissions in the Company's proxy statement.

Before the Court are cross-motions for summary judgment, and the threshold issue is whether the Court should apply the entire fairness or business judgment standard of review. Defendants argue that business judgment is the appropriate standard of review because (1) Hammons was not involved in the process of negotiation for the purchase of the minority shares, (2) the minority stockholders were adequately represented by the disinterested and independent special committee, and (3) a majority of the minority stockholders approved the Merger in a fully informed vote. Plaintiffs, of course, disagree, and contend that entire fairness is the appropriate standard of review because (1) the special committee was ineffective, (2) the majority of the minority vote was "illusory," and (3) Hammons was subject to a conflict of interest because he negotiated benefits for himself that were not shared with the minority stockholders. Plaintiffs assert that the minority stockholders were "coerced" into accepting the Merger because the price of the Class A stock did not reflect the Company's true value. Moreover, according to plaintiffs, Hammons's ability to block any transaction limited the special committee's ability to negotiate at arm's length and relegated it to the subservient role of negotiating only with bidders acceptable to Hammons.

*2 As explained below, I conclude that *Kahn v. Lynch Communication Systems, Inc.* [1] does not mandate application of the entire fairness standard of review in this case, notwithstanding any procedural protections that may have been used. Rather, the use of sufficient procedural protections for the minority stockholders

*could* have resulted in application of the business judgment standard of review in this case. The procedures used here, however, were not sufficient to invoke business judgment review. Accordingly, the appropriate standard of review is entire fairness. As explained below, defendants' motions for summary judgment are granted in part and denied in part, and plaintiffs' motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND

### A. The Parties

Defendant JQH was a Delaware corporation headquartered in Springfield, Missouri that engaged in the business of owning and managing hotels. JQH owned forty-four hotels and managed another fifteen. Most of the hotels were franchised under major trade names, such as Embassy Suites Hotels, Holiday Inn, and Marriott, and located in or near a stable "demand generator" such as a state capital, university, convention center, corporate headquarters, or office park.

JQH was formed in 1994, and used the proceeds from its initial public stock offering to purchase an approximately 28% general partnership interest in John Q. Hammons Hotels, LP ("JQHLP"). Hammons owned the remaining 72% of JQHLP as its sole limited partner. JQH conducted its business operations through JQHLP.

Ownership of JQH was held through two classes of stock. The Class A common stock was publicly traded and entitled to one vote per share. The Class B common stock was not publicly traded and was entitled to fifty votes per share. Hammons and his affiliates owned approximately 5% of the Class A common stock and all of the Class B common stock. Thus, Hammons had approximately 76% of the total vote in JQH, which in turn controlled JQHLP as its sole general partner. Plaintiffs Jolly Roger Fund, LP, Jolly Roger Offshore Fund, Ltd., and Lemon Bay Partners were purported owners of Class A common stock.

The JQH Board of Directors (the "Board") was composed of eight members at the time of the Merger. Hammons was Chairman of the Board and Chief Executive Officer. The other Board members were John E. Lopez-Ona, Daniel L. Earley, William J. Hart, David C. Sullivan, Donald H. Dempsey, James F. Moore, and Jacqueline A. Dowdy.

Defendants JQH Acquisition, LLC ("Acquisition") and JQH Merger Corporation ("Merger Sub") were formed to facilitate the Merger. Eilian is the principal of Acquisition. Merger Sub is a wholly owned subsidiary of Acquisition.

*B. The Company and Hammons Before the Merger*

The price of JQH Class A shares declined after the initial public offering at $16.50 per share, and, according to plaintiffs, eventually traded in the $4 to $7 range until sometime in 2004, when rumors of a possible merger first circulated. Plaintiffs suggest that low stock price could have resulted from the small number of publicly traded shares, the lack of an active trading market in those shares, the lack of any meaningful analyst coverage, and the lack of large institutional investors. Plaintiffs also contend that the shares were "burdened" by the presence of a large controlling stockholder, and that Hammons's self-dealing depressed the price of the Class A shares.

**\*3** Hammons's passion was, and is, developing hotels, and Hammons took pride in the quality of his hotels. Hammons was seen by many as a legend in the hotel business, as evidenced by his biography, *They Call Him John Q.: A Hotel Legend.* [2] It also appears, however, that the relationship between Hammons and the Board was, at least at times, tense.

Plaintiffs cite evidence and quote from Hammons's biography for the proposition that Hammons only reluctantly sold shares in JQH to the public, that he disliked the procedural requirements associated with public stockholders and a board of directors, and that there was tension between Hammons and the Board. Indeed, Hammons and the Board had disagreements over the Board's use of stock options as compensation and over the pace of hotel development. The latter disagreement resulted in the Board's call for a moratorium on the development of hotels by the Company. This moratorium led the Board and Hammons to negotiate an arrangement where Hammons was permitted to use Company resources for his private development activities, in exchange for giving the Company the opportunity to manage such hotels and acquire them if they were offered for sale.

Hammons and the Board also disagreed over Hammons's decision to offer Lou Weckstein, who Hammons hired as

JQH's President in 2001 without consulting the Board, a salary that the Board believed was excessive. This conflict led to deterioration of the relationship between Hammons and Hart, who was then Hammons's personal attorney, and led the Board to retain Katten Muchin Rosenman, LLP ("Katten Muchin") to advise the non-employee members of the Board on how to react to Hammons's hiring of Weckstein.

Plaintiffs point to Eilian's description in a March 7, 2005 email sent during the negotiations that Hammons practiced a " 'liberal' mixing of private and personal expenses and competitive interests." In its 2004 10-K the Company disclosed that:

> Mr. Hammons also (1) owns hotels that we manage; (2) owns an interest in a hotel management company that provides accounting and other administrative services for all of our hotels; (3) owns a 50% interest in the entity from which we lease our corporate headquarters; (4) has an agreement whereby we pay up to 1.5% of his internal development costs for new hotels in exchange for the opportunity to manage the hotels and the right of first refusal to purchase the hotels in the event they are offered for sale; (5) leases space to us in two trade centers owned by him that connect with two of our hotels; (6) has the right to require the redemption of his LP Units; (7) utilizes our administration and other services for his outside business interests, for which he reimburses us; (8) utilizes the services of certain of our employees in his personal enterprises and personally subsidizes those employees' compensation; and (9) owns the real estate underlying one of our hotels, which we lease from him. [3]

Plaintiffs also point to a conflict surrounding rent the Company paid to Hammons for meeting space adjacent to one of the Company's hotels in Portland, Oregon.

In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

Plaintiffs cite evidence that, according to Weckstein and Paul Muellner, JQH's chief financial officer, Hammons insisted on a rent well in excess of market rates and opposed the lower rental offer they proposed.

**\*4** Around early 2004, Hammons and the Board also had conflicts over the plan to dispose of certain Holiday Inn hotels that the Board and management (other than Hammons) deemed were no longer "core assets" of the Company. Hammons, who Muellner described as having an "emotional attachment" to the Holiday Inn brand, opposed the sale of some of the hotels and even threatened to take legal action to stop the Board from selling one of the properties. On a separate occasion, without disclosure to the Board, Hammons entered into a private agreement with a listing broker that gave Hammons a right of first refusal, which would have allowed Hammons to match an offer in the event a third-party offer was approved by the Board. The arrangement was later discovered and disclosed to the Board by the Company's general counsel.

### C. The Barceló Offer and the Creation of the Special Committee

In early 2004, Hammons informed the Board that he had begun discussions with third parties regarding a potential sale of JQH or his interest in JQH. On October 15, 2004, one of these third parties, Barceló Crestline Corporation ("Barceló"), informed the Board that it had entered into an agreement with Hammons and that it was offering $13 per share for all outstanding shares of JQH Class A common stock.

The agreement Barceló reached with Hammons reflected Hammons's tax and other personal objectives. Hammons's tax situation made it essential to him that any transaction be structured to avoid the large tax liability that would result from a transaction that was deemed to be a disposition event for Hammons. To accomplish this goal, Hammons had to retain some ownership in the surviving limited partnership and continue to have capital at risk. Hammons also desired, among other things, a line of credit that would allow him to continue to develop hotels. Thus, the deal announced by Barceló was structured such that in exchange for his interests in JQH and JQHLP, Hammons would receive a small ownership percentage in Barceló's acquisition vehicle and a preferred interest with a large liquidation preference. The Barceló transaction also provided that Hammons would receive a line of credit of up to $250 million and

distribution of Chateau on the Lake Resort (the "Chateau Lake property"), one of JQH's premier properties.

Recognizing that Hammons's interests in the transaction may not have been identical to those of the unaffiliated JQH stockholders, the Board formed a special committee to evaluate and negotiate a proposed transaction on behalf of the unaffiliated stockholders and make a recommendation to the Board. The special committee consisted of Sullivan, Dempsey, and Moore.[4] Discussions at the initial meetings of the special committee in October 2004 reveal that the members realized that the special committee lacked the ability to broadly market the Company in light of Hammons's controlling interest and ability to reject any transaction. Thus, the special committee determined that its goal was to pursue the best price reasonably available to minority stockholders in any transaction the special committee was authorized to consider. The special committee also recognized its duty to recommend against a transaction if the committee concluded that the transaction was not in the best interests of the minority stockholders or if the price offered to the minority stockholders was not fair, from a financial perspective, to the minority stockholders. On the advice of its counsel, the special committee also adopted guidelines that provided that the special committee would conduct a process in which (1) stockholders would be provided a reasonable opportunity to express their views to the committee, (2) all parties interested and willing to explore a transaction would be afforded a level playing field, from the Company's perspective, on which to pursue a transaction in terms of timing and access to information, and (3) the committee and its advisors would be fully informed as to the value, merits, and probability of closing any transaction that there was a reasonable basis for believing could be consummated. The special committee retained Katten Muchin as its legal advisor and Lehman Brothers ("Lehman") as its financial advisor.

**\*5** The special committee also discussed that, after Barceló's public announcement, Eilian had contacted members of the special committee and told them he was interested in entering into a possible transaction with the Company. Eilian indicated that Hammons had suggested that he contact the special committee if he felt he could offer a proposal superior to Barceló's. The special committee agreed that its counsel would contact Eilian and inform him that Lehman had been retained as the special committee's financial advisor.

Case 1:18-cv-00349-TWP-TAB Document 1-2 Filed 02/06/18 Page 137 of 212 PageID #: 146
In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)

2009 WL 3165613

Although Barceló's agreement with Hammons expired by its terms on November 1, 2004, both Barceló and Hammons remained interested in going forward with the transaction pursuant to a new agreement. On November 16, 2004, the Board (with Hammons abstaining) expanded the authority of the special committee to review, evaluate, and negotiate on behalf of the unaffiliated stockholders the terms of the revised Barceló proposal. The Board also gave the special committee the authority to respond to, and act on behalf of the board with respect to, any requests from interested parties.

On December 5, 2004, following a November 18, 2004 meeting with the special committee, Eilian submitted a proposal to the special committee whereby his group would acquire the interests of Hammons in the Company and make a tender offer for the unaffiliated stockholders at a price to be determined. [5] In November, the special committee met with various shareholder groups, including representatives of plaintiffs.

On December 6, 2004, the special committee reviewed the outstanding proposals of Barceló and Eilian. After receiving a preliminary evaluation from Lehman that Barceló's $13 per share offer was inadequate, from a financial point of view, to the minority stockholders, the special committee unanimously agreed to recommend to the Board that it reject Barceló's revised agreement with Hammons. The next day, the special committee advised the Board that Barceló's offer was not acceptable, and the Company issued a press release stating that the Company would not accept the Barceló proposal.

At a December 23, 2004 meeting, two special committee members reported that A.G. Edwards had contacted them on behalf of Eagle Hospitality Properties Trust, Inc. ("Eagle"). The committee, after observing that Eagle would need to raise significant capital, that a transaction with Eagle would involve a significant amount of strategic and financial risks, and that there was no basis to believe that Hammons would have any interest in pursuing a transaction with Eagle, concluded that the inquiry from Eagle was not worth pursuing at that point in time.

By December 28, 2004, Barceló was willing to pay $21 per share of Class A common stock if the transaction was subject to approval by a simple majority of shares, including those owned by Hammons. Barceló was willing

to pay only $20 per share if a separate majority of the minority vote was required. Eilian's proposed transaction with a tender offer for the Class A shares of at least $20.50 per share had been outlined to the special committee on December 23, 2004. At the December 28 meeting, the special committee discussed both proposals and concluded that the Barceló proposal was more fully negotiated and stood a far greater chance of being consummated.

**\*6** At a December 29, 2004 meeting, the special committee was informed that Barceló was willing to increase its offer to acquire the Class A stock to $21 per share and agree that any merger be conditioned on a majority vote of the unaffiliated stockholders. Lehman advised the special committee that the $21 per share offer was fair to the minority stockholders from a financial point of view and that the allocation of consideration between the minority stockholders and Hammons was reasonable.

At a Board meeting later that day, the special committee advised the Board of Barceló's revised proposal as well as the proposal from Eilian's group that would offer $20.50 per share for all Class A shares. Hammons indicated that he was no longer interested in a transaction with Eilian. Based on the special committee's recommendation, the Board resolved to provide Barceló with exclusivity until January 31, 2005.

Negotiations proceeded between Barceló and Hammons, but Hammons was ultimately not comfortable with the proposal, particularly because he believed that the three-year commitment on the line of credit was not sufficient. An agreement was not reached by January 31, and Hammons indicated that he was unwilling to extend exclusivity with Barceló. The special committee then recommended to the Board that the Company not renew exclusivity with Barceló, and the Board followed this recommendation.

### D. The Eilian Offer

On January 31, 2005, the special committee received an offer from Eilian's group by which Acquisition would acquire all outstanding Class A common stock for $24 per share. Eilian's letter to the special committee indicated that the offer was not contingent on third-party financing and that certain Class A stockholders unaffiliated with Hammons had entered into agreements pursuant to which

those stockholders agreed to support Eilian's proposal. [6] The committee informed the Board of this offer, and the Board voted to continue the existence and authorization of the special committee.

At a February 3, 2005 Board meeting, Hammons informed the Board that he would like to negotiate a transaction with Eilian. At the same meeting, the Board was informed that the Company had received an expression of interest from Eagle and from Corporex Companies. The Board concluded that because Eagle and Corporex did not come forward sooner after the expiration of the exclusivity period with Barceló and because of many other factors discussed at the meeting, the Board would not pursue a transaction with that group and would instead proceed expeditiously to negotiate a transaction with Eilian. Based upon a recommendation from the special committee, the Board granted Eilian exclusivity until February 28, 2005.

Over the next several months, representatives of Eilian, Hammons, and the special committee continued to negotiate the terms of a potential deal, during which time the exclusivity agreement with Elian was renewed several times. On June 3, 2005, Hammons and Acquisition (Eilian's acquisition vehicle) informed the special committee that they had reached certain agreements and requested the special committee's approval of them. Acquisition also reaffirmed its offer to purchase all the outstanding shares of Class A common stock held by unaffiliated stockholders for $24 per share.

 *7 On June 14, 2005, the special committee met with its advisors. Katten Muchin reviewed the process the special committee used over the previous nine months and provided an overview of the various agreements between Hammons and Acquisition. Lehman provided a presentation of its analysis and methodology in issuing its fairness opinion that the $24 per share price was fair to the minority stockholders from a financial point of view. Lehman also advised the special committee of its opinion that the allocation of the consideration between Hammons and the unaffiliated stockholders was reasonable. Lehman calculated that the value received by Hammons and his affiliates was between $11.95 and $14.74 per share. The special committee then approved the merger agreement (the "Merger Agreement") and the related agreements between Hammons and Eilian

(collectively with the Merger Agreement, the "Transaction Agreements").

The Board met immediately following the June 14 special committee meeting. Hammons advised the Board that he supported the proposed transactions and then recused himself from the meeting. After presentations from Katten Muchin on the Transaction Agreements and the Board's fiduciary duties, and from Lehman on its fairness opinion, the Board voted to approve the Merger and the Transaction Agreements.

*E. The Merger and the Transaction Agreements*
The Merger Agreement provided that each share of Class A common stock would be converted into the right to receive $24 per share in cash upon consummation of the Merger. The Merger was contingent on approval by a majority of the unaffiliated Class A stockholders, unless that requirement was waived by the special committee. [7] The Merger Agreement included a termination fee of up to $20 million and a "no shop" provision that placed limitations on the Company's ability to solicit offers from other parties. Moreover, Hammons agreed to vote his interests in favor of the Merger and against any competing proposal or other action that would prevent or hinder the completion of the Merger.

In addition to the Merger Agreement, Hammons and Acquisition entered into a series of other agreements, which provided for a complex, multi-step transaction designed to provide Hammons financing to continue his hotel development activities without triggering the tax liability associated with an equity or asset sale. Although each Class B share initially remained a share of common stock of the surviving corporation, those shares were eventually converted into a preferred interest in the surviving limited partnership (the "surviving LP"). In order to achieve his tax goals, Hammons had to have an ownership interest in the surviving LP and continue to have capital at risk. Accordingly, Hammons was allocated a 2% interest in the cash flow distributions and preferred equity of the surviving LP. Atrium GP, LLC, an Eilian company, became general partner of the surviving LP and received a 98% ownership interest. Hammons's preexisting limited partner interest in JQHLP was converted into a capital account associated with his preferred interest in the surviving LP, which had a liquidation preference of $328 million. When combined

with the preferred interest from the conversion of his Class B shares, Hammons's capital account totaled a liquidation preference of $335 million. The partnership agreement provided for events in which the capital account could be distributed during Hammons's lifetime, but because of certain tax consequences, it was anticipated that distribution of the capital account was to occur at Hammons's death.

**\*8** The terms of the Transaction Agreements also provided Hammons other rights and obligations.[8] Importantly, Hammons received a $25 million short-term line of credit and a $275 million long-term line of credit. Hammons also received (1) the Company's Chateau Lake property in exchange for transferring certain assets and related liabilities to an Acquisition affiliate, (2) a right of first refusal to acquire hotels sold post-merger, and (3) an indemnification agreement for any tax liability from the surviving LP's sale of any of its hotels during Hammons's lifetime. Hammons and Eilian entered into a reciprocal agreement that imposed restrictions on the development of new hotels that would compete with existing hotels owned by either party. Hammons also obtained an agreement whereby his management entity would continue to manage the hotels in exchange for payments of actual operating costs and expenses incurred (estimated to be approximately $6.5 million based on the budget for 2005) and a $200,000 annual salary to Hammons, plus benefits.[9]

On August 24, 2005, the Company sent a proxy statement to its stockholders in connection with the vote on the Merger at a special meeting of stockholders on September 15, 2005. Of the 5,253,262 issued and outstanding shares of Class A stock, 3,821,005 shares, or over 72%, were voted to approve the Merger. In total, more than 89% of the Class A shares that voted on the Merger voted to approve it. The Merger closed on September 16, 2005.

### F. Plaintiffs' Contentions Regarding the Negotiation Process

Plaintiffs paint a picture of the negotiation process that is dominated by Hammons's ability to walk away and block any transaction, which would have left plaintiffs holding illiquid stock that would likely trade in the $4 to $7 range.[10] According to plaintiffs, this threat relegated the special committee to a passive, tag-along role and forced

them to be "friends of the deal" in an effort to prevent Hammons from backing out of the deal.

Plaintiffs also contend that both Katten Muchin and Lehman developed conflicts of interest that biased them in favor of completing a transaction with Eilian. In March 2005, Katten Muchin informed the special committee that it would be representing the entity providing Eilian's financing, iStar Financial Inc. ("iStar"), in connection with the Merger. Plaintiffs contend that this representation gave Katten Muchin an incentive to ensure the Merger proceeded with Eilian, and that iStar played a substantial role in negotiation of the transactions between Hammons and Eilian. Defendants point out that a separate team of lawyers represented iStar and was prohibited from discussing the transaction with the team representing the special committee. The special committee discussed the matter and waived the conflict. The conflict, however, was not disclosed in the proxy statement.

Plaintiffs also assert that Lehman faced a conflict of interest because it sought a role in Eilian's planned refinancing of the Company's debt. Although Lehman did not get the business, plaintiffs contend that Lehman had multiple contacts with Eilian and that "Lehman's efforts to secure business that would have dwarfed the value of its advisory services to the Special Committee" presented a "clear conflict" that was not disclosed in the Company's proxy statement.[11] Defendants contend that the group at Lehman that contacted Eilian about the debt refinancing was separate from the group advising the special committee. Defendants further contend that the alleged conflict was not material and that there is no evidence that Lehman's opinion was affected because the contacts regarding the debt refinancing occurred after Lehman had opined to the special committee in December 2004 that a bid of $21 per share was fair to the minority stockholders.

### G. The Litigation

**\*9** This action was filed on October 20, 2004. The now-operative Second Amended and Consolidated Supplemental Class Action Complaint was filed on October 3, 2006. On October 24, 2008, after discovery and an unsuccessful attempt at mediation, the defendants other than Hammons filed their motion for summary judgment.[12] The director defendants seek summary judgment on the grounds that (1) plaintiffs cannot satisfy

Case 1:18-cv-00349-TWP-TAB   Document 1-2   Filed 02/06/18   Page 140 of 212 PageID #: 149
In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

their burden to rebut the presumption of the business judgment rule, (2) the special committee members and the director defendants are shielded from monetary liability pursuant to the Company's 8 Del. C. § 102(b)(7) exculpatory provision, and (3) there is no evidence to support the aiding and abetting claim. On February 20, 2009, after additional discovery, Hammons filed his motion for summary judgment. Hammons contends that he took no part in the negotiations for the purchase of the minority's shares and argues that he is entitled to summary judgment because plaintiffs cannot rebut the presumption of the business judgment rule and because even if entire fairness applies, Hammons acted fairly. On April 17, 2009, plaintiffs filed their motion for partial summary judgment. Plaintiffs seek summary judgment holding that (1) entire fairness is the applicable standard of review, (2) the special committee process and stockholder vote were ineffective and the burden of persuasion at trial remains with defendants, (3) the challenged transactions were the result of unfair dealing, (4) certain defendants are liable for aiding and abetting Hammons's breach, and (5) the only issue for trial is therefore fair price. Plaintiffs now concede that *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* [13] does not govern the duties of the Board, that the special committee was disinterested and independent (although not free from coercion by Hammons), and that a number of the disclosure violations previously alleged should be withdrawn.

## II. ANALYSIS

### A. The Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." [14] The court views the evidence in the light most favorable to the nonmoving party [15] and assumes the truth of uncontroverted facts set forth in the record. [16] When the moving party shows that no genuine issue of material fact exists, "the burden shifts to the nonmoving party to substantiate its adverse claim by showing that there are material issues of fact in dispute." [17] If the nonmoving party bears the burden of proof, summary judgment is appropriate where that party fails to make a sufficient showing on any essential element of its case. [18]

### B. The Standard of Review: Entire Fairness or Business Judgment?

The threshold issue is whether the Court should apply the entire fairness standard or the business judgment standard in reviewing the Merger. Plaintiffs label the Merger a "minority squeeze-out transaction" and contend that *Kahn v. Lynch Communication Systems, Inc.* [19] mandates that the Court apply the entire fairness standard of review, while defendants urge the Court to apply the business judgment standard of review.

**\*10** In *Lynch* the Delaware Supreme Court held "that the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness" and that "[t]he initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction." [20] Additionally, "approval of the transaction by an independent committee of directors or an informed majority of minority shareholders" would shift the burden of proof on the issue of fairness to the plaintiff, but would not change that entire fairness was the standard of review . [21]

Plaintiffs contend that *Lynch* controls this case and mandates application of the entire fairness standard, regardless of any procedural protections that were used that may have protected the minority stockholders. Plaintiffs argue that Hammons stood on both sides of the transaction because he did not in fact sell his interest in the companies to Eilian, but rather restructured them in a way that accomplished his tax and financing goals while maintaining a significant interest in the surviving company, in addition to other rights. Plaintiffs point not only to Hammons's numerous contractual arrangements and continuing preferred interest in the surviving LP, but also to statements from various witnesses that the transaction was not actually a "sale" by Hammons but rather a "joint venture of some sort" or a "recapitalization" designed to accomplish Hammons's tax and liquidity needs. Thus, plaintiffs contend:

> as viewed from a legal and tax standpoint, as communicated to employees and the public, and as understood by the transaction participants themselves, the Related Transactions effected a restructuring in which Mr. Hammons brought in a business partner and obtained access to financing while retaining most of

2009 WL 3165613

his equity (in modified form), together with substantial upside from future growth of JQH, significant veto rights over future operations of the Company, and continued direct management of the Company's hotel properties. Under these circumstances, the rule of *Lynch*-that "the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness,"-applies directly. [22]

Although plaintiffs' argument has some appeal, ultimately, I disagree. Unlike in *Lynch,* the controlling stockholder in this case did not make the offer to the minority stockholders; an unrelated third party did. Eilian had no prior relationship with the Company or with Hammons. Eilian negotiated separately with Hammons, who had a right to sell (or refuse to sell) his shares, and with the minority stockholders, through the disinterested and independent special committee. The rights Hammons retained after the Merger-the 2% interest in the surviving LP, the preferred interest with a $335 million liquidation preference, and various other contractual rights and obligations-do not change that *Eilian* made an offer to the minority stockholders, who were represented by the disinterested and independent special committee. Put simply, this case is not one in which Hammons stood "on both sides of the transaction." [23] Accordingly, *Lynch* does not mandate that the entire fairness standard of review apply notwithstanding any procedural protections that were used. [24]

**\*11** Plaintiffs further contend that, even if Hammons did not stand on both sides of the transaction as contemplated in *Lynch,* the policy rationales underlying the *Lynch* decision warrant extending its holding to this case. In support of this position, plaintiffs cite several Court of Chancery decisions in which the Court applied or extended *Lynch.* Although I do not fully address all the cases plaintiffs cite in support of this argument, I generally reach two conclusions with respect to them: first, the cases plaintiffs cite can be factually distinguished from this case, and second, to the extent those cases extended the application of *Lynch* based on certain policy rationales, I decline to do so here.

For example, in *In re Tele-Communications, Inc. Shareholders Litigation,* [25] the evidence suggested that a majority of the board of directors was interested

because they received material personal benefits from the transaction they approved. [26] Specifically, the transaction materially benefited a majority of the directors because it allocated a disproportionate amount of the merger consideration to the directors' class of stock. [27] Moreover, only one of those directors was a controlling stockholder entitled to a control premium. [28] Thus, the interestedness of a majority of the directors led the Court to apply the entire fairness standard and to conclude that, as in *Lynch,* the approval of the transaction by the stockholders and a special committee could at most shift the burden of demonstrating entire fairness to plaintiffs . [29] Here, in contrast, Hammons negotiated with Eilian and did not participate in the negotiations between Eilian and the special committee. Nothing in *In re Tele-Communications* mandates the extension of *Lynch* to this case. [30]

In *In re LNR Property Corp. Shareholders Litigation,* [31] the complaint alleged that the board breached its fiduciary duties by allowing a conflicted controlling shareholder, who was acting as both buyer and seller in the transaction, to "personally negotiate[ ] a one-sided deal that allowed him and select members of management to continue to reap the benefits of [the company's] future growth while cutting out plaintiff and the class." [32] The complaint also alleged that the controlling shareholder dominated and controlled the board and the "sham" special committee, which did not have the authority to engage in independent negotiations. [33] Taking the allegations in the complaint in the light most favorable to plaintiffs, the Court could not, on a motion to dismiss, rule out the possibility that the entire fairness standard would apply because the controlling stockholder negotiated the transaction, including the allocation of a 20.4% stake in the resulting company for himself. [34] The Court noted, however, that "[t]here is authority for the proposition that the mere fact that a controller has or may be acquiring some interest in the buyer does not automatically trigger entire fairness review." [35] The Court noted that the business judgment standard of review may ultimately apply if, at a later stage, the defendants are able to show that the interests of the minority stockholders were adequately protected. As the *LNR Property* Court stated:

> **\*12** Of course, the defendants may be able to show at the summary judgment stage that Miller, as they argue,

negotiated this transaction as a seller, not a buyer, and that the board and the Special Committee were entitled to repose confidence in his unconflicted motivation to obtain the maximum price for all LNR stockholders. In that case, the court may well be able to conclude that the measures taken by the board and the Special Committee to protect the interests of the minority were adequate in the circumstances to invoke the business judgment standard of review. Nonetheless, those facts and circumstances do not appear in the well pleaded allegations of the complaint. [36]

Although I have determined that the measures taken in this case were not "adequate in the circumstances to invoke the business judgment standard of review," this result is not mandated by *Lynch.* Rather, it results from deficiencies in the specific procedures used in this case. In other words, I accept defendants' argument that *Lynch* does not mandate the application of entire fairness review in this case, notwithstanding any procedural protections for the minority stockholders. [37] In this case-which, again, I have determined is not governed by *Lynch*-business judgment would be the applicable standard of review if the transaction were (1) recommended by a disinterested and independent special committee, *and* (2) approved by stockholders in a non-waivable vote of the majority of all the minority stockholders. [38]

I reject, however, defendants' argument that the procedures used in this case warrant application of the business judgment standard of review. Although I have determined that Hammons did not stand "on both sides" of this transaction, it is nonetheless true that Hammons and the minority stockholders were in a sense "competing" for portions of the consideration Eilian was willing to pay to acquire JQH and that Hammons, as a result of his controlling position, could effectively veto any transaction. In such a case it is paramount-indeed, necessary in order to invoke business judgment review-that there be robust procedural protections in place to ensure that the minority stockholders have sufficient bargaining power and the ability to make an informed choice of whether to accept the third-party's offer for their shares.

Here, the vote of the minority stockholders was not sufficient both because the vote could have been waived by the special committee and because the vote only required approval of a majority of the minority stockholders voting

on the matter, rather than a majority of all the minority stockholders. Defendants would no doubt argue that the special committee merely had the ability to waive the vote but chose not to waive it in this case and that the Merger was in fact approved by a majority of all the minority stockholders. Importantly, however, the majority of the minority vote serves as a complement to, and a check on, the special committee. An effective special committee, unlike disaggregate stockholders who face a collective action problem, has bargaining power to extract the highest price available for the minority stockholders. The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests. Thus, to provide sufficient protection to the minority stockholders, the majority of the minority vote must be nonwaivable, even by the special committee. [39] Moreover, requiring approval of a majority of all the minority stockholders assures that a majority of the minority stockholders truly support the transaction, and that there is not actually "passive dissent" of a majority of the minority stockholders. [40]

**\*13** To give maximum effect to these procedural protections, they must be preconditions to the transaction. In other words, the lack of such requirements cannot be "cured" by the fact that they would have been satisfied if they were in place. This increases the likelihood that those seeking the approval of the minority stockholders will propose a transaction that they believe will generate the support of an actual majority of the minority stockholders. Moreover, a clear explanation of the pre-conditions to the Merger is necessary to ensure that the minority stockholders are aware of the importance of their votes and their ability to block a transaction they do not believe is fair. Accordingly, entire fairness is the appropriate standard of review in this case.

### C. The Entire Fairness of the Merger
The concept of entire fairness has two components: fair dealing and fair price. These prongs are not independent, and the Court does not focus on each of them individually. [41] Rather, the Court "determines entire fairness based on all aspects of the entire transaction." [42] Fair dealing involves "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the

Case 1:18-cv-00349-TWP-TAB Document 1-2 Filed 02/06/18 Page 143 of 212 PageID #: 152
In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)

2009 WL 3165613

directors and the stockholders were obtained." [43] Fair price involves questions of "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." [44] That the special committee approval and the majority of the minority vote were not sufficient to invoke the business judgment standard of review does not necessarily mean that defendants will be unable to prevail on the issue of fair dealing.

Hammons contends that he is entitled to summary judgment even if entire fairness is the applicable standard of review. Hammons asserts that he received less than $24 per share for his Class B shares and did not receive any consideration at the expense of the minority stockholders. In support of this assertion Hammons relies on Lehman's opinion that Hammons received less than $24 per share in actual value for his Class B shares and therefore received less per share than the minority stockholders. Plaintiffs, however, attack Lehman's opinion. For example, plaintiffs criticize Lehman's decision to value the $275 million line of credit at only $20 to $30 million dollars based on the cost to Hammons of a theoretical line of credit obtained in the market, notwithstanding that such a line of credit would not, in fact, have been available to Hammons in the open market. Plaintiffs also contend that Lehman erred by failing to account for the significant tax benefits Hammons received and the other benefits Hammons received that Lehman determined "do not have a quantifiable valuation from a financial point of view." Finally, plaintiffs contend that Lehman's analysis is not determinative on the issue of fair price because it does not account for the impact of Hammons's tax and other specialized requirements on the price obtained for the minority stockholders. [45] These factual and legal disputes regarding the persuasive value of Lehman's opinion on the issue of fair price preclude entry of summary judgment in defendants' favor on that issue.

*14 Because entire fairness is the appropriate standard of review and because there are material factual issues as to the fairness of the price, Hammons's motion for summary judgment on that issue is denied . [46] Similarly, the director defendants' motion for summary judgment on that issue is also denied. [47]

Plaintiffs contend that they have established that the Merger process involved unfair dealing, thus leaving for trial only the issue of fair price. Plaintiffs also argue that the special committee was not effective because the special committee was "coerced" to accept Hammons's offer to avoid the "worse fate" of a continuing presence of minority stockholders. I am not convinced that the special committee was ineffective merely based on the fact that Hammons was able to veto any transaction. In the first instance, there is no requirement that Hammons sell his shares. Nor is there a requirement that Hammons sell his shares to any particular buyer or for any particular consideration, should he decide in the first instance to sell them. There is no requirement that Hammons agree to a transaction that would have adverse tax implications for him. If Hammons chose not to sell his shares, the minority stockholders would have remained as minority stockholders. The mere possibility that the situation would return to the status quo, something Hammons could have chosen to do by never considering selling his shares, is not, standing alone, sufficient "coercion" to render a special committee ineffective for purposes of evaluating fair dealing.

Plaintiffs also contend, however, that the price of the minority shares before the Merger was depressed as a result of Hammons's improper self-dealing transactions. Defendants contend that any "undervaluing" of the shares merely represents the lack of control premium attributable to a minority position in the Company. I am unable, on the current record, to resolve this factual dispute, and neither plaintiffs nor defendants are entitled to summary judgment on the issue of fair dealing. Plaintiffs could prevail at trial on the issue of fair dealing if they were able to establish that the price of the minority shares was depressed as a result of Hammons's improper self-dealing conduct. If the price were depressed as a result of such conduct, then the special committee and the stockholders could have been subject to improper coercion, meaning they would have been coerced into accepting any deal, whether fair or not, to avoid remaining as stockholders. This result addresses the concern that majority stockholders may have an incentive to depress the price of minority shares through improper self-dealing so they could then buy out the minority at a low price. As explained above, however, the issues of whether the price of the minority shares was depressed as a result of such conduct, and whether, as a result, the special committee

In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

or the minority stockholders were improperly coerced into accepting the Merger, must remain for trial. Accordingly, neither plaintiffs nor defendants are entitled to summary judgment on the issue of fair dealing. [48]

### D. The Disclosure Claims

**\*15** As noted above, plaintiffs agree that a number of disclosure violations previously alleged should be withdrawn, but continue to assert that the proxy statement contained four misstatements and omissions. Plaintiffs maintain that the proxy statement mischaracterized the special committee process, omitted information regarding the alleged conflicts of interest of Lehman and Katten Muchin, and omitted information regarding a presentation Eilian made to the special committee. Defendants seek summary judgment on the disclosure claims. [49]

The fiduciary duty of disclosure, which is a specific formulation of the duties of care and loyalty, requires the Board to "disclose fully and fairly all material information within the board's control...." [50] To succeed on their disclosure claims, plaintiffs must identify the facts allegedly omitted from the proxy statement and "state why they meet the materiality standard and how the omission caused injury." [51] "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." [52] In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available." [53] Of course, "[u]nsupported conclusions and speculation are not a substitute for facts." [54]

First, plaintiffs contend that the proxy statement "mischaracterized the Special Committee process as effective and independent of Mr. Hammons" and that "[b]y failing to convey the subservient, deferential approach adopted by the Special Committee, JQH's minority shareholders were led to believe that the price achieved resulted from an effective, arm's length process and not from the constrained, coerced posture occupied by the Special Committee." [55]

Even interpreting the facts in plaintiffs' favor, I am not convinced that they have stated a claim based on the failure to disclose the "subservient, deferential approach adopted by the Special Committee." Plaintiffs point to no specific factual misrepresentation or misleading disclosure in the proxy statement. Rather, plaintiffs seek to have defendants disclose their characterization of the special committee process. This Court has clearly held that directors are not required to disclose the plaintiffs' characterization of the facts or engage in "self-flagellation." [56] Here, I cannot conclude that defendants violated the duty of disclosure by failing to describe the special committee as "subservient" or "deferential." The proxy statement describes the special committee process and even includes disclosure of the special committee's recognition that it lacked the authority and ability to broadly market the Company in light of Hammons's ability to block any transaction and that Hammons's interest in any transaction would be influenced by, among other things, tax implications personal to Hammons and different from those of the minority stockholders. Given this disclosure and the thorough description of the other aspects of the special committee process, Delaware law does not require that the proxy statement include plaintiffs' characterization of the special committee process. [57] Accordingly, summary judgment is granted in favor of defendants on this claim.

**\*16** Plaintiffs also bring a claim based on the failure to disclose that Lehman faced a potential conflict of interest because it had contacts with Eilian about the possibility of underwriting the nearly $700 million commercial mortgage-backed security offering planned by Eilian after completion of the Merger. Plaintiffs contend that the possibility of getting this business gave Lehman a powerful incentive to approve the transaction.

Defendants contend that the group at Lehman that had contact with Eilian about the debt refinancing was different from the group advising the special committee and that Lehman did not ultimately get the business. This Court, however, has stressed the importance of disclosure of potential conflicts of interest of financial advisors. [58] Such disclosure is particularly important where there was no public auction of the Company and "shareholders may be forced to place heavy weight upon the opinion of such an expert." [59] It is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the financial advisor.

Defendants further contend that "there is no evidence that Lehman's opinion was affected by the purported pitch." [60] There is no rule, however, that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict. Thus, defendants cannot defend the alleged omission as immaterial by arguing that any contacts between Lehman and Eilian regarding the refinancing occurred after Lehman opined in December 2004 that the then-high bid of $21 per share was fair to the minority stockholders. By an extension of the logic underlying this argument (that a conflict is not material because the current bid is higher than a bid that was previously found fair by the financial advisor), Lehman's continued engagement after the $21 bid was wholly unnecessary so long as any subsequent bid was not below $21. If this is not the case-if Lehman's judgment was still valuable and necessary even after the opinion on the $21 bid-then the financial advisor's conflict of interest would need to be disclosed in the proxy statement. There remain important factual issues about the timing and content of any contact between Lehman and Eilian regarding the refinancing, as well as whether the Board knew or should have known of the alleged conflict. Defendants, therefore, are not entitled to summary judgment on this claim.

Plaintiffs also assert a claim based on the failure to disclose Katten Muchin's representation of iStar. iStar is the firm that provided Eilian the financing to complete the Merger, and plaintiffs contend that iStar played a substantial role in negotiations between Hammons and Eilian. Plaintiffs argue that this conflict gave Katten Muchin an incentive to see the Merger proceed with Eilian. The special committee was informed of the conflict and that iStar would be represented by a separate team of attorneys at Katten Muchin that was prohibited from discussing the matter with the team of attorneys advising the special committee. The special committee discussed the matter and unanimously approved the representation and agreed that the matter would not compromise Katten Muchin's independence. The conflict, however, was not disclosed to stockholders in the proxy statement.

 **\*17**  Again, the compensation and potential conflicts of interest of the special committee's advisors are important facts that generally must be disclosed to stockholders before a vote. This is particularly true, where, as here, the minority stockholders are relying on the special committee to negotiate on their behalf in a transaction where they will

receive cash for their minority shares. Although the waiver of the conflict by the special committee may have resolved any ethical violation, the special committee's waiver of the conflict would likely be important to stockholders in evaluating the Merger and in assessing the efforts of the special committee and its advisors. For these reasons, defendants are not entitled to summary judgment on this claim.

Finally, plaintiffs bring a claim based on the failure to disclose in the proxy statement a presentation Eilian made to the special committee. The presentation, which was made to the special committee in November 2004, included a valuation of JQH shares from $35.37 to $43.01 based on the average of "peer multiples." Defendants contend that the valuation was based on a hypothetical scenario in which the Company remained public but was transformed into a new entity under Eilian's management. Plaintiffs assert that although the presentation lists several factors that result in JQH's share price being below peer multiples, the presentation does not describe the valuation as contingent on any of these hypothetical factors. Plaintiffs also contend that none of the factors listed are proper grounds for a discount from fair value under Delaware law.

After reviewing the presentation and the minutes of the November 18, 2004 special committee meeting, it is not clear to the Court whether or not the valuation in the presentation was based on a "hypothetical" scenario in which the company remained public with Eilian taking control. If the valuation was not contingent on such a hypothetical scenario, then it appears to be information that a reasonable stockholder would find relevant in determining whether to vote to approve Eilian's $24 per share offer. If, on the other hand, the valuation in the presentation was based on such a hypothetical transaction-a transaction the Board likely could have determined in good faith was highly unlikely given Hammons's objectives-then the Board would likely not have violated their duty of disclosure by failing to disclose the presentation in the proxy statement. Accordingly, defendants are not entitled to summary judgment on this claim.

### E. The Aiding and Abetting Claims
Plaintiffs assert a claim against Acquisition and Merger Sub for aiding and abetting a breach of fiduciary duty. To prevail on an aiding and abetting claim, a plaintiff must

*In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)*
2009 WL 3165613

establish " '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach ." [61] As a controlling stockholder, Hammons owed fiduciary duties to the minority stockholders, and the issue of fair dealing and fair price cannot be decided on summary judgment and therefore must remain for trial. Defendants assert that they are entitled to summary judgment on this issue because there is no evidence that Eilian's entities knowingly participated in a breach of fiduciary duty.

**\*18** "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." [62] Eilian was intimately involved in the negotiations and structuring of the transaction and understood that Hammons and the minority stockholders were in a sense "competing" for the consideration he would pay to acquire JQH. An offeror, however, may bargain at arm's-length for the lowest possible price, and Eilian was permitted to negotiate both with Hammons and the special committee, so long as he did not have knowledge that those negotiations and the resulting transaction would cause a breach of duty to the minority stockholders. As noted above, plaintiffs contend that Hammons's improper self-dealing conduct depressed the price of the minority shares, and plaintiffs could prevail at trial on the issue of fair dealing if they were able to make such a demonstration. Plaintiffs cite evidence that Eilian was aware of those conflicts and that they may have had an effect on the price of the minority shares. For example, plaintiffs point to Eilian's October 28, 2004 letter to the special committee, which cited "[p]erceived conflicts of interest with the controlling Class B shareholder" as an explanation for the underperformance of JQH shares, and Eilian's November 17, 2004 presentation that cited "unique issues of controlling shareholder" as a source of the Company's trading discount. Accordingly, there remains a material issue of fact as to whether Eilian was aware that JQH's stock price was depressed as a result of Hammons's improper self-dealing conduct. Accordingly, defendants are not entitled to summary judgment on this claim.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part, and plaintiffs' motion for partial summary judgment is granted in part and denied in part. Counsel shall confer and submit a form of order that implements the rulings described above.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2009 WL 3165613

Footnotes

1    638 A.2d 1110 (Del.1994).
2    Susan M. Drake, *They Call Him John Q.: A Hotel Legend* (2002).
3    JQH's 2004 Form 10-K at 4.
4    Hart and Lopez-Ona were also initially on the special committee, but withdrew in light of questions that may have been raised regarding their relationship with the Company and Hammons. At the special committee's request, Hart continued to attend special committee meetings as an advisor.
5    Although the special committee had indicated that it would seek to provide "a level playing field" in terms of access to information, the special committee determined at a November 30, 2004 meeting that it would not place JQH management in a "tenuous position" by overriding Hammons's instruction to JQH's general counsel not to send due diligence materials to Eilian at that time. Hammons had expressed that he would not do a deal with Eilian under any circumstances. Nevertheless, the special committee attempted to encourage Eilian and his advisors to not let Hammons's instruction dissuade them from continuing to evaluate a possible transaction and maintaining an open dialogue with the Company's financial advisor.
6    According to defendants, these unaffiliated stockholders represented approximately 23% of the public Class A common stockholders.
7    As explained below, plaintiffs discount the majority of the minority vote because it only required approval of a majority of the minority shares voting, as opposed to a majority of all the minority shares.

8   There were numerous agreements required to execute the complex series of transactions associated with the Merger, some of which are not described in this opinion.

9   Hammons apparently had high standards for his hotels, and took pride in his organization's reputation for quality products. The management agreement allowed Hammons to ensure the hotels were maintained to his standards.

10  To support this assertion, plaintiffs point to statements of special committee members and others that suggest that there were numerous complex issues on Hammons's side of the deal and that, from the perspective of a potential bidder, Hammons was difficult to deal with and had a history of walking away from proposed transactions after significant negotiations.

11  Pls.' Br. in Supp. of their Cross-Mot. for Partial Summ. J. & in Opp'n to Defs.' Mots. for Summ. J. (Pls.' Opening Br.") 34.

12  The JQH directors other than Hammons are referred to collectively as the "director defendants." JQH, Acquisition, and Merger Sub were also part of the director defendants' motion for summary judgment.

13  506 A.2d 173 (Del.1986).

14  Ct. Ch. R. 56(c); *see Gilbert v. El Paso Co.,* 575 A.2d 1131, 1142 (Del.1990); *Conway v. Astoria Fin. Corp.,* 837 A.2d 30, 36 (Del.Ch.2003), *aff'd,* 840 A.2d 641 (Del.2004) (TABLE).

15  *Conway,* 837 A.2d at 36.

16  *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 386 (Del.Ch.1979).

17  *Conway,* 837 A.2d at 36 (quotation omitted).

18  *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991).

19  638 A.2d 1110 (Del.1994).

20  *Id.* at 1117 (citations omitted).

21  *Id.* A different standard applies to transactions that effectively cash out minority shareholders through a tender offer followed by a short-form merger. *See In re Aquila Inc.,* 805 A.2d 184, 190-91 (Del.Ch.2002); *In re Siliconix Inc. S'holders Litig.,* 2001 WL 716787, at *6-9 (Del.Ch. June 21, 2001); *see generally In re Pure Res., Inc. S'holders Litig.,* 808 A.2d 421, 434-39 (Del.Ch.2002).

22  Pls.' Opening Br. 44 (citation omitted).

23  *Lynch,* 638 A.2d at 1117.

24  Importantly, and as explained below, this result does not provide a final answer to the standard of review that will be applied.

25  2005 WL 3642727 (Del.Ch. Dec.21, 2005).

26  *Id.* at *8.

27  *Id.* at *7.

28  *Id.* at *14.

29  *Id.* at *8. Because of the conflict of interest of a majority of the board in that case, the Court in *In re Telecommunications* determined that entire fairness review should apply to the transaction. The Court also determined that, as in *Lynch,* approval by shareholders and a special committee could shift the burden of entire fairness to plaintiffs. Nothing in that case, however, suggests that such a rule must apply in every case in which the Court is determining whether to apply entire fairness review. In other words, the result in *Lynch*-that shareholder and special committee approval merely shifts the burden of entire fairness-does not preclude the possibility that shareholder and special committee review could be relevant in determining whether to apply business judgment or entire fairness in a case that is not governed by *Lynch.*

30  Plaintiffs also cite *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531 (Del.Ch.2003) and *In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192 (Del.Ch. May 22, 2000). In *Cysive,* however, the Court addressed the question of whether the stockholder, who made the buy-out proposal to the minority stockholders, was a "controlling stockholder" for purposes of *Lynch,* and concluded that the large stockholder "possess[ed] the attributes of control that motivate the *Lynch* doctrine." *Cysive,* 836 A.2d at 551-552. In *W. Nat'l,* the plaintiff challenged the merger between Western National Corporation and its 46% stockholder. The Court concluded that the record did not support a finding of control. *W. Nat'l* at *5-10. Here, in contrast, there is no dispute that Hammons was the controlling stockholder of JQH. Hammons, however, did not make the offer to the minority stockholders or agree to a merger with JQH. Rather, an unaffiliated third-party negotiated separately with Hammons and the special committee.

31  896 A.2d 169 (Del.Ch.2005).

32  *Id.* at 176. Similarly, in *Ryan v. Tad's Enterprises, Inc.,* 709 A.2d 682 (Del.Ch.1996) and *In re Dairy Mart Convenience Stores, Inc.,* 1999 WL 350473 (Del.Ch. May 24, 1999), the Court applied entire fairness review where the controlling stockholder negotiated the transaction on behalf of the company and the minority stockholders.

2009 WL 3165613

33    *Id.* at 176-77.

34    *Id.* at 178.

35    *Id.* at 177-78 (citing *Orman v. Cullman,* 794 A.2d 5, 21-22 n. 36 (Del.Ch.2002); *In re Budget Rent A Car Corp. S'holders Litig.,* 1991 WL 36472, at *3 (Del.Ch. Mar.15, 1991)).

36    *Id.* at 178.

37    Although I have determined that the facts of this case fall outside the ambit of *Lynch,* I am also cognizant of recent suggestions of ways to "harmonize" the standards applied to transactions that differ in form but have the effect of cashing out minority stockholders. *See In re Cox Commc'ns, Inc. S'holders Litig.,* 879 A.2d 604, 606-07, 642-48 (Del.Ch.2005); *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 549 n. 23 (Del.Ch.2003); *In re Pure Res.,* 808 A.2d at 443-46.

38    Of course, it is not sufficient for the special committee to merely be disinterested and independent. Rather, the committee must be given sufficient authority and opportunity to bargain on behalf of the minority stockholders, including the ability to hire independent legal and financial advisors. Moreover, neither special committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud. As explained below, plaintiffs contend that the price of the minority shares was depressed as a result of Hammons's improper self-dealing conduct and that as a result the special committee and the minority stockholders were coerced into accepting the Merger. If a plaintiff were able to make such a showing, even special committee approval and a majority of the minority vote would not invoke the business judgment standard of review. Similarly, a stockholder vote would not be effective for purposes of invoking the business judgment standard of review if it were based on disclosure that contained material misstatements or omissions.

39    *See In re JCC Holding Co.,* 843 A.2d 713, 724-25 n. 33 (Del.Ch.2003); *see also Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1150 n. 121 (Del.Ch.2006); *In re Pure Res.,* 808 A.2d at 445.

40    *See In re PNB Holding Co. S'holders Litig.,* 2006 WL 2403999, at *15 (Del.Ch. Aug.18, 2006).

41    *Valeant Pharms. Int'l v. Jerney,* 921 A.2d 732, 746 (Del.Ch.2007) ("[T]he fair dealing prong informs the court as to the fairness of the price obtained through that process.").

42    *Id.*

43    *Emerald Partners v. Berlin,* 787 A.2d 85, 97 (Del.2001) (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983)).

44    *Id.* (quoting *Weinberger,* 457 A.2d at 711).

45    Plaintiffs maintain that "[t]he injury to the Class is measured not by the benefit to Mr. Hammons, but by the loss suffered by Class members as a result of the personal, self-serving requirements he imposed." Pls.' Opening Br. 54.

46    The disclosure claims, which are also addressed in Hammons's motion for summary judgment and the director defendants' motion for summary judgment, are addressed below.

47    *See Emerald Partners,* 787 A.2d at 93-94 ("[W]hen entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided."); *LNR Property,* 896 A.2d at 178 & n. 54 (declining to dismiss claims on the basis of 8 *Del. C.* § 102(b)(7) exculpatory provision because "the entire fairness standard of review may be applicable, and, thus, 'the inherently interested nature of those transactions [may be] inextricably intertwined with issues of loyalty.' ") (quoting *Emerald Partners,* 787 A.2d at 93).

48    Although the procedural protections used in this case were not sufficient to invoke business judgment protection, they could have been sufficient to shift the burden of demonstrating entire fairness to plaintiffs. As explained below, some of plaintiffs' disclosure claims have survived summary judgment. Accordingly, at this stage, I cannot conclude that the majority of the minority vote shifts the burden of demonstrating entire fairness to plaintiffs. Because of the material issues of fact that remain, I also leave open the question whether the special committee's process and approval were sufficient to shift the burden of entire fairness to plaintiffs.

49    Defendants cite *In re Transkaryotic Therapies, Inc.,* 954 A.2d 346 (Del.Ch.2008) and argue that they are entitled to summary judgment because there is no longer a remedy available for any of the alleged disclosure violations. Entire fairness, however, is the appropriate standard of review in this case, and because of the issues of loyalty "intertwined" with transactions subject to such a standard, this is not a case in which the Court will refrain from granting relief for disclosure violations because the transaction has been completed. *See LNR Property,* 896 A.2d at 178 & n. 54. In other words, this is not a case "where there is no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures." *Transkaryotic,* 954 A.2d at 362; *see Emerald Partners,* 787 A.2d at 93-94. Similarly, the Board is not entitled to summary judgment at this stage under the Company's 8 *Del. C.* § 102(b)(7) exculpatory provision. *See LNR Property,* 896 A.2d at 178 & n. 54; *Emerald Partners,* 787 A.2d at 93-94.

50    *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1172 (Del.2000) (quoting *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992)).

*In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)*

2009 WL 3165613

51  *Id.* at 1173 (*Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 141 (Del.1997)).

52  *Loudon,* 700 A.2d at 143.

53  *Skeen,* 750 A.2d at 1172 (quoting *Loudon,* 700 A.2d at 143) (internal quotation marks omitted).

54  *Id.* at 1173.

55  Pls.' Opening Br. 67.

56  *Khanna v. McMinn,* 2006 WL 1388744, at *29, 34 (Del.Ch. May 9, 2006) ("A long-standing principle of disclosure jurisprudence provides that a board need not engage in 'self-flagellation.' Notwithstanding the requirement that directors disclose fully all material facts in the solicitation of proxies from shareholders, a board of directors is not required to 'confess to wrongdoing prior to any adjudication of guilt,' nor must it 'draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.' ") (footnotes omitted); *In re MONY Group, Inc. S'holder Litig.,* 853 A.2d 661, 682 (Del.Ch.2004) (" '[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the facts.' ") (quoting *Seibert v. Harper & Row, Publishers, Inc.,* 10 Del. J. Corp. L. 645, 655, 1984 WL 21874, at *6 (Del.Ch. Dec.5, 1984)).

57  *See In re Lear Corp. S'holder Litig.,* 926 A.2d 94, 111 (Del.Ch.2007).

58  *See David P. Simonetti Rollover IRA v. Margolis,* 2008 WL 5048692, at *8 (Del.Ch. June 27, 2008) ("[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.... A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis.").

59  *Braunschweiger v. Am. Home Shield Corp.,* 17 Del. J. Corp. L. 206, 217, 1991 WL 3920, at *6 (Del.Ch. Jan.7, 1991).

60  Def. John. Q. Hammons's Reply in Supp. of His Mot. For Summ. J. & Opp'n to Pls.' Mot. for Partial Summ. J. 17.

61  *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) (quoting *Penn Mart Realty Co. v. Becker,* 298 A.2d 349, 351 (Del.Ch.1972)).

62  *Id.* at 1097.

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

# *TAB 7*

Case 1:18-cv-00349-TWP-TAB Document 1-2 Filed 02/06/18 Page 151 of 212 PageID #: 160
Police & Fire Ret. Sys. of City of Detroit v. Bernal, Not Reported in A.2d (2009)
2009 WL 1873144

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re MetroPCS Communications, Inc., Tex.App.-Dallas, January 8, 2013

2009 WL 1873144
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Re: POLICE & FIRE RET. SYS.
OF the CITY OF DETROIT
v.
BERNAL, et al.

Civil Action No. 4663–CC.
|
Submitted: June 26, 2009.
|
Decided: June 26, 2009.

West KeySummary

1    **Injunction**

👉 Mergers and acquisitions;anti-takeover measures

Shareholders of a data company were entitled to a preliminary injunction for an alleged breach of fiduciary duty by the board of directors in connection with a sale of control transaction. The sale of control transaction was subject to deal protection measures that resulted in the deterrence of other potential bidders for the data company that might have offered a greater value for the data company's shareholders. Additionally, attempting to unwind the merger between the data company and the company it had the merger agreement with would be nearly impossible. 8 West's Del.C. § 102(b)(7).

3 Cases that cite this headnote

**Attorneys and Law Firms**

Jay W. Eisenhofer, Cynthia A. Calder, Grant & Eisenhofer, P.A., Wilmington, DE.

R. Judson Scaggs, Jr., Jay N. Moffitt, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

Donald J. Wolfe, Jr., Brian C. Ralston, Abigail M. LeGrow, Potter Anderson & Corroon LLP, Wilmington, DE.

**Opinion**

WILLIAM B. CHANDLER III, Chancellor.

**\*1** Dear Counsel:

Plaintiff, a shareholder of Data Domain, Inc., has moved for expedited proceedings in connection with its motion to enjoin certain provisions of the Agreement and Plan of Merger between Data Domain and NetApp, Inc (the "Merger Agreement"). In March 2009, the Data Domain board of directors began discussions with NetApp regarding a potential business combination. On May 11, at a meeting to continue discussing such a combination, the Data Domain board was informed of EMC Corporation's interest in meeting with Data Domain. A meeting was scheduled for May 27, 2009. On May 20, however, Data Domain and NetApp entered into the Merger Agreement whereby Data Domain would be merged into two NetApp subsidiaries, with the Data Domain shareholders receiving a combination of cash and NetApp stock worth approximately $25 for each Data Domain share.

According to plaintiff, the Merger Agreement contained a number of "deal protection mechanisms," including: (1) a "matching right" that gives NetApp five business days to revise its proposal in response to a proposal from a third party bidder; (2) a "no solicitation" clause that prevents Data Domain from soliciting the submission or announcement of another offer to acquire Data Domain; and (3) a termination fee. The board and executive officers of Data Domain also entered into a voting agreement whereby they pledged to vote their shares, representing approximately 20% of Data Domain's outstanding shares, in favor of the NetApp merger. Plaintiff argues that these measures lock up the deal between Data Domain and NetApp and dissuade interested parties from making an offer for the company. Plaintiff further alleges that

Data Domain's officers and directors will receive benefits separate and apart from Data Domain's shareholders, including: (1) assumption and conversion of their Data Domain options, (2) indemnification from liability for matters arising from the completion of the merger, and (3) for certain individuals, positions with the company after the merger.

On June 1, EMC launched an all cash tender offer for Data Domain at a tender price of $30 per share. Plaintiff contends that EMC was prepared to execute an agreement if Data Domain would terminate the NetApp agreement. On June 3, NetApp increased the cash component of the merger consideration by $5, raising the overall value of its offer to $30 per share. Data Domain's board agreed to this revised offer, and left all the deal protection measures in place. The Data Domain board has stated that it is unable to negotiate with EMC because of the deal protection provisions of the Merger Agreement, and that if it failed to reject the EMC bid, Data Domain would be at risk of losing the NetApp transaction.

In deciding whether to expedite proceedings, the Court must determine "whether in the circumstances the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding ." [1] At this procedural stage, I accept as true the well-pleaded factual allegations in the complaint.

 **\*2** Plaintiff contends that Data Domain's directors have violated their fiduciary duties in the context of a sale of control of the company, as those duties are described in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* [2] and its progeny. Those cases counsel that when there will be a sale of control of the company, the "board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise." [3] Plaintiff argues that the Data Domain directors have agreed to a deal that results in a change of control because the majority of the current Data Domain shareholders' equity stakes is being paid off with cash. Thus, plaintiff alleges that the Data Domain directors breached their fiduciary duties by failing to take any steps to secure the best price reasonably available, by granting preclusive deal protection measures that deter any other bidders,

and by failing to inform themselves about the possibilities for greater value to be obtained for Data Domain shareholders through the EMC bid.

Defendants, of course, contend that the board's process was reasonable, and will result in the highest reasonably available value for the Data Domain shareholders. Defendants argue that the deal protection measures are common, permissible features of merger agreements, and that the Merger Agreement advances Data Domain shareholders' interests, as evidenced by EMC's bid for Data Domain notwithstanding the deal protection measures.

While I have not done justice to the arguments presented in the parties' written submissions and during today's oral argument, I need only determine if plaintiff has stated a sufficiently *colorable* claim to justify proceeding on an expedited schedule. Here, plaintiff has stated such a colorable claim. It is well established that there is no blueprint that a board must follow to fulfill its duties in a change of control transaction. The board, however, must exercise its duties in service of obtaining the maximum price reasonably available for the company. Plaintiff has alleged facts that state a colorable claim that the Data Domain board is favoring one bidder over others, thereby deterring bids from third parties that could provide greater value to Data Domain shareholders. Moreover, on a motion for a preliminary injunction, the plaintiff does not have to overcome the hurdle of an exculpatory provision that, as permitted by 8 *Del. C.* § 102(b)(7), exculpates directors from personal liability for *monetary damages* for certain breaches of fiduciary duty.

Plaintiff has also established a sufficient likelihood of irreparable injury. Plaintiff alleges that the deal protection measures in the Merger Agreement are currently having an adverse impact on Data Domain shareholders by deterring potential bidders, including EMC. Harm resulting from such deterrence is incalculable. Moreover, it would be impossible to "unscramble the eggs" by attempting to unwind the merger once it has been completed. Defendants argue that plaintiff is not threatened with irreparable harm because the shareholders will have an opportunity to vote on the NetApp merger. The opportunity for a shareholder vote sometime in the future, however, does not address the alleged current deterrent effect of the deal protection measures.

Case 1:18-cv-00349-TWP-TAB   Document 1-2   Filed 02/06/18   Page 153 of 212 PageID #: 162
Trustees of Pol. Sys. of City of Detroit v. Bernal, Not Reported in A.2d (2009)
2009 WL 1873144

**\*3** Finally, I note that injunctive relief may be the only relief reasonably available to shareholders for certain breaches of fiduciary duty in connection with a sale of control transaction, particularly where the company has adopted a provision exculpating its directors from personal liability for monetary damages for breaches of the duty of care. As explained in *Lyondell Chemical Co. v. Ryan,* a plaintiff faces a significant burden in showing that a board acted in bad faith by failing to reasonably inform themselves or otherwise carry out their fiduciary duties in a sale of control. [4] Thus, in cases such as this one, the shareholders' only realistic remedy for certain breaches of fiduciary duty in connection with a sale of control transaction may be injunctive relief.

For the reasons set forth above, plaintiff's motion for expedited proceedings is granted. A preliminary injunction hearing will be held at 10:00 a.m. on Thursday, August 13, 2009 in Georgetown.

IT IS SO ORDERED.

### All Citations

Not Reported in A.2d, 2009 WL 1873144

Footnotes

1  *Giammargo v. Snapple Beverage Corp.,* 1994 WL 672698, at \*2 (Del.Ch. Nov.15, 1994).

2  506 A.2d 173 (Del.1986).

3  *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 239 (Del.2009) (quoting *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001)).

4  Lyondell, 970 A.2d at 243–44 ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.").

---

End of Document                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 8*

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re American Intern. Group, Inc., Del.Ch., February 10, 2009

935 A.2d 1046
Court of Chancery of Delaware.

Gary L. SAMPLE, on behalf of himself and all persons similarly situated on Counts I, IV, V, and VI and on behalf of Nominal Defendant Randall Bearings, Inc., on Counts II, III, and VI, Plaintiff,
v.
Kent P. MORGAN, Jeffrey L. Hager, David L. Wierwille, Kenneth C. Harrod, Stephen M. Richmond, Baker & Hostetler LLP, and Joseph P. Boeckman, Defendants,
and
Randall Bearings, Inc., Nominal Defendant.

C.A. No. 1214–VCS.
|
Submitted: Sept. 6, 2007.
|
Decided: Nov. 27, 2007.

**Synopsis**
**Background:** Shareholder brought derivative breach of fiduciary duty and waste action against board of directors, alleging that shareholders' approval of stock incentive plan entrenched and enriched insider majority and was procured through materially misleading disclosures. Board of directors' motion to dismiss for failure to state a claim was denied. Shareholder added lawyer and law firm that were corporation's outside counsel as defendants. Lawyer and law firm moved to dismiss for lack of personal jurisdiction.

**Holdings:** The Court of Chancery, New Castle County, Strine, Vice Chancellor, held that:

[1] filing of certificate amendment in the state was transaction of business and tortious injury sufficient to satisfy long-arm statute, and

[2] it was reasonably foreseeable that lawyer and law firm might be sued in the state as a result of filing the certificate

amendment that satisfied due process requirement for long-arm jurisdiction.

Motion to dismiss denied.

See also 914 A.2d 647.

West Headnotes (5)

**[1]** **Pretrial Procedure**
     Matters considered in general
**Pretrial Procedure**
     Presumptions and burden of proof

In considering a motion to dismiss for lack of personal jurisdiction, the chancellor is not limited to the pleadings; the chancellor is permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction, and in doing so, the chancellor must draw reasonable inferences in favor of the plaintiff. Chancery Court Rule 12(b)(2).

9 Cases that cite this headnote

**[2]** **Courts**
     Actions by or Against Nonresidents, Personal Jurisdiction In;"Long-Arm" Jurisdiction

Trial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's intent to ensure that the state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. U.S.C.A. Const.Amend. 14; 10 West's Del.C. § 3104.

3 Cases that cite this headnote

**[3]** **Courts**
     Professional services;malpractice

Filing of corporate certificate amendment in the forum state by corporation's nonresident outside counsel was a transaction of business

in the state and, as part of a scheme by top managers to gain majority of voting shares, caused tortious injury to corporation incorporated in the state, which satisfied the requirements for personal jurisdiction under the long-arm statute, in derivative action alleging breach of fiduciary duty, where outside counsel were alleged to have aided and abetted top managers to accomplish their scheme. 10 West's Del.C. § 3104.

12 Cases that cite this headnote

[4]   **Courts**
      👉 Business contacts and activities; transacting or doing business

The involvement of a defendant in arranging, either directly or through an agent, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in a Delaware court is sufficient to constitute the transaction of business under the state's long-arm statute for required to exercise personal jurisdiction over the defendant. 10 West's Del.C. § 3104(c)(1).

21 Cases that cite this headnote

[5]   **Constitutional Law**
      👉 Banks, banking, finance, and securities
      **Courts**
      👉 Professional services;malpractice

It was reasonably foreseeable to corporation's nonresident outside lawyer and law firm that its action in filing certificate amendment in forum state that aided top corporate managers in entrenchment scheme might result in shareholder derivative action in the state alleging lawyer and law firm aided and abetted the top managers in their scheme, as required to satisfy due process requirement for long-arm jurisdiction. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1047**  Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, A. Zachary Naylor, Esquire, Daniel J. Brown, Esquire, Chimicles & Tikellis LLP, Wilmington, Delaware, Attorneys for Plaintiff.

David A. Jenkins, Esquire, Michele C. Gott, Esquire, Smith Katzenstein & Furlow LLP, Wilmington, Delaware, Attorneys for Defendants Baker & Hostetler LLP and Joseph P. Boeckman.

James J. Merkins, Jr., Esquire, Blank Rome LLP, Wilmington, Delaware; Attorneys for Kent P. Morgan, Jeffrey L. Hager, and David L. Wierwille.

Joanne Pileggi Pinckney, Esquire, Susan E. Poppiti, Esquire, Pinckney Harris & Poppiti, LLC, Wilmington, Delaware, Attorneys for Defendants Kenneth C. Harrod and Stephen M. Richmond.

S. Mark Hurd, Esquire, Samuel T. Hirzel, II, Esquire, Morris, Nichols, Arsht & Tunnel, Wilmington, Delaware, Attorney for Nominal Defendant Randall Bearings, Inc.

OPINION

STRINE, Vice Chancellor.

I. *Introduction*

The question presented is a straightforward one. May a corporate lawyer and his law firm be sued in Delaware as to claims arising out of their actions in providing advice and services to a Delaware public corporation, its directors, and its managers regarding matters of Delaware corporate law when the lawyer and law firm: i) prepared and delivered to Delaware for filing a certificate amendment under challenge in the lawsuit; ii) advertise themselves as being able to provide coast-to-coast legal services and as experts in matters of corporate governance; iii) provided legal advice on a range of Delaware law matters at issue in the lawsuit; iv) undertook to direct the defense of the lawsuit; and v) face well-pled allegations of having aided and abetted the top managers of the corporation in breaching their fiduciary duties by entrenching and enriching themselves at the expense of the corporation and its public stockholders? The answer is yes.

The lawyer and law firm's conduct in arranging the filing of the certificate amendment in Delaware satisfies both § 3104(c)(1) and § 3104(c)(3) of Delaware's long-arm statute. [1] That Certificate Amendment was integral to an alleged scheme by the top managers of the corporation to have issued to themselves at an unfair price a large bloc of voting stock that would secure their control over the **\*1048** corporation. Thus, the scheme not only involved an act in Delaware, it also involved an injury in Delaware to the Delaware corporation.

Likewise, it is constitutionally permissible to exercise jurisdiction over the lawyer and his law firm. Having directed their legal practice toward Delaware by regularly providing advice about Delaware law matters to the corporation, these defendants should have reasonably expected that they might face suit here if the managers and directors they were advising were sued for a breach of fiduciary duty related to that advice. These sophisticated defendants had to know of the strong interest Delaware has in ensuring that Delaware corporations and their stockholders have access to this court to hold corporate fiduciaries and their advisors accountable for honoring their legal and fiduciary obligations. Given their Delaware-directed conduct and the tight nexus between that conduct and this suit, these defendants have no basis to object to having to appear in Delaware to defend this suit.

Their motion to dismiss for lack of personal jurisdiction will therefore be denied.

## II. *Factual Background*

These are the relevant facts from the record, with inferences drawn in the plaintiff-friendly manner required in this procedural context. [2]

In 2004, the three "Top Managers" of Randall Bearings, Inc., an Ohio-headquartered bronze ball bearings concern incorporated in Delaware, received 200,000 shares of the company's stock. [3] Although the Top Managers' right to ownership of the shares was subject to a vesting schedule, the shares could be voted immediately, had dividend rights, and all of the shares vested immediately in the event of a "proposed or actual change in control" of

the company. [4] The 200,000 shares amounted to nearly a third of the company's voting power. The Top Managers comprised three of the board of directors' five members.

The Top Managers paid a total of $200 in exchange for the shares, $199,800 less than if the corporation had not amended its certificate of incorporation to lower the par value of its shares from $1.00 to $0.001. That "Certificate Amendment" was put to the Randall Bearings stockholders at the same time as the stockholders voted to authorize an "Equity Incentive Plan," by which up to 200,000 shares of stock could be issued by the board to employees or officers for the purposes of—or so the stockholders were told—"attracting and retaining key employees for the company." [5]

Before the full board and stockholders approved these items, the Top Managers sought advice from the company's outside counsel, defendant Joseph Boeckman of the Columbus, Ohio office of defendant Baker & Hostetler LLP. Although being paid at all relevant times by Randall Bearings to act as the company's counsel, Boeckman developed options for the Top Managers that would facilitate their objectives of voting control. These options always involved in part the issuance of **\*1049** shares by the company to the Top Managers. In providing his advice to the Top Managers, Boeckman noted that the amount of shares that the Top Managers would need to be a serious obstacle to any change of control exceeded the amount of shares that boards were typically authorized to grant to employees in compensation plans.

In the end, Boeckman and the Top Managers agreed to seek board and stockholder approval for a Certificate Amendment that would, as noted, lower the par value of the company's stock from $1.00 to $0.001 and for an Equity Incentive Plan that would authorize the board to issue up to 200,000 shares—or some 31.7% of the company's voting power—to officers and managers. The pled facts suggest that the Top Managers and Boeckman intended from the get-go for all 200,000 shares to be issued to the three Top Managers—100,000 shares to Morgan, 75,000 to Hager, and 25,000 to Wierwille—so as to accomplish their entrenchment objectives. [6] The reduction in par value would allow the Top Managers to receive the shares for a total of $200 rather than $200,000. This reduction, one can infer, was not chump change to the Top Managers, who later sought and accomplished

having the company pay the taxes they owed on their receipt of the shares.

At the time Boeckman was providing advice about these issues, the Top Managers were insecure because the company's former CEO and largest stockholder had died. A relative of the founder and Chairman of the Board at the time of his death, Bruce Dickerson, owned a bloc of nearly 30%. The leader of the Top Managers, defendant Kent Morgan, had succeeded Bruce Dickerson as Chairman and CEO and had joined the company only a few years earlier.

The Top Managers feared that the Dickerson stock could end up in hands that were unfriendly to management. Boeckman aided the Top Managers in their efforts to manage this risk. Boeckman sent two memoranda to Morgan in late May of 2003. At first, Boeckman recommended securing an agreement from Bruce Dickerson's widow, Susan Dickerson, to put the family's shares in a voting trust whereby she would pledge support for management. At that point, Boeckman contemplated using a combination of a voting trust and the grant of a smaller, but still sizable, number of shares to the Top Managers as a method for achieving their entrenchment objectives.

When the voting trust option became either unattractive or unavailable, Boeckman altered tactics. For one thing, he then recommended that a much larger grant of shares —the 200,000 shares ultimately granted—be authorized for issuance to the Top Managers. [7] When the Randall Bearings board approved the Certificate Amendment and the Equity Incentive Plan some months later, neither the Top Managers nor Boeckman—who was acting as the board's counsel—disclosed the memoranda Boeckman had written to the Top Managers discussing the options they had to achieve their entrenchment objectives. Nor did they disclose to the non-management director who was present that the number of shares to be included in **\*1050** the Equity Incentive Plan far exceeded that which was standard. [8]

Boeckman also helped the Top Managers ensure that the Dickerson bloc ended up in hands friendly to management. Around the same time as the Randall Bearings Board approved the Certificate Amendment and Equity Incentive Plan, Boeckman told the board that Susan Dickerson wanted to sell her stake in Randall

Bearings. Boeckman immersed himself in the negotiations over the terms of sale for Susan Dickerson's bloc of shares to the A Cubed Corporation. Once billed to the court by counsel to the defendants as "an entity that the Dickersons were familiar with" which "do[es]n't have a relationship with the company," [9] the defendants finally and belatedly admitted—through counsel for the nominal defendant, Randall Bearings, at oral argument on this motion—that A Cubed is affiliated with Randall Bearings' principal supplier of raw materials, Concast. [10] Taken together with the contemplated grant of 200,000 shares to the Top Managers, the sale of the 127,442–share Dickerson bloc to A Cubed would place a majority of Randall Bearing's voting power under the control of the Top Managers and A Cubed, if they acted concertedly.

In this respect, A Cubed's supplier relationship was not the only tie that would bind together the 58% voting bloc. Notably, the arrangement with A Cubed also involved a contractual commitment on Randall Bearings' part not to issue more than 200,000 shares of stock during the next five years. That number was not coincidental. It was precisely the larger number of shares the Top Managers sought to have issued to them under the Equity Incentive Plan once the option of securing a voting trust agreement with Susan Dickerson had evaporated. Also in connection with the negotiations over the sale of the Dickerson bloc, Boeckman had the Top Managers execute a "Term Sheet" reflecting an agreement in principle with the sole owner of A Cubed, Alfred Barbour, that was signed on November 21, 2003, along with the Stock Purchase Agreement. [11] Months before stockholder approval, the Term Sheet specified that the 200,000 shares would be distributed to the Top Managers in certain proportions, stating that those shares "will be awarded" to the Top Managers. [12] Of course, as of November 21, 2003, the Randall Bearings stockholders had not yet been informed of, much less voted to approve, the Equity Incentive Plan.

The Term Sheet also contemplated two future agreements among the Top Managers, Barbour, and A Cubed to be executed when the Top Managers were awarded stock under the Equity Incentive Plan. One would require the Top Managers to vote their shares for a board nominee of Barbour's choosing if he requested they do so. Another agreement governed the future sale of Randall Bearings' stock by the **\*1051** signatories to the Term Sheet. This "Co–Sale Rights Agreement" included a term prohibiting

any of the Top Managers, A Cubed, or any affiliate of A Cubed from selling less than all of its stock to a third party. [13] Another related term provided that if any party covered by that restriction found a buyer for its holdings then all parties would have equal rights to sell to that buyer for the same price and on the same terms and conditions. It also granted an assignable option to the Top Managers that would allow them to purchase the Randall Bearings shares owned by A Cubed in the event Barbour ever transferred away his majority voting control over A Cubed. [14]

When Boeckman reported the consummation of the A Cubed transaction to the board, the meeting minutes indicate he told them that: "The company's participation in the transaction was solely to facilitate the transaction." [15] It is not clear how informed the only non-management director in attendance was about these side arrangements.

After the board approved the Certificate Amendment and Equity Incentive Plan, Boeckman prepared and sent to Morgan a checklist listing what needed to be done to implement the Equity Incentive Plan. [16] That checklist included executing stock award agreements and stock certificates reflecting the 200,000 shares the Top Managers would receive. [17] This was in March 2004, two and a half months *before* Randall Bearings held a meeting for its stockholders to vote on the Certificate Amendment and the Equity Incentive Plan. Boeckman played the key role in drafting the proxy statement for that meeting, too.

The proxy statement is remarkable for what it did not say. It told the Randall Bearings stockholders that the purpose of the Equity Incentive Plan was to enable the company to "attract[ ] and retain[ ] key employees." [18] But it failed to mention that the Top Managers already contemplated that all 200,000 shares would be granted to the Top Managers, leaving no shares left for the "attract[ion]" of anyone, and no shares left to help "retain[ ]" any but the three Top Managers on the board itself. Likewise, the proxy statement failed to disclose anything about the contractual arrangements Randall Bearings had entered into with A Cubed. By those arrangements, Randall Bearings had bound itself not to issue any more equity for five years other than the shares contemplated by the Equity Incentive Plan. As important, the proxy statement did not disclose that A Cubed—an affiliate of Randall

Bearings' major supplier—and the Top Managers would, if their plans were implemented, control over 50% of the company's voting power. And, as noted, the A Cubed agreements evidenced a plan for **\*1052** the immediate grant of all the Equity Incentive Plan shares to the Top Managers and the Top Managers' contemplated right to purchase A Cubed's shares if A Cubed sought to sell its shares. These subjects were not addressed at all in the proxy statement.

After the stockholders approved the Certificate Amendment and the Equity Incentive Plan in a close vote, a Baker & Hostetler employee under Boeckman's supervision played the key role in ensuring the Certificate Amendment he drafted was filed in Delaware with the Secretary of State. [19] The pled facts support the inference that Boeckman's firm, Baker & Hostetler, engaged the Corporation Service Company ("CSC") to accomplish the filing. Indeed, a list of "Action Items" Boeckman himself prepared for Randall Bearings identified himself as the "Responsible Party" for filing the Certificate Amendment [20] and other evidence belatedly produced in discovery demonstrates that Baker & Hostetler transmitted the Certificate Amendment to CSC in Delaware for filing. [21]

Once the Certificate Amendment and the Equity Incentive Plan became effective, Boeckman then acted as the sole source of advice to the board committee that was charged with determining how and on what terms to allocate the shares authorized by the Equity Incentive Plan. Boeckman presented the committee with a proposal to grant all 200,000 shares to the Top Managers. [22] After brief meetings at which Boeckman provided the only advice, the committee agreed to do what he recommended —grant the Top Managers all the shares, with immediate voting power and dividend rights, and accelerated vesting in the event of a change of control. Not only that, the committee decided to have the company pay the $930,000 in taxes that the Top Managers owed on the shares they had received. This was a sizable sum that Randall Bearings could not pay out of available funds. Rather, it was forced to take out a five year loan to acquire the funds. During the committee's deliberations, Boeckman did not disclose his discussions with or memoranda to the Top Managers regarding their voting control objectives.

In a prior decision in this case, I denied the defendant-directors' motion to dismiss. [23] In that decision, I concluded that the plaintiff Sample had pled viable claims for breach of fiduciary duty against all the directors of Randall Bearings who served during the period relevant to the grant of 200,000 shares to the Top Managers. In so holding, I noted that the amended complaint pled facts supporting the inference "that the [Certificate] Amendment and the Equity Incentive Plan resulted from a conscious scheme of entrenchment and personal self-enrichment by the [Top Managers], facilitated by the advice of Boeckman, which was purposely concealed from the Randall Bearing stockholders when they were asked to vote on the Amendment and the Plan." [24]

After the court's decision, the plaintiff sought to further amend the complaint to **\*1053** state claims for aiding and abetting breaches of fiduciary duty against Boeckman and Baker & Hostetler. [25]

Boeckman and Baker & Hostetler have now moved to dismiss the claims against them solely on the grounds that personal jurisdiction over them cannot be had in this court. Before addressing that motion's legal merits, it is worth noting that Boeckman and Baker & Hostetler were involved in this litigation long before the third amended complaint added them as parties.

### III. *The Litigation To Date*

Since the inception of this litigation, Boeckman and Baker & Hostetler have played a major role in shaping the defense strategy, although no Baker & Hostetler lawyer sought admission pro hac vice. Oddly, until a few months ago, counsel for Randall Bearings itself (a nominal party in this derivative and class action) and for the defendant-directors (who themselves were until recently represented by a single counsel purporting to represent both the Top Managers and the outside directors) seem to have relied almost entirely upon Baker & Hostetler to do the key work required in connection with the production of documents. The defendant-directors' compliance with their discovery obligations has been, to put it mildly, woefully and repeatedly inadequate.

A full recitation of the repeated discovery violations committed by the defendants in this litigation could go

on for dozens of pages. One glaring example is worth mentioning. Before this court issued its first decision rejecting the defendant-directors' motion to dismiss, the defendant-directors had been under an obligation to produce documents, including documents relating to the Dickerson shares and any arrangements made in connection with the sale of those shares. But it was not until July 20, 2007—six months after the prior decision was issued—that the defendants finally produced documents revealing the Top Managers' negotiations over voting, sale rights, and other issues with A Cubed. Even worse, the defendants continued to dribble out documents, and only in the same time period did they finally produce documents indicating that the Top Managers, Boeckman, and A Cubed had already planned for the Top Managers to receive all 200,000 shares under the Equity Incentive Plan—with immediate voting and dividend rights—before the Randall Bearings stockholders were asked to vote on the Plan. The omission of these material documents from the earlier production has, to date, not been explained.

### IV. *A "Coast–To–Coast" Platform*

This substantial direction of the legal work by Baker & Hostetler for its clients regarding Delaware law matters is, of course, not surprising. Baker & Hostetler touts itself as a "Counsel to Market Leaders," including businesses that "are leaders globally, nationally, regionally[,] and locally." [26] With the strength of being "one of the nation's largest law firms" with "more than 600 lawyers" and a "unique [10 office] coast-to-coast platform" consisting of "[c]oordinated national and international practice groups," Baker & Hostetler advertises itself as being able to handle the full range of any corporation's legal needs, regardless of its location in the United States. [27] In fact, as to corporations in **\*1054** particular, Baker & Hostetler says that it has "200 business lawyers in all ten of [its] offices [who] work with clients in every region in the United States and many parts of the world providing comprehensive and experienced business counsel to large and small ... corporations of ... all sizes." [28] As to corporate law itself, Baker & Hostetler promotes as "practice strengths" its expertise in understanding the "evolving requirements and actions necessary to maintain or achieve compliance with fiduciary duty obligations ... and [corporate] disclosure requirements." [29]

### V. *The Motion To Dismiss*

Boeckman and Baker & Hostetler have not moved to dismiss the claims against them under Rule 12(b)(6). Rather, they have only challenged the complaint on the ground that they are not subject to personal jurisdiction in Delaware.

Frankly, their opening brief was an odd one in that it entirely ignored the fact that they had prepared the Certificate Amendment and caused it to be filed in Delaware. In support of that brief, Boeckman filed an affidavit that, although true in the most literal of senses, seems intended to distract attention from Baker & Hostetler's role in the Certificate Amendment filing. In Boeckman's words:

> 10. I was the Baker Hostetler attorney who supervised all legal services performed in connection with the transactions giving rise to Plaintiff's alleged claims in the above captioned matter.

> * * *

> 13. I had no cause to enter Delaware in connection with my representation, *nor did I file any documents with any court or agency in Delaware in connection with this representation.* [30]

When the plaintiff's answering brief was filed, it understandably featured the Certificate Amendment. After that brief was submitted, more late-produced documents came in when Baker & Hostetler finally produced its billing records. The records demonstrated that a paralegal under Boeckman's supervision at Baker & Hostetler sent the Certificate Amendment to CSC in Delaware for filing. [31] Confronted with the reality—which they might have thought to disclose up-front—that they not only drafted the Certificate Amendment, but sent it to CSC *in Delaware* for filing, the moving defendants retreated to the contention that although they sent the Certificate Amendment to CSC in Delaware, CSC was the registered agent who actually filed the Certificate Amendment with the Secretary of State. Why this matters as a jurisdictional matter, they do not make clear.

Recognizing that their direct role in filing the Certificate Amendment undercut most of the arguments made in their opening brief, the moving defendants then resorted to a panoply of implausible and strained new arguments, which, if accepted, would undermine the purposes of our state's long-arm statute and the ability of stockholders of Delaware corporations to avail themselves of this court as a forum to hold parties responsible for aiding and abetting breaches of fiduciary duty. Consistent **\*1055** with the pattern of this litigation, it turns out that the briefs on this motion were drafted by attorneys at Baker & Hostetler, but filed and signed only by Delaware counsel, who argued the motion. At oral argument, Delaware counsel conceded that at least one of the arguments in the Baker & Hostetler briefs lacked any plausible basis in law or logic. [32]

Distilled down, the arguments made by Boeckman and Baker & Hostetler go essentially as follows. For starters, they note that all the legal work they did was done in offices of Baker & Hostetler outside Delaware. The only potentially relevant act that they directed toward Delaware itself as a physical place was the transmission of the Certificate Amendment to CSC in Delaware. But that action was, they say, not sufficient to constitute a qualifying act under the long-arm statute because the reduction in the Top Managers' cost of acquisition from $200,000 to $200 was simply a nice extra of the overall scheme alleged by the plaintiff. Absent the Certificate Amendment, the approval of the Equity Incentive Plan would still have enabled the Top Managers to obtain voting control over 200,000 shares, although at a much richer price.

In addition, they argue that because the Certificate Amendment was filed by the company, albeit by Baker & Hostetler sending it to CSC, the filing cannot be attributable to any of the Top Managers with whom Boeckman and Baker & Hostetler allegedly conspired. Rather, the filing was a corporate act, and a corporation cannot, say the moving parties, conspire with its own officers, directors, and lawyer. In that same vein, Boeckman and Baker & Hostetler argue that a lawyer who is simply acting for a client with only the hope of getting paid for his work cannot conspire with that client and therefore the conspiracy theory of jurisdiction cannot be used against the lawyer to hold him accountable for acts of the client in the forum state.

Sample v. Morgan, 935 A.2d 1046 (2007)

Finally, Boeckman and Baker & Hostetler contend that it would offend notions of due process for them to have to defend this suit in Delaware. Although they admit to having acted as outside general counsel to a Delaware corporation on matters of Delaware law as to the very matters at dispute in this lawsuit, and to regularly giving clients advice on matters of Delaware law, the fact that their "coast-to-coast" platform of offices does not include a Delaware office makes it constitutionally offensive for them to have to face suit in this state, even as to claims challenging the propriety, as a matter of Delaware law, of board actions on which they gave advice about Delaware law and of a Certificate Amendment they caused to be filed in Delaware.

## VI. *Legal Analysis*

 **[1]**   In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am "permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether **\*1056** the defendants are subject to personal jurisdiction." [33]  In evaluating the record, I must draw reasonable inferences in favor of the plaintiff. [34]

There are two legal questions to be answered in considering a motion under Rule 12(b)(2). The first is whether there is a statutory basis for serving the defendants with process. [35]  The second is whether this court's exercise of personal jurisdiction over the defendants is consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. [36]

Here, the first question is, I suppose, modestly more difficult to answer than the second, which is not close at all. Before beginning, it is useful to reiterate that the moving defendants have not challenged the viability of the claims pled against them. They accept the proposition that the plaintiff has alleged well-pled facts supporting the inference that Boeckman consciously assisted the Top Managers in conceiving and implementing a scheme to enrich and entrench the Top Managers at the expense of Randall Bearings and its stockholders. The sole determination I must now make is whether the moving

defendants must defend that claim on the merits in this court.

Boeckman and Baker & Hostetler were served under Delaware's long-arm statute, 10 *Del. C.* § 3104. That statute provides in pertinent part that:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State; [or]

\* \* \*

(3) Causes tortious injury in the State by an act or omission in this State.... [37]

 **[2]**   The Delaware Supreme Court has made clear that trial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. [38]  In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly. [39]

 **\*1057**   **[3]**   Here, the parties initially joined issue over whether Boeckman and Baker & Hostetler could be served under § 3104 because well-pled facts support the inference that Boeckman engaged in concerted activity with the Top Managers to entrench and enrich the Top Managers at the unfair expense of Randall Bearings and its stockholders. As an element of that scheme, Boeckman and the Top Managers proposed and obtained approval for the Certificate Amendment, which was filed in Delaware. That Certificate Amendment permitted the Top Managers to receive the disputed shares for only $200, saving themselves $199,800. Using the so-called conspiracy theory of jurisdiction, the plaintiff argues that the act of filing the Certificate Amendment can be imputed to Boeckman and Baker & Hostetler, thereby satisfying both § 3104(c)(1) and § 3104(c)(3) of the long-arm statute.

**[4]**   As things turn out, the inquiry is much simpler. Discovery has since revealed that Boeckman and Baker & Hostetler themselves prepared and sent the Certificate Amendment to CSC in Delaware for filing with the Secretary of State.[40] That is, the moving defendants themselves directly transacted business in Delaware for purposes of § 3104(c)(1).[41] The involvement of a defendant in arranging, either directly or through an agent such as CSC, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in this court has been repeatedly recognized as sufficient to constitute the transaction of business under § 3104(c)(1).[42] The Certificate Amendment is directly at issue in the claims against the moving defendants, and therefore the use of § 3104(c)(1) to serve the moving defendants is permissible.[43] Likewise, the moving defendants' filing of the Certificate Amendment in Delaware satisfies § 3104(c)(3) because that action injured Randall Bearings, a Delaware corporation. When a Delaware corporation is financially injured by faithless conduct of its directors, the corporation is injured in its legal home, this State, for purposes of § 3104(c)(3). As this court has previously observed:

> When conspirators commit a breach of fiduciary duty against a Delaware corporation **\*1058** that causes cognizable injury to the entity (as an unfair dilution is deemed to do) ... it is fair to say that the entity was injured in its chosen home—Delaware—the situs that reflects the center of gravity of the corporation for all issues involving its internal affairs. The balance sheet and voting dilution injuries that result in fiduciary duty cases are in some sense metaphysical, but that reality strengthens the argument that the corporation at the very least suffers these injuries in its chosen domicile. Any problems with this common sense approach are best policed by the minimum contacts tests or by the other aspects of § 3104, which for the most part require that an actual act take place in Delaware.[44]

Because Boeckman and Baker & Hostetler were the parties responsible for filing the Certificate Amendment, there is, as noted, no need to impute the conduct of the Top Managers to them by using the conspiracy theory. But the moving defendants make another odd argument that I must consider. That argument—improperly advanced for the first time in the moving defendants' reply brief—consists in the notion that

because the Certificate Amendment was filed on behalf of Randall Bearings as a corporation, Boeckman and Baker & Hostetler cannot be held personally responsible for the filing, for purposes of a personal jurisdiction inquiry under the long-arm statute. That is, even though the moving directors in fact were the parties who prepared the Certificate Amendment, retained CSC to file it as registered agent, and transmitted the Amendment to CSC in Delaware for filing with the Secretary of State, the fact that the Certificate Amendment was filed on behalf of Randall Bearings immunizes the moving defendants.[45] In its broadest form, a form that **\*1059** the moving defendants did not shy from advancing, the moving defendants posit that the filing of a charter amendment or other key corporate instrument with the Secretary of State in Delaware may never form the basis for serving a party sued for aiding and abetting a breach of fiduciary duty in Delaware. Why? Because such documents are formally filed by the corporation itself and thus respect for the corporation's separate legal identity requires that the individuals who caused the corporation to make the filings cannot be held personally accountable for those filings for purposes of § 3104.

One can sleep soundly at night confident that rejection of this argument is not at odds with either logic or sound public policy. When a claim for breach of fiduciary duty is at issue, the underlying conduct almost always involves formal action of the corporation itself. After all, the very essence of a breach of corporate law fiduciary duty claim is the misuse of corporate control.[46] For example, an unfair squeeze out merger by a controlling stockholder quintessentially involves the corporation entering into a merger agreement allowing the controlling stockholder to purchase the corporation for an unfair price.[47] That is, claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests, typically so that the fiduciary could secure an improper personal benefit.[48] Indeed, in fiduciary duty cases, the relief that is sought often involves enjoining or rescinding official corporate action. That is in fact the situation presented by this case, in which the plaintiff seeks rescission of the grant of the disputed shares to the Top Managers.

Although there are sound public policy reasons for limiting the ability of contract **\*1060** and tort claimants to file certain claims against corporate officers and

directors for conduct of the corporation itself,[49] those reasons have little to do with this case or other cases involving the internal affairs of corporations. When well-pled facts support the inference that a person caused a corporation to take jurisdictionally-significant conduct in Delaware and that conduct is an element in a scheme by corporate fiduciaries to unfairly advantage themselves at the expense of a Delaware corporation and its stockholders, our case law has consistently held that the long-arm statute may be used to serve that person.[50] It would be surprising were it otherwise, because a contrary ruling would turn the very essence of faithless conduct—the abuse of corporate power—into an immunity from accountability, precisely because the disloyal fiduciaries derived their wrongful gains from actions of the corporation itself, albeit corporate actions that their own conduct brought about.[51] Such an accountability-destroying reading of the long-arm statute would itself be entirely disloyal to the statute's purpose, as articulated by our Supreme Court in its *Hercules* decision.[52]

Boeckman and Baker & Hostetler assert a narrower version of the prior argument to protect them from application of the conspiracy theory of jurisdiction—that is, that the filing of the Certificate Amendment, although brought about by humans at Baker & Hostetler, was a corporate act of Randall Bearings, for which those humans may not be held responsible for purposes of a personal jurisdiction analysis under § 3104. This narrower version centers on considerations supposedly unique to the legal profession. According to the moving defendants, case law in some other jurisdictions says that lawyers cannot be sued simply for performing services for a client if all that the lawyers get out of **\*1061** those services is a fee.[53] That is, if the only benefit of the lawyer's actions is getting a fee for the work he did, this doctrine supposedly gives the lawyer a free pass from being held civilly responsible for his actions to those who would sue their clients. The moving defendants refer to this doctrine as a version of the "intra-corporate conspiracy doctrine" or the "agent's immunity rule," whereby corporate officials acting in their official capacity are usually deemed incapable of conspiring with the corporation.[54]

Again, the problem with the moving defendants' argument is that they seek to wrench notions that are logical in some contexts into a context in which they make no sense. For certain purposes—for example, claims of tort or antitrust violations brought against a corporation and its officers—it makes little sense to describe the officers as conspiring with the corporation.[55] After all, corporations make decisions through humans, usually humans involved in collaborative activity. Indeed, if one assumes that every corporate action must involve some human actor, every corporate act could be a conspiracy between the corporation and the human causing its act.[56] This area of the law is complex and freighted with important policy questions regarding the circumstances in which both the corporation and those who cause it to act should be held accountable to third-parties and society for corporate conduct. Unsurprisingly, for example, there are distinctions in this area between civil and criminal responsibility and among various kinds of civil claims.[57]

 **\*1062** Here, however, those complications are not present. The alleged conspiracy does not include Randall Bearings; Randall Bearings is one of the alleged victims. The conspiracy is among the Top Managers, allegedly with the knowing assistance of Boeckman and Baker & Hostetler, who were being paid to represent Randall Bearings, not the Top Managers. The conspiracy was intended to entrench and enrich the Top Managers.

Given the nature of this conspiracy, the doctrine on which the moving defendants rely does not even apply on its own terms. Well-pled facts support the inference that the moving defendants were not acting within the appropriate scope of their agency. That is, there are well-pled allegations that the moving defendants were in fact acting to unfairly advantage the Top Managers at the expense of their real client, the company. As the moving defendants admit, when an agent is alleged to have breached its duty to its principal, the so-called agent's immunity they rely upon does not apply.[58] Furthermore, it is not the case, as the moving defendants allege, that the only benefit the moving defendants got was the fees they were paid for their work. By assisting in an entrenchment scheme, the moving defendants got a benefit similar to that obtained by the Top Managers, securing their position as company counsel against the risk of displacement in a takeover. I perceive no Delaware public interest that would be served by adopting a rule that insulates advisors of managers of a Delaware corporation from accountability if can be proven that those advisors,

although being paid by the corporation to advise the managers in their official capacity, consciously assisted the managers in breaching their fiduciary duties.

Put simply, the use of § 3104 to serve the moving defendants is entirely consistent with the language and evident purpose of that statute, and with the precedent interpreting it. The requirement that there be a statutory basis for service is therefore met.

The second step in the personal jurisdiction analysis is a simple one. The United States Supreme Court has held that it is constitutionally permissible to exercise personal jurisdiction over a non-resident defendant when that defendant should have "reasonably anticipated ... that his ... actions might result in the forum state exercising personal jurisdiction over him in order to adjudicate disputes arising from **\*1063** those actions." [59] To satisfy this test, the defendant need not have ever entered the forum state physically because the Supreme Court has rightly focused the test on the more relevant question of whether the defendant has engaged in such conduct directed toward the forum state that makes it reasonably foreseeable that that conduct could give rise to claims against the defendant in the forum state's courts. [60]

**[5]**   That test is easily satisfied here. As noted previously, Baker & Hostetler advertises itself as a national, indeed, international, firm that regularly advises public corporations in matters of corporate and securities law. It touts its coast-to-coast platform.

As sophisticated practitioners of corporate law, the moving defendants realize that Delaware, as a chartering state, has an important interest in regulating the internal affairs of its corporations, in order to ensure that the directors and officers of Delaware corporations honor their obligations to operate the corporation lawfully and in the best interest of the corporation's stockholders. The United States Supreme Court has long recognized the legitimacy and importance of a state's interest in regulating the internal affairs of its corporations. [61] It can also be no surprise to the moving defendants that this important interest is given life in our state by providing stockholders with access to Delaware's court system in order to assert claims of breach of fiduciary duty; after all, decisions too numerous to cite make this clear. [62] So too does § 3114 of Title 10, which makes clear that the

directors **\*1064** and officers of Delaware corporations, accept, as a condition of office, the responsibility for answering official capacity suits in the court of this State. [63] Therefore, the moving defendants had to know that if the Top Managers and other defendant-directors engaged in conduct that gave rise to fiduciary duty claims, that the Top Managers and other defendant-directors were likely to be sued in Delaware. [64]

Given these realities, it is difficult to conceive how it would shock the conscience to require the moving defendants to defend a lawsuit in Delaware. As is clear, the moving defendants purported to provide a wide range of advice and services to the board and officers of a Delaware corporation about important issues of Delaware law. [65] That advice and assistance included the conception, preparation, and **\*1065** filing of the Certificate Amendment, which culminated in a filing in Delaware. Indeed, it is difficult to find a part of the scheme attacked by the plaintiff that did not involve substantial participation by the moving defendants.

For sophisticated counsel to argue that they did not realize that acting as the de facto outside general counsel to a Delaware corporation and regularly providing advice about Delaware law about matters important to that corporation and its stockholders might expose it to this court's jurisdiction fails the straight-face test. The moving defendants knew that the propriety of the corporate action taken in reliance upon its advice and through its services would be determined under Delaware corporate law, and likely in a Delaware court.

As a more general matter, the moving defendants are poorly positioned to claim a violation of Due Process. Given its own self-proclaimed national reach, Baker & Hostetler is in a graceless position to claim to be constitutionally aggrieved by an exercise of jurisdiction by this court over it in a case where the claims against it entirely rest on its actions in providing Delaware law advice to a Delaware corporation. That is especially so when Baker & Hostetler has taken the role of quarterbacking the defense of this action by drafting pleadings and briefs filed by other lawyers with this court, directing the defendants' (inadequate, incomplete, and untimely) responses to discovery, and even drafting the briefs in support of this motion.

Lastly, I reject the idea that denying the moving defendants' motion somehow will undermine the public policy of this state, by causing law firms that provide advice to Delaware corporations to fear that they will be regularly hauled into court here. This is a highly unusual case. In most fiduciary duty cases, it will be exceedingly difficult for plaintiffs to state an aiding and abetting claim against corporate counsel. But in this case, the moving defendants have conceded—as frankly the record makes clear they must—the pleading-stage viability of the claims against them.

More importantly, Delaware has no public policy interest in shielding corporate advisors from responsibility for consciously assisting the managers of Delaware corporations in breaching their fiduciary duties. If well-pled facts can be pled that support the inference that a corporate advisor knowingly assisted corporate directors in breaching their fiduciary duties, Delaware has a public policy interest in ensuring that its courts are available to derivative plaintiffs who wish to hold that advisor

accountable to the corporation. The precise circumstances when corporate advisors should be deemed responsible to the corporation or its stockholders for their role in advising directors and officers should be determined by decisions addressing the merits of aiding and abetting claims, not by decisions about motions to dismiss for lack of personal jurisdiction. Lawyers and law firms, like other defendants, can be sued in this state if there is a statutory and constitutional foundation for doing so.

## VII. *Conclusion*

Both the statutory and constitutional bases for jurisdiction over defendants Boeckman and Baker & Hostetler are obvious. Their motion to dismiss is denied. IT IS SO ORDERED.

**All Citations**

935 A.2d 1046

## Footnotes

1    10 *Del. C.* § 3104.

2    *Outokumpu Eng'g Enter., Inc. v. Kvaerner EnviroPower, Inc.,* 685 A.2d 724, 727 (Del.Super.1996).

3    The Top Managers included CEO Kent P. Morgan, Treasurer and CFO David L. Wierwille, and Vice President of Manufacturing Jeffrey L. Hager. Kenneth C. Harrod and Stephen M. Richmond rounded out the board at the time the grant of shares under the Equity Incentive Plan was approved.

4    Naylor Aff. Ex. 19.

5    Third Amended Class Action and Derivative Complaint ("Compl.") Ex. 1, at 4.

6    Compl. ¶ 30; *see* Naylor Aff. Ex. 7.

7    The second of the two memoranda from Boeckman to Morgan, sent May 22, 2003, is substantially identical to the first, sent two days earlier. *Compare* Compl. 26 *with id.* 29. It downplays the voting control protection afforded against third parties, and omits discussion of the smaller size of most equity incentive plans and the voting trust with Susan Dickerson, subjects that were all covered in the May 20, 2003 memo. *Id.* 26, 29, 30.

8    Randall Bearing's board then included two members who were not managers. One was Susan Dickerson, who had stopped attending meetings by that point because she was feuding with the company over a contractual benefits package. The other was Kenneth Harrod, who had retired in 1997 as a senior executive at Randall Bearings after 30 years of service.

9    Transcript of Oral Argument on Defendant's Motion to Dismiss the Second Amended Complaint (Nov. 6, 2006) ("Nov. 6, 2006 Tr.") at 15, 16–17.

10   Transcript of Oral Argument on Defendant's Motion to Dismiss the Third Amended Complaint (Aug. 29, 2007) ("Aug. 29, 2007 Tr.") at 59–60.

11   Naylor Supp. Aff. Ex. 16.

12   *Id.*

13   *Id.* For the purposes of this provision, the Co–Sale Rights Agreement treats A Cubed and all of its affiliates as a single stockholder.

14   Although the Term Sheet mentions an option being granted in favor of the Top Managers and the company, its other terms seem to make clear that the Top Managers control its exercise. For example, the option was assignable by the Top

Managers to a third party. Moreover, the board minutes for the November 17, 2003 meeting indicate that the company's involvement in the transaction with A Cubed was "to make certain representations in the stock purchase agreement concerning corporate matters beyond the knowledge of the Dickerson Family ... solely to facilitate the transaction." Naylor Aff. Ex. 10.

15   Naylor Aff. Ex. 10.

16   Naylor Aff. Ex. 7. The checklist was attached to an email sent from Boeckman to Morgan on March 11, 2004.

17   *Id.*

18   Compl. Ex. 1, at 4.

19   *See* Naylor Supp. Aff. Exs. 1, 2 (evidencing "preparations for and transmissions with the CSC regarding filing certificate of amendment with the Delaware Secretary of State"); Boeckman Aff. ¶ 10 (acknowledging he "supervised all legal services performed in connection with the transactions giving rise to" the claims in this suit).

20   Naylor Aff. Ex. 7.

21   Naylor Supp. Aff. Exs. 1, 2.

22   Naylor Aff. Ex. 13.

23   *Sample v. Morgan,* 914 A.2d 647 (Del.Ch.2007).

24   *Id.* at 675.

25   *See* Compl. ¶¶ 91, 92.

26   Baker Hosteler—About Us, http://www.bakerlaw.com/AboutUs. aspx?Abs_ WP_ID=56b84b31–3f37–41eb–8960– e42b349976f6 (last visited Nov. 27, 2007).

27   *Id.*

28   Baker Hosteler—Practice Strengths—Business, http://www. bakerlaw. com/BDs.aspx?Abs_BD_ID=116896b2–50a8– 4fde–88c9–21f4fa0cab48 (last visited Nov. 27, 2007).

29   Baker Hosteler—Practice Strengths—Business—Corporate Governance, http://www.bakerlaw.com/BDs.aspx? Abs_BD_ID=9fd65ea7–8a93–4a79–afa9–acceafd 19e24 (last visited Nov. 27, 2007).

30   Boeckman Aff. ¶¶ 10, 13 (emphasis added).

31   Naylor Supp. Aff. Ex. 1.

32   That argument contended that because the director-defendants, including the Top Managers, had been served under 10 *Del. C.* § 3114, the plaintiff could not utilize the so-called "conspiracy" theory of jurisdiction to obtain jurisdiction over Boeckman and Baker & Hostetler under 10 *Del. C.* § 3104. Why this was so was not something counsel for Boeckman and Baker & Hostetler could explain. And for good reason, it makes no sense. The fact that the director-defendants were served under § 3114 does not mean that they could not have engaged in a civil conspiracy with a co-conspirator who was not subject to service under § 3114 in order to determine whether that person could be served under the long-arm statute.

33   *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 974 (Del.Ch.2000).

34   *Outokumpu Eng'g Enter., Inc.,* 685 A.2d at 727.

35   *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.,* 871 A.2d 428, 438 (Del.2005).

36   *Id.*

37   10 *Del. C.* § 3104.

38   *See Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.,* 611 A.2d 476, 480–81 (Del.1992) ("[Section] 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.") (internal citations omitted).

39   *See Chandler v. Ciccoricco,* 2003 WL 21040185, at *10–11 (Del.Ch.2003) ("Under [the *Hercules* ] mandate, my task should be to give the words of the statute a liberal construction and to conclude that [a filing in Delaware] is a transaction of business if that can be reasonably done. Any problems of overbreadth by such a liberal construction can be policed by application of the minimum contacts analysis under the due process clause of the Fourteenth Amendment."); *cf. Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 980 (Del.Ch.2000) (advocating the use of the Due Process analysis to temper potentially overbroad application of the terms of Delaware's director consent statute, 10 *Del. C.* § 3114).

40   Naylor Aff. Exs. 1, 2.

41   *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828, at *6, *8 (Del.Ch.2005); *Gibralt Capital Corp. v. Smith,* 2001 WL 647837, at *6 (Del.Ch.2001).

42   *E.g., In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *22 (Del.Ch.2005) (certificate of merger); *Benihana,* 2005 WL 583828, at *8 (certificate of designation); *Chandler,* 2003 WL 21040185, at *11 (certificate of designation); *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1229 (Del.Ch.2001) (charter amendments),

*rev'd on other grounds,* 817 A.2d 149 (Del.2002); *Gibralt,* 2001 WL 647837, at *6 (charter amendment and certificate of designation); *Kahn v. Lynch Commc'n Sys., Inc.,* 1989 WL 99800, at *4 (Del.Ch.1989) ("negotiating and consummating the merger at issue" constituted transaction of business under 10 *Del. C.* § 3104(c)(1) when the merger's consummation required a filing with the Secretary of State).

43   The "single act" or specific jurisdiction subsections of § 3104(c), such as § 3104(c)(1), only allow jurisdiction over causes of action that are closely intertwined with the jurisdictional contact. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 3–5[a][1][iii] (2005); *accord* 10 *Del. C.* § 3104(c). When service is premised on these subsections, the Delaware-related conduct must form a source of the claim. *E.g., Arnold v. Soc'y for Sav. Bancorp., Inc.,* 1993 WL 526781, at *3 (Del.Ch.1993). Here, the tight nexus between the Certificate Amendment and the entrenchment scheme forming the cause of action make service under the single act provisions of the long-arm statute unproblematic.

44   *Chandler v. Ciccoricco,* 2003 WL 21040185, at *11 n. 46 (Del.Ch.2003). This court noted in *Chandler v. Ciccoricco* that the mandate to construe § 3104(c) to the constitutional limits of Due Process should warrant treatment of Delaware as the situs of injury to a Delaware corporation. Id. As *Chandler* mentioned, the seminal conspiracy jurisdiction case in Delaware, *Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.,* 449 A.2d 210, 228 (Del.1982), may seem at first blush to preclude a holding that the situs of injury to a Delaware corporation not headquartered in Delaware that is victimized by a breach of fiduciary duty is in Delaware for purposes of § 3104(c)(3). *Chandler,* 2003 WL 21040185, at *11 n. 46. Upon close examination, there is not as much tension between this conclusion and the Supreme Court's decision in *Istituto* as the Chandler decision perceived. In that case, an Italian holding company in financial difficulty pledged its entire 10,000 shares of a wholly-owned Delaware subsidiary to an Italian bank. *Istituto,* 449 A.2d at 214–15. When it appeared that the loan would not be repaid, the subsidiary's board authorized additional shares and distributed 190,000 shares as a stock dividend that was then transferred to another owner, thus diluting the security interest from 100% to 5% of the subsidiary's assets. *Id.* On those facts it appeared clear to the Supreme Court that the situs of the injury to the pledgee's security interest in a direct suit by the Italian bank was either the location of the pledge, or the home of the pledgee Italian bank. *Id.* at 228. In other words, *Istituto* did not involve a derivative claim. By contrast, when a Delaware resident—a Delaware corporation—is injured by a breach of fiduciary duty, it is easy to conceive of the corporation as having been injured in its chosen place of legal residence. After all, it is precisely for purposes of internal affairs that corporations—which are not physical beings—choose a legal domicile. When they suffer financial injury, that injury should, consistent with the instruction of *Hercules* and other Delaware public policies favoring a broad construction of § 3104's reach, be deemed to have been suffered in Delaware for purposes of § 3104(c)(3).

45   The defendants cite to cases which advance a fairness-based policy rationale for protecting corporate fiduciaries from being sued personally when jurisdiction over them is based solely on contacts initiated in their fiduciary capacity. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1246 (Del.Super.1987) ("The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.") (quoting *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir.1981)); *Marketing Products Management, LLC v. HealthandBeautyDirect.com, Inc.,* 2004 WL 249581, at *3 (Del.Super.2004) (citing *Plummer & Co. Realtors,* 533 A.2d at 1246).

46   *E.g., Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939) ( "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

47   *E.g., Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

48   *E.g., Zahn v. Transamerica Corp.,* 162 F.2d 36, 46 (3d Cir.1947) ( "[T]he directors of Axton–Fisher ... were the instruments of [a controlling stockholder,] Transamerica[,] ... voting in favor of their special interest, that of Transamerica, [and they] could not and did not exercise an independent judgment in calling the Class A stock, but made the call for the purpose of profiting their true principal, Transamerica. In short a puppet-puppeteer relationship existed between the directors of Axton–Fisher and Transamerica. The act of the board of directors in calling the Class A stock, an act which could have been legally consummated by a disinterested board of directors, was here effected at the direction of the principal Class B stockholder in order to profit it."); *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 721 (Del.1971) ("Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary."); *Bennett v. Propp,* 187 A.2d 405, 408 (Del.1962) (Chairman of the board caused a corporation to engage in unauthorized stock purchases in anticipation of a hostile tender offer. Share "purchases were made to preserve the control of the corporation in [the chairman] and his fellow directors.... The use of corporate funds for such a purpose is improper.").

49    *See Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1044 n. 63 (Del.Ch.2006) ("When corporations commit intentional torts or breaches of contract, they obviously do so at the behest of some human agent and often more than one. Therefore, if corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could also regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally."); Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule,* 84 NEB. L.REV. 1, 25 (2005) (explaining that because corporate principals can only act through their agents, agency relationships and breaches of contract by the corporate principal would be chilled if agents "were to absorb the cost of tort liability for inducing a breach of their principals' contracts—or, more accurately, if they internalized the risk of such liability ex ante").

50    *See, e.g., Benihana,* 2005 WL 583828, at *8; *In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *22; *Gibralt,* 2001 WL 647837, at *6 (Del.Ch.2001).

51    This is not a novel observation. In *U.S. v. Montreal Trust Co.,* for example, a New York federal court asserted jurisdiction over a corporate officer of a publicly-owned Canadian company who had been diverting funds through New York agents. 358 F.2d 239, 243 (2d Cir.1966). The officer claimed that because his only contacts with New York were in an official corporate role on behalf of the Canadian company he was charged with victimizing, he was protected by the fiduciary shield doctrine. In rejecting his argument on appeal, the Court of Appeals for the Second Circuit stated: "It would be ironic, indeed, if the very corporations whose funds [the officer] is charged with diverting were to supply him with a shield against suit for tax liability allegedly incurred in connection with this purported breach of his fiduciary duty." *Id.; see also Marine Midland Bank,* 664 F.2d at 902 (2d Cir.1981) (summarizing *Montreal Trust,* 358 F.2d at 243).

52    611 A.2d 476, 480–81 (Del.1992).

53    *See, e.g., In re County of Orange,* 203 B.R. 983, 999–1000 (Bankr.C.D.Cal.1996), *rev'd on other grounds* ("The gain must be more than the fees received from the fiduciary-defendant that the nonfiduciary is accused of conspiring with."); *Cooper v. Equity Gen. Ins. Co.,* 219 Cal.App.3d 1252, 268 Cal.Rptr. 692, 696–97 (1990) (holding that an attorney working on a contingency basis did not have an independent financial stake because plaintiff did not allege that the attorney "stood to gain anything more than a fee for his work as an attorney."); *see also General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir.2003) ("[T]he mere fact that attorneys have 'mixed motives' such as 'enhancing' their reputation by aggressive representation, does not remove their conduct from the scope of the agency.").

54    *See, e.g., Superior Court Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv. Inc.,* 2004 WL 877599, at *11 (R.I.Super.2004) ("It is well-settled that 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.' ... The policy behind the intracorporate conspiracy doctrine "is to preserve independent decision-making by business entities and their agents free of the pressure that can be generated by allegations of conspiracy.") (quoting *Marmott v. Maryland Lumber Co.,* 807 F.2d 1180, 1184 (4th Cir.1986) and *Fairley v. Andrews,* 300 F.Supp.2d 660, 668 (N.D.Ill.2004)); *see also Roth v. La Societe Anonyme Turbomeca France,* 120 S.W.3d 764, 778 (Mo.App.2003) ("Because an attorney is an alter ego of his or her client, a conspiracy between the attorney and the client is not possible.").

55    *See Allied Capital Corp.,* 910 A.2d at 1044 n. 63 (discussing the complexities of using the tort of civil conspiracy to apply to concerted action among corporate officials); *see also* Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant,* 52. U. CIN. L.REV. 431, 432–33 (1983).

56    *See Allied Capital Corp.,* 910 A.2d at 1044 n. 63 ("[I]f corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally.").

57    *See* Pritikin, *supra* note 49 at 4–5 ("[T]he single legal actor theory—the fiction that the agent's acts are those of the principal, and thus that the 'plurality' element of conspiracy is absent—arose where policy considerations regarding the underlying offense supported its application. The fiction is accepted in the antitrust context, on the rationale that proscribing certain intracorporate combinations that restrain trade could chill legitimate business conduct. However, the same fiction is rejected in the context of criminal conspiracy, on the rationale that the increased danger arising from a group of criminal actors that justifies punishing conspiracy generally exists even where the conspirators are all agents and employees of a single entity."); *see also* Brickey, *supra* note 55 at 438–40 ("The incongruity of these rules is attributable to the disparate policy considerations that shaped them.").

58    *E.g., Amaysing Techs. Corp v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *7 (Del.Ch.2005) ("An exception exists to this general rule, however, when the officer or agent of the corporation steps out of her role as an officer or agent and acts pursuant to personal motives.... Courts interpreting the 'personal reasons' exception ... have read it to mean a personal

animus and/or desire for financial benefit other than one's corporate salary.") (internal citations and quotations omitted); Pritikin, *supra* note 49 at 25 (The agent's privilege is "based on the agent's value to the principal in accomplishing its legitimate business goals.... [I]f benefiting the principal is no longer the sole or primary purpose of the agent in inducing a breach, the social interest in the agent's inducement no longer outweighs the interest in upholding the contract, so the privilege is vitiated.").

59   *In re USACafes, L.P. Litig.,* 600 A.2d 43, 50 (Del.1991) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

60   *E.g., Asahi Metal Indus. Co. Ltd. v. California,* 480 U.S. 102, 110, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also* William M. Richman, *Understanding Personal Jurisdiction,* 25 ARIZ. ST. L.J. 599, 617–18 (1993) ("The Court has realized that 'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence.' *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. It is enough if defendant's conduct is 'purposefully directed' at the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).... Also, defendant may be amenable when her actions outside the state have foreseeable effects inside the state. Indeed, if the defendant's out-of-state activity is purposeful and geographically targeted at the forum state, jurisdiction can be based on a single transaction or occurrence—the most minimal of contacts. *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).").

61   *E.g., CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 91, 93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (recognizing that "[a] State has an interest in promoting stable relationships among parties involved in the corporations it charters" and "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing."); *cf. Edgar v. MITE Corp.,* 457 U.S. 624, 645–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (observing that no state has a legitimate interest "in regulating the internal affairs of foreign corporations").

62   *E.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1125 (Del.1988) ( "The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law and the desirability of providing a definite forum in which shareholders can challenge the actions of corporate management without having to overcome certain procedural barriers which can be particularly onerous in the context of derivative litigation.' ") (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980)); *In re Topps Co. S'holders Litig.,* 924 A.2d 951, 960 (Del.Ch.2007) ("[I]n Delaware's system of corporate law, the adjudication of cases involving the fiduciary duties of directors in new business dynamics is one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority."); *Ryan v. Gifford,* 918 A.2d 341, 349–50 (Del.Ch.2007) (Delaware has a "significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations.") (quoting *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at *8 (Del.Ch.1993)); *see also Diedenhofen–Lennartz v. Diedenhofen,* 931 A.2d 439, 451 n. 26 (Del.Ch.2007) (citing numerous cases evidencing Delaware's "compelling interest in the efficient and consistent application of its laws governing business entities").

63   *HMG/Courtland Properties, Inc. v. Gray* explains why Delaware's director consent statute is constitutionally valid:

   [T]he power of defendant directors to act in their director capacity arises exclusively under the Delaware corporation laws; defendant directors avail themselves of important privileges and legal powers and protections when they accept office as directors of Delaware corporations; by virtue of § 3114, defendant directors who accept such privileges are put on notice that they can be haled into court here to answer for breaches of Delaware corporation laws; Delaware has a legitimate interest in enforcing those laws; § 3114 is narrowly tailored to serve that legitimate interest and to compel the appearance of defendant directors only where that purpose is served; that the state's legitimate interest outweighs any burden to defendant directors; and, as a result, defendant directors served in conformity with § 3114 can fairly be expected to defend suits here.

   729 A.2d 300, 304 n. 3 (Del.1999) (summarizing *Armstrong v. Pomerance,* 423 A.2d 174 (Del.1980)).

64   *See HealthTrio, Inc. v. Margules,* 2007 WL 544156, at *6 (Del.Super.2007) (finding that a non-Delaware attorney's provision of legal services for a client in filing its certificate of incorporation in Delaware and in acting for it in connection with a prior Delaware litigation, including calls and letters to corresponding counsel in Delaware, satisfied the long-arm statute and the Due Process Clause when the lawyer was sued in Delaware for malpractice relating to the prior Delaware litigation even though the attorney never appeared in the prior Delaware litigation or physically entered Delaware).

65   In fact, during the period when the Certificate Amendment and the Equity Incentive Plan were being devised and implemented, Boeckman was representing Randall Bearings in connection with a books and records request made by the lead plaintiff in this action, Gary Sample. *See* Naylor Supp. Aff. Exs. 9, 10, 11, 12, 13, 14. In the § 220 litigation,

Boeckman appeared on pleadings and a response to interrogatories filed in this court as of counsel and took the lead in jousting with Sample's Delaware-based counsel over the books and records that the company would produce to Sample. *See* Answer, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Defendant Randall Bearing, Inc.'s Responses to Plaintiff's First Set of Interrogatories, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Naylor Aff. Exs. 25, 26, 28, 30. In the course of that jousting, Baker & Hostetler also gave its view on the propriety and scope of Sample's right to books and records under Delaware law. *See* Naylor Aff. Exs. 25, 26, 28. Notably, in a memorandum that Boeckman wrote to Top Manager and Randall Bearings CEO Kent Morgan relating to the grants issued under the Equity Incentive Plan, Boeckman reminded Morgan that there are "stockholders like Gary Sample out there." Naylor Aff. Ex. 7.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 9*

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Cox Radio, Inc. Shareholders Litigation, Del.Ch.,
May 6, 2010

532 A.2d 1324
Court of Chancery of Delaware,
New Castle County.

SEALY MATTRESS COMPANY OF NEW
JERSEY, INC., Lillian Lewis and United Jersey
Bank, co-executors of the estate of Morris
Lewis, Walter Hertz, Lorraine Klein, Howard
Lewis, Harold Naiman, and Harold and Rose
Naiman, on behalf of themselves and derivatively
on behalf of Sealy, Incorporated, Plaintiffs,
v.
SEALY, INC., The Ohio Mattress Company, Ohio–
Sealy Mattress Manufacturing Co., Sealy Merging
Corporation, Ernest M. Wuliger, Thomas Smudz,
C. Steven Kneeland and Gary Pleasant, Defendants.

Civ. A. No. 8853.
|
Date Submitted: July 7, 1987.
|
Date Decided: July 20, 1987.
|
Revised: July 24, 1987.

**Synopsis**

Individual and derivative action was filed by minority
stockholders to enjoin proposed cash-out merger of
parent corporation into wholly owned subsidiary of its
majority shareholder. The Court of Chancery In and For
New Castle County, Jacobs, Vice-Chancellor, held that
minority shareholders adequately established lack of fair
price, lack of fair dealing, and breach of fiduciary duties
by directors to minority shareholders as well as irreparable
harm, and were thus entitled to preliminary injunction of
proposed merger.

So ordered.

West Headnotes (15)

**[1]    Corporations and Business Organizations**
🔑 Fairness of transaction

Where target corporation's parent
corporation and its directors, who are
employees of and controlled by target's
majority stockholder, stand on both sides of
proposed merger and fix its terms, majority
stockholders have burden of establishing
"entire fairness" of merger, which is the most
scrupulous inherent fairness of the bargain,
sufficient to pass test of careful scrutiny by the
courts.

2 Cases that cite this headnote

**[2]    Corporations and Business Organizations**
🔑 Mergers and Consolidations

The concept of "entire fairness" as used for
corporate mergers is not restricted to matters
of valuation alone, but embraces fair dealing
as well as fair price.

Cases that cite this headnote

**[3]    Injunction**
🔑 Mergers and acquisitions;anti-takeover
measures

For purpose of preliminary injunction of
proposed merger, determination of whether
minority shareholders have shown that
proposed corporate merger will not pass
"entire fairness" test involves an assessment
of whether majority shareholders will be able
to carry their ultimate burden of persuading
court that transaction is entirely fair in the
dual sense of fair dealing and fair price.

4 Cases that cite this headnote

**[4]    Injunction**
🔑 Mergers and acquisitions;anti-takeover
measures

On motion for preliminary injunction against
proposed merger, majority shareholder failed
to carry burden of showing that it would
probably succeed in proving that book-
value merger price of $178.46 per share
was entirely fair, record did not disclose
what corporation's present fair-value price

might be, although there was evidence that corporation's fair value was significantly higher than $58 million book-value price being offered in merger, that book value to be paid to licensees for their stock was higher than proposed merger price, and that brokerage firm had valued corporation at $140 to $160 million.

1 Cases that cite this headnote

**[5]**    **Injunction**
        👉 Mergers and acquisitions;anti-takeover measures

Minority shareholders seeking preliminary injunction against proposed corporate merger showed that directors would probably not succeed in carrying their burden of proving that they, in their capacity as fiduciaries, dealt fairly with minority shareholders in seeking to accomplish merger; merger was timed and structured in a way that had foreseeable effect of producing an unfair result at a time when valuation of corporation was difficult because of directors' refusal to permit posttrial review of antitrust judgment, process by which merger terms were arrived at did not involve procedural protections which would have tended to assure fair result, and directors failed to fulfill obligations to make informed deliberate judgment that merger terms were fair and that merger would not become vehicle for economic oppression, and to candidly disclose all material facts concerning merger.

10 Cases that cite this headnote

**[6]**    **Corporations and Business Organizations**
        👉 Disclosure of information in general
    **Corporations and Business Organizations**
        👉 Fairness of transaction

As fiduciary seeking to "cash out" minority stockholders of Delaware corporation, majority shareholder was obliged not to time or structure transaction or to manipulate corporation's values so as to permit or facilitate forced elimination of minority stockholders at unfair price, to make

informed, deliberate judgment in good faith that merger terms including price were fair and that merger would not become vehicle for economic oppression, and to candidly disclose all material facts concerning merger so that minority shareholders could make informed decision as to whether to accept merger price or seek judicial remedies.

22 Cases that cite this headnote

**[7]**    **Corporations and Business Organizations**
        👉 Good faith and fiduciary duties

Evidence, that corporate merger was timed and structured in a way that had foreseeable effect if not intent of producing unfair result went to concept of whether timing and structure of merger met "fair dealing" standard; there was evidence that majority stockholder timed merger to occur at time when valuation of corporation was difficult, if not impossible, and that it used antitrust judgments to manipulate corporation's value for their benefit, as well as other evidence suggesting calculated effort to depress price of corporation until minority stockholders were eliminated.

5 Cases that cite this headnote

**[8]**    **Corporations and Business Organizations**
        👉 Good faith and fiduciary duties

Fact that majority stockholder unilaterally determined merger price without putting into place any of procedural protections tending to assure fair substantive result such as placing independent directors on board, employing independent representatives to negotiate on behalf of minority, and retaining independent investment banker or other financial expert or legal counsel to represent minority interests was evidence of lack of fair dealing by majority shareholder in arriving at merger terms.

3 Cases that cite this headnote

**[9]**    **Corporations and Business Organizations**

⚷ Duties of directors and officers in
general;business judgment rule

Directors of parent corporation approving
proposed merger of parent by subsidiary
of majority shareholder breached fiduciary
duties to minority shareholders by being
completely uninformed and making no
effort to inform themselves of material
facts, and admittedly functioning in a
ministerial capacity to carry out parent
corporation's bidding, without making any
effort to determine whether proposed price
was fair, without considering facts that would
bear materially on that issue, and without
independent expert financial or legal advice.

4 Cases that cite this headnote

**[10]** **Corporations and Business Organizations**
⚷ Duties of directors and officers in
general;business judgment rule

Directors of parent corporation, in carrying
out board's affirmative duty to protect
interests of minority shareholders, could
not abdicate obligation to make informed
decision on fairness of merger by simply
deferring to judgment of controlling
shareholder particularly, where majority
shareholder's interests were in unalloyed
conflict with those of minority.

7 Cases that cite this headnote

**[11]** **Corporations and Business Organizations**
⚷ Disclosure of information in general

Corporate directors breached fiduciary duty
to minority shareholders to disclose all
material facts pertaining to merger, evidence
showed few if any facts material to informed
investment decision were disclosed, that facts
disclosed were, in the main, highly misleading,
including implication that board had made
independent informed judgment that book
value was fair price, disclosures relating to
book value were misleading, and information
statement and supplement contained virtually
no information material to any informed
judgment on value.

9 Cases that cite this headnote

**[12]** **Corporations and Business Organizations**
⚷ Disclosure of information in general

Fact that one minority shareholder was
knowledgeable about facts material to
informed investment decision at time of
proposed corporate merger did not vitiate
other directors' breach of fiduciary duties
to other minority shareholders who knew
virtually nothing about corporate affairs,
particularly as record showed that minority
shareholder had not been a director for 9
years, and had limited knowledge of material
facts relating to corporate value, particularly
value of antitrust judgments and corporation's
future business plans, protected earnings, and
prospects.

2 Cases that cite this headnote

**[13]** **Corporations and Business Organizations**
⚷ Disclosure of information to corporation
and shareholders or members

Disclosure burden owed by director of
corporation as fiduciary cannot be discharged
by fiduciary's lawyer to beneficiary's lawyer in
context of litigation.

1 Cases that cite this headnote

**[14]** **Injunction**
⚷ Mergers and acquisitions;anti-takeover
measures

Minority shareholders of parent corporation
for which merger was proposed adequately
established that they would suffer
irreparable harm if merger were not
preliminarily enjoined; minority shareholders
did not receive sufficient information to
make informed decision among available
alternative, board had approved merger
which was preliminarily found to be in
violation of state corporations law regarding
disclosure obligation, and damages would be
difficult to assess, particularly due to status of
antitrust judgments involving corporation.

9 Cases that cite this headnote

**[15]**    **Injunction**
   👉 **Mergers and acquisitions;anti-takeover measures**

Court was not precluded from granting preliminary injunctive relief in parent-subsidiary merger given nature of conduct involved and harm likely to result in case involving his misrepresentation, self-dealing, and gross and palpable overreaching.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1326**  Rodman Ward, Jr., Marc B. Tucker, Paul L. Regan and John G. Day of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for plaintiffs.

Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, for defendant Sealy, Inc.

Clark W. Furlow and Craig B. Smith of Lassen, Smith, Katzenstein & Furlow, Wilmington, and Frederic F. Brace, Jr. and Michael D. Craig, Chicago, Ill., for other defendants.

**OPINION**

JACOBS, Vice-Chancellor.

This individual and derivative action was filed by minority stockholders of Sealy, Incorporated ("Sealy"), a Delaware corporation, on February 13, 1987, to enjoin a proposed cash-out merger of Sealy into a wholly-owned subsidiary of Ohio–Sealy Mattress Manufacturing Company ("Ohio–Sealy"), Sealy's majority stockholder. Sealy is one of the nation's leading manufacturers and distributors of bedding products, and is over 93% owned by Ohio–Sealy. The plaintiffs, who collectively own the remaining 6.1% of Sealy's stock, are its sole minority stockholders. [1] Under the terms of the proposed merger, Sealy is to be merged into Sealy Merging Corporation, a second-tier subsidiary of Ohio–Sealy, [2] and all shareholders other than Ohio–Sealy (*i.e.,* the

plaintiffs) are to receive $178.46 cash—representing Sealy's book value as of December 31, 1986—for each share of their Sealy stock.

Upon filing this action, the plaintiffs sought a preliminary and permanent injunction against consummation of the merger. Expedited discovery was conducted during the week of February 15, 1987, and a hearing on the preliminary injunction motion was scheduled for February 23, 1987, one day before the stockholders' meeting at which the merger was to be approved. [3] In response, the defendants postponed the stockholders' meeting for the purpose of discussing settlement. Settlement was not achieved, and the plaintiffs **\*1327** advised the defendants that they (the plaintiffs) intended to press their motion for a preliminary injunction. The defendants then announced that the merger would again be deferred, this time for the stated reason that Ohio Mattress intended to complete a public offering of its stock. They announced also that the stockholders' meeting would also be postponed until further notice. [4]

On February 27, 1987, the plaintiffs filed a motion for an allowance of attorneys' fees and expenses. The defendants opposed that motion on the grounds, *inter alia,* that no benefit had been achieved by the plaintiffs' efforts, because the merger had not been abandoned. The defendants also filed, and the parties subsequently briefed, a motion to dismiss the amended complaint. [5] On May 14, 1987, the day after this Court heard argument on the fee application motion, the defendants informed the plaintiffs and the Court that a stockholders meeting to approve the merger would be convened on July 21, 1987. The plaintiffs then renewed their motion for a preliminary injunction. Further expedited discovery and briefing followed, and oral argument on the preliminary injunction motion took place on July 7, 1987.

This is the decision of the Court on the plaintiffs' motion for a preliminary injunction.

*I. The Facts*

To understand the issues presented, it is necessary to discuss the facts at somewhat greater than normal length. The material facts are essentially uncontested.

Sealy's principal business consists of manufacturing bedding products. Until recently, Sealy also derived revenues from a network of licensee organizations located in different states. The licensees manufactured and marketed bedding products under the Sealy tradename.

With the exception of Ohio–Sealy, the Sealy licensees were also Sealy's stockholders. Until late 1986 when Ohio–Sealy acquired majority control of Sealy, the following entities owned Sealy stock in the following percentages:

| | |
|---|---|
| New York-Sealy | 18.66% |
| Kansas City-Sealy | 3.34% |
| Illinois-Sealy | 16.35% |
| Connecticut-Sealy | 14.96% |
| Maryland-Sealy | 8.51% |
| Memphis-Sealy | 15.59% |
| Virginia-Sealy | 2.83% |
| Michigan-Sealy | 11.95% |
| New Jersey-Sealy Group | 6.19% |
| Howard Haas [6] | 1.62% |
| | 100.00% |

For the previous 16 years, Ohio–Sealy had been involved in antitrust litigation against Sealy and certain of its licensees in the United States District Court located in Chicago, Illinois. Ohio–Sealy charged Sealy and the defendant licensees with having violated the federal antitrust laws in various respects. Michigan–Sealy, a licensee, was also a plaintiff in certain of those actions. On June 14, 1986, Ohio–Sealy obtained a verdict of $27 million against Sealy, plus a separate verdict of $50 million against Sealy and certain Sealy licensees that collectively owned about 58% of Sealy's stock. [7] Michigan–Sealy obtained a separate verdict of $45 million against Sealy alone. The antitrust defendants then filed post-trial motions attacking the antitrust judgments. In response, Ohio–Sealy and Michigan–Sealy pressed for an order requiring the licensee defendants to post appropriate security as a condition of their pursuing post-judgment relief.

Shortly after the June, 1986 verdicts, Ohio–Sealy filed new antitrust litigation against Sealy and the defendant licensees. That new litigation, combined with the $122 million of judgments, became material inducements **\*1328** for the antitrust licensee defendants to sell their businesses (including their stock holdings in Sealy) to Ohio–Sealy. Accordingly, a series of negotiations between the licensees and Ohio–Sealy, followed by sales of the licensees' business to Ohio–Sealy, took place during the last quarter of 1986.

Specifically, during the fall of 1986, New York–Sealy negotiated a sale of its business (including New York–Sealy's 18% stock interest in Sealy) to Ohio–Sealy at a price representing book value. Thereafter in December, 1986, the remaining antitrust defendant licensees (Illinois–Sealy, Connecticut–Sealy, and Maryland–Sealy), plus Kansas City, which was not a defendant, reached agreement with Ohio–Sealy to sell their businesses. The consideration was an overall, single lump sum for all of the businesses, which sum would be allocated among the sellers as they collectively agreed. Those acquisitions gave Ohio–Sealy an additional 43.16% of Sealy's outstanding stock which, when combined with previous stock purchases, made Ohio–Sealy the 77.41% owner of Sealy. Ohio–Sealy then purchased the Bluefields, Virginia–Sealy licensee, and later the stock of Howard Haas, Sealy's then-President. Those acquisitions brought Ohio–Sealy's stock ownership of Sealy up to approximately 82%.

All of the sales of the licensees' businesses to Ohio–Sealy took place against the backdrop of both the Damoclean $122 million antitrust judgments and the prospect of continued antitrust litigation. As stated, the Sealy stock owned by each of the acquired licensees was included among the assets sold to Ohio–Sealy. The price paid by Ohio–Sealy for the licensees' respective bedding businesses was, in each case, negotiated. However, in all cases Ohio–Sealy insisted upon allocating book value to the acquired licensee's Sealy stock. Several licensees testified that the Sealy stock, standing alone, was worth significantly more, but the licensees did not oppose allocating book value as the agreed price for their Sealy stock because the overall purchase price for the combined assets was acceptable to them. How that price was to be allocated among specific acquired assets was not important.

Because Ohio–Sealy would be taking control of Sealy, Ohio–Sealy's counsel requested the federal court in the antitrust litigation to defer ruling upon the antitrust defendants' post-trial motions challenging the antitrust judgments. That court did so defer. Ohio–Sealy's counsel also instructed Sealy's antitrust counsel to take no further action to challenge the verdicts. That directive was also carried out. As of this time no steps have been or are being taken to obtain post-judgment review of the antitrust verdicts.

In late November, 1986, Frederic F. Brace, Jr., Esquire, Ohio–Sealy's Chicago, Illinois antitrust counsel, recommended to his client that it assume control of Sealy shortly after the closing on the licensee acquisitions. Mr. Brace recommended that nondirector employees of Ohio–Sealy be elected as the majority of the members of Sealy's Board, because, in Brace's view, the Clayton Act arguably prohibited electing persons who were directors of Ohio–Sealy or Ohio Mattress.

On December 29, 1986, Ohio–Sealy assumed control of Sealy, and following Brace's advice, reconstituted Sealy's Board with its own appointees. That was accomplished by a written consent executed by defendant Thomas Smudz, acting on behalf of Ohio–Sealy in its capacity as Sealy's controlling stockholder, in which he and defendants Charles Kneeland and Gary Pleasant were named as Sealy's Board of Directors. All of Sealy's new Board members are employees of Ohio–Sealy or Ohio Mattress, Ohio–Sealy's parent. Each director reports either directly to Ernest Wuliger, Chairman of Ohio Mattress, or to

a person who reports to Mr. Wuliger. Mr. Smudz has worked for Ohio Mattress for eight years, during the last five of which he has been Ohio Mattress' Vice President. Mr. Kneeland has worked for Ohio–Sealy for eighteen years and since April 1986 has been its President. Mr. Pleasant has been employed by Ohio–Sealy for the last two years and currently serves as its Vice President.

**\*1329** Shortly before the change of control, Ohio–Sealy and Ohio Mattress entered into a Memorandum of Understanding with Sealy. In the Memorandum, Ohio–Sealy represented that "any offer it will make to purchase the remaining outstanding shares of Sealy that it has not previously committed to purchase will be made for cash in an amount per share of no less than $178.46, which is the amount per share paid in connection with the transaction [defendant Ohio–Sealy's impending acquisitions of the Sealy licensees] based upon the existing capitalization of Sealy." Ohio–Sealy further represented that it intended "to fulfill its fiduciary duties in its dealings with and treatment of [the minority] stockholders...." Sealy's former directors testified that that Memorandum did not signify an understanding on their part that $178.46 per share was a fair price. They also testified that they did not know what a reasonable and fair price would be.

Apropos book value, it is important to note that during the six months intervening between the June, 1986 antitrust verdicts and Ohio–Sealy's December 29, 1986 assumption of control, several events occurred of which Ohio–Sealy and Mr. Smudz were or soon became aware. Those events indicated that Sealy's book value —the price allocated for the licensees' Sealy stock—was considerably less than Sealy's fair value. At $178.46 per share, Sealy's book value is approximately $58 million dollars ($178.46 x 325,703 shares = $58,000,000). In July, 1986, Salomon Brothers performed a valuation of Sealy to assist the antitrust defendants in meeting security and bond requirements. Salomon valued Sealy at $140 to $160 million. In October, 1986, Morgan, Lewis, Githens & Ahn performed a study that also contained relevant valuation information. In November, 1986, Shearson Lehman Brothers made an offer to acquire Sealy for approximately $150 million. In response, Sealy's President Howard Haas and Messrs. Jay and Robert Pritzker made a competing offer to acquire all of the stock of Sealy for approximately $152.5 million. Those offers were not accepted, the licensee stockholders having decided instead to sell their businesses and Sealy stock to Ohio–Sealy. [8]

Lastly, Mr. Smudz, in his capacity as an Ohio–Sealy executive officer, had prepared valuations of Sealy and had sent them to Ohio–Sealy's investment banker. In a letter to Lazard, Freres & Co. dated December 2, 1986, Mr. Smudz expressed his belief that "the [Sealy] name alone (which he included among 'other intangibles—Sealy tradename, etc.' at a value of $102 million) ... might be worth $100–$300 million." That amount was in addition to the "net assets" figure of $54,187,000 at which Ohio–Sealy carried its investment in Sealy, Inc.

As a result of Ohio–Sealy's acquiring the licensees in late 1986, only two minority stockholders of Sealy remained —the plaintiffs **\*1330** (the New Jersey–Sealy group) and Michigan–Sealy, which held a $45 million antitrust judgment against Sealy. Michigan–Sealy's status as a judgment creditor placed it in a position of conflict with, and of adversity to, its erstwhile ally, Ohio–Sealy, because Ohio–Sealy now owned 82% of the judgment debtor (Sealy). Because of its interest in eliminating Michigan–Sealy as a judgment creditor, Ohio–Sealy had a strong incentive to acquire Michigan–Sealy's assets, including its $45 million judgment. Accordingly, since at least November, 1986, Ohio–Sealy had been exploring ways in which it might acquire Michigan–Sealy and thereby eliminate it from the picture.

The merger became the defendants' chosen method of bringing Michigan–Sealy (and, it was hoped, New Jersey–Sealy) to terms. In a letter written by Mr. Brace to Ronald E. Trzcinski, President of Ohio Mattress, on January 6, 1987, Mr. Brace advised:

> I enclose a bare-bones communication reflecting what I think Sealy's new board should do fairly soon. Also, I think they should initiate a merger at the same time. That will put Michigan in the position of simultaneously evaluating its inconsistent positions as both a shareholder and judgment creditor of Sealy.

After summarizing his negotiation with Michigan–Sealy's representative over the issue of price, Mr. Brace concluded thusly:

> Whatever else we do, we should buy Michigan's $45 million judgment against Sealy, rather than have Sealy satisfy it for a lesser amount. That will increase our advantage vis a vis Paterson [New Jersey–Sealy].

It was in that adversarial posture that the stage was set for the proposed merger that is the focus of this litigation.

On January 21, 1987, Sealy's directors held a meeting by telephone to approve the merger. The meeting lasted between fifteen minutes and one-half hour. Sherry Treston, Esquire, an attorney with a Chicago firm that acts as corporate counsel to Ohio Mattress, also participated.

Before the meeting the directors had received nothing but a copy of the resolutions, which included the proposal for the merger that they later approved *verbatim.* During the meeting the directors had no materials available to them, including financial information, other than the proposed resolutions. The $178.46 per share merger price was presented to the directors by Ms. Treston as a *fait accompli,* with no explanation other than that book value was the number that Ohio–Sealy had used in all of its negotiations to acquire the licensees' Sealy stock. That price was accepted with no deliberation as to its basis or adequacy, and no other price was discussed. No determination was made that the $178.46 price was fair or what a fair price would be, no investment banker or other financial expert was hired or consulted for any purpose, and no consideration was given to appointing a special committee of disinterested persons to review independently the merger price or to represent the minority shareholders.

The Board neither had, nor did it request, any documentation to support the adequacy of the merger price. Nor was the Board made aware of the Salomon Brothers July, 1986 valuation of Sealy ($140–$160 million), the Shearson Lehman Brothers, Inc. offer for Sealy (approximately $150 million), the Haas/Pritzker offer in the fall of 1986 ($152.5 million), or the study by Morgan, Lewis, Githens & Ahn in October, 1986. Mr. Smudz did not share with his fellow directors his knowledge of that information or his opinion that the

value of the Sealy name alone was possibly as high as $300 million.

A critical factor in any assessment of the fairness of the merger price was the value of the antitrust judgments. (*See* fn. 8, *supra* ) That issue was never addressed. There is evidence that the value of the judgments was less than the $122 million gross amount of the verdicts. Mr. Brace had earlier opined to Mr. Trzcinski that Michigan–Sealy's $45 million judgment was probably worth only $20 million, a valuation later borne out by Ohio–Sealy's subsequent acquisition of Michigan–Sealy. Mr. Brace had also opined to his client that as a **\*1331** result of Ohio–Sealy's acquisition of the licensees, "it could be argued that our [antitrust] judgments have been satisfied at least to the extent of $50 million and possibly to the extent of the full $77 million." The Board did not consult Sealy's (or Ohio–Sealy's) attorneys in the antitrust case to assess the risk that the antitrust judgments might be reversed or reduced, or otherwise to determine how those judgments might be objectively valued.

In sum, the Sealy Board, in approving the merger, acted solely as conduits to implement the will of their employers, Ohio–Sealy and Ohio Mattress. The 15 to 30 minute meeting had six important agenda items of which the merger was but one. [9] The agenda had been established by Ohio–Sealy's antitrust lawyer, Mr. Brace.

One week later, the defendants mailed an Information Statement to the plaintiffs and to Michigan–Sealy, announcing the proposed merger, and noticing a special stockholders meeting for February 24, 1987, to approve the merger. The Information Statement contained only skeletal information, *viz.,* a description of the terms of the merger, including the $178.46 per share price, and statutory appraisal rights. The only financial data supplied in the Information Statement consisted of one-half page chart showing Sealy's revenue, net income, and dividend-per-share information for 1984 and 1985 and for the nine months ended September 30, 1986. Other than that, the only value pertaining to Sealy that was described in the Information Statement was book value. The Information Statement promised that the 1986 financial statements would be furnished on February 20, 1987, four days before the meeting. It further disclosed that the approval of the merger was assured, since Ohio–Sealy intended to vote in favor of it.

After receiving the Information Statement, plaintiff Walter Hertz, on behalf of the other plaintiffs, retained counsel (Skadden, Arps, Slate, Meagher & Flom) in early February, 1987. Shortly thereafter, this action was filed derivatively on behalf of Sealy and individually on behalf of the minority stockholders other than Michigan–Sealy. In their complaint the plaintiffs alleged that the merger price was unfair, that material facts had been misrepresented in the Information Statement, and that the merger terms had not been adequately considered by Sealy's Board. As previously noted, the defendants responded by postponing the stockholders meeting. They then deferred the merger until further notice.

By way of hindsight, it is apparent that Ohio–Sealy's objective in postponing the merger was to enable it to complete its acquisition of Michigan–Sealy, with which it had been negotiating since the fall of 1986, and to wage its dispute with plaintiffs in a forum of its own choosing. On February 19, 1987, Ohio–Sealy and Michigan–Sealy reached an agreement in principle for Michigan–Sealy to sell its ($45 million) judgment, its business, and its Sealy stock [10] to Ohio–Sealy for a total price of $45 million. That agreement was reduced to a written contract dated March 26, 1987. As part of the acquisition, Ohio–Sealy originally offered, and Michigan–Sealy agreed, to have Sealy pay $25 million for the antitrust judgment. Ohio–Sealy then changed its mind and advised A. Bart Lewis, Michigan–Sealy's former president, that it had decided to allocate $35 million to the judgment in order to achieve tax benefits for itself. Thus, the portion of the total purchase price that was allocated (and that was to be paid by Sealy) for Michigan–Sealy's judgment was increased by almost $10 million dollars, and the amount allocated to Michigan–Sealy's business was correspondingly **\*1332** reduced. [11] The effect of the unilaterally increased allocation (consistent with Mr. Brace's earlier advice to "buy Michigan's $45 million judgment against Sealy rather than have Sealy satisfy it for a lesser amount" in order to "increase our advantage vis a vis [New Jersey–Sealy]") was to increase Sealy's liability to Ohio–Sealy—and thereby to decrease Sealy's asset value —by $10 million dollars. [12]

The Michigan–Sealy purchase was consummated in early April, 1987. Having thus eliminated Michigan–Sealy from the scene, Ohio Mattress was then able to concentrate its fire upon New Jersey–Sealy, the corporation's only

remaining minority stockholder. On April 10, 1987, Ohio Sealy and Sealy filed two lawsuits against New Jersey–Sealy in the United States District Court in Chicago, Illinois. In one of those actions (*Sealy, Incorporated, et al. v. Sealy Mattress Company of New Jersey,* No. 87–C–1477), [13] Ohio–Sealy alleged that New Jersey–Sealy's filing of this Chancery action constituted a violation of the federal antitrust laws, an abuse of process, and malicious prosecution, for which Ohio–Sealy claimed $2 million in compensatory damages, plus punitive damages. [14] Ohio–Sealy also initiated intensive discovery, noticing and taking eleven *seriatim* sets of depositions in this and the Chicago federal action. Plaintiffs claim that these tactics, among others, were part of Ohio–Sealy's broader strategy to use litigation as a weapon to beat them into submission and to force them to sell their business and Sealy stock on unfavorable terms.

If that was Ohio–Sealy's objective, it did not succeed. Plaintiffs vigorously defended the Chicago actions and pressed their motion in this Court for attorneys' fees. In response, the defendants announced that they would revive the proposed merger that had been shelved since March, 1987, and for that purpose the defendants later noticed a special stockholders' meeting for July 21, 1987.

The defendants also issued a Supplemental Information Statement, which consisted largely of (i) *verbatim* quotations from the "disclosure" allegations of the plaintiffs' own complaint, (ii) argumentative assertions that the Salomon Brothers valuation "did not assess any value to ongoing or pending litigation" and that the Haas/Pritzker offer required that $135 million of the offering price be escrowed for payment of the judgment and expenses, (iii) selective information about the terms of the Michigan–Sealy acquisition, and (iv) certain other matters. [15]

**\*1333** However, the Supplemental Statement, like its predecessor, disclosed no information as to the process by which the book value merger price was arrived at, the directors' assessment of the value of the antitrust judgments (including the fact that $35 million had been allocated to the Michigan–Sealy judgment), or other pertinent financial information that would enable plaintiffs to assess the fairness of the merger price.

This renewed motion for a preliminary injunction followed.

## II. *The Law*

The standards governing a motion for preliminary injunctive relief are well established. The plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer imminent irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if relief is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 179 (1986); *Gimbel v. Signal Companies,* Del.Ch., 316 A.2d 599, 602–03, *aff'd,* Del.Supr., 316 A.2d 619 (1974); *Shields v. Shields,* Del.Ch., 498 A.2d 161 (1985).

**[1]**  It is undisputed that Sealy's parent corporation, and its directors who are employees of and are controlled by Sealy's majority stockholder, stood on both sides of the proposed merger and fixed its terms. Under those circumstances the defendants have the burden of establishing the entire fairness of the merger, *i.e.,* the "most scrupulous inherent fairness of the bargain," sufficient to pass the test of careful scrutiny by the courts. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983); *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57, 58 (1952); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 110 (1952).

**[2]** **[3]**  The concept of entire fairness is not restricted to matters of valuation alone. Fairness embraces "fair dealing" as well as "fair price." *Weinberger,* 457 A.2d at 711. Fair dealing includes fairness as to "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Thus, a determination of whether the plaintiffs have shown a likelihood of success on the merits necessarily involves an assessment, based upon the present record, of whether the defendants will be able to carry their ultimate burden of persuading the Court that the transaction is entirely fair in the dual sense of fair dealing and fair price. Cf. *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 431 (1968). It is from that standpoint that the plaintiffs' motion is evaluated.

The plaintiffs' probability of success on the merits is treated in Part III, *infra,* of this Opinion. The issue of irreparable harm is addressed in Part IV, *infra.* [16]

### III. *Probability of Success*

#### A. *Fair Price*

Although the plaintiffs focus primarily upon the element of fair dealing, fairness **\*1334** of price is an element of their case as well. Moreover, price considerations form much of the essential background for the analysis of the fair dealing issues. Accordingly, the matter of fair price is first addressed. Under that heading the question becomes whether, based on the present record, the defendants will probably succeed in carrying their burden of proving that the book value merger price of $178.46 per share is entirely fair. The answer, in my opinion, is clearly no.

 **[4]**   The critical fact relating to fair price is that the present record does not disclose what Sealy's present fair value or price might be. No one, including Sealy's directors, has attempted to make that determination. What the record does show is substantial (and disturbing) evidence that Sealy's fair value is significantly higher than the $58 million dollar book value price being offered in the merger.

The defendants seek to justify the book value figure on the basis of the December, 1986 Memorandum of Understanding, in which Ohio–Sealy and Sealy's former directors agreed that any offer by Ohio–Sealy to acquire Sealy would be for not less than $178.46 per share. Defendants claim that the Memorandum represents a good faith business judgment by Sealy's prior independent directors that book value is a fair price for Sealy. For that purpose the defendants also rely upon the fact that in the various licensee acquisitions which occurred in late 1986 (transactions which, the defendants assert, were the subject of hard arm's length bargaining), the licensees were willing to accept book value as the price for their Sealy stock.

The record fails to support either contention. As previously indicated, Sealy's former directors never determined that $178.46 per share was a fair price. One

former director testified that the former board "had no idea what a reasonable and fair price would be, because this price ... was not ... arrived at with arm's length bargaining...." And while the licensee acquisitions might have involved arm's length bargaining, the bargaining focused upon the *overall* price for the licensees' businesses, not upon the Sealy stock that was but one of a multitude of assets being acquired. At Ohio–Sealy's insistence the parties agreed that book value would be the price allocated to the Sealy stock component. The testimony of the licensees (including Michigan–Sealy) fairly indicates that they believed that Sealy's stock, standing alone, was worth substantially more than book value, but were willing to accept book value because the overall purchase price was acceptable. One licensee testified that the Sealy stock was "worth a hell of a lot more than $58 million" but that the licensees were persuaded to accept book value because they would receive "inflated" prices for their bedding businesses and an enhanced price above book value for the Sealy stock if the closing on the stock purchase took place during 1987. [17]

That latter point warrants elaboration. During discovery the plaintiffs learned that the book value price that was to be paid to the licensees for their Sealy stock—the price which the defendants now assert as justification for the merger price—was higher than what the defendants now propose to pay in the merger. The consideration the licensees were to receive for their Sealy stock was based on a book value of $65 million—$7 million more than the $58 million book value being used as the basis for the merger price. That higher amount was offered to any licensees whose Sealy stock was acquired in 1987. In this merger the plaintiffs are being forced to surrender their stock in 1987. Yet the merger consideration is based on a price $7 million lower than what the defendants were willing to pay to those licensees. That price differential, if offered to the plaintiffs, would represent an additional $427,000 for plaintiffs' 6.1% stock interest.

The defendants' own internal documents and in-court representations are further evidence **\*1335** that book value does not represent a fair price for the Sealy stock. The minutes of Ohio Mattress' January 10, 1987 board meeting reflect Mr. Wuliger's statement that:

"... in his view, the recent $77 million judgment by the Company [Ohio–Sealy] made possible both the

Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc., 532 A.2d 1324 (1987)

significantly favorable price paid for the [licensees'] Sealy, Incorporated stock...."

And in their federal complaint filed in Chicago in April of this year, Ohio–Sealy and Sealy judicially admitted that Sealy's book value is "less than its actual going concern value."

Finally, there are the valuations of Sealy by Salomon Brothers at $140–$160 million, the Shearson offer to acquire Sealy for approximately $150 million, the Haas/ Pritzker offer to acquire Sealy for $152.5 million, and Mr. Smudz' opinion that the Sealy name alone might be worth as much as $300 million. These offers and valuations were for prices averaging two and one half times Sealy's book value. To arrive at a fair value, an appropriate adjustment would have to be made for the value of the Michigan–Sealy and Ohio–Sealy judgments, as determined in some objective manner. However, defendants have made no effort to adduce evidence of what those judgments are objectively worth. Of the $122 million face amount of the judgments, $45 million consisted of the Michigan–Sealy judgment which both Ohio and Michigan–Sealy agreed was worth $25 million. [18] And defendants have not shown that the Ohio–Sealy judgment is objectively worth its $77 million face amount. On the contrary, there is evidence that Ohio–Sealy's judgment, objectively valued, may be worth considerably less, and the defendants have adduced no evidence that shows otherwise. Moreover, by their actions defendants have made highly difficult any objective evaluation of Ohio–Sealy's antitrust judgment, because they have not permitted Sealy to pursue post-trial review of those judgments and have allowed both judgments to remain unsatisfied in their full amount.

Accordingly, I find that the plaintiffs will probably succeed in establishing at a final hearing that $178.46 per share is not a fair price for their Sealy shares.

## B. *Fair Dealing*

**[5]** Under this heading the second question becomes whether, based upon the present record, the defendants will probably succeed in carrying their burden of proving that they, in their capacity as fiduciaries, dealt fairly with the plaintiffs in seeking to accomplish this particular merger. Again this answer must clearly be no.

**[6]** As fiduciaries seeking to "cash out" the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects. *Weinberger v. UOP, Inc.,* 457 A.2d at 710. The majority stockholder was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price. The corporation's directors were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, were fair and that the merger would not become a vehicle for economic oppression. And finally, the directors (and the majority stockholder, to the extent that it involved itself in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post-merger damage action.

None of these fiduciary obligations were satisfied in this instance. Indeed, if one were setting out to write a textbook study on how one might violate as many fiduciary precepts as possible in the course of a single merger transaction, this case would be a good model.

**\*1336** 1. *Timing and Structure*

The concept of fair dealing, as defined in *Weinberger v. UOP, Inc.,* 457 A.2d at 711, embraces the notion of fairness as to the timing and structure of the challenged transaction. Here the merger was timed and structured in a way that had the foreseeable effect, if not the intent, of producing an unfair result.

**[7]** First, the corporate defendants timed the merger to occur at a time when valuation of Sealy was difficult, if not impossible, because of defendants' refusal to permit post-trial review of the antitrust judgments. Moreover, the corporate defendants used those judgments, and took other steps as well, to manipulate Sealy's values for their benefit and to the plaintiffs' detriment. Rather than satisfy the Michigan–Sealy judgment at its fairly-determined value, Ohio–Sealy purchased that judgment and caused Sealy to overpay for it by $10 million dollars. The record evidence indicates that that was done deliberately. [19]

There is other evidence that values were manipulated to the minority's detriment. Defendants' corporate counsel wrote on his copy of Mr. Brace's January 6, 1987 letter the following comment: "to the extent these actions increase the value of Sealy, they should be deferred." The "actions" being referred to included the acquisition of Michigan–Sealy's antitrust judgment and business. Mr. Brace's letter, upon which the foregoing advice was noted, was written only two weeks before the directors meeting at which the merger was approved.

All of the foregoing evidence, not rebutted by defendants, suggests a calculated effort to depress the price of Sealy until the minority stockholders were eliminated by merger or some other form of acquisition. Such behavior by a majority stockholder constitutes unfair dealing. *See Roizen v. Multivest, Inc.,* Del.Ch., C.A. No. 6535, Brown, V.C. (September 25, 1981); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 599 (1986) ( "prototype instance" of majority stockholders breach of duty involves timing of merger with resulting financial injury to minority and with commensurate gain to controlling stockholder); *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1107 (1985) (claim that merger timed so as to avoid contractual duty held to state a claim of breach of duty of fair dealing).

 **[8]** A second indicium of fair dealing, or its absence, is whether the process by which the merger terms were arrived at involved procedural protections that would have tended to assure a fair result. For example, in *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985) the Supreme Court held that the majority stockholder had dealt fairly with the minority in proposing a cash-out merger, where the transaction had been negotiated by an independent committee representing the minority, an investment banking firm had been retained to advise the committee, and the merger required approval by a majority of the minority stockholders. By the same token, in *Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d at 599, this Court observed that the absence of a minority stockholder "veto" and of an independent board committee to negotiate on behalf of the minority, are "pertinent factors" in assessing whether fairness was accorded to the minority.

Here the majority stockholder, Ohio–Sealy, unilaterally determined the merger price without putting into place any of the procedural protections, such as those described above, that would have tended to assure a **\*1337** fair substantive result. No independent directors were put on the Sealy board, no steps were taken to appoint independent representatives to negotiate on behalf of the minority, and no independent investment banker or other financial expert or legal counsel was retained to represent the minority interests. In short, the minority stockholders were were left exposed to the discretion of a majority stockholder whose interests were in direct conflict with theirs and whose approach to these matters was, and has continued to be, unremittingly hostile. The absence of these procedural safeguards, while not actionable of themselves, is highly persuasive evidence that the merger terms were the product of unfair dealing.

### 2. *Uninformed Board Approval of the Merger*

Before making a business decision, the directors of a corporation, in discharging their duty of care, must inform themselves of all available material information. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872–873 (1985). In the case of a merger under 8 *Del.C.* § 251(b), that duty is a statutory as well as a common law obligation. Indeed, the Supreme Court has indicated that a merger that has not been the subject of a properly informed director judgment may not be submitted to shareholders. That Court said in *Smith v. Van Gorkom,* 488 A.2d at 873:

> In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del.C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of 8 *Del.C.* § 251(b) may be submitted to the shareholders under § 251(c). (Citations omitted).

[9] In this case it is undisputed that Sealy's directors, in approving the merger, were completely uninformed and made no effort to inform themselves of the material facts. Indeed, the defendants concede in their brief that the directors were not independent and that they "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding...." Ohio–Sealy's attorney told the Sealy directors that the $178.46 book value price was what Ohio–Sealy intended to pay. Sealy's directors, all of whom were employees of, and beholden to, Ohio–Sealy or Ohio Mattress, uncritically accepted that price. They did so (to reiterate) without making any effort to determine whether the price was fair, without considering facts that would bear materially on that issue (including the Shearson and Pritzker offers, the Salomon evaluation, Mr. Smudz's opinion as to the value of the Sealy name, or the value of the antitrust judgments), and without independent expert financial or legal advice.

Given these circumstances, one might debate the legal characterization that most appropriately describes the conduct of the Sealy directors and of the majority stockholder to whom those directors apparently felt they owed their exclusive loyalty. For this purpose it is enough to say that the manner in which this merger was considered and blessed amounted to a fundamental breach of the directors' duty of care and violated 8 *Del.C.* § 251(b) as that statute has been interpreted in *Smith v. Van Gorkom.*

The defendants argue that even though the Sealy directors were not personally informed of the facts, they did not have to be, because they were entitled to rely upon the judgment of Ohio–Sealy, whose directors were properly informed. That position is incorrect as a matter of law and fact, and runs counter to fundamental principles of law applicable to fiduciaries of Delaware corporations.

As key employees of Ohio–Sealy and Ohio Mattress, the individual defendants were entitled, indeed obliged, to demonstrate their loyalty to their employer whose directions they were bound to follow. But **\*1338** once having assumed the position of directors of Sealy, Inc., a corporation that had stockholders other than Ohio–Sealy, those defendants became fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders. The fiduciary obligation they assumed was not unlike that of persons holding dual directorships in both a parent and subsidiary corporation. As to such persons, the Supreme Court admonished in *Weinberger v. UOP, Inc.,* 457 A.2d at 710–711:

> There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. *Levien v. Sinclair Oil Corp.,* Del.Ch. 261 A.2d 911, 915 (1969). Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and in the absence of an independent negotiating structure ... or the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies. *Warshaw v. Calhoun,* Del.Supr., 221 A.2d 487, 492 (1966).

And again in *Smith v. Van Gorkom,* 488 A.2d at 872, the Supreme Court said:

> But fulfillment of the fiduciary function requires more than the mere absence of bad faith or fraud. Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information of the type and under the circumstances present here.

*See also Valente v. Pepsico, Inc.,* 68 F.R.D. 361, 364 (D.Del.1975).

[10] Thus, the Sealy board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority. Just as there

is no "safe harbor" for directors with divided loyalties, *Weinberger v. UOP, Inc.,* 457 A.2d at 710, Sealy's directors cannot erect those divided loyalties as a defense so as to excuse abdicating their fiduciary responsibility to the minority stockholders. [20]

### 3. *Disclosure of Material Facts Pertaining to the Merger*

**[11]** A third factor evidencing the presence or absence of fair dealing is whether the defendant fiduciaries disclosed to the minority stockholders all material facts pertaining to the merger. That the defendants had a fiduciary obligation to disclose all material facts in an atmosphere of complete candor is unquestioned. *Rosenblatt v. Getty Oil Co., supra,* 493 A.2d at 944; *Smith v. Van Gorkom, supra,* 488 A.2d at 890; *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 121 (1986). The fact that the defendants control the outcome of the vote on the merger and seek to force an involuntary acceptance of the merger, "makes this a more compelling case for the application of the recognized disclosure standards." *Wacht v. Continental Hosts, Ltd.,* Del.Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986), at 7 [Available on WESTLAW DE–CS database].

**\*1339** In this case few, if any, of the facts material to an informed investment decision were disclosed, and the facts that were disclosed were, in the main, highly misleading.

The only value discussed in the Information Statement was book value, and the disclosures pertinent to book value were presented in a manner calculated to justify that figure. Those disclosures consisted of the following single paragraph:

> In reaching the above conclusion, the Board of Directors took into consideration that the $178.46 to be paid in the merger is the same price paid after vigorous arm's length negotiations in respect to (i) stock of the Corporation held by licensees of the Corporation acquired by Ohio–Sealy in December 1986 and (ii) stock of the Corporation formerly held by Howard G. Haas and acquired by Ohio–Sealy in December 1986. In

addition, the Board of Directors took into consideration the fact that the independent directors of the Corporation, prior to their resignation, entered into a Memorandum of Understanding with Ohio–Sealy to effectuate the smooth transition of ownership in a manner designed by provide for, among other things, continuity in the operation of the business and to protect the minority stockholders of the Corporation and pursuant to which Ohio–Sealy represented that any offer it would make to purchase the remaining outstanding shares of the Corporation that it had not previously committed to purchase would be made for cash in an amount per share of not less than $178.46.

That disclosure was materially false and misleading in several respects. First, it implied that the Board had made an independent, informed judgment that book value was a fair price, whereas in truth the Board's decision was neither independent nor informed. In this context the quality of the Board's decision making process was material, since in a non-arm's length transaction, minority shareholders would normally be entitled (absent any disclosure to the contrary) to assume that the Board was acting to protect their interests. *See Wacht v. Continental Hosts, Ltd., supra,* at 8; *Kahn v. United States Sugar Corp.,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) [Available on WESTLAW, DE–CS database].

Second, the particular disclosures relating to book value were misleading. The Information Statement suggested that book value was a price that had been agreed to in prior "vigorous" arm's length negotiations. In fact, these negotiations were for the purchase of the licensees' entire businesses, including the Sealy stock. As previously indicated, the licensees acceded to book value as the allocated value of their Sealy shares, but did so for reasons totally unrelated to the value of that stock. Mr. Haas agreed to accept book value for his stock only because he did not want to risk Ohio–Sealy terminating his more valuable severance agreement. The description of the Memorandum of Understanding, with its suggestion

that Sealy's prior board had determined $178.46 to be a fair price, which also was materially misleading. And entirely omitted from the Information Statement was the fact that the book value amount payable to licensees who sold their Sealy stock in 1987, was higher than the book value amount that was being offered to the minority stockholders who were to be merged out during the same year. [21]

Third, the Information Statement and the Supplement contained virtually no information material to any informed judgment on value. Nowhere disclosed were the prior offers or valuations, or the studies of Sealy that occurred during the latter part of 1986, involving values ranging from $140 to $160 million dollars. Nowhere is there any reference to or analysis of the value or effect of the antitrust judgments. And nowhere discussed are the corporation's future prospects, its business plans or **\*1340** projected revenues or income. Moreover, the antitrust judgments were allowed to remain outstanding, even though Michigan–Sealy's $45 million judgment had been satisfied by Sealy's payment of $35 million—$10 million more than the judgment creditor and debtor had agreed it was worth. A false impression was thereby created that the judgments against Sealy remained an outstanding valid liability in the amount of $122 million.

These misdisclosures and nondisclosures were, in these circumstances, highly material and constituted violations of the defendants' duty of candor. *Weinberger v. UOP, Inc., supra,* 457 A.2d at 709; *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984); *Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278 (1977). So pervasive and so fundamental were those violations that it is difficult to conclude that they were unintentional. The defendants' duty of candor required them to provide the minority stockholders with sufficient information to enable them to make an informed, reasoned investment decision. *Wacht, supra,* at 7; *Weingarden & Stark v. Meehan Oil Co.,* Del.Ch., C.A. Nos. 7291 and 7310, Berger, V.C. (January 2, 1985). Clearly that was not done here.

Much of the foregoing the defendants do not seriously dispute. Their position is that the disclosures in the Information Statements do not constitute a fiduciary violation, because (i) most of the omitted facts were known to the plaintiffs, particularly Walter Hertz, at the time this lawsuit was filed, and (ii) if the plaintiffs did not know the material facts at that time, they know them now

as the result of discovery. The first argument is incorrect as a matter of fact; the second is incorrect as a matter of law.

[12] The defendants argue that plaintiff Hertz is knowledgeable of the facts because of his intimate acquaintance with Sealy (he had been a member of the Sealy Board), and because he had extensive contact with the other shareholders. But the record shows that except for Mr. Hertz, the other plaintiffs knew virtually nothing about Sealy's affairs. The record also shows that Mr. Hertz has not been a Sealy director since 1978, and had very limited knowledge of the material facts relating to Sealy's value, particularly the value of the antitrust judgments and Sealy's future business plans, projected earnings, and prospects.

[13] The defendants further argue that the discovery in this case has cured any disclosure deficiencies. If that were the law no disclosure claim would ever succeed, because discovery of the proof of the merit of a disclosure claim would destroy its validity. Moreover, the disclosure burden owed by the fiduciary would be thrust upon the beneficiary to whom the duty is owed. The duty of candor must be discharged by the fiduciary directly to the beneficiary stockholder in the transaction itself, and not by the fiduciary's lawyer to the beneficiary's lawyer in the context of litigation.

For the above reasons, I find that the plaintiffs will probably succeed in establishing at final hearing that the defendants did not deal fairly with the minority stockholders in promulgating the challenged merger.

## IV. *Irreparable Harm*

[14] The third and final question is whether if the merger is not preliminary enjoined, the plaintiffs will likely suffer irreparable harm. For the reasons now discussed, I find that they will.

To begin with, the plaintiffs have not received sufficient information to make an informed decision among the available alternatives, *i.e.,* whether to accept the merger price or to elect an appraisal or other judicial remedy. In this case the inability to make that choice constitutes irreparable harm, because once having foregone one remedy, the plaintiffs may be unable to obtain the economic equivalent of the others. In this case, for

example, if the plaintiffs seek appraisal and it is later found that the antitrust judgments (objectively valued) reduce Sealy's fair value to less than $178.46 per share, plaintiffs would have lost their right to accept the higher merger price. *See* 8 *Del.C.* § 262(e). If plaintiffs were to accept the merger price and the values were later shown to be **\*1341** higher than the merger price, then the plaintiffs would have lost their right to a fair price through appraisal. The plaintiffs should not be required to make these choices in the informational vacuum into which the defendants have thrust them. *See, e. g., In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 669, 679 (1986); *Trans World Airlines, Inc. v. Icahn,* 609 F.Supp. 825, 830 (S.D.N.Y.1985). An injunction is the remedy most likely to achieve disclosure of the information necessary to an informed decision. [22]

Second, the Board has approved a merger that has preliminarily been found to be in violation 8 *Del.C.* § 251(b) and which, as the Supreme Court indicated in *Smith v. Van Gorkom,* may not be submitted to the shareholders under § 251(c). While situations might arise where violations of this character would arguably not warrant an injunctive remedy, in this extreme set of circumstances where (i) the Board has made no informed decision, (ii) the Board is uniquely situated to make determinations concerning Sealy's value, and (iii) the Board has not disclosed material facts to the minority stockholders, an injunction is clearly the most appropriate remedy to vindicate the statutory mandate of § 251(b) and the policies underlying the fiduciary obligation of full disclosure.

Third, irreparable harm warranting injunctive relief is appropriate in cases where damages would be difficult to assess. *See In re Anderson, Clayton Shareholders' Litigation, supra,* 519 A.2d at 676. *Weinberger v. UOP, Inc.,* Del.Ch. C.A. No. 5642, Brown, (January 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) is an example of the difficulty of assessing damages in a parent-subsidiary merger in a trial occurring long after the event. In this case that difficulty is particularly significant, because due to the status of the antitrust judgments, damages may be highly difficult to calculate. Those difficulties are avoided by a grant of preliminary injunctive relief.

I need not decide whether any of these factors, standing alone, would constitute irreparable harm warranting injunctive relief. In this case, the presence of all three

factors in combination is clearly sufficient to establish irreparable injury.

**[15]** The defendants' response is that no matter how egregious their conduct may be, as a matter of law the plaintiffs are not entitled to an injunction. Defendants argue that under *Weinberger v. UOP, Inc.,* which signaled a return to the "well established principles" of *Stauffer v. Standard Brands, Inc.,* Del.Supr. 187 A.2d 78 (1962), the exclusive remedy available in a parent-subsidiary merger, particularly where (as here) the parent owns over 90% of the subsidiary's stock, is an appraisal or, alternatively, a damage action. In short, defendants appear to be arguing that as a result of *Weinberger* and its progeny, injunctive relief has been judicially eliminated as a remedy in all but the most "extremely unusual" parent-subsidiary merger cases.

To that argument I would respond as follows: To say that this Court has the power to condemn the egregious conduct involved here (as it preliminarily has done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of that conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State. Given the nature of the conduct involved in this case and the harm that will likely result from it, only a clear, positive declaration by the Delaware Supreme Court proscribing injunctive relief would cause this Court to stay its hand. The defendants have cited no case which mandates **\*1342** that result. Indeed, in *Rabkin v. Philip A. Hunt Chemical Corp.,* the Supreme Court held that an appraisal is not an exclusive remedy in cases involving a breach of the duty of fair dealing, of which this case is one. It may be arguable that as a result of *Weinberger* and *Rabkin,* injunctive relief may be less appropriate in certain parent-subsidiary merger cases. But neither decision proscribes the injunctive remedy altogether. On the contrary, the Supreme Court noted in *Weinberger,* 457 A.2d at 714, and has repeated in *Rabkin,* 498 A.2d at 1104, that:

> [W]hile a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case

may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association,* Del.Ch., 156 A. 183, 187 (1931).

In this case misrepresentation, self-dealing, and gross and palpable overreaching have been alleged and preliminarily established. Damages, in these circumstances, would not be an adequate remedy. Therefore, I find that injunctive relief is the appropriate remedy and that the plaintiffs are preliminarily entitled to it.

3

For the foregoing reasons the plaintiffs motion for a preliminary injunction is granted. An appropriate form of order will be submitted in conformity with this Opinion.

**All Citations**

532 A.2d 1324

## Footnotes

1.  At the time that the merger was originally proposed, Ohio–Sealy owned approximately 82% of Sealy's stock, the plaintiffs owned approximately 6.1%, and Sealy Mattress Company of Michigan ("Michigan–Sealy") owned 11.95%. In April, 1987, two months after this action was filed, Michigan–Sealy's business and assets, including its stock interest in Sealy, were acquired by Ohio–Sealy.

2.  Sealy Merging Corporation is a wholly-owned subsidiary of Ohio–Sealy which in turn is wholly-owned by Ohio Mattress Corporation ("Ohio Mattress").

3.  Approval of the merger was a foregone conclusion. The Information Statement disclosed that Ohio–Sealy intended (and still intends) to vote its 93% stock interest in favor.

4.  In addition to Ohio–Sealy and its subsidiaries, the defendants include Sealy's directors, all of whom are employees of Ohio–Sealy or of Ohio Mattress.

5.  The motion to dismiss has been denied in a separate Opinion being issued concurrently herewith.

6.  All but Mr. Haas were licensees. Mr. Haas had for many years been Sealy's president and Chief Executive Officer.

7.  *i.e.,* New York–Sealy, Minnesota–Sealy, Illinois–Sealy, Connecticut–Sealy and Maryland–Sealy.

8.  Under the circumstances, the licensees had little practical choice. The Shearson and Pritzker proposals would have required that about 90% of the purchase price be placed into escrow for payment of the antitrust judgments and litigation expenses. Because of the pendency of those judgments, acceptance of the Shearson or Pritzker offers would leave the licensee-sellers in a position of uncertainty as to what amount of net proceeds that they would ultimately receive and when they would receive it. The liquidation of those judgments was largely in the control of Ohio–Sealy, subject only to post-verdict challenges and possible appellate review. There is evidence—not rebutted by the defendants—that those judgments were worth considerably less than their face amount. In a letter to Ohio Mattress' President, Mr. Brace opined that Michigan–Sealy's $45 million judgment was worth only $20 million. Moreover, the antitrust defendants' attorneys had taken the position that Ohio-Sealy's judgment was vulnerable in several respects. No objective determination had been made of the worth of these judgments. As a $77 million judgment creditor of Sealy with the goal of obtaining control of Sealy for itself, Ohio–Sealy had no interest in resolving the issue of the validity and amount of the judgments before achieving its objective. Given Ohio–Sealy's significant leverage due to its judgment creditor status, the Sealy licensees apparently found it preferable to sell their business to Ohio–Sealy for an overall price that would be immediate and certain, rather than to accept an offer from Shearson or the Pritzkers that had built-in uncertainties and that would result in a delayed payment of most of the purchase price (in some unknowable amount) until an indefinite point in the future after what promised to be years of hard-fought litigation against Ohio–Sealy.

9.  The other agenda items were: increasing Sealy's royalties to the maximum level, eliminating exclusive manufacturing territories provided in the Sealy License Agreement, authorizing discussions concerning the sale of the Des Moines plant, authorizing negotiations to end certain antitrust litigation in Canada, and making Canada available for competition by all Sealy licensees.

10    The price for the Sealy stock owned by Michigan–Sealy was to be determined by an appraiser agreed to by the parties or by an appraisal pursuant to 8 *Del.C.* § 262.

11    The amount allocated to Michigan–Sealy's business was reduced by $5.5 million, not by the full $10 million that had been shifted from the business to the judgment, because Ohio–Sealy added nearly $4 million to the total package to offset adverse tax consequences to Mr. Lewis that would have resulted from the inflated price paid for the judgment.

12    These facts were not disclosed in the Information Statements and were not uncovered until plaintiffs took Mr. Lewis' deposition during discovery.

13    The second federal action was dismissed in June, 1987 on the motion of New Jersey–Sealy.

14    In their federal complaint, Sealy and Ohio–Sealy made allegations in which they admitted that the book value of Sealy stock was less than its going concern value. Paragraph 29 of the Ohio–Sealy's federal complaint alleges:

> 29. At no relevant time was it defendant's [New Jersey–Sealy] primary purpose or motive to obtain an adjudication from the Delaware Court on their request for a permanent injunction against Sealy, Inc.'s proposed cash-out merger. On the contrary, defendant does not want to retain *its Sealy, Inc., stock,* which pays no dividends and *can only be sold for book value, which is less than its actual going-concern value.* Defendant concedes that the Delaware Chancery Court cannot grant relief with respect to the other matters complained of in its Delaware suit, such as raising royalties, trying to end the Chicago antitrust litigation, and eliminating the exclusive manufacturing territories. (Emphasis added).

15    Those other matters included the following disclosure:

> "In connection with appraisals performed after the acquisitions by Ohio–Sealy Mattress Manufacturing Co. of the seven Sealy licensees, an appraisal performed by Marshall and Stevens Incorporated valued the Corporation at $117.5 million, plus or minus 20%, without assessing any value to on-going or pending litigation."

A copy of the Marshall, and Stevens report, the existence of which had never been disclosed, was made available to plaintiffs' counsel, only a few days before the oral argument on the injunction motion.

16    The third factor, the "balance of hardships," requires no extended discussion, because the defendants' "balance of hardships" argument—that no injunctive relief is available to plaintiffs as a matter of law because of the availability of a damages or appraisal remedy—goes to the issue of irreparable harm and is thus more appropriately addressed in that portion of the Opinion. Moreover, it is clear from the record that any harm that the defendants might suffer from a preliminary injunction would be *de minimis.* The defendants have not shown, nor do they claim, any reason why the effectuation of the merger should be viewed as a matter of particular urgency. When confronted with plaintiffs' injunction motion, the defendants postponed the merger indefinitely, electing instead to do battle with the plaintiffs in their newly-filed federal court litigation in Chicago. Only after plaintiffs insisted upon pressing their motion for attorneys' fees (predicated upon the argument that the plaintiffs' litigative efforts caused the defendants to abandon the merger, thereby creating a compensable corporate benefit) did the defendants elect to revive their merger proposal. The inescapable inference from the record is that if the plaintiffs had not pressed their attorneys' fee motion, the merger would have continued in its state of dormancy while the defendants responded to plaintiffs' charges against them—not as defendants in this lawsuit but as plaintiffs in their chosen Chicago forum.

17    Mr. Haas' sale of his Sealy stock at book value is similarly unreliable as evidence of the fair value of his Sealy stock. Haas feared that if he objected to Ohio–Sealy's proposal to pay him book value for his Sealy stock, Ohio–Sealy would terminate his more valuable severance agreement. Accordingly, Mr. Haas decided "to get out and take the money and run."

18    The unilateral allocation by Ohio–Sealy of the additional $10 million to that judgment will be disregarded for present valuation purposes.

19    The defendants contend that their decision not to permit review of the antitrust judgments, if found to constitute unfair dealing, would be tantamount to a ruling that a merger can never occur while material litigation remains unresolved. That contention misses the point. The relevant principle is that the defendants, as fiduciaries, cannot cause the litigation to remain unresolved and then take advantage of that nonresolution for their own benefit and to the minority stockholders' detriment. The defendants had a duty to determine objectively the value of the antitrust judgments. That might be done in many ways, including (i) having the litigation resolved judicially by post-judgment review, (ii) appointing an independent committee to negotiate a settlement, or (iii) retaining independent financial and legal advice to assist the directors in a good faith determination of the value of the judgment. None of those steps was taken.

20    Even if the Sealy directors were entitled to rely upon the judgment of Ohio–Sealy as to the fairness of the merger terms (which they were not), such reliance would be of no help to them, because Ohio–Sealy's Board of Directors did not, insofar as the record discloses, purport to consider the fairness of the merger from the point of view of the minority. The

Board considered the merger price only from its self-interested perspective, which was directly adverse to the minority's interests. The record is less than clear as to what materials the Ohio–Sealy Board actually did consider, but the Board did not attempt to obtain an objective valuation of Sealy's going concern value, taking into account the antitrust judgments as fairly valued. It appears that the materials concerning Sealy's value that the Ohio–Sealy Board did review were related to their decision to approve the acquisition of four licensees (and their Sealy stock) as a package for $161 million dollars. None of these disclosure violations were cured in the Supplemental Information Statement.

Defendants argue that there is an air of unreality to this contention, since it is obvious that the plaintiffs have no intention of accepting the merger price. Plaintiffs point out, however, that appraisal and fraud suits are expensive to prosecute, that plaintiffs have no appetite for the expense and procedural delays of such litigation, and that if after the defendants, in compliance with the law, independently value Sealy and it becomes apparent that the merger price is a fair one, plaintiffs may accept the merger price. But, plaintiffs say, the duty of valuation must be performed by Sealy, and cannot be thrust upon the minority stockholders as the defendants have sought to do here.

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 9

Filed: 2/2/2018 4:40 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT |
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## VERIFIED PETITION FOR TEMPORARY ADMISSION OF ATTORNEY
## J. DANIEL ALBERT *PRO HAC VICE*

Pursuant to Indiana Admission and Discipline Rule 3, Attorney J. Daniel Albert hereby requests that the Court grant him permission to appear *pro hac vice* and participate in this litigation as counsel for Plaintiff. In support of this Petition, Attorney Albert, under the penalties of perjury, states as follows:

1.      Brad A. Catlin of the law firm of Price Waicukauski Joven & Catlin, LLC is a member of the Indiana Bar and is admitted to practice in Indiana. Attorney Catlin has appeared in this matter as counsel and has agreed to act as co-counsel.

2.      I am not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana.

3.      I seek admission to practice *pro hac vice* in this cause on behalf of the Plaintiff.

4.      My residential address is: 751 South Marvine Street, Philadelphia, PA 19147. My law firm name, office address, telephone number, and email address are: Kessler Topaz Meltzer

REC'D AT COUNTER ON

FEB -2 2018

GREGORY R. PACHMAYR
CLERK OF COURTS · STATE OF INDIANA

& Check, LLP, 280 King of Prussia Road, Radnor, PA 19087; (610) 667-7706; dalbert@ktmc.com.

5.      I am licensed to practice law in the following states or territories:

| JURISDICTION | DATE OF ADMISSION | BAR I.D. NUMBER | STATUS |
|---|---|---|---|
| Commonwealth of Pennsylvania | December 13, 2005 | 201640 | Active |

6.      I am a member in good standing in all the jurisdictions listed in paragraph 5.

7.      I have never been suspended, disbarred or resigned from the practice of law as a result of disciplinary charge, investigation, or proceeding in any jurisdiction.

8.      In the last five years, I have not appeared in any proceedings in the courts of the State of Indiana.

9.      I seek to appear in this matter *pro hac vice* for good cause because the action involves a complex field of law in which I am a specialist.

10.      I will be bound by the Rules of Professional Conduct adopted by the Indiana Supreme Court and I consent to the jurisdiction of the State of Indiana, the Indiana Supreme Court and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise from my representation of the Plaintiff.

11.      I have paid the registration fee to the Clerk of the Indiana Supreme Court in compliance with Indiana Admission and Discipline Rule 3, § 2(a)(3).  A genuine and authentic copy of my payment receipt and temporary admission attorney number are attached hereto as Ex. 1.

12.      Pursuant to Indiana Admission and Discipline Rule 3, §2(b), I will file a Notice with the Clerk of the Supreme Court within 30 days after this Court grants me permission to appear *pro hac vice*.

WHEREFORE, I respectfully request the permission of this Court to appear *pro hac vice* and participate in all proceedings of this case.

I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT.

Date: 2-1-18

J. Daniel Albert, Atty. No.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA  19087
Tel. (610) 667-7706
Fax. (267) 948-2512
dalbert@ktmc.com

Petition co-signed and respectfully submitted by co-counsel for Plaintiff.

Brad A. Catlin, Atty. No. 21570-29
PRICE WAICUKAUSKI JOVEN & CATLIN, LLC
Hammond Block Building
301 Massachusetts Avenue, 2nd Floor
Indianapolis, IN  46204
Tel. (317) 633-8787
Fax (317) 633-8797
bcatlin@price-law.com

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 2nd day of February, 2018, a copy of the foregoing was served upon

counsel of record via the Court's e-filing system, and upon the following via First Class United States

mail:

Biglari Holdings Inc.                  Kenneth R. Cooper
17802 IH 10 West, Suite 400,           18814 Cierra Sur
San Antonio, TX 78257                  San Antonio, TX 78258

Sardar Biglari                         James P. Mastrian
138 Manchester Way                     210 Bella Colinas Dr
Shavano Park, TX 78249                 Austin, TX 78738

Philip L. Cooley                       Ruth J. Person
438 Bentley Mnr                        2404 Tamarack Ct
Shavano Park, TX 78249                 Ann Arbor, MI 48105


/s/ Brad A. Catlin
Brad A. Catlin

Filed: 2/2/2018 4:40 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# Temporary Admission Receipt

## J. Daniel Albert (6325-95-TA)

**Firm:** Kessler Topaz Meltzer & Check, LLP

**Phone:** (610) 667-7706
**Mobile:**

**Status Date:** 02/02/2018

**Business Address:**

280 King of Prussia Road
Radnor, Pennsylvania  19087

**Fax:** (267) 948-2512

---

**Amount Paid:** $180.00

**Date Paid:** 02/02/2018

**For Year:** 2018

| Case Number | Start Date | Notice Return Date | End Date |
|---|---|---|---|
| 29D01-1801-CT-000760 | 02/02/2018 | | |

Ex. 1

Filed: 2/2/2018 4:31 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## VERIFIED PETITION FOR TEMPORARY ADMISSION OF ATTORNEY JUSTIN O. RELIFORD *PRO HAC VICE*

Pursuant to Indiana Admission and Discipline Rule 3, Attorney Justin O. Reliford hereby requests that the Court grant him permission to appear *pro hac vice* and participate in this litigation as counsel for Plaintiff. In support of this Petition, Attorney Reliford, under the penalties of perjury, states as follows:

1.     Brad A. Catlin of the law firm of Price Waicukauski Joven & Catlin, LLC is a member of the Indiana Bar and is admitted to practice in Indiana. Attorney Catlin has appeared in this matter as counsel and has agreed to act as co-counsel.

2.     I am not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana.

3.     I seek admission to practice *pro hac vice* in this cause on behalf of the Plaintiff.

4.     My residential address is: 610 Oxford Road, Bala Cynwyd, PA 19004. My law firm name, office address, telephone number, and email address are: Kessler Topaz Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, PA 19087; (610) 667-7706; jreliford@ktmc.com.

RECEIVED AT COUNTER ON:

FEB - 2 2018

GREGORY R. PACHMAYR
CLERK OF COURTS - STATE OF INDIANA

5.      I am licensed to practice law in the following states or territories:

| JURISDICTION | DATE OF ADMISSION | BAR I.D. NUMBER | STATUS |
|---|---|---|---|
| Commonwealth of Pennsylvania | November 5, 2007 | 205776 | Active |
| State of New Jersey | January 24, 2008 | 020872007 | Active |

6.      I am a member in good standing in all the jurisdictions listed in paragraph 5.

7.      I have never been suspended, disbarred or resigned from the practice of law as a result of disciplinary charge, investigation, or proceeding in any jurisdiction.

8.      In the last five years, I have not appeared in any proceedings in the courts of the State of Indiana.

9.       I seek to appear in this matter *pro hac vice* for good cause because the action involves a complex field of law in which I am a specialist.

10.      I have read and will be bound by the Rules of Professional Conduct adopted by the Indiana Supreme Court and I consent to the jurisdiction of the State of Indiana, the Indiana Supreme Court and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise from my representation of the Plaintiff.

11.      I have paid the registration fee to the Clerk of the Indiana Supreme Court in compliance with Indiana Admission and Discipline Rule 3, § 2(a)(3).  A genuine and authentic copy of my payment receipt and temporary admission attorney number are attached hereto as Ex. 1.

12.      Pursuant to Indiana Admission and Discipline Rule 3, §2(b), I will file a Notice with the Clerk of the Supreme Court within 30 days after this Court grants me permission to appear *pro hac vice*.

WHEREFORE, I respectfully request the permission of this Court to appear *pro hac vice* and participate in all proceedings of this case.

I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT.

Date: 2-1-18

Justin O. Reliford, Atty. No.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA  19087
Tel. (610) 667-7706
Fax. (267) 948-2512
jreliford@ktmc.com

Petition co-signed and respectfully submitted by co-counsel for Plaintiff.

Brad A. Catlin, Atty. No. 21570-29
PRICE WAICUKAUSKI JOVEN & CATLIN, LLC
Hammond Block Building
301 Massachusetts Avenue, 2nd Floor
Indianapolis, IN  46204
Tel. (317) 633-8787
Fax (317) 633-8797
bcatlin@price-law.com

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 2nd day of February, 2018, a copy of the foregoing was served upon

counsel of record via the Court's e-filing system, and upon the following via First Class United States

mail:

| | |
|---|---|
| Biglari Holdings Inc. | Kenneth R. Cooper |
| 17802 IH 10 West, Suite 400, | 18814 Cierra Sur |
| San Antonio, TX 78257 | San Antonio, TX 78258 |
| | |
| Sardar Biglari | James P. Mastrian |
| 138 Manchester Way | 210 Bella Colinas Dr |
| Shavano Park, TX 78249 | Austin, TX 78738 |
| | |
| Philip L. Cooley | Ruth J. Person |
| 438 Bentley Mnr | 2404 Tamarack Ct |
| Shavano Park, TX 78249 | Ann Arbor, MI 48105 |

/s/ Brad A. Catlin
Brad A. Catlin

Filed: 2/2/2018 4:31 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# Temporary Admission Receipt

## Justin O. Reliford (6326-95-TA)

**Firm:** Kessler Topaz Meltzer & Check, LLP

**Business Address:**

280 King of Prussia Road
Radnor, Pennsylvania  19087

**Phone:** (610) 667-7706
**Mobile:**

**Fax:** (267) 948-2512

**Status Date:** 02/02/2018

---

**Amount Paid:** $180.00

**Date Paid:** 02/02/2018

**For Year:** 2018

---

| Case Number | Start Date | Notice Return Date | End Date |
|---|---|---|---|
| 29D01-1801-CT-000760 | 02/02/2018 | | |

Ex. 1

Filed: 2/2/2018 4:37 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA ) IN THE HAMILTON COUNTY SUPERIOR COURT
) SS:
COUNTY OF HAMILTON ) CAUSE NO. 29D01-1801-CT-000760

JOSEPH HIPPS, Individually and on )
Behalf of All Others Similarly Situated, )
)
   Plaintiff, )
)
  v. )
)
BIGLARI HOLDINGS, INC., SARDAR )
BIGLARI, PHILIP L. COOLEY, )
KENNETH R. COOPER, JAMES P. )
MASTRIAN, and RUTH J. PERSON, )
)
   Defendants. )

**VERIFIED PETITION FOR TEMPORARY ADMISSION OF ATTORNEY
CHRISTOPHER M. WINDOVER *PRO HAC VICE***

Pursuant to Indiana Admission and Discipline Rule 3, Attorney Christopher M. Windover hereby requests that the Court grant him permission to appear *pro hac vice* and participate in this litigation as counsel for Plaintiff. In support of this Petition, Attorney Windover, under the penalties of perjury, states as follows:

1. Brad A. Catlin of the law firm of Price Waicukauski Joven & Catlin, LLC is a member of the Indiana Bar and is admitted to practice in Indiana. Attorney Catlin has appeared in this matter as counsel and has agreed to act as co-counsel.

2. I am not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana.

3. I seek admission to practice *pro hac vice* in this cause on behalf of the Plaintiff.

4. My residential address is: 4055 Ridge Avenue, Apartment 6201, Philadelphia, PA 19129. My law firm name, office address, telephone number, and email address are: Kessler Topaz

Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, PA 19087; (610) 667-7706; cwindover@ktmc.com.

     5.      I am licensed to practice law in the following states or territories:

| JURISDICTION | DATE OF ADMISSION | BAR I.D. NUMBER | STATUS |
|---|---|---|---|
| Commonwealth of Pennsylvania | January 9, 2012 | 312365 | Active |
| State of New Jersey | January 31, 2012 | 46822011 | Active |

     6.      I am a member in good standing in all the jurisdictions listed in paragraph 5.

     7.      I have never been suspended, disbarred or resigned from the practice of law as a result of disciplinary charge, investigation, or proceeding in any jurisdiction.

     8.      In the last five years, I have appeared in the following proceeding in a court of the State of Indiana:

> *In re Celadon Group, Inc. Shareholder Derivative Litigation*
> Marion Superior Court, Lead Cause No. 49D01-1708-CT-033115
> (Consolidated with: Cause No. 49D06-1709-CT-033758)

     9.      I seek to appear in this matter *pro hac vice* for good cause because the action involves a complex field of law in which I am a specialist.

     10.     I have read and will be bound by the Rules of Professional Conduct adopted by the Indiana Supreme Court and I consent to the jurisdiction of the State of Indiana, the Indiana Supreme Court and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise from my representation of the Plaintiff.

     11.     I have paid the registration fee to the Clerk of the Indiana Supreme Court in compliance with Indiana Admission and Discipline Rule 3, § 2(a)(3). A genuine and authentic copy of my payment receipt and temporary admission attorney number are attached hereto as Ex. 1.

12.     Pursuant to Indiana Admission and Discipline Rule 3, §2(b), I will file a Notice with the Clerk of the Supreme Court within 30 days after this Court grants me permission to appear *pro hac vice*.

WHEREFORE, I respectfully request the permission of this Court to appear *pro hac vice* and participate in all proceedings of this case.

I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND CORRECT.

Date: 2-1-18

Christopher M. Windover, Atty. No. 6141-95-TA
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA  19087
Tel. (610) 667-7706
Fax. (267) 948-2512
cwindover@ktmc.com

Petition co-signed and respectfully submitted by co-counsel for Plaintiff.

Brad A. Catlin, Atty. No. 21570-29
PRICE WAICUKAUSKI JOVEN & CATLIN, LLC
Hammond Block Building
301 Massachusetts Avenue, 2nd Floor
Indianapolis, IN  46204
Tel. (317) 633-8787
Fax (317) 633-8797
bcatlin@price-law.com

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 2nd day of February, 2018, a copy of the foregoing was served upon

counsel of record via the Court's e-filing system, and upon the following via First Class United States

mail:

| | |
|---|---|
| Biglari Holdings Inc.<br>17802 IH 10 West, Suite 400,<br>San Antonio, TX 78257 | Kenneth R. Cooper<br>18814 Cierra Sur<br>San Antonio, TX 78258 |
| Sardar Biglari<br>138 Manchester Way<br>Shavano Park, TX 78249 | James P. Mastrian<br>210 Bella Colinas Dr<br>Austin, TX 78738 |
| Philip L. Cooley<br>438 Bentley Mnr<br>Shavano Park, TX 78249 | Ruth J. Person<br>2404 Tamarack Ct<br>Ann Arbor, MI 48105 |

/s/ Brad A. Catlin
Brad A. Catlin

Filed: 2/2/2018 4:37 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# Temporary Admission Receipt

## Christopher M. Windover (6141-95-TA)

**Firm:** Kessler Topaz Meltzer & Check, LLP

**Phone:** (610) 667-7706

**Mobile:**

**Status Date:** 09/12/2017

**Business Address:**

**Fax:**

280 King of Prussia Road
Radnor, Pennsylvania  19087

---

**Amount Paid:** $180.00

**Date Paid:** 01/01/2018

**For Year:** 2018

---

| Case Number | Start Date | Notice Return Date | End Date |
|---|---|---|---|
| 49D06-1709-CT-033758 | 09/12/2017 | 09/26/2017 | |
| 29D01-1801-CT-000760 | 02/02/2018 | | |

Ex. 1

Filed: 2/2/2018 4:25 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D01-1801-CT-000760 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, and RUTH J. PERSON, | ) ) ) ) ) |
| Defendants. | ) ) |

## VERIFIED PETITION FOR TEMPORARY ADMISSION OF ATTORNEY ERIC L. ZAGAR *PRO HAC VICE*

Pursuant to Indiana Admission and Discipline Rule 3, Attorney Eric L. Zagar hereby requests that the Court grant him permission to appear *pro hac vice* and participate in this litigation as counsel for Plaintiff. In support of this Petition, Attorney Zagar, under the penalties of perjury, states as follows:

1.  Brad A. Catlin of the law firm of Price Waicukauski Joven & Catlin, LLC is a member of the Indiana Bar and is admitted to practice in Indiana. Attorney Catlin has appeared in this matter as counsel and has agreed to act as co-counsel.

2.  I am not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana.

3.  I seek admission to practice *pro hac vice* in this cause on behalf of the Plaintiff.

4.  My residential address is: 2012 Waverly Street, Philadelphia, PA 19146. My law firm name, office address, telephone number, and email address are: Kessler Topaz Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, PA 19087; (610) 667-7706; ezagar@ktmc.com.

REC'D AT COUNTER ON:

FEB - 2 2018

GREGORY P

5.      I am licensed to practice law in the following states or territories:

| JURISDICTION | DATE OF ADMISSION | BAR I.D. NUMBER | STATUS |
|---|---|---|---|
| Commonwealth of Pennsylvania | December 6, 1995 | 76596 | Active |
| State of California | May 30, 2007 | 250519 | Active |
| State of New York | December 6, 2007 | 4555512 | Active |

6.      I am a member in good standing in all the jurisdictions listed in paragraph 5.

7.      I have never been suspended, disbarred or resigned from the practice of law as a result of disciplinary charge, investigation, or proceeding in any jurisdiction.

8.      In the last five years, I have appeared in the following proceeding in a court of the State of Indiana:

> *In re Celadon Group, Inc. Shareholder Derivative Litigation*
> Marion Superior Court, Lead Cause No. 49D01-1708-CT-033115
> (Consolidated with: Cause No. 49D06-1709-CT-033758)

9.      I seek to appear in this matter *pro hac vice* for good cause because the action involves a complex field of law in which I am a specialist.

10.      I have read and will be bound by the Rules of Professional Conduct adopted by the Indiana Supreme Court and I consent to the jurisdiction of the State of Indiana, the Indiana Supreme Court and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise from my representation of the Plaintiff.

11.      I have paid the registration fee to the Clerk of the Indiana Supreme Court in compliance with Indiana Admission and Discipline Rule 3, § 2(a)(3). A genuine and authentic copy of my payment receipt and temporary admission attorney number are attached hereto as Ex. 1.

12.     Pursuant to Indiana Admission and Discipline Rule 3, §2(b), I will file a Notice
with the Clerk of the Supreme Court within 30 days after this Court grants me permission to appear
*pro hac vice*.

WHEREFORE, I respectfully request the permission of this Court to appear *pro hac vice*
and participate in all proceedings of this case.

I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING
REPRESENTATIONS ARE TRUE AND CORRECT.

Date: _2-1-18_ 

_____
Eric L. Zagar, Atty. No. 6142-95-TA
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel. (610) 667-7706
Fax. (267) 948-2512
ezagar@ktmc.com

Petition co-signed and respectfully submitted by co-
counsel for Plaintiff.

_____
Brad A. Catlin, Atty. No. 21570-29
PRICE WAICUKAUSKI JOVEN & CATLIN, LLC
Hammond Block Building
301 Massachusetts Avenue, 2nd Floor
Indianapolis, IN 46204
Tel. (317) 633-8787
Fax (317) 633-8797
bcatlin@price-law.com

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 2nd day of February, 2018, a copy of the foregoing was served upon

counsel of record via the Court's e-filing system, and upon the following via First Class United States

mail:

Biglari Holdings Inc.                          Kenneth R. Cooper
17802 IH 10 West, Suite 400,                   18814 Cierra Sur
San Antonio, TX 78257                          San Antonio, TX 78258

Sardar Biglari                                 James P. Mastrian
138 Manchester Way                             210 Bella Colinas Dr
Shavano Park, TX 78249                          Austin, TX 78738

Philip L. Cooley                               Ruth J. Person
438 Bentley Mnr                                2404 Tamarack Ct
Shavano Park, TX 78249                          Ann Arbor, MI 48105


/s/ Brad A. Catlin
Brad A. Catlin

Filed: 2/2/2018 4:25 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# Temporary Admission Receipt

## Eric L. Zagar (6142-95-TA)

**Firm:** Kessler Topaz Meltzer & Check, LLP

**Phone:** (610) 667-7706

**Mobile:**

**Status Date:** 09/12/2017

**Business Address:**

280 King of Prussia Road
Radnor, Pennsylvania  19087

**Fax:**

---

**Amount Paid:** $180.00

**Date Paid:** 01/01/2018

**For Year:** 2018

---

| Case Number | Start Date | Notice Return Date | End Date |
|---|---|---|---|
| 49D06-1709-CT-033758 | 09/12/2017 | 09/26/2017 | |
| 29D01-1801-CT-000760 | 02/02/2018 | | |

---

Ex. 1